UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

     Petitioner,

                             CIVIL NO. 4:15cv108
v.                 [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

     Respondent.

## OPINION

This matter comes before the court on the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence ("Motion"), filed by David Anthony Runyon ("Petitioner") on February 4, 2016. ECF No. 511.[1] Further before the court are the Petitioner's First Motion for Discovery, filed on December 9, 2015, ECF No. 491, and Second Motion for Discovery, filed on April 1, 2016. ECF No. 530. All matters have been fully briefed and are ripe for decision. For the reasons contained herein, the First Motion for Discovery is **DENIED**, and the Second Motion for Discovery is **DENIED**. The Motion to Vacate brought pursuant to 28 U.S.C. § 2255 is **DENIED**.

---

[1] The Petitioner filed his original Motion under 28 U.S.C. § 2255 on October 5, 2015, ECF No. 478, after which he filed an amended Motion on February 4, 2016. ECF No. 511. This amended Motion is the operative pleading. See infra Part II.

## I. FACTUAL BACKGROUND[2]

On April 29, 2007, Cory Allen Voss ("Voss"), an officer in the United States Navy, was murdered. At the time, Voss was married to Catherina Voss ("Cat"), and the couple had two children, ages eight and seven. He was stationed out of Norfolk Naval Base, and lived in Newport News, Virginia, with his wife and children. On April 29, 2007, Voss returned home from a twenty-four hour shift aboard the USS Elrod, where he served as the Communications Officer. That night, Cat asked Voss to go to the ATM at Langley Federal Credit Union ("LFCU") in Newport News, Virginia. The next morning, Voss was found dead in his truck, after being shot five times with a .357 revolver as part of a murder-for-hire conspiracy. The facts neither start nor end here.

Testimony presented at trial revealed that in 2006, while Voss was at sea on a six-month deployment, Cat began having an extramarital affair with Michael Draven ("Draven"). After Voss returned home from that deployment, Cat and Cory Voss began experiencing financial difficulties, and the affair between Cat

---

[2] The following is a summary of the voluminous evidence presented to the jury, both through testimony and exhibits, during the guilt phase of trial. The appellate process is complete, and the case is now on collateral review. See infra Part II.

and Draven remained ongoing. Cat had no independent source of income, and Draven had no regular employment, but earned some money from participating in experimental clinical drug studies. Cat and Draven realized that if they were to stay together, and have the money to live the lavish lifestyle they wanted, they needed to get rid of Voss. As a member of the United States Navy, Voss had a life insurance policy through the Office of Servicemember's Group Life Insurance ("SGLI"), which named Cat as the primary beneficiary.   Once Voss was dead, Cat would receive the $400,000 SGLI life insurance policy benefit, together with other Navy spousal benefits.

Cat and Draven decided that the best way to accomplish their goal was to hire someone to commit the actual murder. Draven had met David Anthony Runyon ("Runyon") while participating in experimental clinical drug trials, and Draven now reached out to Runyon about joining the conspiracy. Runyon was a former police officer and former member of the United States Army, as well as a firearm enthusiast. Runyon agreed to act as the triggerman, in exchange for payment. Once Runyon agreed to participate, phone records show that the defendants began to communicate and plan how to commit the crime.

On April 20, 2007, Cat Voss opened an account with LFCU, into which she deposited only five dollars. On April 29, 2007,

3

the day of the murder, Runyon bought a .357 magnum Taurus revolver from George Koski in Morgantown, West Virginia, where Runyon was then living. Koski testified that he wrote down Runyon's driver's license number and phone number, and he also provided Runyon with some old ammunition. Koski further testified that the type of gun he sold Runyon could shoot both .357 magnum and .38 special cartridges. That same day, Runyon drove from Morgantown to Newport News, Virginia, to complete his part of the crime. He stopped at payphones along the way, including one at a Newport News Waffle House, to communicate with Draven, and Draven provided him with identifying information about Voss's truck. Runyon wrote down this information on a map of the Hampton Roads area, which police later discovered in Runyon's car. Phone records also indicate multiple calls between Draven and Cat Voss during this same time span.

Later on the night of April 29, 2007, around 11:00 p.m., Cat sent Voss to the ATM at LFCU. At approximately 11:31 p.m., Voss attempted a transaction but entered the wrong personal identification number. Surveillance footage and phone records reveal that Voss was talking to Cat on his cell phone at this time. At around 11:33 p.m., while Voss was still at the ATM, video shows that an assailant wearing a black hoodie climbed

4

into Voss's truck. Voss reentered his truck at around 11:36 p.m. and began to drive away from the ATM, before returning at approximately 11:41 p.m. to attempt three withdrawals. All the withdrawals were denied for insufficient funds, because unbeknownst to Voss, Cat had placed only five dollars in the account. Voss then got back in his truck and drove away. He was found dead in his truck the next morning in a nearby parking lot. He had been shot five times, with three of the shots being fatal. Four hollow-point bullets and one jacket were recovered. The bullets were identified as .38 class, which can be used with guns capable of firing .357 magnum and .38 special cartridges.

Just a few days after the murder, Runyon checked back into a clinical drug study, and ordered online a stainless steel bore brush, which is used to clean the inside of the barrel of a gun, to be shipped to his West Virginia address, but under a false name. Expert testimony revealed this type of brush can impact examinations that attempt to link bullets to a specific gun. Testimony also revealed that in the Fall of 2007, Runyon had a friend pawn his .357 Taurus magnum revolver several times. Then, in December 2007, Runyon instructed his friend to retrieve the firearm from the pawn shop one last time, and to give the gun back to him. The police were unable to locate the gun after its return to Runyon.

5

While the police were beginning the investigation into the crime, the defendants were working together to hide evidence of the murder. Although Cat had received an initial $100,000 death gratuity benefit from the United States Navy, which she and Draven quickly spent, she had yet to receive the $400,000 life insurance benefit on Voss. In order to receive the full payout, Cat had to clear herself from suspicion, and emails and wiretaps showed that the defendants coordinated amongst themselves to align their alibis and hide their relationships with each other from the investigators.

During police interviews, the defendants gave conflicting stories and attempted to obstruct the investigation. Runyon denied owning any firearms, and he was unable to confirm his whereabouts on April 29 and 30, 2007. All of the parties denied the relationship between Draven and Cat for several months, although Draven did eventually admit the affair to the police.[3] Both Draven and Runyon stated they had met or called each other from a Waffle House in Newport News during the Spring of 2007. Draven further admitted that Runyon used the payphone there to

---

[3] Cat admitted the relationship when she pled guilty, as set forth in her Statement of Facts accompanying her plea agreement. Case No. 4:08cr16-1, ECF Nos. 69, 70. Both the plea agreement and Statement of Facts were admitted into evidence by defense counsel, during the mitigation phase of trial. Def. Exs. 4, 7.

6

talk with him on the night of the murder, although Draven claimed that Runyon stopped at the Waffle House on his way to an out-of-state fishing trip.

In December 2007, nearly eight months after the murder, police executed search warrants in West Virginia for Runyon's residences, vehicle, and storage unit, and the contents of the search were introduced during the guilt phase of trial. In the console of Runyon's car, agents found a map of Newport News, Virginia, on which Runyon had written the following: "Langley Federal Credit Union, 97 grey Ford Ranger, FL hubcap missing, tailgate down, J. Morris Blvd, Cory." The description of the Ford Ranger matched the description of Voss's truck, and J. [Clyde] Morris Boulevard is a street near the LFCU that Voss went to on the night he was murdered. Also found with the map was a photograph of Cat and Draven, with their names, addresses, and social security numbers written on the back.

In Runyon's residence, the investigators located a shopping list written by Runyon, which included a taser, Spyderco knife, tarp, trash bag, boots, gloves, military-style pants, and a black hoodie. Runyon had also written on that list the location of LFCU, and travel time and mileage from Morgantown, West Virginia, to Newport News, Virginia. Although Runyon had apparently requested a payment of five hundred dollars ($500) up

7

front for the murder, a Western Union receipt indicated that Runyon received two hundred seventy-five dollars ($275) from Draven's brother, Randy Fitchett, on June 1, 2007. Fitchett testified, and while he denied that he sent the money order, he recalled going with Draven to send the money order to a friend of Draven's. Additionally, the police found boxes of .38 special and .357 magnum bullets in the basement of Runyon's former residence.[4] Five of the Winchester .357 magnum hollow-point bullets were missing from the box, and medical reports revealed that Voss had been shot five times by hollow-point .38 class bullets. Expert witness testimony provided that .38 class bullets include .357 magnum and .38 special bullets. Multiple witnesses also testified that Runyon had bragged about killing Voss, or a military member or other unidentified person, for money.

In February 2008, a five-count Indictment was returned against Runyon, Cat, and Draven. Although Cat pled guilty in exchange for a life sentence, the above facts were established through evidence and testimony during the trial against Runyon

---

[4] At the time of the search, Runyon had moved to a new address in Morgantown, West Virginia. Agents searched both Runyon's current and former residences, and the residents at his former address indicated that the bullets found in the basement belonged to Runyon.

and Draven. The jury then found Runyon guilty of Conspiracy to Commit Murder for Hire, Carjacking Resulting in Death, and Murder with a Firearm in Relation to a Crime of Violence.

## II. PROCEDURAL HISTORY

On February 13, 2008, a federal grand jury returned a five-count Indictment against the Petitioner and his co-defendants, Michael Draven and Catherina Voss, in the murder of Cat Voss's husband, Cory Voss. ECF No. 3. The Indictment charged the defendants with Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a) (Count One); Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2 (Count Two); Bank Robbery Resulting in Death, in violation of 18 U.S.C. §§ 2113(a), (e), and 2 (Count Three); Conspiracy to Commit Robbery Affecting Commerce, in violation of 18 U.S.C. § 1951(a) (Count Four); and Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(j) and 2 (Count Five). Id.

The Indictment also included a Notice of Special Findings for the death penalty, pursuant to 18 U.S.C. §§ 3591 and 3592. Id. at 13-14. The Notice set out the statutory requirements for the death penalty: the defendants were more than eighteen years old at the time of the offense; there was the requisite intent

to cause death, serious bodily injury, or engage in acts of violence using lethal force or knowingly creating a grave risk of death; and there were statutory aggravating factors. Id. at 13. As to Counts One, Two, Three, and Five, all three defendants were found to meet the statutory aggravating factors of having "committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value," and having "committed the offense after substantial planning and premeditation to cause the death of a person." Id. at 13-14. Additionally, for those same counts, the grand jury found Cat Voss and Draven satisfied the statutory aggravating factor of having "procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value." Id. at 14.

On March 4, 2008, Lawrence Woodward and John Babineau were appointed to represent the Petitioner. On July 17, 2008, the government filed its Notice of Intent to Seek a Sentence of Death against the Petitioner. ECF No. 67. The government also filed a Notice stating that it would not seek the death penalty against Draven. Case No. 4:08cr16-2, ECF No. 68. Cat Voss pled guilty to all five counts the following day on July 18, 2008.

On February 13, 2009, Babineau withdrew from the Petitioner's case due to a conflict of interest, and attorney

10

Stephen Hudgins was appointed. ECF No. 161. The Petitioner filed various pre-trial motions and reports,[5] and on June 30, 2009, the jury trial against the Petitioner and Draven commenced. The first two days consisted of voir dire, and the jury was impaneled on July 2, 2009, after which opening statements and the presentation of evidence began. On July 15, 2009, at the conclusion of all evidence, the court dismissed Count Three, pursuant to Federal Rule of Criminal Procedure 29. On July 17, 2009, the jury found the Petitioner and Draven guilty as to Counts One, Two, and Five, and not guilty as to Count Four. Verdict Form, ECF No. 245, attached hereto as Exhibit A. On July 22, 2009, the trial continued with the eligibility phase, in which the government argued that the Petitioner was eligible to receive the death penalty. The jury found that the Petitioner intentionally killed Cory Voss. Special Verdict Form – Eligibility Phase, ECF No. 255, attached hereto as Exhibit B. The jury also found two statutory aggravators: (1) the Petitioner "committed the offense in consideration for the receipt of, or in expectation of the receipt, of anything of pecuniary value"; and (2) the Petitioner "committed the offense

---

[5] Due to the large volume of filings, the court will not review all the motions and reports at this point. To the extent the filings relate to this Motion, they will be discussed at such point as they are relevant to the claims for relief.

after substantial planning and premeditation to cause the death of a person." Id. On August 19, 2009, the penalty phase of the trial commenced. On August 27, 2009, the jury returned a recommendation for death on Counts One and Five, and life imprisonment on Count Two. Special Verdict Form – Selection Phase, at 5, ECF No. 291, attached hereto as Exhibit C. The jury found four non-statutory aggravating factors. Id.[6] The jury also found two statutory mitigating factors and eight non-statutory mitigating circumstances proposed by defense counsel, along with finding three mitigating factors of their own accord. Id.[7] On

---

[6] The non-statutory aggravating factors found by the jury were that the Petitioner (1) caused injury, harm, and loss to the victim, and the victim's family and friends; (2) utilized training, education, and experience gained during criminal justice college courses, his time in the Kansas National Guard, his work as a law enforcement officer, and his experience as a member of the United States Army; (3) engaged in acts of physical abuse towards women; and (4) demonstrated a lack of remorse. Special Verdict Form - Selection Phase, at 1-2, ECF No. 291.

[7] The statutory mitigating factors found by the jury were that (1) the Petitioner did not have a serious criminal record, and (2) other persons equally culpable in the crime will not be punished by death. Special Verdict Form - Selection Phase, at 1-2, ECF No. 291.

The non-statutory mitigators presented by defense counsel, and found by the jury, were that (1) the Petitioner will serve a sentence of life in prison without the possibility of release, if not sentenced to death; (2) the Petitioner has worked and been legally employed for all of his life; (3) the Petitioner committed acts of kindness and generosity for his neighbors and community; (4) the Petitioner grew up, witnessed, and

December 4, 2009, pursuant to the jury's verdict, the Petitioner was sentenced to death for Counts One and Five and to life imprisonment without the possibility of release for Count Two. ECF No. 313.[8]

The Petitioner timely filed an appeal, and on February 25, 2013, the Fourth Circuit Court of Appeals affirmed his conviction and sentence. United States v. Runyon, 707 F.3d 475 (4th Cir. 2013). On October 6, 2014, the Supreme Court denied his petition for writ of certiorari. Runyon v. United States, 135 S. Ct. 46 (2014) (No. 13-254). The Petitioner filed

---

experienced domestic violence and parental conflict until his mother and biological father separated; (5) the Petitioner's son will suffer emotional harm, if the Petitioner is executed; (6) the Petitioner's mother will suffer emotional harm, if the Petitioner is executed; (7) the Petitioner served his country as a member of the United States Army and was honorably discharged; and (8) the Petitioner graduated from high school, earned an associate of arts degree, and took further college courses. Id. at 3-4.

The jury also found the following three non-statutory mitigating factors of their own creation: (1) the Petitioner continued to witness and experience domestic violence and parental conflict/abuse from his mother and adoptive father; (2) the Petitioner's brother will suffer emotional harm, if the Petitioner is executed; and (3) the Petitioner was given the impression that Cory Voss was molesting his own daughter. Id. at 4.

[8] Cat Voss was sentenced to life in prison on Counts One, Two, Three, and Five, and twenty (20) years imprisonment on Count Four. Case No. 4:08cr16-1, ECF No. 127. Draven was sentenced to life in prison on all counts of conviction. Case No. 4:08cr16-2, ECF No. 304. Both of these cases are closed, and the convictions and sentences are final.

his Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or
Correct a Sentence on October 5, 2015. ECF No. 478. The
government filed its Response on January 11, 2016, ECF No. 497,
and the Petitioner filed his Reply on March 28, 2016. ECF No.
526.

On December 9, 2015, the Petitioner filed his First Motion
for Discovery. ECF No. 491. The government submitted its
Response on January 15, 2016, ECF No. 500, and the Petitioner
filed his Reply on January 29, 2016. ECF No. 506. Both the
Response and the Reply to the Discovery Motion incorporated the
Response and Reply to the § 2255 Motion. On April 1, 2016, the
Petitioner filed his Second Motion for Discovery. ECF No. 530.
The government filed a Response on April 8, 2016, ECF No. 532,
and the Petitioner submitted a Reply on April 13, 2016. ECF
No. 533.

On February 4, 2016, the Petitioner filed an amended Motion
Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a
Sentence. The government filed its Response to the amended
Motion on April 22, 2016. The Petitioner submitted his Reply to
the amended filings on July 7, 2016. As Fourth Circuit precedent
provides that an amended pleading supersedes the original, the
court will now consider the amended Motion and corresponding
Response and Reply. See Young v. City of Mount Ranier, 238 F.3d

14

567, 573 (4th Cir. 2001) ("[A]n amended pleading supersedes the original pleading, rendering the original pleading of no effect.").[9] The court will also consider the First and Second Discovery Motions in the same sections as the claims to which each discovery request relates.

### III. STANDARDS OF REVIEW

#### A. MOTIONS BROUGHT PURSUANT TO 28 U.S.C. § 2255

A prisoner may challenge a sentence imposed by a federal court, if (1) the sentence violates the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum; or (4) the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). A sentence is "otherwise subject to collateral attack" if a petitioner shows that the proceedings suffered from "'a fundamental defect which inherently results in a complete miscarriage of justice.'" United States v. Addonizio, 442 U.S. 178, 185 (1979) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).

The petitioner bears the burden of proving one of those grounds by a preponderance of the evidence. See Miller v. United

---

[9] All citations in this Opinion will refer to the amended pleadings unless otherwise specified.

States, 261 F.2d 546, 547 (4th Cir. 1958). If he satisfies that burden, the court may vacate, set aside, or correct the sentence. 28 U.S.C. § 2255(b). However, if the motion, when viewed against the record, shows that the petitioner is entitled to no relief, the court may summarily deny the motion. Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

### 1. Ineffective Assistance of Counsel

In cases where a petitioner claims to have received ineffective assistance of counsel as grounds for relief, a petitioner must show by a preponderance of the evidence that (1) the attorney's performance was deficient; and (2) such deficient performance prejudiced the petitioner by undermining the reliability of the judgment against him. Strickland v. Washington, 466 U.S. 668, 687 (1984).

To show deficient performance, counsel's actions or omissions must be measured against what "an objectively reasonable attorney would have done under the circumstances existing at the time of the representation." Savino v. Murray, 82 F.3d 593, 599 (4th Cir. 1996); see Lawrence v. Branker, 517 F.3d 700, 708-09 (4th Cir. 2008) (noting that this is a "difficult" showing for a petitioner to make). The court must attempt to "eliminate the distorting effects of hindsight," and instead "must indulge a strong presumption that counsel's

16

conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In doing so, a petitioner "must demonstrate that the error worked to his 'actual and substantial disadvantage,' not merely that the error created a 'possibility of prejudice.'" Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1997) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)). Because a petitioner must satisfy both parts of the Strickland test, a failure to carry the burden of proof as to one prong precludes relief and relieves the court of the duty to consider the other. Strickland, 466 U.S. at 700.

Due process of law also requires that a defendant receive effective assistance of counsel on direct appeal. Evitts v. Lucey, 469 U.S. 387, 396-97 (1985). As with trial counsel, effectiveness of appellate counsel is evaluated under the two prongs of Strickland. See Smith v. Murray, 477 U.S. 527, 535-36 (1986). To determine effectiveness of appellate counsel, a court must evaluate whether counsel failed to raise "a particular nonfrivolous issue [that] was clearly stronger than issues that counsel did present" on direct appeal. Smith v. Robbins, 528

17

U.S. 259, 288 (2000). However, appellate counsel need not raise every nonfrivolous claim in their brief. See id.; Jones v. Barnes, 463 U.S. 745, 753 (1983) ("A brief that raises every colorable issue runs the risk of burying good arguments."). As to prejudice, the Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

### 2. Procedural Default

Claims that could have been "fully and completely addressed on direct review based on the record" are considered procedurally defaulted, if raised for the first time during collateral review. Bousley v. United States, 523 U.S. 614, 622 (1998). In order to obtain collateral relief based on issues that could have been raised on direct appeal, but were not, the movant must ordinarily show "'cause' excusing his . . . procedural default," and "'actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 167-68 (1982); see also Massaro v. United States, 538 U.S. 500, 504 (2003) ("[C]laims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice."). "The existence of cause for a procedural default must turn on something external to the defense, such as

the novelty of the claim or a denial of effective assistance of counsel." United States v. Mikalajunas, 186 F.3d 490, 493 (4th Cir. 1999). Prejudice is shown when the alleged errors worked to the petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Frady, 456 U.S. at 170.

Even in the absence of cause for the procedural default and resulting prejudice, a defendant may proceed with a collateral attack, if he is able to show that a fundamental miscarriage of justice would result were his claim denied. United States v. Maybeck, 23 F.3d 888, 892 (4th Cir. 1994). To demonstrate a "miscarriage of justice," the petitioner "must show actual innocence by clear and convincing evidence." United States v. Williams, 396 F. App'x 951, 953 (4th Cir. 2010) (unpublished); Mikalajunas, 186 F.3d at 493.

### 3. Bar on Relitigating Claims Brought on Direct Appeal

A petitioner is generally not permitted to relitigate issues brought on direct appeal in a collateral attack. Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (per curiam). Accordingly, courts may "refuse to reach the merits of a constitutional claim previously raised and rejected on direct appeal." Withrow v. Williams, 507 U.S. 680, 720-21 (1993) (Scalia, J., concurring in part and dissenting in part)

(collecting cases). Exceptional circumstances, however, such as an intervening change in the law, may warrant a departure from this law-of-the-case doctrine. See Davis v. United States, 417 U.S. 333, 342-47 (1974) (holding that when relevant substantive law changed after the petitioner's trial and unsuccessful appeal, the petitioner could file a § 2255 motion for collateral relief based on the intervening change in the law); Jones v. United States, 178 F.3d 790, 796 (6th Cir. 1999) ("It is equally well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law.").

### 4. Retroactive Application of New Rules to Cases on Collateral Review

Generally, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague v. Lane, 489 U.S. 288, 310 (1989). There are two exceptions to this bar on retroactivity. First, "[n]ew substantive rules generally apply retroactively." Schriro v. Summerlin, 542 U.S. 348, 351 (2004). The other exception is for "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." Saffle v. Parks, 494 U.S. 484, 495

(1990). Only if one of these exceptions is met may a court retroactively apply a new rule of criminal procedure to a case on collateral review.

### 5. Evaluation of New Claims Contained in Amended Pleadings

To be timely, a motion brought pursuant to 28 U.S.C. § 2255 must be filed within one year of the latest of

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

In the instant case, the Petitioner properly amended his Motion, but the amended Motion was filed more than one year after his conviction became final. For the arguments that were raised for the first time in the amended Motion, Rule 15 of the Federal Rules of Civil Procedure provides for "relation back of

amendments to the original pleading under certain circumstances." United States v. Pittman, 209 F.3d 314, 317 (4th Cir. 2000). Such circumstances occur when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Thus, in a collateral attack, a claim added by amendment relates back unless "it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." Mayle v. Felix, 545 U.S. 644, 650 (2005).

## B. DISCOVERY FOR MOTIONS BROUGHT PURSUANT TO 28 U.S.C. § 2255

Discovery for motions brought pursuant to 28 U.S.C. § 2255 can occur only upon leave of the court, and after a showing of good cause by the Petitioner. Rule 6(a), Rules Governing Section 2255 Proceedings for the United States District Courts. According to Rule 6(b), "[a] party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents." Good cause for discovery is found "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . .

entitled to relief.'" Bracy v. Gramley, 520 U.S. 899, 908-09 (1997) (quoting Harris v. Nelson, 394 U.S. 286, 300 (1969)); see also United States v. Roane, 378 F.3d 382, 402-03 (4th Cir. 2004) (clarifying that the good cause standard is met when a petitioner establishes a prima facie case for relief). Importantly, the petitioner must be able to point to specific factual allegations when making his request; he "may not use discovery to go on a 'fishing expedition' through the Government's files in search of evidence to support an imagined and fanciful claim." United States v. Lighty, No. CIV. PJM 12-3065, 2014 WL 5509205, at *3 (D. Md. Oct. 30, 2014) (citing United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990)).

Once good cause is established, the district court has discretion to determine the scope and extent of discovery. See Bracy, 520 U.S. at 909; see also Roane, 378 F.3d at 394 (using an abuse of discretion standard to review a district court's denial of discovery in a § 2255 case). A judge may "authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a), Rules Governing Section 2255 Proceedings for the United States District Courts.

### IV. THE PETITIONER'S CLAIMS

The Petitioner has raised eighteen claims in his instant Motion, many with one or more subparts. He has also made requests for six different categories of discovery, including requests for both documents and interrogatories. The court will now address each of the eighteen claims in turn. The court will also address the arguments for discovery within the relevant section for each request.[10]

### A. CLAIM ONE – DISHONEST LAW ENFORCEMENT OFFICERS INVOLVED IN CASE

In this claim, the Petitioner asserts that Robert Glenn Ford and Clifford Dean Posey, who assisted in the investigation of the Petitioner's case, were also engaged in criminally dishonest acts before and/or during participation in his case. Mot. at 11. He alleges that their involvement in his case denied him of his right to a fair trial, and that the government should have provided him with information about the charges against both individuals and about Posey's work in the government's investigation. Id. at 11-16. The Petitioner further argues that,

---

[10] The court finds that based on the substantial amount of evidence presented and the extensive filings by both parties, there remain no factual disputes, and an evidentiary hearing is not necessary to resolve the Petitioner's claims.

if his trial counsel knew about the charges against Ford and Posey, trial counsel was ineffective for not taking appropriate action. Id. at 11, 14, 16. The Petitioner also seeks discovery of documents and records held by various agencies concerning both Ford and Posey, and he requests permission to propound corresponding interrogatories. First Mot. for Discovery at 26-29.

The United States asserts that this claim is procedurally defaulted, and, regardless of the default, lacks merit. Resp. at 20. In his Reply, the Petitioner asserts that the government never told his counsel about the charges against Ford and Posey, even during direct appeal. Reply at 10-11. He claims this prevented him from objecting or raising the issue on appeal, and, as such, the claim is not procedurally defaulted. Id.

### 1. Robert Glenn Ford

The Petitioner alleges that Robert Glenn Ford, a former police officer who was appointed at the request of the Petitioner's trial counsel as an investigator for the defense, ECF Nos. 40, 41, was a "dirty cop," and that his involvement in a bribery scheme may have tainted the investigation in the Petitioner's case. Mot. at 11.

Records show that an informant, Marcus Adams, entered into a plea deal for the charge of Felon in Possession of a Firearm.

United States v. Adams, 2:08cr103, ECF No. 37. As part of Adams's cooperation, he disclosed that Ford was involved in a scheme whereby Ford "accepted bribes from criminal defendants in exchange for making false representations to prosecutors and judges that the defendants had assisted him in homicide investigations," thereby leading to reduced sentences for the defendants. Id. at 1. On May 7, 2010, nearly six months after the Petitioner was sentenced and almost a year after his trial, Ford was indicted for these actions. United States v. Robert Glenn Ford, 2:10cr83, ECF No. 1. Ford's seven-day jury trial was held in October 2010, and he was sentenced on February 25, 2011. Id. ECF Nos. 57-60, 63, 66, 69, 87, 90. All of these proceedings were public and of record.

The Petitioner's appellate counsel filed their opening appellate brief on February 29, 2012, almost two years after Ford's indictment, and a year after sentencing. Appellate counsel had full benefit of knowledge of Ford's public indictment, trial, and sentencing. As such, the court is unconvinced that this claim could not have been discovered and raised at the time of appeal, and it finds that the claim is procedurally defaulted. However, the Petitioner argues that if appellate counsel knew about Ford's dishonest acts, then appellate counsel was ineffective for not raising this claim on

appeal, and such ineffectiveness would excuse default. Mot. at 11. The court will now examine the merits of this claim. If it lacks merit, then the Petitioner will have failed to show the required prejudice for ineffective assistance of appellate counsel, and he will be unable to excuse the procedural default.

First, the Petitioner only speculates about what dishonest acts Ford may have been involved in with regard to Ford's investigation of the Petitioner's case. Id. at 12. The Petitioner theorizes that Ford may have filed a false report or taken a bribe from a witness, but the Petitioner can provide no evidence or example of these, or any other, dishonest acts by Ford in the investigation of the Petitioner's case. Id. Frankly, this argument is merely speculation, with no support in fact. There was no evidence or argument presented at Ford's seven-day trial, sentencing, or motions hearings, that in any way involved the Petitioner's case. See United States v. Robert Glenn Ford, 2:10cr83, Transcripts, ECF Nos. 61, 64, 73, 74, 77, 79, 96-103, 108-110, 112.

Further, the Petitioner's lead attorney, Lawrence Woodward, indicated that Ford and Sheila Cronin, a mitigation investigator, "worked very hard and did a good job investigating the case and [the Petitioner's] background." Mot. Attach. 6, ¶ 4. Cronin stated that she often provided Ford with a list of

27

questions to ask witnesses. Id. Attach. 4, ¶ 3. The Petitioner's other attorney, Stephen Hudgins, also stated that, although he relied on Ford's and Cronin's witness interviews, he talked to the witnesses himself before and during the penalty phase. Id. Attach. 5, ¶ 8. In sum, defense counsel believed that Ford produced quality work, but counsel also provided questions for Ford to ask witnesses and interviewed witnesses themselves. Ford did not investigate the case alone, and counsel did not rely solely on Ford's reports.

Cronin also stated that she knew that Ford was "under considerable stress from the fall-out of the infamous 'Norfolk Four' case." Id. Attach. 4, ¶ 4. Presumably the Petitioner's defense team was on alert to watch over Ford's work, and yet counsel still found no reason to think that he was manipulating witnesses or performing any of the acts that the Petitioner now speculates occurred. Importantly, Ford's case involved his acceptance of bribes in exchange for lower sentences for defendants, and it was not a case where any judge or prosecutor was found to be corrupt. Ford was a person working for the Petitioner's trial counsel, at their request, under their supervision and direction, and with others of the Petitioner's defense team. The Petitioner offers no basis whatsoever why Ford would manipulate witnesses against him or try to harm his case.

Additionally, the Petitioner argues that the government should have told defense counsel about Ford's conduct, as it would have caused defense counsel to question the reliability and honesty of Ford's reports to the Petitioner's counsel. Mot. at 12-13. He bases this argument on Fifth Amendment due process principles found in Berger v. United States, 295 U.S. 78 (1935), and an argument that, by not providing trial counsel with this information, the government deprived the Petitioner of effective assistance of trial counsel. Mot. at 13-14. This argument is a bit far-fetched, but the court addresses it below.

As the Petitioner recognizes, the information the government had about Ford's misconduct at the time of the investigation was highly confidential and part of an ongoing criminal investigation not involving the Petitioner's case. Id. at 13 n.4. Ford was not a witness in the Petitioner's case. If anything, Ford would have been a defense witness, not a government witness, so there was no need for impeachment evidence. Ford had not been indicted at that time, and the government was still conducting its investigation. There was no reason that the government should have provided confidential information about the Ford investigation to the Petitioner's counsel. Moreover, as reflected by the transcripts of Ford's

29

trial, cited above, there was no evidence presented that even touched upon the Petitioner's case.

In sum, the Petitioner's conclusory, speculative statements do not show that he was harmed by Ford's involvement in his case, or that Ford's unrelated extortion scheme, in which he took bribes to reduce other defendants' sentences, affected the Petitioner or affected his Fifth Amendment right to a fair trial or his Sixth Amendment right to effective assistance of counsel. The Petitioner was not denied any constitutional rights here, and, as such, the court finds this claim has no merit. As this claim has no merit, the Petitioner fails to show any prejudice from appellate counsel's decision not to argue this claim on appeal, and he fails to overcome the procedural default.

The Petitioner's claim for discovery about Ford is further without merit. To receive discovery, the Petitioner must show good cause. Good cause is shown, "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" Bracy, 520 U.S. at 908-09 (quoting Harris, 394 U.S. at 300).

The Petitioner is unable to meet this standard. To learn about the scope of Ford's criminal acts and when the government first knew or should have known about those acts, the Petitioner

requests "[a]ll documents in the government's possession that both refer or relate to Robert Glenn Ford and this [the Petitioner's] case." First Mot. for Discovery at 29. The Petitioner has shown no cause, much less good cause, as to why this request would help him overcome procedural default or prove ineffective assistance of trial counsel. As Ford was a defense investigator, it would be the Petitioner's defense counsel that knew of Ford's involvement in the Petitioner's case, not the government. While Ford participated in a criminally dishonest scheme to aid criminal defendants, as discussed above, there is no evidence or allegation of record that it in any way involved the Petitioner's case. See United States v. Robert Glenn Ford, 2:10cr83. The Petitioner fails to show how gaining access to the government's records about Ford will help in his request for relief, and the court declines to grant this discovery request.

### 2. Clifford Dean Posey

The Petitioner next alleges that there was a second "dirty cop," Clifford Dean Posey, working on his case, and he argues Posey's involvement led to a due process violation. Mot. at 14. Posey was a special agent with the Bureau of Alcohol, Tobacco, and Firearms, and he was indicted on April 5, 2011, for embezzlement, money laundering, wire fraud, possessing or receiving stolen firearms, and false statements. United States

v. Clifford Dean Posey, 3:11cr94, ECF No. 3. The Statement of
Facts for Posey's case indicates that this conduct began in or
around 2007, but was not known or identified by the government
until around October 2010, well beyond the Petitioner's trial.
Id. ECF No. 14. Posey was sentenced on September 16, 2011. Id.
ECF No. 38.

     As discussed above, the government argues that this claim
about Posey is procedurally defaulted. Resp. at 20. The
Petitioner's appellate counsel filed their opening brief on
February 29, 2012, and the indictment against Posey was filed
sealed on April 5, 2011, and unsealed on April 6, 2011. Posey
was sentenced on September 16, 2011. Again, Posey's case is of
public record. The court finds that, based on these dates,
appellate counsel could have raised this claim on appeal, and
the claim is procedurally defaulted. The Petitioner, however,
argues that appellate counsel was ineffective for not raising
this claim on appeal, and that such ineffectiveness constitutes
the cause and prejudice required to overcome default. Reply
at 11. As such, the court will now examine the Petitioner's
argument to determine if it has any merit. If it does, then the
Petitioner may be able to show ineffective assistance of
appellate counsel and overcome default.

Posey investigated Cory Voss's death, but did not testify at trial, and the Petitioner does not know the full extent of Posey's involvement. Mot. at 15. The Petitioner points to a trial exhibit where Posey is listed as the transcriber of a phone call and to a few unadmitted documents that contain Posey's name to support his belief that Posey "played a substantial role in investigating and preparing the evidence in this matter." Id. Posey's dishonest acts, however, were not discovered by the government, until over a year after the Petitioner's trial. Accordingly, the government did not have a duty to give anything to the defense prior to trial, nor did they even have anything to give.

This claim is also entirely speculative. Discovery during trial showed what work Posey had done on the Petitioner's case, and the records indicated this was minimal. The Petitioner presents unsupported theories as to what harmful acts he thinks Posey may have committed, Mot. at 15, but that is not enough for relief. The Petitioner can point to no specific harm, and is simply guessing that Posey may have converted firearms or falsified records, without indicating any such record or any shred of evidence to support this claim. The Petitioner does not make a claim for relief or show constitutional harm. Because the Petitioner fails to present a meritorious claim, he cannot show

33

that appellate counsel was ineffective for not raising this claim on appeal, and he does not overcome default.

Not only does the court find this claim to be procedurally defaulted, it also finds that the Petitioner fails to show good cause for discovery. The Petitioner requests information from the government about Posey's involvement with his case and Posey's illegal activities. First Mot. for Discovery at 28. However, trial counsel already conducted discovery and received all documents that showed Posey's involvement with the Petitioner's case.  The Petitioner fails to show good cause for further discovery, as he does not show how gaining access to the government's records will assist him in overcoming default or proving ineffective assistance of counsel. As with Ford, the court does not dispute that Posey engaged in criminally dishonest acts in other cases. The Petitioner does not articulate how this current global discovery request will yield additional information about Posey's role in his case. This appears to the court to be an overly broad "fishing expedition," and the Petitioner simply is not entitled to further discovery here.

### 3. Ineffective Assistance of Trial Counsel

The Petitioner briefly alleges that, if trial counsel knew of the investigations into the law enforcement officers, then

they were ineffective for failing to take appropriate action. Mot. at 11, 14, 16. However, these brief allegations of ineffective assistance of trial counsel do not meet the deficiency and prejudice standard under Strickland. Even assuming counsel knew of the investigations, and nothing suggests they did, the court has already concluded that the claims have no merit. Thus, the Petitioner was not prejudiced by any decision trial counsel may have made not to further explore the issue.

### 4. Conclusion

The Petitioner has failed to overcome the procedural default on his due process claim about the involvement of Ford and Posey in his case. He has also failed to show that trial or appellate counsel were ineffective in their actions regarding Ford and Posey. For these reasons, Claim One is DENIED.

### B. CLAIM TWO - PROSECUTION FAILED TO DISCLOSE EXCULPATORY EVIDENCE ABOUT CO-DEFENDANT MICHAEL DRAVEN

In Claim Two, the Petitioner argues that the government failed to disclose evidence of co-defendant Draven's violent criminal past, in violation of the Fifth, Sixth, and Eighth Amendments. Mot. at 16. According to the Petitioner, this evidence would demonstrate that Draven had a particularly violent history, including sexual assaults against children. Id.

at 16-17.[11] The Petitioner contends that the government should have turned this information over to defense counsel, as it would have been important to the mitigation strategy. Id. Specifically, the Petitioner alleges that such information "would have added substantial weight to the 'equally-culpable-codefendant' mitigator found by the jury and . . . would have also reduced the weight of the 'abuse of women' aggravator." Id. at 16. The Petitioner believes that failure by the government to hand over this information violated his constitutional rights and the holdings in Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and Kyles v. Whitley, 514 U.S. 419 (1995). Mot. at 19. The government argues that this claim is procedurally defaulted, and, regardless of the default, it has no merit. Resp. at 24. For the reasons set forth below, the court agrees.

Claim Two is **DENIED**.

### 1. Procedural Default

As this claim was not brought on direct appeal, the government argues it is procedurally defaulted. Id. at 24. The Petitioner argues in his Reply that this claim could not have been brought on direct appeal because it contains information

---

[11] For the purpose of evaluating this claim, the court assumes that these allegations are true.

that was not disclosed by the prosecution. Reply at 19; see Bousley, 523 U.S. at 622 (petitioner's claim was defaulted because it could have been "fully and completely addressed on direct review based on the record" in the case). The Petitioner further argues that a successful Brady claim satisfies the cause and prejudice standard required to excuse default. Reply at 19-20 (citing Wolfe v. Clarke, 691 F.3d 410, 420 (4th Cir. 2012)).

The court does not agree with the Petitioner that this claim was unavailable on direct review. Information about Draven's past existed during the time of direct appeal, and, as mentioned by the Petitioner later in this claim, such information was cited in Draven's sentencing proceedings, which occurred on November 17, 2009. Case No. 4:08cr16-2, ECF No. 303. The Petitioner's appellate counsel filed their opening brief on February 29, 2012. As such, the court finds that had appellate counsel chosen to pursue this line of investigation, information about Draven's past was available and could have been discovered, and the claim could have been raised on appeal. Nevertheless, the Petitioner may still be able to overcome default, as a successful Brady claim would provide the necessary cause and prejudice. The court will now conduct such an analysis.

37

### 2. Brady Claim

In Brady, the Supreme Court held that suppression by the prosecution of evidence material to the defendant's guilt or punishment violates due process. 373 U.S. at 87. To make a successful Brady claim, the Petitioner must prove the following three elements: "[1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Banks v. Dretke, 540 U.S. 668, 691 (2004) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). Prejudice for the final Brady requirement is met when the evidence is material. Id. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985); see also Kyles, 514 U.S. at 435 (describing materiality as "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"). This level of prejudice is also the prejudice

required to overcome procedural default. <u>Walker v. Kelly</u>, 589 F.3d 127, 137 (4th Cir. 2009).

There is no question that the government did not provide the Petitioner's trial counsel with information about Draven's past. What the parties now debate is whether this information is material under <u>Brady</u>.[12] As to whether the information is material to the Petitioner's guilt, Draven's past crimes do not affect whether the Petitioner was involved with the murder of Cory Voss. In fact, Draven's past crimes have little relation to his own guilt for the murder of Cory Voss. Although the defense did argue the other co-defendants were bad actors who were attempting to blame the Petitioner for their crimes, the information about Draven's previous violent acts is unrelated to the murder of Cory Voss and fails to suggest that the Petitioner was not involved with the Voss murder. The court finds that even had this information been introduced during the guilt phase,[13] the extensive direct and circumstantial evidence about the

---

[12] Although the parties do not argue the first prong of the test for a <u>Brady</u> violation, the court does not see how this evidence would be exculpatory or impeaching. Nevertheless, it will examine the arguments set forth regarding materiality.

[13] The court is unsure how information about Draven's past crimes could even have been introduced at the guilt stage, with Draven as a co-defendant who did not testify. <u>See also</u> <u>supra</u> note 12.

Petitioner's involvement in the murder-for-hire cannot support any finding of a reasonable probability that the proceeding would have resulted in a different outcome.

When the police searched the Petitioner's house and car in December 2007, some eight months after the murder, they found a list of items, written in the Petitioner's handwriting, including a taser, Spyderco knife, tarp, trash bag, boots, gloves, military-style pants, and a black hoodie.[14] The list also mentioned the location of Langley Federal Credit Union ("LFCU") and a distance of three hundred eighty (380) miles and driving travel time of 6.25 hours from Morgantown, West Virginia, to Newport News, Virginia. A map was located that contained identifying information about Cory Voss's car, and a Western Union receipt indicated that the Petitioner received $275 from Draven's brother on June 1, 2007. Telephone and email records showed extensive planning and communication by all three defendants, both before, during, and after the murder. The government established that the Petitioner had bought a .357 magnum revolver and ammunition the day of the murder, April 29, 2007, and then he drove from Morgantown, West

---

[14] Video surveillance from the night of the murder shows an intruder wearing a black hoodie enter Cory Voss's truck while Cory Voss is at the ATM.

Virginia, to Newport News, Virginia. A box of .357 bullets with five missing was found at the Petitioner's former residence in Morgantown, West Virginia. A video of the ATM at LFCU showed a man wearing a hoodie entering Cory Voss's car, and Cat Voss had already pled guilty and signed a statement of facts describing the murder of Cory Voss and the Petitioner's involvement.

The next question is whether the evidence is material as to the Petitioner's sentence. The Petitioner's argument centers on how evidence of Draven's past would have influenced a jury during the penalty phase, particularly the weight given to the abuse of women aggravator and the equally culpable co-defendant mitigator. Mot. at 16. The Petitioner argues that the government introduced testimony and incident reports against him to provide support for the abuse of women aggravating factor, and his counsel could have done the same with the requested materials to show that Draven had an equally, if not more, violent past. Id. at 19. He believes at least one juror would have been influenced by knowing the government thought that the Petitioner, but not Draven with his more violent past, was deserving of death. Id. at 19-20.

This argument is a "red herring." First, the jury did find the equally culpable co-defendant mitigator, even without this extra evidence about Draven's history. Special Verdict Form –

41

Selection Phase, at 2, ECF No. 291. The information about Draven may have added additional support for this mitigator, but it was clearly unnecessary because the jury did find this mitigating factor. Second, it is unclear how evidence of Draven's past would affect the abuse of women aggravator for the Petitioner. The past conduct of Draven and the Petitioner are separate and distinct. Just because Draven had a more violent past does not negate the Petitioner's violent criminal history. The court is unconvinced that a jury would not have considered the abuse of women factor to be serious in relation to the Petitioner, simply because Draven had past, separate violent acts from those of the Petitioner. Additionally, the Petitioner played a substantial role in the crime, and the evidence was overwhelming that the Petitioner was the actual perpetrator of the murder; Draven's criminal history does not lower the Petitioner's culpability as to his role in the crime of conviction as compared to his co-defendants. The reliability of the penalty phase is not undermined simply because information about a co-defendant's past was not included.

The Petitioner's cite to Banks v. Dretke, 540 U.S. 668 (2004), is not on point here. Mot. at 16-17. In that case, the Court held that information about an informant's role was material, as that information was central to the prosecution's

argument about the defendant's own propensity to commit violent acts and the jury was unable to accurately assess the informant's credibility without the withheld information. Banks, 540 U.S. at 700-01. That evidence went to the heart of the case and dealt directly with how the jury perceived the defendant's culpability and propensity for violence. Id. Such evidence is quite different from introducing a co-defendant's history in order to weaken already-established violent acts of the Petitioner during the penalty stage, after the Petitioner has been found guilty of the murder in phase one.

Further, in this case, the jury found two statutory aggravating factors in the eligibility phase of trial, and four non-statutory aggravating factors in the penalty selection phase of trial. Special Verdict Form - Eligibility Phase, ECF No. 255; Special Verdict Form – Penalty Selection Phase, ECF No. 291. The jury also found two statutory mitigating factors, and a majority of jurors found eleven other non-statutory mitigating factors, eight presented by defense counsel and three of their own creation. Special Verdict Form – Penalty Selection Phase, ECF No. 291. The jury weighed these factors, and even though it found more mitigating factors, it clearly attached substantial weight to the aggravating factors, such as to outweigh the mitigators. Thus, even had the evidence of Draven's past been

43

introduced, the Petitioner is unable to show prejudice. In light of the jury's decision on the other aggravating and mitigating factors and the apparent weight given to the mitigating and aggravating factors, along with all the evidence introduced against the Petitioner during the guilt and penalty phases, the court is not convinced that there is a reasonable probability that the proceeding would have been different, if evidence of another individual's past had been introduced. As such, the Petitioner is unable to show that the information about Draven's crimes is material, and the court finds that this Brady claim is both procedurally defaulted and without merit.

### 3. Ineffective Assistance of Trial Counsel

The Petitioner also raises an ineffective assistance of trial counsel claim. Mot. at 20-21. He argues that "[t]o the extent that counsel failed to investigate and present the information about Draven, despite the evidence being withheld by the prosecution, they were ineffective because the information supported the defense." Id. at 20. The Petitioner further claims that his attorneys were ineffective for not filing a motion to set aside the death penalty or for a new sentencing hearing after the government filed a position paper for Draven's sentencing, which revealed some of Draven's violent past. Id. at 21. In support for why counsel should have further

44

investigated the matter, the Petitioner cites the testimony of Draven's brother at trial and the brother's allegation that Draven raped him and his sister. Id. at 20 n.8.

Counsel does not have a duty to include co-defendant background information in the penalty phase or to perform an in-depth investigation because of a statement made by a witness during trial. Moreover, counsel's decision on how to proceed after judgment is entitled to deference, and the Petitioner fails to show how declining to request that his sentence be set aside based on information about Draven was deficient conduct on the part of counsel. Even had counsel discovered more evidence on Draven's past conduct, the lack of materiality discussed above shows that the Petitioner cannot prove a reasonable probability of a different outcome had counsel argued this information during sentencing or used it to support a motion for resentencing. For these reasons, the Petitioner fails to prove that trial counsel's conduct was either deficient or prejudicial to the Petitioner. There was no ineffective assistance of trial counsel on this claim.

### 4. Discovery

The Petitioner also requests discovery in the form of documents and corresponding interrogatories about Draven's past actions and the investigation into Draven's background. First

Mot. for Discovery at 21-25, 30. The Petitioner suggests no purpose for the requested documents other than using them to prove Draven's past. For purposes of this claim, the court assumed the truth of the Petitioner's allegations about Draven[15] and still found that the Petitioner failed to make a claim. Accordingly, the court finds that the Petitioner fails to make a showing of good cause, or any cause, for the request for discovery and corresponding interrogatories.

### C. CLAIM THREE - COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT GUILT PHASE OF TRIAL BY FAILING TO INVESTIGATE, PRESENT, HIGHLIGHT, AND/OR ARGUE EVIDENCE OF INNOCENCE

The Petitioner next argues that his trial counsel was ineffective during the guilt phase for failing to investigate and present evidence regarding his innocence. Mot. at 21. He cites multiple pieces of evidence and potential testimony that either were not introduced at trial or that he believes were not fully investigated by counsel, and the court will address each of these witnesses and types of evidence in turn.

To prove ineffective assistance of counsel, the Petitioner must show that (1) counsel's representation was deficient and (2) that he was prejudiced as a result. Strickland, 466 U.S. at 693. The court must evaluate counsel's conduct at the time

---

[15] See supra note 11 and accompanying text.

such decisions were made, and not with the "distorting effects of hindsight." Id. at 689. Additionally, counsel's decision to pursue certain lines of defense is owed deference when based on reasonable professional judgment. See id. at 681. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 691. This helps to prevent a court from second guessing counsel's strategy, after such a strategy, although reasonably pursued, was not successful. See id.

### 1. Chad Costa

The Petitioner first argues that counsel should have called Chad Costa to testify during the guilt phase of trial. Mot. at 21-25. He asserts that because defense counsel did not introduce witnesses who knew the Petitioner in the years prior to the murder and arrest, the prosecution was able to argue that there was no evidence to counter the claim that the Petitioner was a cold, calculated killer. Id. at 22. The Petitioner contends that Chad Costa could have testified as someone who knew the Petitioner in the "years that preceded the murder and Runyon's arrest," as Costa met the Petitioner in the second half of 2007, when they would drive together to New Jersey to work in clinical drug studies. Id. This contention again reflects a distortion of the facts, as Costa did not know the Petitioner

47

before the murder. The murder occurred on April 29, 2007, but in Costa's declaration, submitted by the Petitioner, Costa states that he met the Petitioner "in the second half of 2007." Id. Attach. 7, ¶ 2. Costa knew the Petitioner briefly before the Petitioner was arrested on March 4, 2008, which is why Costa was questioned by authorities.

The Petitioner next alleges that Costa could have testified that the Petitioner had a tendency to boast, but the Petitioner never told Costa that he killed anyone. Id. at 22-24. This argument does not relate to the Petitioner's innocence. Just because the Petitioner did not tell Costa that he murdered Cory Voss does not mean he is innocent. It is quite conceivable that one might brag or exaggerate to sound tough, but choose to avoid mentioning an actual crime, such as murder.

The Petitioner also argues that the police told Costa about the crime, and that doing so influenced Costa's grand jury testimony. Id. at 23. For this reason, the Petitioner claims that the police investigation into the murder-for-hire conspiracy, and the Petitioner's participation in the conspiracy, was unreliable, and Costa's testimony could have shown the jury this unreliability. Id. at 23-24. This simply is

48

not true.[16] The police telling someone about the facts of a crime is hardly coercion or improper conduct.[17]

not true. Finally, the Petitioner argues that Costa had seen the Petitioner with a black, six-shot revolver, and counsel should have questioned Costa to bring out inconsistencies in the government's statements about the murder weapon, which could have provided the jury with reasonable doubt about whether the Petitioner's gun was used to shoot Cory Voss. Id. at 22-23. These alleged inconsistencies deal with the type and number of bullets used, the fact that the gun was black or "blued,"[18] and the pattern of the gunshot wounds. This argument does not persuade the court that counsel acted deficiently. Counsel could reasonably have decided not to draw attention to the

---

[16] The court has reviewed the grand jury testimony and finds that nothing untoward occurred.

[17] Although grand jury testimony is not normally admissible, it would have been admissible to impeach Costa, had he testified, and there is plenty in the testimony that could have been used for such a purpose. Accordingly, were Costa's grand jury testimony to be introduced, it would only have added to the evidence about the Petitioner's gun ownership, and the pawning of such gun, and would have been quite damaging.

[18] "Bluing" refers to a procedure that is done to protect a gun against rust, and is so named because the process gives the gun a blue-black appearance.

Petitioner's gun ownership and use,[19] and the court fails to accept the Petitioner's argument that drawing more attention to the gun and his gun ownership would have created a reasonable probability of a different result.

The court declines to second guess counsel's decision not to call Costa to the stand, other than to comment in hindsight, after a review of the grand jury testimony, that it was a good one. Counsel is afforded much deference in litigation strategy, and this decision does not appear to be unreasonable. The Petitioner simply fails to show that Costa's lack of testimony undermines the confidence in the outcome here, particularly given their after-the-murder relationship. The Petitioner shows neither cause nor prejudice here.

### 2. Cat Voss

The Petitioner next argues that his trial counsel was ineffective for not calling his co-defendant, Cat Voss, to testify at trial. Mot. at 25-26. This argument is based on a declaration by Cat Voss, secured by the Petitioner's current habeas counsel on September 10, 2015, in which Cat Voss asserts that she did not have independent personal knowledge about the Petitioner's involvement in the conspiracy to murder Cory Voss.

---

[19] See supra note 17 and accompanying text.