Id. Attach. 9. The Petitioner argues that reasonable doubt would have been raised had Cat Voss testified based on what is contained in this 2015 declaration. Id. at 25-26. This after-the-fact declaration by Cat Voss in 2015 does not reflect the record at the time of trial.

At the time of trial, defense counsel understood that Cat Voss would testify "that she hired Runyon and that Runyon and Michael Draven were lying in wait for Cory." Id. Attach. 6, ¶ 11 (Woodward declaration). At the time of trial, Cat Voss had pled guilty to all counts, had a written Plea Agreement and Statement of Facts, both filed under oath, Case No. 4:08cr16-1, ECF Nos. 69, 70, and she was obligated to testify under the agreement. Plea Agreement ¶ 13. Counsel indicated that when making the decision about whether to call Cat Voss to the stand, they knew all of the foregoing, i.e, that Cat Voss pled guilty to hiring the Petitioner to kill her husband, she had reviewed and signed the Statement of Facts under oath, and further, that Draven's counsel had interviewed Cat Voss and shared the information from that interview with the Petitioner's counsel. Mot. Attach. 6, ¶ 11. Cat Voss's Statement of Facts discusses the involvement of all co-defendants, including the Petitioner, in the plot to kill her husband, and she stated that such

information was "true and accurate." Statement of Facts, Case
No. 4:08cr16-1, ECF No. 70, attached hereto as Exhibit D.

The Petitioner fails to show deficient action on the part
of counsel. It is reasonable that counsel for the Petitioner
would not have wanted Cat Voss to testify. Based on the
information available at the time, which was that Cat Voss would
testify that she and Draven hired the Petitioner to kill her
husband, counsel made a sound, strategic decision not to call
her as a witness. Cat Voss had just pled guilty to hiring the
Petitioner to kill Cory Voss and had signed under oath a
Statement of Facts to that effect, and testifying differently
would have risked her plea agreement. Had Cat Voss testified
according to the current declaration, she would have been
impeached with her Statement of Facts, and the Petitioner fails
to show how either of these outcomes creates a reasonable
probability of a different result. Counsel made a proper
decision not to call Cat Voss as a witness.

### 3. Scott Linker

The Petitioner next asserts that his counsel was
ineffective for failing to elicit certain testimony from Scott
Linker, the Petitioner's former brother-in-law. Mot. at 26-27.
According to a September 2015 declaration by Linker, he would
have testified that the Petitioner was a "gun enthusiast," who

collected and traded guns, and was an expert marksman. Id. Attach. 13, ¶¶ 10-12. The Petitioner argues that this testimony would have provided context for his gun purchase the day of the crime, and for his ownership of guns and ammunition that was explored by the government through trial exhibits and testimony. Id. at 26-27. Likewise, it could have provided inferences in the other direction as presented at trial.

Regardless of the government's argument that Linker's testimony is irrelevant, the court finds no reason to believe that the decision not to elicit such testimony was based on unsound trial strategy or lack of investigation by counsel. The testimony could have had the opposite effect of what the Petitioner claims. Instead of showing that the Petitioner did not commit the crime, the jury could have found that because the Petitioner was a "gun enthusiast" and an expert marksman, he was an ideal hit man as alleged by the government. As the jury could easily have viewed this evidence as harmful to the defense, the Petitioner fails to show any prejudice or deficient performance. Accordingly, counsel was not ineffective for not calling Linker as a witness at trial.

### 4. Rose Wiggins

The Petitioner next claims that counsel was ineffective in handling Rose Wiggins's testimony. Mot. at 27-28. Wiggins is Cat

Voss's mother, and she testified at trial that when Cat called her the night of the murder, Wiggins offered to search for Cory because Cat stated that her children were sleeping. Tr. at 259-61. Wiggins testified that she drove by the credit union parking lot in the early morning, and then again several hours later, and she did not see Cory Voss's truck or the white BMW, which Cat Voss normally drove, in the parking lot. Id. The Petitioner asserts that counsel failed to properly highlight Wiggins's testimony. Mot. at 27-28. Specifically, he argues that counsel failed to ask why Wiggins did not know if Cory Voss had driven his truck or the white BMW, and why Wiggins did not go to Cat's home until around 8:00 a.m. Id. The Petitioner contends that Wiggins's search timeline, during which she did not see either of the vehicles, would have shown inconsistencies with the government's case and caused reasonable doubt. Id. These assertions are not only flimsy, but overreaching and tiresome.

Wiggins's testimony did answer these questions to the extent possible. She did not go to Cat Voss's home until later, because Cat indicated the children were sleeping, so Wiggins volunteered to search for Cory that night. Tr. at 260. She also testified that she looked for both Cory Voss's truck and the white BMW. Id. at 260-61. It is not relevant if she knew which vehicle Cory Voss drove, as she looked for both, and the jury

54

heard Wiggins's testimony that she did not see either vehicle during the timeline in question. Moreover, the facts showed that Cory Voss's truck was not at the ATM, but rather in a nearby office complex. There was no testimony from Wiggins that she searched this area. See id. at 257-65.

### 5. Whereabouts of the Petitioner on the Day of the Murder

The Petitioner next claims that there was evidence relating to his cell phones that would have shown that he was not in Newport News at the time of the murder. Mot. at 28-29. The Petitioner starts by stating that he owned two cell phones, one that he kept for himself and one that he provided to his son's babysitter, Paula Dalton, so that all three of them could remain in contact. Id. at 28. Records show that none of the calls made from those phones on the day of the murder incurred roaming charges, which the Petitioner argues is proof that he was in West Virginia at 8:37 p.m., when a call was placed from his phone to his son's phone. Id. at 29. Based on that 8:37 p.m. call, the Petitioner claims that he would not have been able to drive from West Virginia to Newport News in time to commit the murder. Id. at 28.

The Petitioner now argues that counsel never asked prosecution witness Paula Dalton whether she received a call on

the Petitioner's son's phone from anyone other than the Petitioner, or whether she was given a different contact number for the Petitioner for the date of April 29, 2007, and that failure to ask these questions was prejudicial. Id. at 29. The Petitioner states that Dalton would have testified that the only calls she received on the Petitioner's son's phone were from the Petitioner, and she never was given an alternate phone number for the Petitioner. Id. The Petitioner argues such answers could have rebutted the prosecution's theory that the reason for the lack of roaming charges on April 29, 2007, was that the Petitioner left a phone in West Virginia before driving to Newport News to commit the murder. Id. The Petitioner, however, fails to cite any declaration or other evidence to support this contention. The court cannot assume the witness would have testified to something based solely on a conclusory statement of the Petitioner.[20]

Further, there was cell phone testimony by a government expert, Paul Swartz, who was cross-examined by defense counsel.

---

[20] Although there is a declaration by Dalton, it does not address the issues of whether someone other than the Petitioner ever called her on the cell phone that he provided to her or whether she was given an alternative phone number to reach him on the night of the murder. Mot. Attach. 11. The Petitioner's counsel continues to overreach and second-guess trial counsel to an extent of frivolity and abuse of process.

Tr. at 1476-88. It was during this cross examination that counsel brought up the fact that the Petitioner's call at 8:37 p.m. did not incur any roaming charges. Id. at 1485. Counsel could have reasonably decided not to ask additional questions about the Petitioner's cell phone use to another witness, and the court sees no reason to doubt counsel's decision. Moreover, the Petitioner has failed to show a reasonable probability that asking a few additional questions on cross examination would have led to a different outcome, considering all the other evidence introduced against him at trial and the lack of clarity about how Dalton would have responded.

### 6. Cell Tower Testimony

The Petitioner's next claim is that the government introduced unreliable cell tower testimony in an effort to show that Draven was moving away from the credit union at the time of the murder and could not have been the person who shot Cory Voss. Mot. at 29-31. At trial, Paul Swartz testified as a government expert about the cell phone tower data and analysis performed on the Petitioner's, and his co-defendants', phones.

Tr. of 7/14/09.[21] During this analysis, Swartz relied on cell tower data to locate where the co-defendants were during the times preceding and soon after the crime. Id. The Petitioner argues that this type of testing is unreliable, and that his counsel was ineffective for failing to object. Mot. at 30.

The Petitioner first cites several articles written on the subject, but they were published after his trial. Id. In his Reply, he includes a declaration by Joseph F. Kennedy, a Senior Manager at Cherry Biometrics Corporation who works with cell tower data analysis. Reply Attach. 3, at 1. However, the court declines to conclude that counsel was deficient based on one declaration by an alleged expert, when a qualified expert testified at trial and was fully questioned by both parties. Tr. of 7/14/09.

The Petitioner also references several cases to support his argument that other courts have held cell phone tower data to be unreliable; however, the holdings are not so broad as suggested. Reply at 28-29; see Elmore v. Ozmint, 661 F.3d 783, 851 (4th Cir. 2011) (finding ineffective assistance due to counsel's

---

[21] Swartz testified that he had performed over five hundred hours of telephone work, he began doing telephone investigations in 1987, he attends conferences on the subject, and his knowledge on the subject is current due to his training and contact with the telephone companies. Tr. at 1450-51.

blind acceptance of the government's multiple pieces of forensic evidence, "including the medical examiner's time-of-death opinion, the pubic hairs allegedly recovered from [the victim's] bed, the nature of the 'Item T' materials removed from [the victim's] bloody abdomen, and the fingerprint lifted from the blood-smeared toilet in [the victim's] en suite bathroom"); Roberts v. Howton, 13 F. Supp. 3d 1077, 1100-03 (D. Or. 2014) (ruling that counsel was ineffective for advising his client to plead guilty, as counsel failed to investigate preliminary cell tower evidence that could pinpoint the location and direction the defendant was traveling); United States v. Evans, 892 F. Supp. 2d 949, 956-57 (N.D. Ill. 2012) (holding that the government's use of a specific theory of cell tower analysis was unreliable, but noting that other methods of cell site analysis have been tested by the scientific community).

Additionally, in this case, Swartz did not give the precise location of Draven's phone. Rather, he testified that if someone used a phone and it registered with a certain tower, it must be within a specific radius. Tr. at 1437. He did not say where in the radius the phone was located. He acknowledged that a phone may be able to connect with more than one tower, if, for example, a tower is busy. Id. at 1438. Swartz, thus, testified to the general location where a caller would have to be to

59

connect to a tower, but not a more specific location based on coverage overlap, as seen in the Evans case.

For the above reasons, counsel was not ineffective in their handling of the cell tower testimony. Counsel did attempt a cross examination, in which they elicited testimony that the cellular records did not indicate that either of the Petitioner's phones was in Newport News, Virginia, on April 29, 2007. Id. at 1478. Counsel then focused on their own theory of the case — that someone else murdered Cory Voss. Based on the evidence and research at the time of trial, counsel did not act deficiently. Further, the Petitioner fails to show prejudice. Swartz did not attempt to precisely determine the Petitioner's location. He simply said that Draven must be located in a certain vicinity based on the surrounding cell towers. The government used this testimony in closing to suggest that Draven spoke with Runyon before heading home, not as definitive proof that Draven was not the shooter. Id. at 1595. As such, the Petitioner fails to show that counsel's decision in 2009 not to further challenge the cell tower data was objectively unreasonable, or that, considering the other evidence and research available at the time of trial, such a

challenge would have led to a reasonable probability of a different outcome.[22]

### 7. The Petitioner's Shopping List

The Petitioner next challenges another piece of evidence introduced at trial. Mot. at 31-32. This evidence is a "shopping list" that was found among the Petitioner's belongings, months after the murder, together with a map of the Hampton Roads area with identifying information about Cory Voss's car and a photo of Cat Voss and Draven with their names and addresses on the back, and was characterized as a "checklist" for the crime. Gov't Ex. 217. It listed such items as a taser, Spyderco knife, tarp, trash bags, and various pieces of clothing. Id. The Petitioner argues that counsel deficiently failed to highlight that neither a gun nor a mask, both of which were used in the crime, was on the list, and, additionally, that some of the items on the list were not used during the crime. Mot. at 31-32.

Counsel's decision not to highlight the list can be seen as a reasonable strategic decision. Along with the above mentioned

---

[22] At the end of this argument, the Petitioner adds that if information about cell tower reliability was not available at the time of trial, it constitutes newly-discovered evidence of innocence. Mot. at 31. The court does not find that the Petitioner's two-sentence argument for innocence is persuasive, particularly as the Petitioner is still unable to show that the testimony in this case was unreliable or tainted the trial process.

items, the list also contained the address of Langley Federal
Credit Union, directions to the credit union, and a time of 6.25
hours, which is roughly the time to get from Morgantown, West
Virginia, where the Petitioner resided, to Newport News,
Virginia. Gov't Ex. 217. It is reasonable that counsel may have
thought these writings to be highly prejudicial to the
Petitioner, and chose to avoid highlighting the document. This
decision was not deficient representation. Further, the
Petitioner fails to explain how the lack of two items on the
list, or the fact that some items on the list were not related
to the crime, means he did not commit the murder. Thus, he fails
to show a reasonable probability of a different outcome had
counsel spent more time challenging the list.

### 8. Ballistics Tests

The Petitioner next raises several arguments concerning the
ballistics testimony. Mot. at 32-34.[23] During the trial, John
Willmer, a firearms and toolmark examiner, testified as an

---

[23] The government argues that this claim is untimely because
it was not added until the Amended Motion, see Resp. at 34-35,
which was filed more than one year after the Petitioner's
conviction became final. See 28 U.S.C. § 2255(f). Although the
ballistics testing was not challenged earlier, the Petitioner
did claim that counsel was ineffective for failing to argue that
the Petitioner's gun was not the murder weapon. Reply at 37. As
such, the court finds that this new argument tenuously relates

expert for the government concerning the bullets and ballistics testing. Tr. at 353-70. The Petitioner now asserts that defense counsel was ineffective for failing to challenge the scientific validity of the ballistics testing and failing to question Willmer during cross examination about the type of bullets found and their relation to the Petitioner's gun. Mot. at 32-33.

The Petitioner first points to the fact that caliber .38 class bullets were found at the crime scene, and the government's evidence was that the murder weapon was the Petitioner's .357 magnum Taurus revolver. Id. During his testimony, however, Willmer specifically stated that caliber .38 class bullets can be used in both .357 magnum revolvers and firearms that can hold .38 special cartridges. Tr. at 362-63. Willmer referenced a certificate of analysis that discussed the types of guns that could fire .38 class bullets and leave rifling characteristics like those on the bullets found at the crime scene. Id. at 369-70. The certificate of analysis stated that these guns "include, but are not limited to, caliber .357 Magnum revolvers with the brand names Astra and Llama." Gov't Ex. 23. The Petitioner now claims that counsel should have

---

to the underlying conduct set out in the original claim, and will consider it. In this way, the appellate court will have full benefit of the court's analysis here.

corrected "the mis-impression . . . that the .38 bullets could have been fired from Runyon's Taurus .357" because the "certificate of analysis excludes the Taurus brand of .357 firearms." Mot. at 33. The certificate did not exclude the Taurus .357. The list is clearly not exhaustive, as proven by the statement "include, but are not limited to." Gov't Ex. 23. There was also clear, additional testimony by George Koski, who sold the gun to the Petitioner, that the gun could fire both .357 magnum and .38 special bullets. Tr. at 849.

The Petitioner also challenges the way counsel handled the ballistics tests, as well as ballistics tests in general. Mot. at 32-33; Reply at 34-37. He further requests discovery of the records from his case to help present this argument. Second Mot. for Discovery at 2-6. Trial counsel in the Petitioner's case did not request the bullets or test results, nor did they perform their own tests or hire their own expert. As such, the Petitioner argues that had counsel requested the ballistics tests or performed a more thorough cross examination about the reliability of ballistics tests, there is a reasonable probability that at least one juror would have found reasonable doubt that the Petitioner's gun was the murder weapon. Second Mot. for Discovery at 5-6.

In support, the Petitioner relies on several studies that discuss the unreliability of forensic testing. Mot. at 33 n. 20; Reply at 35-36. Nothing suggests, however, that counsel did not know of these studies at trial or unreasonably decided to forego a stronger challenge to the ballistics evidence. Decisions about evidence and expert testimony are vital parts of trial strategy, and the court gives much deference to counsel's decisions on these matters.

Additionally, the court subpoenaed the ballistics records from the Virginia Department of Forensic Science, and these reports are filed under seal. After an in camera review by the court of the reports, the court finds nothing contrary to the evidence presented at trial. The certificate of analysis included with the subpoenaed records is the same as the one introduced at trial. Gov't Ex. 23.

Regardless of the reason that counsel did not further challenge the evidence or request copies of the ballistics records, the court finds there is no prejudice, as the records only support the testimony and evidence introduced at trial. As such, the Petitioner fails to show ineffective assistance of counsel. For the above reasons, the court also denies the Petitioner's related discovery request.

### 9. Conclusion

The court has evaluated all of the witnesses and evidence that the Petitioner now claims should have been introduced by trial counsel, and the court has found no ineffective assistance of counsel here. Even if cumulatively evaluating the suggested evidence and testimony, counsel was not ineffective. It is apparent that counsel had a strategy and focused on the evidence they thought most advantageous to the Petitioner. The Strickland standard is high, and courts do not later judge a strategy to be unreasonable simply because it was ultimately unsuccessful, for with hindsight any number of things could or could not have been done. It is easy to criticize after-the-fact, as the Petitioner's habeas counsel has done here. The question is would the proceeding have reasonably had a different outcome. In light of the voluminous evidence introduced against the Petitioner, see supra Part I and trial record of testimony and exhibits, the court finds no reasonable probability of a different outcome had counsel done all that the Petitioner now requests.

Accordingly, Claim Three is **DENIED**.

### D. CLAIM FOUR – COUNSEL ABDICATED RESPONSIBILITY TO ADVOCATE AT ELIGIBILITY PHASE OF TRIAL

In this claim, the Petitioner argues that his counsel was ineffective for not advocating for him at the eligibility phase

of trial. Mot. at 35. This claim is bogus. Before trial began, defense counsel filed a Motion to Trifurcate the Jury Deliberations. ECF No. 93. Counsel requested that instead of having bifurcated proceedings with a guilt phase and penalty phase, the court should also have an eligibility phase, wherein the jury would decide if the government had met its burden in proving the statutory requirements for capital punishment. Id. at 4. By keeping this phase separate from sentencing, the jury would not be swayed by evidence relating to non-statutory aggravating factors and the process of weighing the aggravating and mitigating factors. Id. The court granted this motion on December 8, 2008. ECF No. 132.

The Petitioner, through counsel, now argues that trial "counsel failed to guard the presumption of innocence or hold the government to its burden when he abdicated the role of advocate at the eligibility phase." Mot. at 35. To show that counsel was ineffective in the decision on how to proceed at the eligibility phase, the Petitioner must be able to show that counsel's actions were deficient and that such actions demonstrated a "probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 687, 694.

Part of counsel's strategy during the eligibility phase was to argue that the law never requires the death penalty. Tr.

at 1771. Counsel told the jury that, even though they had found the Petitioner guilty, they should look at the evidence and consider the judge's instructions "with new eyes." Id. at 1772. Counsel did not present new evidence during this phase, assuming any was available, and that failure to present evidence to counter the eligibility factors is what the Petitioner now argues was ineffective. Mot. at 36.[24]

While counsel certainly has an "overarching duty to advocate the defendant's cause," Strickland, 466 U.S. at 688, the court does not find the Petitioner's argument that trial counsel failed in its duty to advocate at the eligibility phase to be persuasive. To prove death eligibility, the government needed to prove beyond a reasonable doubt that: (1) the Petitioner was older than eighteen years of age at the time of

---

[24] The Petitioner also argues in a footnote that counsel was ineffective for failing to object to the substantial planning aggravator on due process grounds, as the government argued mutually inconsistent theories of the case against the co-defendants with regards to the planning of the crime. Mot. at 36 n.22. Based on the little information provided in this argument, the court does not find that counsel was ineffective. The government never argued that one of the co-defendants was not involved in the planning; rather, it just switched the way the same argument was presented, depending on the co-defendant at issue. Due to the amount of evidence showing substantial planning by all co-defendants relating to the Charge of Conspiracy to Commit Murder for Hire (Count One), counsel was not deficient in failing to object, and the Petitioner shows no prejudice.

the offense; (2) at least one gateway factor regarding intent was present; and (3) at least one statutory aggravating factor was present. Special Verdict Form - Eligibility Phase, ECF No. 255. The statutory aggravating factors argued by the government at this phase were that: (1) the offense was committed after substantial planning and premeditation to cause the death of another; and (2) the offense was committed in consideration for the receipt of, or in expectation of the receipt of, anything of pecuniary gain. Id.

As these aggravating factors were elements of the crime of Conspiracy to Commit Murder for Hire and were argued at the guilt phase, the government had no new evidence to present at the eligibility phase. Resp. at 38. Rather than make the same argument against these factors, which the jury had already heard and rejected during the earlier phase, defense counsel urged the jury to look at the evidence anew and to consider that the death penalty is never required by law. Tr. at 1771-72. This was a strategic decision by trial counsel not to alienate the jury and to set the stage for the penalty phase. Mot. Attach. 6, ¶ 10.

The purpose of the eligibility phase was not to introduce mitigating factors or have the jury weigh aggravators and mitigators. It was simply to determine if the government met the statutory requirements for the death penalty. At the penalty

69

phase, counsel did argue for mitigators to counteract the statutory aggravating factors. In fact, counsel argued that all the co-defendants were equally culpable, and the jury found the equally culpable co-defendant mitigator, during the penalty phase. Special Verdict – Selection Phase, at 2. Considering that the jury had already rejected the claim that the Petitioner was not involved in planning and executing the crime for monetary gain, the court finds that counsel's chosen strategy to handle the eligibility phase was not objectively unreasonable.

The court also finds that the Petitioner did not suffer prejudice from this strategy. The jury had already found the facts required for the two statutory aggravators, so it is unclear how counsel could have fought against those factors at this stage. Even had counsel attempted to introduce evidence of the co-defendants' involvement, such an argument does not negate the amount of evidence put forth at trial that showed substantial planning by the Petitioner. As to the pecuniary gain factor, confidence in the outcome is not undermined simply because counsel declined to again argue that the Petitioner did not receive full payment for the crime, which the jury already knew from the guilt phase. For these reasons, the court **DENIES** Claim Four.

70

**E. CLAIM FIVE – TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DISCOVER, AND PRESENT EVIDENCE OF INCOMPETENCY TO STAND TRIAL**

In Claim Five, the Petitioner asserts that counsel was ineffective for failing to argue that he was incompetent to stand trial. Mot. at 38. To support his claim, the Petitioner points to various reports by mental health professionals, which stated that the Petitioner likely suffered from delusional beliefs and that there was a family history of psychiatric illnesses and neurological/cognitive/developmental disabilities. Id. at 38-39.

### 1. Standard for Ineffective Assistance of Counsel for Failure to Request Competency Hearing

"[T]the conviction of an accused person while he is legally incompetent violates due process." Pate v. Robinson, 383 U.S. 375, 378 (1966). To be competent to stand trial, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam). To ensure that such rights are not violated

> [t]he court shall grant [a motion for a hearing on competency], or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the

71

nature and consequences of the proceedings against him
or to assist properly in his defense.

18 U.S.C. § 4241(a).

As to the standard for an ineffective assistance claim
relating to failure to investigate competency, the Petitioner
must show that counsel acted deficiently and that there was
resulting prejudice. Strickland, 466 U.S. at 687. Counsel acts
deficiently, if he does not act as a reasonably objective
attorney would under the circumstances. Savino, 82 F.3d at 599.
"An attorney's duty, of course, does not mandate the exploration
of the issues of sanity and/or competency in every instance."
Wood v. Zahradnick, 430 F. Supp. 107, 111 (E.D. Va. 1977),
aff'd, 578 F.2d 980 (4th Cir. 1978). However, when "the facts
known and available, or with minimal diligence accessible, to
defense counsel raise a reasonable doubt as to a defendant's
mental condition, counsel has an affirmative obligation to make
further inquiry." Id. (holding that there was ineffective
assistance because counsel did not take even the first step of
requesting a mental examination when the defendant's rape and
robbery of a sixty-seven-year-old woman for no reason was of
"such a bizarre nature as to call into question the petitioner's
mental condition").

If such reasonable doubt is raised, "a lawyer is not entitled to rely on his own belief about a defendant's mental condition, but instead must make a reasonable investigation" before deciding how to proceed. Becton v. Barnett, 920 F.2d 1190, 1192 (4th Cir. 1990) (involving a "senseless" crime where the defendant raped an elderly woman and told counsel that he had been in and out of mental hospitals prior to his arrest). Importantly, proving ineffective assistance of counsel does not require meeting the standard in Dusky, but requires showing that had counsel investigated the defendant's mental health, a hearing could have been held, at which point Dusky would have applied. Id. at 1193.

As support for what constitutes incompetency, the Petitioner cites two Fourth Circuit cases. Mot. at 40.[25] In United States v. White, the defendant was found incompetent to stand trial during a preliminary psychological evaluation. 620 F.3d 401, 405 (4th Cir. 2010). The defendant believed she had found a cure for AIDS and breast cancer. Id. at 406. She refused to leave her cell, even to take a shower or to have staff clean her cell, and she began writing on the walls in blood after her

---

[25] Although these cases deal with determining incompetency versus ineffective assistance for failing to investigate and request a competency hearing, the court finds the facts in them to be instructive when evaluating the facts in the instant case.

writing instruments were removed. Id. In United States v. Culp, the defendant robbed a bank because he heard voices telling him to do so, and he was diagnosed with paranoid schizophrenia. 930 F.2d 23 (4th Cir. 1991) (unpublished table decision). He tampered with the pipes in his cell so that it would flood, and an independent psychiatrist reported that he became "very psychotic without medication." Id.

### 2. Whether Counsel was Ineffective for Failing to Investigate Competency and Request a Hearing on the Issue

The Petitioner argues that had trial counsel properly investigated his mental health, they would have determined that he was incompetent to stand trial and requested a hearing to that effect. Mot. at 38-40. The declarations filed with the Petitioner's Motion, however, show that defense counsel investigated the Petitioner's mental health, interviewed mental health experts, and filed such reports with the court. See id. Attachs. 5, 6. Counsel also tried to track down military medical records and evidence of a car accident, although they were unable to find all the sought-after records. Id. Attach. 6, ¶ 5, Attach. 5, ¶ 5.[26]

---

[26] There is no evidence to show that all of these unavailable records exist or could be "tracked down." Moreover, the Petitioner's habeas counsel seem to lose sight of the legal

The fact that the Portsmouth City Jail records noted the Petitioner was "somewhat grandiose" and "verbalized some delusional material," id. Attach. 16, at 4, is not enough to put counsel on notice that further inquiry, beyond the mental health experts retained and reports already filed, was required. That trial counsel knew the Petitioner compared himself to great historical figures or talked about how many lives he saved, see id. at 39, Attach. 4, ¶ 7, does not rise to the level of incompetency seen in the White and Culp cases cited by the Petitioner. Further, unlike in White, there was no preliminary psychological evaluation that suggested incompetency. Although the Petitioner now argues some of the mental health examinations were preliminary in nature, that does not make counsel's conduct deficient. Reply at 46-47. The records show that the Petitioner underwent multiple tests and counsel gathered numerous medical and other records, and none suggested mental health issues that rose to the level of incompetency to stand trial. See infra Part IV.F.

Additionally, the crime was not so bizarre or senseless as to cause counsel to reasonably question the Petitioner's mental

standard that the evidence has to present a reasonable probability that the outcome would have turned out differently, if the evidence had been presented. It is not a question just of availability, but one of materiality.

health and consider an incompetency argument. While murder-for-hire may be cold and calculating, it is not so unique as the facts of Becton and Wood. The Petitioner met Draven while they were paid volunteers in clinical drug trials, and the Petitioner was offered money to murder Cat Voss's husband, and followed through on the plan. The evidence shows that the motive was driven by greed for the Petitioner, and by both greed and lust, for Cat and Draven. The crime was carefully planned, and it presented counsel with no signs to question the Petitioner's competency. In fact, the evidence at trial showed a competent, intelligent defendant. Regardless, counsel still did extensive investigation into the Petitioner's mental health.

Based on counsel's investigation and the facts before the court, the Petitioner fails to show that trial counsel acted in a deficient manner by not requesting a competency hearing, as none was warranted. The Petitioner also does not provide evidence that had a hearing been held, he would have been declared incompetent. The court does not find that counsel was ineffective, and Claim Five is **DENIED**.

### 3. Discovery

For the reasons stated herein, the Petitioner also fails to show good cause for additional discovery. All he seeks for this claim are records from the Portsmouth City Jail. First Mot. for

Discovery at 33-36. He already has records from the jail, and although those records do reference a follow-up visit, Mot. Attach. 16, at 4, the Petitioner makes no showing that such a visit even happened. Further, he does not state how he hopes these records, which may or may not exist, would prove anything different from the multiple mental health records already filed by counsel in this case. Accordingly, his request for discovery of any Portsmouth City Jail records is DENIED.[27]

### F. CLAIM SIX - COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO INVESTIGATE AND PRESENT MITIGATING EVIDENCE REGARDING PSYCHO-SOCIAL HISTORY, BRAIN DAMAGE, AND MENTAL HEALTH

The Petitioner next alleges that his counsel was ineffective for failing to investigate his mental health and psycho-social history, and for not using the results of such an

---

[27] The same reasoning applies to the request for discovery of the Portsmouth City Jail records in relation to all other claims. See First Mot. for Discovery at 33-36 (stating how the records relate to multiple claims in the instant Motion). Counsel talked to multiple mental health experts and had those experts write up reports. Counsel further requested relevant records from the Petitioner's past. Collateral counsel even submitted updated mental health records with the instant Motion. It is unclear and unspecified what the Petitioner hopes to discover in the Portsmouth City Jail records that are not contained in the other reports and the current record before the court. Thus, the court finds that the Petitioner fails to show good cause for global discovery of the Portsmouth City Jail records, to the extent they have not been so discovered, as to all claims mentioned in the First Motion for Discovery.

investigation as mitigating evidence to offset the prosecution's presentation of aggravating factors. Mot. at 41. Specifically, the Petitioner breaks Claim Six down into several subparts: (1) counsel Hudgins appeared in the case too late for him to effectively investigate and present mitigation evidence; (2) counsel failed to present mental health experts, and, instead, used ineffective lay person testimony; (3) a complete psycho-social history, which counsel failed to provide, would have countered the aggravating factors, added weight to the mitigating factors, and informed the jury that the Petitioner had a lesser moral culpability; and (4) the combination of all these factors resulted in prejudice to the Petitioner. The court will address these arguments in turn.

### 1. Ineffective Assistance Standard

To make a successful showing of ineffective assistance of counsel, the Petitioner must prove that (1) his attorneys' performance was seriously deficient, and (2) such deficient performance prejudiced him by undermining the reliability of the judgment against him. See Strickland, 466 U.S. at 687. To show deficient performance, counsel's actions or omissions must be measured against what "an objectively reasonable attorney would have done under the circumstances existing at the time of representation." Savino, 82 F.3d at 599. To demonstrate

prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

In so doing, the court keeps in mind that when deciding an ineffective assistance claim involving counsel's strategy, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689. As such, "every effort [should] be made to eliminate the distorting effects of hindsight." Id. This is because "[i]n many cases, counsel's decision not to pursue a particular approach at sentencing reflects not incompetence, but rather a sound strategic choice." Lovitt v. True, 403 F.3d 171, 179 (4th Cir. 2005).

Accordingly, "Strickland does not require defense counsel to 'investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.'" Gray v. Branker, 529 F.3d 220, 229 (4th Cir. 2008) (quoting Wiggins v. Smith, 539 U.S. 510, 533 (2003)). The requirement is that "counsel has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. Even a showing that counsel could have conducted a more thorough investigation is not enough to show that counsel was ineffective. See Burger v. Kemp, 483 U.S. 776, 794-95 (1987).

Additionally, there is no per se rule requiring counsel to introduce mental health evidence at the penalty phase of a capital trial. See Meyer v. Branker, 506 F.3d 358, 372 (4th Cir. 2007). "In fact, there are many strategically valid reasons why defense counsel, given the circumstances of an individual case, may decide not to offer mental health mitigation testimony: it may not be persuasive; it may appear to be a 'flight into theory' without proper grounding in the facts of the case." Id. As such, the court must determine whether counsel performed a reasonable investigation of the law and facts regarding the Petitioner's mental health and made an objectively reasonable

80

decision to forego a mental health strategy. See Strickland, 466 U.S. at 690-91.

### 2. Hudgins's Involvement with the Case

The Petitioner first alleges that counsel Stephen Hudgins appeared too late in the case to perform an effective mitigation investigation. Mot. at 41. On February 18, 2009, Hudgins was appointed to replace attorney Jon Babineau, who had developed a conflict of interest. ECF No. 161; see also Mot. to Continue at 12-13, ECF No. 179. On February 26, 2009, the Petitioner filed a Motion for Continuance and for Hearing to Schedule Trial. ECF No. 164. The court continued the trial to June 30, 2009. ECF No. 171. As such, Hudgins had four months to get ready for trial once he was appointed. Importantly, Hudgins did not start from the beginning when he was appointed to the Petitioner's defense team. Babineau, along with a mitigation expert and an investigator, had already been conducting an investigation for the penalty phase since June of 2008,[28] and Hudgins was able to use that work as the basis for his continuing investigation. Using what had already been discovered, Hudgins was able to expand on that investigation and

---

[28] See infra Part IV.F.3.

find new experts, arrange for examinations, and search for additional medical records.

Hudgins may have felt constrained by the amount of time he had on the case and the lack of communication with Babineau,[29] Reply Attach. 1, at 1, but the fact is that Hudgins joined a team that had already done much work on the case. After reviewing the extensive record in this case, which is set out below, the court finds that counsel took reasonable and proper steps to investigate the Petitioner's mental health and psycho-social history, both before and after Hudgins was appointed to the case, and that the Petitioner suffered no prejudice by the later addition of Hudgins to the defense team.

### 3. Counsel's Mental Health Investigation

Investigation into the Petitioner's mental health began soon after he was indicted, when the government filed a motion regarding discovery of mental health evidence on April 25, 2008. ECF No. 46. The court held a hearing on the matter, and on June 16, 2008, issued orders setting forth a comprehensive scheme for mental health testing and notice to each party. ECF Nos. 65, 66. The first order provided that any defendant

---

[29] Once Babineau had withdrawn due to a conflict, he could then only ethically communicate and pass on his efforts before the withdrawal.

intending to introduce mental health experts at the penalty phase must file written notice of such experts no later than ninety (90) days prior to the commencement of jury selection. Order at 1, ECF No 65. It also stated that failure to provide the proper notice could result in forfeiture of the right to present mental health testimony at trial. Id. at 3.

On December 12, 2008, the Petitioner provided notice that he intended to introduce expert mental health evidence and may call two expert witnesses to testify at the penalty phase: Dr. Evan S. Nelson and Dr. Mark D. Cunningham, both licensed clinical psychologists. Notice at 1-2, ECF No. 135. The Notice also mentioned that the Petitioner was seeking court budget approval for a neuropsychologist. Id. at 3. While Dr. Nelson did examine the Petitioner, no reports were filed, and in a declaration filed with the Petitioner's instant motion, Hudgins asserts that the results of Dr. Nelson's testing were not favorable to the defense. Mot. Attach. 5, ¶ 4. On February 25, 2009, the court approved funding for the Petitioner to hire a neuropsychologist. ECF No. 163.

On April 8, 2009, the Petitioner filed notice that he intended to hire Dr. Scott D. Bender, a neuropsychologist, to perform psychological testing, once the medical records of the Petitioner and his family were received. Notice at 1, ECF

No. 177. The Petitioner also indicated that Dr. Seymour Halleck, a psychiatrist, would "be testifying to factors discovered in defendant's medical records and those of his family" and "may interview defendant on issues discovered in the medical records." Id. at 2.

The Petitioner requested another continuance on April 13, 2009. ECF No. 179. In that motion, counsel argued for a six-month extension, due to such challenges as trying to get copies of medical records of the Petitioner's family from the military and dealing with the remoteness of mitigation witnesses. Id. at 13. Although the government did not object, it pointed out that it had provided counsel for the Petitioner with "voluminous background materials, including school, employment and military records." ECF No. 181, at 1 n.1. It further stated that the "pre-indictment investigation conducted by the United States did not reveal a background of abuse or hospitalization of the defendant, which appears to serve as the justification for obtaining certain types of records." Id. The court declined to continue the trial, noting that "[w]hen Babineau withdrew, he had been paid for considerable legal services, in addition to significant payments having been made for various investigative and expert services on behalf of Runyon, relating to the penalty phases of the proceedings." ECF No. 194., at 3 n.4. The court

indicated that if the Petitioner were found guilty, it would consider a motion to continue the penalty phase at that later time. Id. at 8-9.

On June 9, 2009, the Petitioner filed a motion to appoint additional mental health experts. ECF No. 206. In this filing, counsel again discussed the difficulty in obtaining medical records from the military, and noted its intention to add Dr. James Merikangas, a psychiatrist, as a new expert, and to replace Dr. Bender with Dr. Allan Mirsky, for the neuropsychological services. Id. at 1-3. On June 29, 2009, counsel filed a notice that the Petitioner intended to rely on Dr. Merikangas and Dr. Mirsky as experts, although he stated that the "notice is dependent on defendant's receipt of his and his family's medical records from the United States Government for periods of time when defendant was in the Army and when he and his mother were Army dependents." ECF No. 230, at 1. On June 29 and 30, 2009, the government filed the reports of its mental health experts, Dr. Raymond Patterson and Dr. Paul Montalbano. ECF Nos. 276, 277.

The jury convicted the Petitioner on July 17, 2009. On that same day, the Petitioner filed a Supplemental Motion to Continue Capital Sentencing Hearing, in which he requested a ninety-day continuance to gather records and engage in more mental health

testing. ECF No. 240, at 1-4. The Petitioner also filed a statement indicating that "Dr. Mirsky's testing revealed deficits which will require neurological testing and the evaluation by a neurologist" and suggesting that Dr. Merikangas, whom he wished to engage as an expert, be appointed to perform those tests. ECF No. 242, at 1-2. On July 20, 2009, the reports of Dr. Mirsky and Dr. Cunningham were filed with the court, ECF No. 246, and the Petitioner filed a Notice of Intent to Introduce Mental Health Testimony at the penalty phase. ECF No. 248. The Notice stated that the Petitioner intended for Dr. Cunningham and Dr. Mirsky, and potentially Dr. Merikangas, to testify at the penalty phase. Id. On July 22, 2009, after the jury found the Petitioner eligible for the death penalty, the court granted the Petitioner's request for Dr. Merikangas to be appointed to serve as a psychiatrist and neurologist. ECF No. 257. The court also ordered that the penalty phase of the trial be continued for four weeks. ECF No. 254.

On August 6, 2009, a preliminary report by Dr. Merikangas was filed with the court. ECF No. 263. In the report, Dr. Merikangas indicated that he had ordered an MRI scan of the brain, a PET scan of the brain, and an electroencephalogram (EEG), none of which had been performed at the time of the report. Id. at 1. He opined that the Petitioner is "either in a

fantasy world of grandiose wishful thinking, or suffering from delusions." Id. at 2. He ended with a conclusory statement that the Petitioner "clearly has impaired executive functioning suggestive of frontal lobe brain impairment." Id. However, Dr. Merikangas did not indicate what tests and information he relied upon in making these determinations. Counsel for the government made several requests for such underlying data, but did not receive the information. ECF No. 273, at 1-2.

During this period between the eligibility and penalty phases, the Petitioner filed several motions, including motions to supplement his mental health reports after Dr. Merikangas and Dr. Mirsky noted a potential brain injury, and to release the results of the MRI and PET scans directly to defense counsel. ECF Nos. 269, 274. It appears the brain scans were read as normal at this time, although Dr. Mirsky wrote after trial that such a reading is not conclusive as to whether the Petitioner ever suffered brain injuries. Mot. Attach. 22, at 1. Dr. Merikangas now reads the MRI scans as showing white matter hyperintensities, which is consistent with the Petitioner's history of head injuries and migraines, and the PET scan as being "non-diagnostic." Id. Attach. 2, at 4.

Around this time, the parties also argued over the extent of Dr. Cunningham's testimony. According to the Notice filed on

December 12, 2008, defense counsel intended to have Dr. Cunningham testify as to developmental factors in the Petitioner's background and factors that would indicate a positive adjustment to a term of life imprisonment. ECF No. 135, at 2. On August 10, 2009, the government filed a motion to limit Dr. Cunningham's testimony. ECF No. 267. The court later ruled that Dr. Cunningham could testify as to positive prisoner evidence, if it related to the Petitioner specifically, but not to generalized data from other Bureau of Prisons inmates. Tr. at 2077-83. The court further ruled that Dr. Cunningham could not testify about developmental factors in the Petitioner's background, as Dr. Cunningham did not include this information in his report. Id. at 2079.[30]

A review of the above filings and the court record shows that defense counsel did not neglect their duty to investigate and prepare mitigating mental health evidence, despite the fact that Hudgins joined the case later in the proceedings. Babineau before him, then Hudgins, and the rest of the defense team,

---

[30] The Petitioner states that counsel was ineffective for not properly directing Dr. Cunningham or preserving this issue for appeal. Mot. at 46. However, the Petitioner's one conclusory statement is not enough to show that counsel was deficient or that there was resulting prejudice, particularly as counsel did introduce background factors about the Petitioner through other witnesses.

effectively searched for experts and various forms of testing, and the Petitioner fails to show that Hudgins was unable to effectively represent him during trial.

As to whether counsel collectively did a proper investigation into the Petitioner's mental health, counsel was not required to follow every conceivable trail of potential mental health information. They were required to conduct a reasonable investigation, which the court must evaluate by taking into account circumstances as they were at the time of counsel's decision. In this case, counsel engaged multiple defense experts and had the Petitioner undergo different tests, including brain scans. When one of the defense experts did not create a favorable report, counsel searched for new experts. Mot. Attach. 5, ¶ 4. As to the brain scans, it appears that counsel was informed they were read as normal at the time of trial. While Dr. Mirsky and Dr. Merikangas later stated that the scans were not conclusive as to brain damage, based on the knowledge available at the time, counsel was not deficient for declining to introduce them, as the jury could have easily concluded either normality or unreliability, neither of which was necessarily favorable to the Petitioner. Further, while counsel did not introduce the brain scans, nothing suggests that their results were what caused counsel to forego use of mental

health evidence or stop investigating. Reply Attach. 1, at 2.
Second-guessing counsel at this stage is fruitless.

Counsel tried to continue the trial on several occasions
and argued to the court that more testing and reports were
needed. Counsel recognized the perceived problems with the
current mental health information and tried to fix them. But
regardless of the fact that the court denied some of their
motions for the reasons stated on the record,[31] counsel performed
a reasonable investigation and followed potential leads to find
mitigating mental health evidence. As such, counsel's
performance was not deficient, and the investigation was not
harmed by the addition of Hudgins to the defense team on
February 18, 2009, over four months before the trial.

### 4. Counsel's Decision Not to Introduce Mental Health as a Mitigating Factor

The Petitioner also argues that counsel was ineffective for
failing to introduce mitigating mental health evidence at the
penalty phase, and for instead relying on "repetitive lay person
testimony." Mot. at 46. The court will now evaluate this
decision using the two-pronged Strickland standard.

---

[31] None of the court's rulings are at issue here on
collateral review.

90

The Petitioner's trial counsel chose to argue that the Petitioner was not the "worst of the worst" because (1) two equally culpable co-defendants were not receiving the death penalty, so it was unfair for the Petitioner to receive such a sentence; (2) family sympathy weighed in favor of life imprisonment; and (3) the Petitioner would not be a threat of violence in prison. Id. Attach. 6, ¶ 13; Tr. 1818-21. While at one point counsel may have thought that including mental health information would be beneficial, based on the results of their investigations, tests, and subsequent reports, they chose to forego a mental health mitigator. This decision was a reasonable strategy.[32] As the court detailed earlier in this claim, see supra Part IV.F.3, counsel performed a thorough and in-depth investigation into the Petitioner's mental health history. Counsel had multiple reports and records to evaluate when making their decisions about trial, and the results were such that counsel had to make a tactical choice about whether to introduce mental health information during sentencing.

---

[32] The Petitioner argues that counsel promised the jury that they would introduce mental health information. Mot. at 46. However, what counsel actually said was that if the jury found the Petitioner eligible for the death penalty, counsel would put on evidence including "things like his history as far as his schooling, his family, perhaps mental health information." Tr. at 1770 (emphasis added).

When making this decision, counsel would have looked at the potentially helpful mitigating evidence, but would have also had to look at the evidence that may not help, or could even be harmful, and balance all of these considerations. For example, Hudgins searched for injuries that may have affected the Petitioner's reasoning ability, but was unable to locate records for a grenade blast in the Army and a car accident, both of which the Petitioner reported caused injury. Mot. Attach. 5, ¶ 5, Attach. 6, ¶ 5. Woodward recalls that the government's witnesses, Dr. Patterson and Dr. Montalbano, expressed a strong opinion that the Petitioner did not have any mitigating mental or emotional issues. Id. Attach. 6, ¶ 12. Further, although the defense filed reports from Dr. Mirsky and Dr. Merikangas, and requested a brain scan of the Petitioner, some of the reports remained preliminary at the time of sentencing, and contrasted with the findings in the government's experts' reports. Id. Attach. 5, ¶ 6.

Dr. Cunningham, one of the Petitioner's witnesses, was permitted to testify at the penalty phase only as to specific positive prisoner evidence, and not developmental factors in the Petitioner's background, which the Petitioner's counsel also

wanted him to discuss.[33] Additionally, if the Petitioner's mental health was introduced at the penalty phase, the government's expert mental health witnesses would have testified and offered contradicting evidence.[34] While such different opinions are to be expected in the adversarial system, how to counteract those differences in opinion is certainly a consideration that counsel must have when deciding whether to introduce mental health evidence. Although counsel had reports that the Petitioner had grandiose thoughts and delusions and head injuries from past accidents, there was a lack of evidence showing how this would act as mitigating evidence for a contract kill. After considering the many records and tests, counsel decided to focus their mitigation strategy on three prongs: equally culpable co-defendants, family sympathy, and lack of a threat in prison.

When evaluating counsel's decision, the court recognizes that there is no per se rule requiring counsel to introduce

---

[33] The court ruled on the record that this latter testimony was outside the scope of Dr. Cunningham's expert reports, and this ruling is not at issue in the collateral proceedings.

[34] For example, the arguments that the Petitioner compared himself to great figures in history and talked about how many lives he saved could also have been shown to fit the government's experts' theory that the Petitioner had narcissistic personality features. Mot. Attach. 4, ¶ 7; Dr. Patterson Report, ECF No. 276, at 23; Dr. Montalbano Report, ECF No. 277, at 27.

mental health evidence at the penalty phase of a capital trial. Meyer, 506 F.3d at 372. Although such evidence may be helpful, it is not right in all situations, and the court must not look back on this decision and judge it with the distorting effect of hindsight. See Strickland, 466 U.S. at 689. Rather, the court must consider all the options available to counsel at the time of trial and determine if counsel acted as an objectively reasonable attorney would have.

Based on the above information and records, the court finds that counsel thoroughly investigated the Petitioner's mental health and found that there was not enough support to present a viable mitigation argument. It was reasonable for counsel to decide that the strongest argument was that "it just wasn't fair for Runyon to be sentenced to death when two equally culpable co-defendants were receiving life sentences," followed by the argument of family sympathy. Mot. Attach. 6, ¶ 13. Counsel put forth many witnesses who testified that the Petitioner was a good father and did kind acts and helped many people. Other witnesses testified about his time in the military and his work history. The idea was to present evidence that the Petitioner was not the "worst of the worst." Although the Petitioner argues that this was repetitive lay testimony and should have been

94

replaced or supplemented with mental health testimony, it had a vital place in the defense's mitigation strategy.[35]

Just because this strategy did not succeed in the end does not mean it was wrong.[36] Counsel performed a most reasonable investigation and carefully considered the available records and evidence when determining their strategy, and the court cannot discount such a strategy based only on the end result. Accordingly, counsel was not deficient for deciding to forego certain mental health evidence and instead present a mitigating strategy that focused on co-defendant culpability, positive prisoner evidence, and family sympathy.

### 5. Decision Not to Present a Complete Psycho-Social History

The Petitioner next argues that counsel was ineffective with respect to the mitigating factors because a complete psycho-social history would have added weight to the mitigating factors and detracted from the weight of the aggravating factors, given context to the Petitioner's life trajectory, and established additional mitigating factors. Mot. at 50. The

---

[35] Had it not been presented, the Petitioner would likely now argue that it should have been. The attorneys simply "can't win for trying," as hindsight involves this type of "Monday morning quarterbacking," i.e., second-guessing after-the-fact.

[36] See supra note 35.

Petitioner points to readily available evidence and testimony that could have supported his mental health claims and aided in his sentencing. This evidence includes medical records, jail records, letters by the Petitioner, brain scans, government expert reports, and medical records of the Petitioner's biological parents. The testimony includes witnesses who could have testified about various aggravating and mitigating factors, the car accident, the time before the Petitioner was arrested, and how the Petitioner was led to believe that Cory Voss was molesting his daughter. He also discusses several expert analyses and opinions that counsel could have introduced. As discussed above, counsel is given much discretion in deciding on trial strategy. See Strickland, 466 U.S. at 689. Courts must not go into the analysis with an assumption of incompetence, but rather an understanding that counsel's decisions are often based on strategic choices. See id. With this in mind, the court will now address the different pieces of evidence that the Petitioner asserts would have been mitigating.

### a. Various Records, Letters, and Medical Reports

The Petitioner argues that counsel possessed multiple records that would have aided in mitigation, and counsel chose not to introduce these records, or all of the facts in the records, at trial. Mot. at 50. As such, the jury did not hear

96

all of the information that the Petitioner now considers to be important to his mitigation case. Id.

The Petitioner first argues that counsel failed to find and introduce records that dealt with his involvement in two car accidents. Id. at 51-52. The Petitioner argues that he sought treatment from Army medical providers in 1995 for cysts on his forehead that he believed were caused by pieces of glass embedded under his skin from an earlier car accident. Id. Attach. 23, at 1. In 1996, he claims involvement in a head-on collision, and military medical records show that the Petitioner followed up with an Army doctor for injuries from that car accident to his legs, knee, calf, shoulder, and neck, and was directed to undergo physical therapy. Id. Attach. 23, at 2-3. He later complained of insomnia, vertigo, and short-term memory loss, and was informed that PTSD and life stressors were possible etiologies. Id. Attach. 23, at 12.

Hudgins has stated that he tried to find records relating to the Petitioner's head injuries, including records of the 1996 car accident, but he could not locate initial treatment records. Id. Attach. 5, ¶ 5. There is nothing to suggest that counsel acted unreasonably in searching for these records. Further, the 1996 car accident was known at the time of trial, and Dr. Montalbano and Dr. Patterson, the government's experts, found no

97

permanent health effects from it. ECF Nos. 276, 277. The Petitioner does not show how the records he now cites would have supported a mitigation defense, as many of the factors mentioned in the report, such as possible PTSD, were in other expert reports, and counsel still found a mental health strategy unhelpful.[37] As such, the Petitioner fails to show prejudice from counsel's inability to locate all the records related to the car accidents, or that counsel was deficient in not finding and introducing the records.

The Petitioner further mentions that he wrote letters about the 1996 car accident and how he had saved the lives of multiple people. Mot. at 52. It is unclear how such letters would have aided his mitigation case. Counsel was already aware of the 1996 accident. Expert reports from both parties indicated that the Petitioner experienced grandiose thinking, including that he had saved multiple lives, but no other evidence of these life-saving events seems to exist, outside of the Petitioner's letters. As such, counsel already had the opportunity to consider what to do with the information that was contained in the letters, and

---

[37] Hudgins now states that these records were "the type of information I was looking for at the penalty phase," but he fails to explain whether, and how, they would have changed his strategy. Mot. Attach. 1, at 3.

based on their chosen strategy, they were not deficient for declining to introduce the letters at trial.

The Petitioner next references records from the Portsmouth City Jail. Id. at 52-53. The report that he mentions includes a discussion of the Petitioner's concern about HIV exposure after his cellmate fell and lacerated his head. Id. Attach. 16, at 2. The Petitioner also experienced a runny nose, watery eyes, and a feeling of sickness, which he attributed to mustard gas exposure in the military. Id. Attach. 16, at 3-4. The jail records state that the Petitioner was "somewhat grandiose," "his thoughts were flighty and rambled on," and that he "verbalized some delusional material." Id. Attach. 16, at 4. This is all similar to the many mental health records and expert opinions that counsel reviewed and decided against introducing. Accordingly, counsel's decision not to introduce these jail records is objectively reasonable, as the records did not aid in the defense's chosen mitigation strategy.

The Petitioner next references brain scans from August 2009. Id. at 53. Dr. Merikangas, a defense expert, now states after-the-fact that the scans show white matter hyperintensities, consistent with the Petitioner's history of head injuries and migraines. Id. Attach. 2, at 4. At the time of trial, however, it appears the scans were read as normal, so

99

counsel was not deficient for declining to introduce them. See id. Attach. 22, at 1. Although Hudgins now claims that the results of the scans could have been used during the penalty phase, that does not change the reasonableness of his decision at the time it was made, based on the information then available. Reply Attach. 1, at 2.

The Petitioner argues that counsel could have introduced medical records of his parents, which would have shown a family history of depression and other mental illness, and a possible history of domestic abuse. Mot. at 53-54. However, evidence of the Petitioner's family history and abuse was presented at trial. The jury even found two mitigating factors for the Petitioner because he witnessed domestic violence and family conflict when he was younger. Special Verdict Form – Selection Phase, at 3-4, ECF No. 291. The Petitioner fails to show how additional evidence about his parent's mental health or domestic situation would have supported counsel's chosen strategy, and the court finds that counsel was not ineffective for not introducing this information.

The Petitioner argues that the government's experts' reports indicated that the Petitioner suffered from migraines, attention deficit disorder, and post-traumatic stress disorder. Mot. at 53. Presumably, this assertion is meant as an argument