that counsel should have tried to have the government records introduced. Had counsel chosen a mental health mitigation strategy, the reports would likely have been presented to the jury; however, the facts in them are not helpful to the defense. Thus, it is unclear why the Petitioner now argues counsel was ineffective for not having the prosecution expert reports introduced, other than to just add more unnecessary confusion at this juncture.

### b. Government Experts - Dr. Patterson and Dr. Montalbano

Dr. Patterson created a twenty-four page report dated June 24, 2009. ECF No. 276. The report by Dr. Patterson states that "it is my opinion that Mr. Runyon does not suffer from any serious mental illness, mental disorder, or brain pathology and that there are no mental health factors that are mitigating or aggravating to whatever sentence, if any, is determined by the court." Id. at 23. He then goes on to say that the Petitioner "meets the criteria for a diagnosis of Personality Disorder, Not Otherwise Specified with Narcissistic Features." Id. Dr. Patterson wrote that such narcissistic traits, including the Petitioner's history of externalizing responsibility and entitlement, may have affected jobs or relationships, but that they are not a serious mental illness that would be either an

aggravating or mitigating factor in sentencing. Id. He also believed that the Petitioner's self-reported history of concussions and memory problems did not indicate serious or severe impairments suggestive of significant brain damage. Id. at 24.

Dr. Montalbano wrote a thirty-one page report in February 2009 based on extensive testing and discussions with the Petitioner. ECF No. 277. Testing showed the Petitioner's intellectual functioning to be in the high average range, with "no evidence of delusions, hallucinations or disorganized speech or behavior." Id. at 29. He did note that the Petitioner displayed personality driven factors "such as irresponsibility, conflict with peers [and] supervisors, unrealistic expectations for success, irritability and lack of insight," as well as lack of attention to detail. Id. While attention to detail may have been related to the car accident in November 1996, Dr. Montalbano believed the other issues predated the accident. Id.

Dr. Montalbano wrote that "the records reviewed and the testing performed during this evaluation support the conclusion that Mr. Runyon does not suffer from any major mental illness. There is however evidence of personality dysfunction." Id. at 30. He stated that only a more detailed investigation could definitively rule out brain dysfunction, but the results of his

evaluation "find no significant impairment in overall intellectual functioning." Id. Ultimately, Dr. Montalbano found that "[w]ith regard to the mitigating factors of impaired capacity and severe mental or emotional disturbance, the results of this evaluation do not suggest that Mr. Runyon was under any unusual or substantial emotional or psychological duress during the time frame of the alleged offense." Id. at 31.

Based on the opinions contained in the government's experts' reports, counsel was not deficient for choosing to exclude them from consideration by the jury. While some information may have been helpful, or at least neutral, the majority of the reports would have undermined testimony about the Petitioner's positive family and work history, and would have hindered a mental health mitigation strategy. Defense counsel obviously could not "cherry pick" from these reports — it was all or nothing. Accordingly, the court finds that it was reasonable, and counsel certainly was not ineffective, for avoiding introduction of the government's experts' reports on the Petitioner's mental health.

### c. Lay Witnesses

The Petitioner next lists multiple lay witnesses who could have testified to provide more background into his psycho-social history. Mot. at 54. These witnesses relate to the different

103

aggravating and mitigating factors, the car accident, his family background, and his belief that Cory Voss was molesting his own children. The court will address each group of witnesses in turn.

The Petitioner first argues that Dr. Cunningham could have testified about transgenerational family dysfunction and its effect on the Petitioner's mental state, as it relates to the abuse of women aggravator. Id. at 56. The court, however, had limited the scope of Dr. Cunningham's testimony because Dr. Cunningham had not included this information in his mental health reports filed with the court, see Tr. at 2079,[38] so counsel was not ineffective for failing to elicit this testimony.

The Petitioner also contends that David Dombrowski, his father; Mark Runyon, his brother; Maria Runyon, his ex-wife; and Scott Linker, his former brother-in-law, could have testified and provided context related to this aggravating factor. Mot. at 56-59. Counsel's strategy was to focus on positive traits, so drawing attention to instances of domestic violence, failed relationships, and restraining orders may have counteracted that strategy. As such, the Petitioner fails to show that counsel was

---

[38] Again, the court's ruling is not at issue here on collateral review.

deficient for not introducing this testimony. Further, he fails to show prejudice, as there was already testimony about his family history of domestic violence, and the jury found two mitigators in his favor based on that evidence. Special Verdict Form – Selection Phase, at 3-4, ECF No. 291. It is unclear what more testimony about such violence would have done to lessen the abuse of women aggravator.

The Petitioner next argues that counsel should have introduced lay testimony relevant to the family violence mitigator. Mot. at 59-61. This would include testimony by Suk Cha Runyon, his mother; David Dombroski; and Mark Runyon. Id. As mentioned above, counsel did introduce testimony about the Petitioner's background and abuse at trial. The jury even found mitigating factors related to such evidence, when it determined that the Petitioner witnessed domestic violence and family conflict when he was younger. Special Verdict Form – Selection Phase, at 3-4, ECF No. 291. Additional evidence would have been unnecessary, and counsel reasonably could have concluded that a better plan was to spend that time focusing on a different mitigating factor. Furthermore, defense counsel did try to have the Petitioner's mother testify as to her background. Tr. at 2411-13. The court sustained the government's objection, as this testimony was not relevant to the mitigating factors

counsel chose to introduce. Id.[39] For these reasons, counsel was not deficient for choosing not to introduce additional evidence about this mitigator, nor can the Petitioner show prejudice as the jury found this factor in favor of the Petitioner.[40]

The Petitioner further contends that counsel should have called Thomas Preston, a parachute rigger who served at Fort Benning with the Petitioner; Robert and Deborah Seeger, friends of the Petitioner at Fort Benning; Maria Runyon; Mark Runyon; and Captain Jeffrey Harris, of the Fayetteville Police Department, to testify about how the car accident affected the Petitioner's personality. Mot. at 61-65. However, the medical records and doctor opinions in the record do not definitively show that the car accident caused long-term effects to the Petitioner's behavior and personality, and none of these witnesses were experts. Even if there was such a personality change, the Petitioner is unable to show prejudice. According to declarations the Petitioner filed, testimony on this subject

---

[39] The Petitioner argues that counsel was ineffective for not explaining the relevance of his mother's testimony or preserving the issue for appeal, but counsel did argue to the court that the testimony would help explain why the Petitioner turned out the way he did. Tr. at 2412. In the court's opinion, this issue was preserved for appeal and not raised. Importantly, though, the court finds that counsel did not act deficiently in this regard.

[40] Again, this is an example of a "red herring" argument.

would have shown that he became unpredictable, easily frustrated, and paranoid. Id. It is unclear how failure to introduce such information undermines confidence in the outcome, which is that he received the death penalty for a carefully planned contract kill. A personality change is not a defense to murder.

The Petitioner also argues that there were available witnesses who knew him in the time prior to the crime and arrest, and defense counsel should have had those individuals testify. Id. at 65. The Petitioner argues that this could have been used to rebut the government's argument that the defense witnesses had no recent contact with the Petitioner, and that the Petitioner had changed and was not the same caring and kind person described by his witnesses. Tr. at 2610, 2613, 2618-19.

One of these witnesses, Chad Costa, was mentioned in Claim Three, and the court has already discussed why counsel was not ineffective for declining to have him testify. The Petitioner adds nothing in this claim that changes the court's earlier analysis. The other potential witnesses are Matt Long, Paula Dalton, and David Dalton. Mot. at 65-67. Although it is unclear why defense counsel did not call these individuals, the court finds no reason to doubt defense counsel's decision. The Petitioner has failed to show that counsel acted in an

objectively unreasonable way, and choosing what witnesses to call is certainly an important part of counsel's trial strategy, which is given much deference by the court. The Petitioner also fails to show a reasonable probability of a different outcome had witnesses who knew the Petitioner close to the time of the crime testified, considering all the evidence introduced against him at trial.

The Petitioner next argues that Maria Runyon could have testified that after the Petitioner left her and her children, the children's biological father re-entered their lives, and that within a year of the murder of Cory Voss, the father molested one of the children and was convicted. Id. Attach. 28, ¶ 31. Presumably, the Petitioner cites this information to show additional motivation for his undocumented belief that Cory Voss was molesting his own child and why that would upset him. The jury found in favor of the Petitioner on this mitigator; so he can show no prejudice from counsel's decision not to introduce this evidence. Special Verdict Form - Selection Phase, at 4, ECF No. 291.

### d. Defense Experts – Dr. Mirsky, Dr. Merikangas, Dr. Cunningham, and Dr. Dudley

In the final part of this claim, the Petitioner argues that had counsel included expert mental health testimony, counsel

could have established mitigators of disturbance and impaired capacity. Mot. at 67. He argues that such testimony would have shown he had an impaired mental state and decision-making ability, as well as a potential brain abnormality and cognitive defects. Id. at 67-68. This section is similar to Parts IV.F.3 and IV.F.4, and the court incorporates its earlier analysis of the Petitioner's mental health history and counsel's strategy into this section.[41]

The Petitioner alleges that the testimony of Dr. Mirsky would have aided in his mitigation defense. Id. at 68. In August 2015, Dr. Mirsky prepared a declaration after performing a series of tests with the Petitioner. Id. Attach. 35. In his report, Dr. Mirsky wrote that the Petitioner's test results for non-verbal tasks were in the impaired range, and the Petitioner showed evidence of high response time variability, both of which are consistent with damage to the right side of the brain. Id. Attach. 35, at 6. The Petitioner's verbal and memory skills were very strong, and Dr. Mirsky reported that the Petitioner improved or remained consistent on many of the tests that were administered before trial. Id. His final conclusion was that the

---

[41] Here, the Petitioner has filed updated mental health information. The murder occurred on April 29, 2007. The trial was in the Summer of 2009. The four new declarations, which the court will now discuss, were prepared in the Summer of 2015.

results "indicate the presence of significant damage to the right side of the brain, as well as a psychotic disorder," both of which could stem from past head injuries. Id.

However, these findings were made in 2015 and were not available to counsel at the time of sentencing. As discussed in more detail in the earlier sections, based on the evidence available from multiple tests and medical records at the time of trial, counsel made an informed and reasonable decision not to pursue a mental health-based mitigation strategy. This new declaration does not change counsel's earlier decision.

Moreover, Dr. Merikangas conducted a neurological examination in 2009, after the Petitioner was found eligible for the death penalty, and he conducted another exam on August 24, 2015, in preparation for the filing of the instant Motion. Id. Attach. 2. In 2009, Dr. Merikangas suggested that the Petitioner may suffer from "Migraine-like Headaches, Attention Deficit Disorder and Post-Traumatic Stress Disorder," and suggested that an MRI and PET scan be performed. Id. Attach. 2, at 5. In the 2015 declaration, Dr. Merikangas reported that he had reviewed the MRI and PET scans that were done in August 2009. Id. Attach. 2, at 4. He found that the MRI revealed multiple white matter hyperintensities consistent with the Petitioner's history of head injuries and migraines, and the PET

110

scan was non-diagnostic. Id. Dr. Merikangas also stated that if he had testified at trial, he would have said that the Petitioner was "a brain damaged individual with migrainous headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process." Id. Attach. 2, at 1. He does not provide much detail for this diagnosis, and the court notes that his reading of the MRI and PET scan was not made until after trial.

Accordingly, the declaration does not indicate that counsel ignored important, potentially mitigating, mental health evidence at the time of trial. Counsel either already had the information and reasonably chose not to use it, or the information was gathered in preparation for filing the instant Motion and would not have been available at trial. Thus, counsel's decision that the best strategy involved focusing on equally culpable co-defendants and other more positive traits was not unreasonable, and this new declaration does not change that decision.

The Petitioner next discusses the report that Dr. Cunningham wrote prior to trial, as well as the recent report he prepared on September 25, 2015. Id. at 72, Attach. 8. Dr. Cunningham testified at trial about his prison violence risk assessment of the Petitioner, but the Petitioner now claims that

counsel was ineffective for not having Dr. Cunningham also testify as to adverse factors in the Petitioner's upbringing and background and the possible implications of such developmental factors. Id. at 72. However, counsel had tried to expand the scope of Dr. Cunningham's testimony, but the court limited the topics to which Dr. Cunningham could testify. Tr. at 2079.

The Petitioner is also unable to show a reasonable probability of a different result had Dr. Cunningham testified about his background. Several of the factors now mentioned involve the Petitioner's family and history of domestic violence, which were introduced at trial through other witnesses, and can be seen in the jury's finding of two family violence mitigators. See Special Verdict Form - Selection Phase, at 3-4, ECF No. 291. Further, Dr. Cunningham partially based his 2015 declaration on information not available to counsel at the time of trial, or on the trial testimony itself, in which case the jury heard the information. Mot. Attach. 8., ¶ 8. Accordingly, based on the record at the time of trial, the Petitioner fails to show that counsel acted deficiently in relation to Dr. Cunningham's testimony, or, that by not having Dr. Cunningham testify as the Petitioner now suggests, he suffered actual prejudice.

112

The Petitioner finally points to a psychiatric evaluation by Dr. Richard Dudley from September 2015. Id. at 76, Attach. 29. In that report, Dr. Dudley opines that the Petitioner suffers from Post-Traumatic Stress Disorder; Borderline Personality Disorder; Schizoaffective Disorder, Bipolar Type; and Neurocognitive Disorder. Id. Attach. 29, at 14. He also argues that alteration of facial expression and affect are symptoms of these disorders. Id. Attach. 29, at 15. Dr. Dudley attributes these alleged problems to issues in the Petitioner's childhood and history of mental disorders in his family, rather than the brain injuries and car accidents as other experts did, and the Petitioner argues that the jury should have been presented with this information. Id. Attach. 29, at 14-15.

Counsel, however, had a chosen mitigation strategy that was reasonable in light of their investigation. Much of the information in Dr. Dudley's report, such as the Petitioner's family background, was introduced at trial. The other evidence could reasonably have been considered by counsel to be adverse to their chosen strategy. For example, the Petitioner consistently denied involvement in the crime. Counsel may have thought that introducing evidence attempting to explain why the Petitioner committed the crime would go against both what the Petitioner claimed and counsel's strategy based on those

113

assertions. While testimony about the Petitioner's affect may have provided some context for the claim that the Petitioner showed no remorse in the interrogation video, the government argued that lack of remorse was shown not only through the video but through numerous phone calls and conversations about collecting the insurance money and plans to thwart the investigation. Tr. at 2615-17. Accordingly, the Petitioner is unable to show how such testimony would have created a reasonable probability of a different outcome. The court is also convinced that counsel's decision was more than reasonable in light of the facts known at the time and the chosen trial strategy that they thought had the best chance of success.

### 6. Evaluation of Counsel's Strategy Based on All of the Above Factors

The court has individually examined many pieces of evidence that the Petitioner argues counsel was ineffective for not introducing, and it has discussed how counsel was not deficient and/or how there was no prejudice from the decision to forego these pieces of evidence or testimony. The court will now collectively evaluate this evidence and whether counsel was deficient for not introducing it, and, if so, whether prejudice resulted.

To show deficient performance, counsel's actions or omissions must be measured against what "an objectively reasonable attorney would have done under the circumstances existing at the time of the representation." Savino, 82 F.3d at 599. Courts must be aware that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689. Counsel's decisions are often based on a sound strategy, and not incompetence. Lovitt, 403 F.3d at 179. As such, courts should work to eliminate viewing counsel's decision with the "distorting effects of hindsight." Id.

In this case, counsel made a strategic decision to focus on equally culpable co-defendants, family sympathy, and positive prisoner evidence, instead of the Petitioner's mental health, at the penalty phase. This strategy was not ultimately successful, but that does not mean it was deficient. The court has already concluded that counsel performed an objectively reasonable investigation into the Petitioner's mental health, and it will not view counsel's decisions as incompetent based on the fact that some reports were preliminary. Much of the evidence that

115

the Petitioner now suggests would have been cumulative, contrary to counsel's strategy, or simply not of help to the Petitioner's case.

Strickland sets a high bar, and just because a strategy appears better or worse in hindsight does not mean that counsel acted deficiently, given the knowledge at the time of trial. The court will not assume incompetence as the reason for counsel's decision, and the Petitioner has failed to show that trial counsel unreasonably ignored a mitigating strategy that appeared stronger than the strategy counsel decided to use. For the above reasons, and after considering all the evidence and testimony now suggested by the Petitioner, the court does not find counsel was deficient in their investigation into his mental health, and decision not to use a mental health mitigation strategy.

The Petitioner's final argument in Claim Six is essentially that counsel's decisions in the penalty phase were not only deficient, but also prejudicial; thus, counsel was ineffective. Mot. at 81.[42] The Petitioner contends that counsel should have offered the evidence and testimony discussed throughout this claim to counter both statutory and non-statutory aggravating

---

[42] The court has already discussed prejudice as to some of the arguments in Claim Six, and now incorporates that reasoning into this discussion.

116

factors and to strengthen the mitigating factors. Id. at 81-82. Although the court has already found that counsel was not deficient in their chosen strategy, it will nevertheless evaluate this argument.

In assessing this claim, the court will look at the totality of all the potential evidence now offered by the Petitioner. Even when looking at the combined potential strength of this testimony and evidence, however, the Petitioner's argument fails to establish a reasonable probability of a different outcome had counsel done all that he now requests.

Counsel performed a reasonable investigation into mitigating factors and developed a thought-out trial strategy, and the Petitioner's claim of how the jury might have decided differently does not undermine confidence in the outcome. As the government mentions, the mental health evidence is a two-edged sword. Resp. at 76-77. Presenting certain mental health evidence could just as easily have hurt the mitigating factors actually presented, such as the Petitioner's prior acts of kindness, past work and military experience, and the allegation that Cory Voss was molesting his own daughter. Further, the Petitioner cites mental health reports that tend to show he lacked impulse control or had PTSD, but he fails to show how such evidence

would lower his culpability when compared to the government's evidence of a calculated and methodically-planned contract kill.

The court is also unconvinced by the Petitioner's argument that his mental health lessens the substantial planning aggravator. Mot. at 81. Based on the mental health reports available, the Petitioner is unable to prove that his mental health left him as a tool for use in Cat Voss's scheme. His monetary motive is quite clear from the evidence, which included his volunteering for clinical drug trials for compensation, and he fails to show that he could be easily manipulated or lacked understanding of what he was doing.

The Petitioner next references the lack of a complete psycho-social history to argue that counsel was unable to counter the aggravating factors and provide support for the mitigating factors, which caused him to suffer prejudice. Id. at 81-83. The Petitioner claims that the lack of remorse aggravating factor was based on his affect, as seen in the interrogation video, and Dr. Dudley's testimony would have helped provide context for his appearance. Id. at 82. The government argued that this aggravator was also shown through phone calls where the Petitioner and Draven planned their responses to the police, and the Petitioner's boasts that he killed Cory Voss for money. Tr. at 2615-17. Based on all this

other relevant evidence, Dr. Dudley's lack of testimony does not undermine confidence in the jury's finding of this aggravator.

The Petitioner also contends that the pecuniary gain statutory aggravator could not have been given much weight because he did not receive the full payment for the murder of Cory Voss. Mot. at 81. The Petitioner, however, did receive some payment, and his purpose for participating in the murder was monetary gain. The Petitioner does not show how his mental health or psycho-social history would have changed the way the jury viewed this factor. As to the abuse of women aggravator, the jury heard about his family history of domestic violence and found two mitigators in his favor. The Petitioner fails to show how additional evidence would have reduced his culpability for his past acts against women and affected the weight the jury gave to that factor.

### 7. Conclusion

For the above reasons, the Petitioner fails to show a reasonable probability of a different outcome had the evidence he now argues for been introduced at trial. The government introduced compelling evidence against the Petitioner, and the jury found both aggravating and mitigating factors, and was clearly able to weigh the evidence. The court now concludes that the Petitioner is unable to show how introduction of mental

health evidence or a different focus during the penalty phase would meet the Strickland prejudice standard and undermine confidence in the outcome. The number of exhaustive words, pages, and arguments does not make for a successful outcome in a habeas corpus proceeding, particularly in a case of this comprehensive attention to detail in the presentation of the trial evidence, and the fair consideration by a jury in three phases of trial.

As the court discussed in the earlier parts of this claim, counsel was not deficient in their investigation or decision as to the penalty phase strategy. The court now finds that there was no prejudice resulting from such decisions, and counsel was not ineffective regarding their decisions about the Petitioner's mental health, their investigation into the Petitioner's background, and their final trial strategy.

Claim Six is **DENIED**.

### G. CLAIM SEVEN – CONFRONTATION CLAUSE VIOLATED, AND COUNSEL UNREASONABLY FAILED TO OBJECT AND ASK FOR A LIMITING INSTRUCTION

In this claim, the Petitioner alleges a violation of his Sixth Amendment rights because pre-arrest statements of his co-defendant, Draven, were introduced at trial. Mot. at 84. The statements were made by Draven to a Newport News police officer

120

and to his cellmate, and as the Petitioner did not have an opportunity to cross-examine Draven about the statements, he argues that their introduction violated his Confrontation Clause rights. Id.

### 1. Procedural Default

The government argues that this claim is procedurally defaulted, as counsel failed to raise the issue on appeal, and that nevertheless, it has no merit. Resp. at 78-79. The Petitioner asserts that appellate counsel was ineffective for not bringing the claim on direct appeal, and he suffered prejudice as a result; such a finding would excuse the default. Reply at 64. Because the Petitioner alleges ineffective assistance of trial counsel as its own distinct claim, and of appellate counsel as a means to excuse default, the court must examine the arguments in Claim Seven to determine if the Petitioner can prove that counsel acted deficiently and with resulting prejudice.

### 2. Confrontation Clause Claim

During trial, Detective Larry Rilee of the Newport News Police Department testified about several conversations that he had with Draven. Tr. at 1300-09, 1314-22. These conversations included multiple lies, interspersed with bits of truth, such as confirmation that Draven and Cat Voss were having an affair. Id.

121

at 1320. Draven also told Detective Rilee that he had called the phone at the Waffle House in Newport News and spoken to the Petitioner the night of the murder. Id. at 1320-21. This fact was then highlighted in the government's closing statement to show that the Petitioner and Draven had contact on the day of the murder. Id. at 1593. The government also introduced testimony from Edward Fodrey, a cellmate of Draven's at Western Tidewater Jail. Id. at 1231-38. During his testimony, Fodrey stated that Draven told him that he hired some "other guy" to get rid of his girlfriend's husband. Id. at 1236. However, as Draven did not testify, the Petitioner had no way to cross-examine him about the statements. Mot. at 84-85.

The Petitioner now argues that introduction of the above statements violated his right to confrontation under the Sixth Amendment, and as set out in Crawford v. Washington, 541 U.S. 36 (2004). Mot. at 84. Crawford held that out-of-court testimonial statements by a witness are not admissible at trial under the Confrontation Clause, unless the witness is unavailable and there was a prior opportunity for cross examination. 541 U.S. at 68. Certain hearsay exceptions, such as statements in furtherance of conspiracy, are not considered testimonial. Id. at 56 ("Most of the hearsay exceptions covered statements that

by their nature were not testimonial — for example, business records or statements in furtherance of a conspiracy.").

The Petitioner further argues that because the statements were made by the Petitioner's non-testifying co-defendant, counsel should have objected, or at least asked for a limiting instruction. Mot. at 84-86. In Bruton v. United States, 391 U.S. 123, 137-38 (1968), the Court found that a non-testifying co-defendant's confession implicates the defendant's Confrontation Clause right, and a limiting instruction does not necessarily protect that right. However, the Bruton rule does not apply, if the statements are proper co-conspirator statements under the hearsay rules. See United States v. Shores, 33 F.3d 438, 442 (4th Cir. 1994) ("We have held, however, that the Bruton rule does not apply if the nontestifying co-defendant's statement is admissible against the defendant under the co-conspirator exception to the hearsay rule set forth in Federal Rule of Evidence 801(d)(2)(E)." (citing Folston v. Allsbrook, 691 F.2d 184, 187 (4th Cir.1982))).

The court will now evaluate the various statements to which the Petitioner objects. The Petitioner starts by challenging Draven's statement that Draven was having an affair with Cat Voss and Draven's assertion that he spoke with the Petitioner on a pay phone at a Waffle House near the crime scene. Mot. at 85.

At trial, the government argued and presented evidence that before the arrest of the Petitioner and his co-defendants, a conspiracy existed and continued among the co-defendants. Tr. at 1596-1608. This continuing conspiracy included lying to law enforcement in an attempt to thwart the investigation and to obtain Cory Voss's life insurance proceeds, and receiving that money was a central purpose of the conspiracy to commit murder for hire. Id.

The particular statements to which the Petitioner now objects were not shown to be lies, pursuant to the trial evidence. However, they were made by Draven after he had told multiple lies to the police about the crime, and were made in the course of an interview during which he was still attempting to cover up the facts of the crime. Id. at 1314-22. During that interview, Draven did not confess to the crime, and soon after that incident, the police interviewed the Petitioner, who continued to lie and attempt to frustrate the investigation. Id. at 1322-26. A conspiracy to cover up the facts of the crime in order to receive the life insurance proceeds was ongoing at the time Draven made the statements, and the court finds these pre-arrest statements were made in furtherance of the conspiracy. As statements of co-conspirators in furtherance of a conspiracy are admissible under Federal Rule of Evidence

124

801(d)(2)(E) and are not considered testimonial, their admission is not a Sixth Amendment violation under Crawford, and admission of these statements did not violate the Petitioner's rights.

Additionally, any references to the Petitioner by Draven cannot be said to violate Bruton and incriminate the Petitioner. See United States v. Locklear, 24 F.3d 641, 645-46 (4th Cir. 1994) (finding that a co-defendant's post-arrest statement that "he was familiar with the Locklear brothers and that he had known them all his life" could not "fairly be understood to incriminate [defendant] M. Locklear"). The Petitioner argues that the statement by Draven that he and Cat Voss were having an extramarital affair speaks to the Petitioner's guilt. While the affair may be a motive for Draven and Cat Voss to engage in murder and hire someone to commit it, their affair itself does not directly implicate the Petitioner. The fact that the Petitioner and Draven spoke on the phone is also not incriminating due to the evidence put forth by defense counsel to show a prior relationship between Draven and the Petitioner that arose from their time doing clinical drug studies. Draven was attempting to clear himself from suspicion, and although the phone call placed the Petitioner in Newport News, the fact of the prior relationship provided a non-suspicious reason for the call that does not implicate the Petitioner in the crime. The

125

court also notes that it clearly instructed the jurors that they must evaluate the evidence of each defendant's involvement in the crime separately, and return a separate verdict for each defendant. Tr. at 1682.

As to the statements by Edward Fodrey, a jailhouse informant, there is no Confrontation Clause problem. Fodrey made a statement about Draven hiring some "other guy," who "was a friend of his," to kill Cory Voss. Tr. at 1236. The Petitioner's name was never mentioned, and Fodrey testified that Draven tried to contact a number of people online about participating in the conspiracy. Id. Fodrey's statement cannot fairly be said to refer to the Petitioner without additional linking evidence. See United States v. Lighty, 616 F.3d 321, 376-77 (4th Cir. 2010) (noting a difference "between statements that incriminate by inference or only when linked with later evidence and those that obviously refer to a particular person or involve inferences a jury could make even without additional evidence," and only the latter category rises to the level of a constitutional violation (citing Gray v. Maryland, 523 U.S. 185, 196 (1998))).

The Petitioner argues, however, that because the jury heard evidence and argument that connected him with Cat Voss and Draven, it was clear that the Petitioner was Draven's "friend" hired to kill Cory Voss. Reply at 63. This argument is again

126

somewhat nonsensical. Just because people are "friends" does not lead to the conclusion that one would hire the other to commit murder. Moreover, in point of fact, the Petitioner and Draven were friends, and evidence of this connection was certainly relevant and admissible, and just because the statements link to the Petitioner after the introduction of many other pieces of evidence and testimony does not mean the statements violated Bruton. See Lighty, 616 F.3d at 376-77. The important point is that the statements did not directly implicate the Petitioner without additional evidence linking him to the crime.

For the reasons stated above, the introduction of the statements did not violate the Petitioner's rights under the Confrontation Clause or impermissibly refer to the Petitioner in violation of Crawford and Bruton. As this claim has no merit, appellate counsel was not ineffective for declining to include the issue on appeal. Because the Petitioner fails to show cause and prejudice for not having raised the issue on appeal, this portion of Claim Seven is both procedurally defaulted and lacking in merit.

### 3. Ineffective Assistance of Trial Counsel

Along with the underlying Confrontation Clause claim, the Petitioner raises as a separate argument that trial counsel was ineffective for not objecting to the testimony and not asking

127

for a limiting instruction. Mot. at 86. However, trial counsel filed a pre-trial Motion to Sever, in which counsel argued that introduction of Draven's statements at a joint trial would be a Confrontation Clause violation under Bruton. Mem. Supp. at 3-6, ECF No. 89. At an oral hearing on December 8, 2008, the court heard argument on this Motion.

During that hearing, defense counsel argued that the questioning occurred during police interrogation and should be considered testimonial, thus triggering the rules in Bruton and Crawford. Dec. 8, 2008, Tr. at 9-10. The government agreed that the statements were made during police interrogation, but argued that the statements were made in furtherance of the conspiracy and were non-hearsay statements, as they would not be admitted to prove the truth of the matter asserted. Id. at 11. Defense counsel conceded that if the statements were made in furtherance of the conspiracy, and thus properly admissible under Federal Rule of Evidence 801(d)(2)(E) as co-conspirator statements, then Crawford and Bruton would not be implicated. Id. at 8-9. As the court found that the pre-arrest statements were made in furtherance of the conspiracy, it denied the Motion to Sever. Id. at 14-15. The court also noted that although there was a post-arrest statement, the government agreed not to use it in

its case-in-chief, thus eliminating any need to address <u>Crawford</u> or <u>Bruton</u> in relation to that statement. <u>Id.</u> at 15.

The court indicated during the hearing that it would be willing to give limiting instructions regarding the statements, if requested by counsel. <u>Id.</u> at 16. While it is unclear why counsel did not later request such an instruction, the Petitioner is unable to show that the choice not to do so was deficient or prejudicial. After the court already decided that the statements were made in furtherance of a conspiracy, counsel could reasonably not have wanted to challenge the statements again, particularly as they did not directly implicate the Petitioner without more evidence linking him to the crime. Counsel also knew that the court would, and did, instruct the jury that they must consider the acts of the Petitioner and Draven separately, and must reach a separate verdict for each defendant. <u>See</u> Tr. at 1682. Further, the Petitioner is unable to prove prejudice as the Fodrey statements did not name the Petitioner, and Draven's statements could have multiple connotations. With all the other evidence against the Petitioner, the Petitioner fails to prove that a limiting instruction related to a couple of statements would have created a reasonable probability of a different outcome, and the court finds that trial counsel was not ineffective.

The Crawford/Bruton challenge to Draven's statements is procedurally defaulted, and without merit. The Petitioner also fails to show ineffective assistance of trial counsel for not objecting to the inclusion of the statements or requesting a limiting instruction. As such, Claim Seven is **DENIED**.

### H. CLAIM EIGHT – THE PETITIONER ARGUES THAT HIS APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE.

In Claim Eight, the Petitioner alleges ineffective assistance of his appellate counsel because they did not raise certain claims on direct appeal, including but not limited to Claims Seven, Eleven, Twelve, Thirteen, Fourteen, and Sixteen. Mot. at 86-88.[43] The Petitioner also argues that ineffective assistance by appellate counsel should provide an excuse for any procedurally defaulted claim. Id. at 88.

Defendants are entitled to effective assistance of counsel on direct appeal. Evitts, 469 U.S. at 396-97. As with trial counsel, courts evaluate appellate counsel using the two prongs

---

[43] The government argues that this claim is partially time-barred, as the original Motion did not mention ineffective assistance of appellate counsel in relation to claims Eleven, Twelve, Thirteen, and Fourteen. Resp. at 85-87. As failing to raise these additional four claims on direct appeal arises out of the same conduct that was in the original Motion — the failure to raise other claims on direct appeal — the court considers these claims to be timely.

of the Strickland test. See Murray, 477 U.S. at 535-36 (applying Strickland to a claim of ineffective assistance of counsel on appeal). To determine whether appellate counsel acted deficiently, a court must evaluate whether counsel failed to raise "a particular nonfrivolous issue [that] was clearly stronger than issues that counsel did present" on direct appeal. Robbins, 528 U.S. at 288; see also Jones, 463 U.S. at 753 ("A brief that raises every colorable issue runs the risk of burying good arguments."). To prove prejudice, the Petitioner must show a reasonable probability that, but for counsel's actions, the result of the proceeding would have been different. Strickland, 466 U.S. at 694.

The Petitioner argues that many of the claims brought in the instant Motion are stronger than those raised on direct appeal, but he places particular emphasis on two claims, the Batson claim (Claim Sixteen) and the Crawford/Bruton claim (Claim Seven). Mot. at 86-87. He argues that the Fourth Circuit denied some of his appellate challenges as "fail[ing] by a wide margin" and contrary to long-standing precedent, and at least one claim in the instant Motion must be stronger than an issue brought on appeal. Mot. at 87 (quoting Runyon, 707 F.3d at 489). As to the Batson claim, he also argues that counsel did not

request strike lists or juror questionnaires, making them unable to even investigate whether a Batson claim existed. Id. at 86.

The Petitioner, however, provides no proof that counsel did not carefully consider what claims to bring on appeal. While the court acknowledges that the Fourth Circuit did not accept all of appellate counsel's arguments, this court does not find in favor of the Petitioner on any of the claims raised in the instant Motion, including Claims Seven and Sixteen. As the court does not find that any omitted argument was stronger than any included argument on appeal, the court finds that counsel did not act in an objectively unreasonable manner in deciding what claims to file. The Petitioner is also unable to show a reasonable probability of a different outcome, had counsel raised these new meritless arguments in their appellate brief. Moreover, as the court finds the Batson claim to have no merit now that counsel has had the opportunity to evaluate the strike list and questionnaires, the Petitioner fails to show resulting prejudice from appellate counsel's decision not to request those documents.

The Petitioner finally argues that appellate counsel should have used a different font type so that more arguments could have been included in the appellate brief. Mot. at 87-88. However, appellate counsel used a court-approved font, and, even

more important, this court finds that the arguments the Petitioner now suggests should have been included have no merit. Accordingly, Claim Eight is **DENIED**.

Because the court finds appellate counsel was not ineffective for failing to raise the additional claims — Claims Seven, Eleven, Twelve, Thirteen, Fourteen, and Sixteen — contained in this Motion, the court also rejects the Petitioner's argument that ineffective assistance of appellate counsel excuses any procedural default. The Petitioner has made no other argument to overcome default for those claims not raised on direct appeal, and these claims are thereby defaulted. See <u>United States v. Frady</u>, 456 U.S. 152, 167-68 (1982).[44]

**I. CLAIM NINE – THE PETITIONER ARGUES THAT THE HOLDING IN <u>JOHNSON V. UNITED STATES</u>, 135 S. CT. 2551 (2015), INVALIDATES HIS CONVICTION.**

The Petitioner next argues that the recent Supreme Court case, <u>Johnson v. United States</u>, 135 S. Ct. 2551 (2015), which invalidated the residual clause of the Armed Career Criminal Act ("ACCA"), applies to his case and causes his conviction to be in violation of the Fifth, Sixth, and Eighth Amendments, the Equal

---

[44] <u>See</u> <u>supra</u> Part IV.G (Claim Seven); <u>infra</u> Part IV.K (Claim Eleven); Part IV.L (Claim Twelve); Part IV.M (Claim Thirteen); Part IV.N (Claim Fourteen); Part IV.P (Claim Sixteen) for discussion of the specific claims raised in Claim Eight.

Protection Clause, and the Due Process Clause. Mot. at 88. The Petitioner was convicted of Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a) (Count One); Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2 (Count Two); and Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(j) and 2 (Count Five). Jury Verdict Form, ECF No. 245; see Indictment, ECF No. 3. The ACCA did not apply to his conviction and sentencing, but he argues that the holding in Johnson nevertheless applies to his case. Id. at 88-89. To evaluate this claim, the court must first address the holding and retroactivity of Johnson.

### 1. Holding and Retroactivity of Johnson v. United States

The ACCA provides enhanced penalties for defendants with three prior convictions for a violent felony or serious drug offense. 18 U.S.C. § 924(e)(1). The ACCA defines violent felony as a felony that

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

134

Id. § 924(e)(2)(B). The first subsection is known as the force clause, and the "or otherwise involves conduct that presents a serious potential risk of physical injury to another" language in the second subsection is known as the residual clause.

In Johnson, the Supreme Court held that the ACCA residual clause is unconstitutionally vague. 135 S. Ct. at 2557. The Court stated that "[t]wo features of the residual clause conspire to make it unconstitutionally vague." Id. First, "the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime" Id. Second, "the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." Id. at 2558. The analysis under the residual clause of the ACCA "forces courts to interpret 'serious potential risk' in light of the four enumerated crimes," which can lead to problems as evaluating the degree of risk posed by the enumerated crimes is "far from clear." Id. The Court also discussed the problems that arise when trying to evaluate the "serious potential risk" in an "ordinary case" violent felony analysis, and how these concerns were causing the lower federal courts to split on their interpretations of the residual clause. Id. at 2557-60. The Court thus concluded that the residual clause in the ACCA is unconstitutionally vague. Id. at 2557.

135

The Court decided Johnson on June 26, 2015. Generally, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague, 489 U.S. at 310. However, there are two exceptions to the Teague bar on retroactivity. Teague generally does not prohibit retroactive application of new substantive rules. Schriro, 542 U.S. at 351. Additionally, "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding," are an exception to the retroactivity doctrine. Saffle, 494 U.S. at 495.

On April 18, 2016, the Supreme Court held that Johnson created a new substantive rule, which applied retroactively on collateral review. Welch v. United States, 136 S. Ct. 1257, 1265 (2016). Thus, if the holding in Johnson applies to the statute under which the Petitioner was convicted, the court may consider the claim, even though Johnson was decided after his conviction became final, on October 6, 2014, when the Supreme Court declined to grant his petition for a writ of certiorari.

136

## 2. Extension of <u>Johnson</u> to the Petitioner's Case

In the instant case, one of the Petitioner's convictions is for Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(j) and 2. The jury was instructed that the possible predicate crimes of violence were Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a), and Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2. Tr. at 1705.

> The relevant crime of violence definition is a felony that:
>
> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).

As with the ACCA, the first subsection is known as the force clause, and the second subsection is known as the residual clause. The Petitioner argues that the residual clause in the ACCA is analogous to the one in Section 924(c)(3); thus, the residual clause in Section 924(c)(3) is unconstitutionally vague. Mot. at 88-93. The government contends that the two residual clauses should not be given the same treatment. Resp. at 93-100.

Although the language in the ACCA residual clause and the Section 924(c)(3) residual clause are similar, they are not identical. The ACCA residual clause refers to "a serious potential risk of physical injury to another" and is preceded by four enumerated crimes, while the 924(c)(3) clause requires "a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." The court's ruling in Johnson analyzed only the ACCA residual clause, and did not address whether the similar language in Section 924(c)(3) was also unconstitutionally vague.

The Second, Sixth, and Eighth Circuits have held that Johnson did not invalidate the residual clause in Section 924(c)(3). United States v. Prickett, 839 F.3d 697, 700 (8th Cir. 2016); United States v. Hill, 832 F.3d 135, 146 (2d Cir. 2016); United States v. Taylor, 814 F.3d 340, 378-79 (6th Cir. 2016). The Fifth Circuit has held that that the residual clause in 18 U.S.C. § 16(b), which is nearly identical to the Section 924(c)(3) residual clause, was not invalidated by Johnson. United States v. Gonzalez-Longoria, 831 F.3d 670, 677 (5th Cir. 2016) (en banc). However, the Third, Sixth, Seventh, Ninth, and Tenth Circuits have held that the residual clause in § 16(b) was invalidated by Johnson. Baptiste v. Attorney Gen., 841 F.3d 601, 621 (3d Cir. 2016); Golicov v. Lynch, 837 F.3d 1065, 1072 (10th

Cir. 2016); <u>Shuti v. Lynch</u>, 828 F.3d 440, 446 (6th Cir. 2016); <u>United States v. Vivas-Ceja</u>, 808 F.3d 719, 723 (7th Cir. 2015); <u>Dimaya v. Lynch</u>, 803 F.3d 1110, 1120 (9th Cir. 2015), <u>cert. granted</u>, 137 S. Ct. 31 (2016). The Fourth Circuit has not decided whether the language in the Section 924(c)(3) residual clause is void for vagueness after <u>Johnson</u>. The Fourth Circuit has had opportunities to rule on this issue, but has chosen not to address the question under the principle of constitutional avoidance. <u>See</u> <u>United States v. McNeal</u>, No. 14-4871, 2016 WL 1178823, at *8 n.8 (4th Cir. Mar. 28, 2016); <u>United States v. Naughton</u>, 621 F. App'x 170, 178 n.4 (4th Cir. 2015); <u>United States v. Fuertes</u>, 805 F.3d 485, 499 n.5 (4th Cir. 2015).

District courts in this circuit have declined to extend the ruling in <u>Johnson</u> to the residual clause in Section 924(c)(3). <u>See, e.g.</u>, <u>Frenzel v. United States</u>, No. 1:03CR364, 2016 WL 6804358, at *3 (E.D. Va. Nov. 17, 2016); <u>United States v. Jimenez-Segura</u>, No. 1:07-CR-146, 2016 WL 4718949, at *9 (E.D. Va. Sept. 8, 2016); <u>United States v. Green</u>, No. CR RDB-15-0526, 2016 WL 277982, at *5 (D. Md. Jan. 21, 2016) ("In light of the many differences between the residual clause in Section 924(c)(3)(B) and the Armed Career Criminal Act's residual clause, and in accordance with the Fourth Circuit's decision in <u>Fuertes</u>, this Court's decision in <u>Hayes</u>, and the other United

States District Court decisions . . . declining to invalidate Section 924(c)(3)(B) under Johnson, the residual clause in Section 924(c)(3)(B) is not unconstitutionally vague."); United States v. Walker, No. 3:15cr49, 2016 WL 153088, at *8-9 (E.D. Va. Jan. 12, 2016); United States v. Hunter, No. 2:12cr124, 2015 WL 6443084, at *2 (E.D. Va. Oct. 23, 2015) (noting that "[t]he residual clause of the ACCA had faced significantly more confusion in the lower courts, was a much broader clause than § 924(c), and required courts to analyze conduct outside of that conduct required for the charged offense").

In accordance with the other courts in this district, this court declines to extend the holding in Johnson to the residual clause in Section 924(c)(3). Even if the court were to extend Johnson's holding to the residual clause in Section 924(c)(3), the question would remain over its retroactive applicability on collateral review, which only the Supreme Court can determine. See 28 U.S.C. § 2244(b)(2)(A); Tyler v. Cain, 533 U.S. 656, 662 (2001). As such, the Petitioner's conviction under Section 924(c)(3) is not unconstitutional. Claim Nine is DENIED.

### J.  CLAIM TEN – THE PETITIONER ARGUES THAT THE JURY INSTRUCTIONS LOWERED THE GOVERNMENT'S BURDEN OF PROOF.

In this claim, the Petitioner argues that the jury instructions at the penalty phase "unconstitutionally lowered

140

the government's burden of proof in violation of the Fifth, Sixth, and Eighth Amendments." Mot. at 99. The instructions with which the Petitioner disagrees are the charges that the jury must agree that the aggravating factors "sufficiently outweigh" any mitigating factors. Tr. at 2672-73, 2675, 2682-84, 2694.[45] For support, the Petitioner relies on Ring v. Arizona, 536 U.S. 584, 609 (2002), which held that juries, not judges, must find aggravating factors, and they must do so using a beyond a reasonable doubt standard. Mot. at 99. However, the Petitioner already raised this claim on direct appeal. Runyon, 707 F.3d at 515-16. The Fourth Circuit denied the claim, finding that the court's instructions followed the language of the Federal Death Penalty Act ("FDPA") "virtually verbatim." Id. at 516. The Fourth Circuit also stated that although juries must find

---

[45] One such set of instructions is below:

> In this phase, at the end of your deliberations all 12 jurors must unanimously agree that the aggravating factors sufficiently outweigh any mitigating factors, or in the absence of mitigating factors, that the aggravating factors are themselves sufficient to justify a sentence of death. But if any of you, even a single juror, is not persuaded that the aggravating factors sufficiently outweigh any mitigating factors such that a sentence of death is justified, then the jury may not recommend the death penalty on the verdict form.

Tr. at 2675.

aggravating factors beyond a reasonable doubt, that standard of proof has not been extended to the weighing of aggravating and mitigating factors by a jury. Id.

### 1. Bar to Relitigating Claims Raised on Appeal

A petitioner generally is not permitted to relitigate issues brought on direct appeal in a collateral attack. See Boeckenhaupt, 537 F.2d at 1183. As such, courts may "refuse to reach the merits of a constitutional claim previously raised and rejected on direct appeal." Withrow, 507 U.S. at 720-21 (Scalia, J., concurring in part and dissenting in part). Exceptional circumstances, however, such as an intervening change in the law, may warrant a departure from this law-of-the-case doctrine. See Davis, 417 U.S. at 342-47 (holding that when relevant substantive law changed after the petitioner's trial and unsuccessful appeal, the petitioner could file a § 2255 motion for collateral relief based on the intervening change in the law); Jones, 178 F.3d at 796 ("It is equally well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law.").

Here, the Petitioner argues that the case Hurst v. Florida, 136 S. Ct. 616 (2016), created an intervening change in the

142

controlling law that would allow him to relitigate his claim. Mot. at 100. The government argues that this claim should be denied because Hurst does not represent a change in the law with respect to the issue that the Petitioner raised on direct appeal. Resp. at 113. To determine if the Petitioner may relitigate this claim, the court must first examine the ruling in Hurst.

In Hurst, the Supreme Court found that Florida's capital sentencing procedures violated the Sixth Amendment. 136 S. Ct. at 619.   The sentencing scheme at issue permitted a jury to render an advisory opinion as to whether a defendant should be subject to the death penalty, but the judge made the ultimate determination after holding a separate hearing and independently weighing the mitigating and aggravating factors. Id. at 620. When deciding if this scheme impermissibly took the decision out of the hands of the jury, the Court relied on the holding in Ring. Id. at 621-22. Similar to the sentencing procedure in Ring, the Florida courts did "not require the jury to make the critical findings necessary to impose the death penalty." Id. at 622. The Court reasoned that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." Id. at 619. Accordingly, the Court found that a jury's advisory

143

opinion on the death penalty does not protect a defendant's constitutional rights, and it struck down Florida's capital sentencing scheme. Id.

### 2. Extension of Hurst v. Florida to the Petitioner's Case

The court will now determine whether the rule in Hurst applies to the Petitioner's claim about the standard to be used when juries weigh the aggravating and mitigating factors during the penalty phase. Hurst held that the Sixth Amendment requires a death sentence be based "on a jury's verdict, not a judge's factfinding," and a jury's mere advisory opinion is not enough to safeguard this right. 136 S. Ct. at 624. The Petitioner does not argue that the judge was involved in determining or weighing the aggravating and mitigating factors in his case, or was in any other way improperly usurping the role of the jury in deciding whether to impose the death penalty. Rather, the Petitioner argues that the jury should have been required to make its final comparison of the weight of the aggravating and mitigating factors using a beyond a reasonable doubt standard, not a sufficiently outweighs standard. Mot. at 99-101.

That both Hurst and Ring deal with juries in death penalty trials does not automatically mean that Hurst represents an intervening change in the law set forth in Ring, and argued by

the Petitioner on his direct appeal. Hurst does not mention the
weight a jury should give to the aggravating and mitigating
factors, as it is concerned with whether a judge may take over
the jury's role in determining these factors. The Petitioner's
claim does not deal with that specific issue, and his attempt to
link Hurst to his case stretches the holding too far.

As such, the court finds that Hurst does not represent an
intervening change in the law, with respect to the issue the
Petitioner raised on appeal, and it does not affect the Fourth
Circuit's earlier finding that the FDPA requires only that the
jury decide "whether all the aggravating . . . factors found to
exist sufficiently outweigh all the mitigating . . . factors
found to exist," and that this court's instructions during the
penalty phase were proper. Runyon, 707 F.3d at 516 (quoting 18
U.S.C. § 3593(e)). The Fourth Circuit found no error here. Id.
at 516.

For the above reasons, the Petitioner is barred from
relitigating this claim, and Claim Ten is DENIED.

**K. CLAIM ELEVEN – THE PETITIONER ARGUES THAT HIS SENTENCE
IS UNCONSTITUTIONAL BECAUSE IT IS BASED ON AGGRAVATING
CIRCUMSTANCES THAT ARE ARBITRARY AND OVERBROAD.**

In this claim, the Petitioner challenges the aggravating
factors presented during the penalty and eligibility phases.
Mot. at 102-05. The jury found two statutory aggravating factors

145

in the Petitioner's case: (1) the Petitioner "committed the
offense in consideration for the receipt of, or in expectation
of the receipt, of anything of pecuniary value"; and (2) the
Petitioner "committed the offense after substantial planning and
premeditation to cause the death of a person." Special Verdict
Form - Eligibility Phase, at 5-6, ECF No. 255. The non-statutory
aggravating factors that the jury found were that the Petitioner
(1) "caused injury, harm, and loss to the victim . . . and the
victim's family and friends"; (2) "utilized training, education,
and experience" gained during criminal justice college courses,
his time in the Kansas National Guard, his work as a law
enforcement officer, and his experience as a member of the
United States Army; (3) "engaged in acts of physical abuse
towards women"; and (4) "demonstrated a lack of remorse."
Special Verdict Form - Selection Phase, at 1-2, ECF No. 291. He
now contends that the statutory factors unconstitutionally
mirrored the elements of the conduct required for conviction,
and the non-statutory factors were arbitrary and overbroad. Mot.
at 102-05.

### 1. Procedural Default and Bar on Relitigation

The government argues that the claim about the statutory
factors is procedurally defaulted because it was not raised on
appeal, and that the claim regarding the non-statutory factors

cannot be relitigated because it was raised on appeal. Resp. at 115, 117.[46] The Petitioner argues that he can show cause and prejudice to overcome the procedural default because his appellate counsel was ineffective for not raising the statutory aggravating factor claim on direct appeal. Reply at 86. He further argues that although he challenged the non-statutory factors on appeal, that challenge was based on a different premise than the current claim. Id. at 87.

To determine if the Petitioner can overcome the procedural default, the court will examine the statutory aggravating factor portion of the instant claim to determine if it is stronger than the claims presented on appeal, and if the Petitioner suffered prejudice as a result of counsel's failure to raise it on appeal. If the Petitioner cannot make such a showing, the default may not be excused. The court will also examine the non-statutory factor challenge to see if it is different from the claim presented on appeal, in which case the bar on relitigation would not apply.

---

[46] The government also asserts that this claim is barred by the Teague non-retroactivity doctrine. Resp. at 115. However, there have been no changes to the relevant law since the Petitioner's case became final, so this claim is not barred by Teague.

## 2. Standard for Evaluating Aggravating Factors

"[A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant v. Stephens, 462 U.S. 862, 877 (1983). This "narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses . . . so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase." Lowenfield v. Phelps, 484 U.S. 231, 246 (1988).

Because of the importance in narrowing the application of the death penalty, aggravating factors may not be unconstitutionally vague or overbroad. See Tuilaepa v. California, 512 U.S. 967, 972 (1994). "[T]he [aggravating] circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." Id. During the penalty selection phase, it is vital that juries make an "individualized determination on the basis of the character of the individual and the circumstances of the crime," and aggravating factors assist with this determination

148

and narrow down "those defendants who will actually be sentenced to death." Zant, 462 U.S. at 878-79.

### 3. The Petitioner's Statutory Aggravating Factor Claim

The Petitioner argues that because the pecuniary gain and substantial planning statutory factors mirrored elements of the crime of Conspiracy to Commit Murder for Hire, an unconstitutional application of the death penalty resulted. Mot. at 102. However, the Supreme Court has held that a statutory aggravating factor may be the same as an element of the crime of conviction. See Tuilaepa, 512 U.S. at 972 ("The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)." (citing Lowenfield, 484 U.S. at 244-46)); Lowenfield, 484 U.S. at 246 ("[T]he fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.").[47]

The Petitioner argues that because Lowenfield and Tuilaepa involve sentencing schemes with different narrowing procedures than the FDPA, the legal principles contained in them do not

---

[47] Both of these cases involved narrowing the class of defendants eligible for the death penalty at the guilt phase of trial, whereas the FDPA narrowing function occurs during the penalty selection phase.

apply to his case. Reply at 85. While the court recognizes that the sentencing schemes in those cases differ from the instant case, the court finds that their reasoning extends to the Petitioner's case.[48] The purpose of statutory aggravating factors is not to require the government to prove facts separate from the crime of conviction for death penalty eligibility; their purpose is to narrow down from all those defendants convicted of murder the specific subclass who may receive the death penalty. See Tuilaepa, 512 U.S. at 972. Whether this is done in the guilt phase, penalty selection phase, or, as in the instant case, eligibility phase, is not the important question, so long as the factors perform the proper narrowing function. See Lowenfield, 484 U.S. at 246. Further, there is no bar on aggravating factors overlapping with facts of conviction, and such an overlap has been specifically upheld in certain instances. See Tuilaepa, 512 U.S. at 972; Lowenfield, 484 U.S. at 246.

If an aggravating factor was such that it applied to every defendant convicted of murder, or perhaps even a large percentage of those convicted, then that may be a constitutional

---

[48] The court also notes that the Petitioner fails to provide any case where a court found that an overlap between the statutory aggravating factors and the underlying facts of conviction was unconstitutional, because the narrowing function occurred during the penalty phase instead of the guilt phase.