**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

DAVID ANTHONY RUNYON,

        Petitioner,

    v.

UNITED STATES OF AMERICA,

        Respondent.

Case No. 4:15-cv-108

Initial Criminal No. 4:08-cr-16-3

CAPITAL § 2255 PROCEEDINGS
HON. REBECCA BEACH SMITH

**PETITIONER'S RESPONSE TO UNITED STATES MOTION IN LIMINE AS TO
CERTAIN PROPOSED EVIDENCE AND EXPERT WITNESSES, ECF NO. 859**

**INTRODUCTION**

The government's attempt to drastically limit the scope of Mr. Runyon's ineffective assistance of counsel claim in this death penalty case not only rests on arguments this Court has already considered and rejected, but also on significant mischaracterizations of the evidentiary record. Virtually all of the government's arguments are ones it has made before, all unsuccessfully and sometimes more than once. And given that the government does not cite anything new to support its recycled arguments—every document cited in the government's brief was disclosed in February 2023 or earlier—there is no basis for the Court to entertain what is essentially a series of reconsideration motions styled as a motion in limine right before the hearing resumes. The government's attempt to exclude evidence or otherwise limit the scope of the hearing rings particularly hollow given that the Fourth Circuit remanded this case so that evidence could be adduced to determine whether Mr. Runyon's trial counsel were constitutionally ineffective. As explained below, each of the government's arguments fails for multiple reasons.

1

*First*, the Fourth Circuit did not narrow the scope of Mr. Runyon's ineffective assistance of counsel claim on remand. Briefing by both parties and the panel's opinion make clear that the claim litigated on appeal and remanded to this Court for further proceedings included the full suite of issues contained in Mr. Runyon's "Claim 6" as it was pled: brain injury, mental illness, and psycho-social history. The government's contrary argument—which it also raised during the February 2023 hearing—ignores this critical context and rests entirely on the use of the shorthand phrase "brain injury and mental illness" to describe that broader claim. Had the Fourth Circuit intended to limit Mr. Runyon's claim, it would have said so. It did not, and Mr. Runyon's substantive rights should not be curtailed based on an occasional inartful titling of the claim.

*Second*, this Court has already considered and rejected the government's attempts to preclude Mr. Runyon from presenting evidence going to the prejudice prong of his ineffective assistance of counsel claim. The government does not acknowledge these prior rulings, much less offer any explanation for why they were incorrect. None exists. The government has had every document it cites since February 2023, and in fact cited every one of these documents in its prior (unsuccessful) request for similar relief back in February. Further, none of the documents cited comes close to being "claim dispositive" on the question of trial counsel's performance, and the government's arguments to this effect overstate and mischaracterize the meaning of these documents.

*Finally*, while the government posits that Mr. Runyon should not be permitted to prove his claim through "post hoc" expert evidence, this is how ineffective assistance of counsel claims are litigated. And the government's specific reasons for why Mr. Runyon's experts should be barred from testifying are waived (*e.g.*, Dr. Cunningham), recycled (*e.g.*, Dr. Nadkarni), and/or unreasonable (Dr. Martell). In the case of Dr. Martell—a neuropsychologist the government hired

*twice* as its own expert in this case—the government argues that now that "his present opinion is generally favorable to Petitioner, Dr. Martell lacks the expertise to render a relevant opinion today." Mot. at 18.

The Court should deny the government's motion and permit the evidentiary hearing to proceed as planned and without further limitation.

## ARGUMENT

### I. The Fourth Circuit Did Not Limit The Scope Of Mr. Runyon's Ineffective Assistance Of Counsel Claim On Remand.

The claim the panel majority remanded for an evidentiary hearing includes the full scope of Mr. Runyon's "Claim 6" as it was raised and ligated in this Court. The government's arguments, Mot. at 5-6 & 8-9, improperly elevate form over substance, are based on an incomplete reading of the record on remand, and are contrary to this Court's prior rulings during the February 2023 hearing concerning the evidence to be explored at the hearing.

In denying Mr. Runyon's § 2255 petition, the Court walked through each of Mr. Runyon's eighteen claims individually. *See* ECF No. 560. "Claim 6" was described in the briefing and in the Court's opinion as follows: "COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO INVESTIGATE AND PRESENT MITIGATING EVIDENCE REGARDING PSYCHO-SOCIAL HISTORY, BRAIN DAMAGE, AND MENTAL HEALTH." *Id.* at 77. This claim was appealed without modification or narrowing. In seeking a Certificate of Appealability, Mr. Runyon styled Claim 6 as involving the question of whether "reasonable jurists could debate whether counsel rendered ineffective assistance by failing to investigate and present evidence about Runyon's brain damage and mental health," Mot. Certificate Appealability, *United States v. Runyon*, No. 17-5, ECF 36 at 8-9 (Aug. 24, 2018). That shorthand phrasing from the Certificate of Appealability was used by both parties and the Fourth Circuit throughout the appeal to describe

the claim, but the way the claim was briefed and decided leaves no doubt that both the parties and the Fourth Circuit recognized that the claim encompassed a broader set of issues, including Mr. Runyon's psycho-social history. Both parties briefed the issue of Mr. Runyon's psycho-social history as part of the appeal. *See*, *e.g.*, Pet'r Br., *United States v. Runyon*, No. 17-5, ECF No. 56 at 53, 63-64, 67, 72-74 (Sept. 30, 2019); Resp't. Br., *United States v. Runyon*, No. 17-5, ECF No. 64 at 43-44 (Jan. 13, 2020); Pet'r Reply Br., *United States v. Runyon*, No. 17-5, ECF No. 81 at 21, 26-31, 39, 45-47 (March 16, 2020). At no point during the appeal did the government argue that the claim was limited to evidence of brain damage and mental illness to the exclusion of the deeply inter-related issue of Mr. Runyon's psycho-social history. And in deciding it was appropriate to remand Claim 6 for further exploration at an evidentiary hearing, the panel discussed and relied on all of the expert evidence presented, including that concerning psycho-social history. *See, e.g.*, *United States v. Runyon*, 994 F.3d 192, 206-07 (4th Cir. 2021) (discussing evidence that trial counsel could have presented to the jury but did not concerning Mr. Runyon's social history, including from experts like Drs. Cunningham and Dudley).

For example, the panel quoted the report of psychologist Dr. Cunningham, who "concluded that 'Runyon suffered from a myriad of malignant formative influences that he did not choose,' meaning that 'there are a number of adverse developmental and life trajectory factors . . . that singly and collectively increased the likelihood of his having adverse and criminally violent outcomes in adulthood.'" *Id.* at 206. And, as the Fourth Circuit also recognized, the proper prejudice analysis here "require[s] us to 'consider the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding — and reweigh it against the evidence in aggravation.'" *Id.* (quoting *Porter v. McCollum*, 558 U.S. 30, 41 (2009)). The government's argument that "the Court of Appeals declined to remand claims involving trial

counsels' investigation or presentation of Petitioner's 'generational trauma' and 'Psycho-Social History,'" Mot. at 2, ignores all of this important context and rests entirely on the styling of the claim, beginning with Mr. Runyon's request for a Certificate of Appealability. But the appellate record, "read in its entirety," "unmistakably" includes psycho-social history as part of the claim, and "[t]o punish [Mr. Runyon] for using shorthand at times . . . would elevate form over substance." *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 583 (E.D. Mich. 2017). To the extent the panel intended to narrow Claim 6, it would have said so expressly. That it did not is dispositive, especially given what is at stake in this case. *See United States v. Kellam*, 403 F. App'x 815, 817–818 (4th Cir. 2010) ("A resentencing hearing is generally conducted de novo unless the court of appeals' mandate specifically limits the district court to certain issues") (finding the mandate "precise and unambiguous" in that case); *United States v. Woodside*, 895 F.3d 894, 899 (6th Cir. 2018) ("A remand is presumptively general as opposed to limited, and [] to limit the scope of a remand we 'must convey clearly our intent to limit the scope of the district court's review with language that is in effect, unmistakable.'"); *United States v. Lang*, 405 F.3d 1060, 1064 (10th Cir. 2005) ("Where the appellate court has not specifically limited the scope of the remand, the district court generally has discretion to expand the resentencing beyond the sentencing error causing the reversal" and finding "nothing [in the opinion] specifically limiting the scope of remand"); *U.S. v. Ruis*, 133 F.3d 930, *1 (9th Cir. 1998) ("We have found remands to be limited in scope only when they carefully and explicitly set forth such limitations.").

Moreover, as the United States acknowledges in its brief, the government repeatedly objected during the February 2023 evidentiary hearing to Mr. Runyon's attempt to elicit testimony concerning Mr. Runyon's psycho-social history as being beyond the scope of the remand. *See* Mot. at 3, 8-9. This Court overruled those objections, making clear "it would properly dissect the

evidence at the conclusion of the hearing." *Id.* at 3. *See* Feb. Hr'g Tr. at 533, 599-600, 726. The Court's prior rulings and approach to the evidence were correct, and the government offers no basis for why the remand of the hearing should proceed differently. Indeed, even if the Court were persuaded by the government's argument that the Fourth Circuit narrowed Mr. Runyon's "Claim 6" on remand, the most prudent and efficient course still would be to proceed as the Court did in February to permit development of the full evidentiary record. That would ensure that this Court, and the Fourth Circuit in the event of any appeal, would have the full complement of information needed to decide the claim. That conclusion is underscored by the fact that it often is not possible to draw a clean line between evidence of "psycho-social history" and mental illness, as social history information is critical to informing the mental health analysis, as several of Mr. Runyon's experts (*e.g.*, Dr. Cunningham and Dr. Nadkarni) have opined, and as the operative American Bar Association Guidelines recognize.[1,2]

---

[1] As noted in its remand order, the Fourth Circuit "look[s] to the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases" to establish "prevailing professional norms," which include that "'investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence.'" *Runyon*, 994 F.3d at 208 (cleaned up, internal citations omitted). *See also* American Bar Association, *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 956 (2003) ("[T]he defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase."); *id.* at 1061 ("Since an understanding of the client's extended, multi-generational history is often needed for an understanding of his functioning, construction of the narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present. Expert witnesses may be useful for this purpose and may assist the jury in understanding the significance of the observations."); *id.* at 959 (describing duties of mitigation specialists as including "compil[ing] a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation" and "analyz[ing] the significance of the information in terms of impact on development, including effect on personality and behavior . . .").

[2] The government seems to conflate its so-called "mandate rule" argument with other arguments in its motion concerning discovery violations by Mr. Runyon's former counsel, making a vague

II.  **There Is No Basis To Revisit The Court's Earlier Decision Rejecting The Government's Attempt To Preclude Evidence That Mr. Runyon Was Prejudiced By His Trial Counsel's Deficient Performance.**

The government separately attempts to preclude any further evidence related to the prejudice prong of Mr. Runyon's IAC claim by arguing that documents provided by Mr. Runyon during the February hearing are "dispositive" of the performance prong, and thus of Mr. Runyon's ineffective assistance of counsel claim. The Court should decline this invitation for at least two reasons. *First*, the Court has already twice rejected the government's attempt to limit Mr. Runyon's ability to present evidence concerning the prejudice prong of his ineffective assistance of counsel claim. *Second,* the documents at the heart of prior habeas counsel's unfortunate discovery violations show only that Dr. Merikangas reviewed the MRI and PET scans he ordered around the time of trial. The government's claim that these documents prove that Dr. Merikangas *discussed with trial counsel his findings and opinions about the MRI scans* is wholly unsupported. There is no dispute that without that imaging, Dr. Merikangas's opinions (and Dr. Mirsky's, for that matter) were merely "preliminary"; there is no evidence of any communication between Dr. Merikangas and trial counsel *after* Dr. Merikangas would have had an opportunity to review the imaging; and there accordingly is no evidence that trial counsel ever learned Dr. Merikangas's ultimate opinion about Mr. Runyon's brain injury. *This* is the core of the inquiry, as strategic decisions cannot be made without proper investigation, which the evidence will show trial counsel failed to complete.

---

request that the Court take a "stricter view" toward the relevance of anticipated testimony at the upcoming November hearing. Mot. at 3. But the question of the scope of the mandate is one of law that has nothing to do with any events that post-dated the appeal. And in any event, the Court has already denied the government's previous request for similar remedies. *See* ECF No. 799 at 2–3. The government points to no intervening events to justify reopening the issue of sanctions now. And though the government complains that continuing with the hearing will cost time and resources, Mot. at 4, this Court already determined that, "given the capital sentence in this case, it is imperative that any sanction not impede [Mr. Runyon's] ability to present his claim, *even if burdensome to counsel*," ECF No. 799 at 2–3 (emphasis added).

Documents showing that Dr. Merikangas received and reviewed the scans—unaccompanied by any evidence that trial counsel ever took steps to learn the results of that review—cannot be "dispositive" of the performance prong. *Cf.* Mot. at 3.

A.   **The government's request to decide Mr. Runyon's claim based on an incomplete record has already been denied.**

The Court has already twice rejected the government's attempts to limit litigation of Mr. Runyon's Claim 6 to an inquiry of whether trial counsel's performance was deficient. The first came before the February 2023 hearing, when the government moved to bifurcate the hearing, arguing that only if Mr. Runyon proved deficient performance should he be permitted to adduce evidence of prejudice. ECF No. 672 at 13-14. The Court correctly concluded that this was "not the appropriate path forward." ECF No. 685 at 23. After it was determined that Mr. Runyon's prior counsel had not timely disclosed certain documents responsive to the discovery order in this case, the government tried again, arguing that the late disclosures from Mr. Runyon were "claim dispositive" in showing "that trial counsel was not deficient in their performance," such that there was no need to resume the evidentiary hearing or further litigate Mr. Runyon's Claim 6. *See* ECF No. 799 at 2 n.1 (describing the government's request). Once again, the Court rejected this, finding the request moot and "not[ing] that, given the capital sentence in this case, it is imperative that any sanction not impede Petitioner's ability to present his claim, even if burdensome to counsel." *Id.* at 2-3. The government does not acknowledge these prior rulings in its Motion, let alone argue that they were incorrect or should be revisited. Given that *nothing* in the government's third request to prematurely truncate Mr. Runyon's claim is new—it relies on the very same documents it cited in that prior February 21, 2023 motion, *see* ECF No. 793—there is no basis to reconsider them.

B.   **The government's claim that the Dr. Merikangas documents are "dispositive" is based on factual misrepresentations.**

In addition to failing to acknowledge that its arguments have already been litigated and

decided, the government's brief also rests on significant factual misrepresentations. It is critically important to be clear about what the documents the government claims are "dispositive" do and do not prove. They do show that Dr. Merikangas at some point in August 2009 viewed Mr. Runyon's MRI scans. They *do not* show that trial counsel ever spoke to Dr. Merikangas after he reviewed those scans, and they therefore *do not* show that trial counsel ever learned Dr. Merikangas's view of Mr. Runyon's MRI scans before the sentencing proceeding. These latter issues are at the heart of Mr. Runyon's ineffective assistance of counsel claim, and they very much remain live issues requiring further development through live testimony.

To support its "claim dispositive" argument, the government contends that "documents produced reveal that Dr. Merikangas did, in fact, receive and review the 2009 brain imaging scans *and discussed those results with trial counsel*"; and that documents "demonstrate that Dr. Merikangas did review the MRI and PET scans (indeed, he billed $200 for this work), *that Dr. Merikangas talked with trial counsel after the brief report, and that he them [sic] that he should not testify because Petitioner did not have defects and had lied to him*." Mot. at 12 (emphases added). The claims about what happened after Dr. Merikangas reviewed the scans are unsupported by any evidence in the record. The documents the government relies on to make these statements include: (i) a "memo to file" from attorney Hudgins that reflects an August 13, 2009, telephone conference with attorney Woodward and Dr. Merikangas; (ii) invoices from Dr. Merikangas that include an entry dated August 17, 2009, for reviewing Mr. Runyon's PET and MRI scans; and (iii) "[b]illing records from Mr. Woodward that reflect an entry entitled 'Memo to file regarding Dr. Merikangas interview' on August 13, 2009; and an entry entitled 'Memo to file regarding mental health evidence/interview with Dr. Merikangas' on August 16, 2009." Mot. at 11-12.

To understand what these documents do and do not show, the timeline of events leading

up to the penalty phase of Mr. Runyon's trial is important:

- August 13, 2009: The MRI scans were conducted. The scans were read by the radiologist on duty at 3:21 PM and electronically signed at 3:29 PM. *See* Feb. Hr'g Tr. at 127; Gov't. Ex. 61 (2009 MRI Report).

- August 13, 2009: The "Memo to File" cited by the government states that trial counsel spoke with Dr. Merikangas by phone on this date at 3:30 PM—almost the same time the scans were being read by the hospital radiologist—and that Dr. Merikangas was away in Vermont at that time. The memo makes clear that neither trial counsel nor Dr. Merikangas had yet seen the MRI at the time they spoke. *See* ECF No. 793-1 (". . . *unless there is something glaring in the MRI or PET scan . . .*") (emphasis added).[3]

- August 14, 2009: Mr. Hudgins filed a motion, ECF No. 274, to allow the scans "to be released directly to counsel from either the healthcare provider, the Portsmouth Sheriff's Office, or the United States Marshall's Service so that getting the materials to the defense expert can be expedited." This further demonstrates that, as of that date, trial counsel had not yet obtained the MRI scans.

- August 16, 2009: Mr. Woodward's billing records contain an entry labeled: "Memo to file regarding mental health evidence/interview w/Dr. Merikangas." It does not contain an entry for a phone call or meeting with or about Dr. Merikangas that day, nor do Mr. Hudgins's billing records from that date. *See* ECF No. 793-1.

- August 17, 2009: Mr. Hudgins's billing records contain an entry labeled: "to jail for med. Scans, scans to marshall [sic]," indicating that trial counsel first obtained the computer disks containing images of the MRI scans on that date. *See* Feb. Hr'g Tr. at 88-89.

- August 17, 2009:  Dr. Merikangas's invoices contain an entry for review of the MRI and PET scans with this date. *See* ECF No. 793-1.

- August 19, 2009: The penalty phase of Mr. Runyon's trial began.[4]

---

[3] Mr. Woodward's August 13, 2009, billing records reflect an entry entitled "Memo to file regarding Dr. Merikangas interview." However, given that the second sentence of the Memo reads "Larry Woodward and I had a conference call," it is clear that Mr. Woodward did not author the Memo. It thus seems likely that Mr. Woodward's billing entry—which states only "Memo to File" with no associated verb such as "draft" or "write"—was for reviewing the memo written by Mr. Hudgins rather than drafting his own memo about the same event. In any case, the government is certainly free to examine Mr. Woodward about this at the upcoming hearing.

[4] Indeed, after the penalty phase was over, Mr. Hudgins spoke with Dr. Mirsky and told him that the brain scans were read as "normal," which is further evidence that Mr. Hudgins never heard Dr. Merikangas's opinion on the scans. Feb. Hr'g Tr. at 93; Def. Ex. 41 (Sept. 18, 2009, letter from

The government repeatedly claims that its cited documents prove Dr. Merikangas not only reviewed the MRI, but also "discussed those results with trial counsel." *See* ECF 859 at 3, 12, 13. That is false. The evidence shows that Dr. Merikangas had a conversation with trial counsel on August 13, *before* he or trial counsel had obtained the scans. And there is support for the fact that Dr. Merikangas reviewed the MRI on or after August 17. But there is no support in these documents for the government's claim that Dr. Merikangas spoke to trial counsel about his review of the scans, or at any point after the August 13 conversation memorialized in the Memo to File. Indeed, August 13 is the last record in trial counsels' billing records (and everywhere else) of any conversation with Dr. Merikangas. And there is no support for the claim that he provided trial counsel with any opinions resulting from his review of the MRI scan. That is the crux of the ineffectiveness inquiry—not whether Dr. Merikangas ever received the scans, but whether trial counsel ever spoke to him about what the scans showed.[5]

Without that critical information, trial counsel could not have made a reasoned strategic decision about what mitigation evidence to present to the jury. *See Strickland v. Washington*, 466 U.S. 668, 690-91 (1984) ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (counsel's failure to uncover and present certain mitigating evidence could

---

Dr. Mirsky to Mr. Hudgins in which Mirsky recounts that Hudgins told him the brain scans were read as normal).

[5] Although prior counsel focused on Dr. Merikangas *reviewing* the scans, the relevant question concerning trial counsel's ineffectiveness is whether trial counsel took the steps necessary to learn the results of that review.

not be justified as a tactical decision to focus on a different mitigation strategy, because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background."); *Wiggins v. Smith*, 539 U.S. 510 (2003) (finding trial counsel deficient for failing to pursue thorough social investigation); *Gray v. Branker,* 529 F.3d 220, 230-33 (4th Cir. 2008) ("[D]efense counsel could not have made a 'strategic' choice 'about whether to introduce mental health evidence because they failed to undertake a reasonable investigation in that area.'"). *See also* Mot. at 16 (government citing *Hinton v. Alabama*, 571 U.S. 263 (2014) for the same proposition).

None of the records or testimony in this case shows that Dr. Merikangas spoke to trial counsel about his findings on the MRI scans after he reviewed them. The performance prong of the ineffective assistance of counsel claim, far from being conclusively decided by the documents cited by the government, requires further evidentiary development at the upcoming hearing.

### III.   The Prejudice Prong Inquiry, By Its Very Nature, Requires Consideration Of "Post Hoc" Evidence.

The government's argument that the Court should disregard any "post hoc" evidence going to Mr. Runyon's brain injury or mental illness fundamentally misunderstands how ineffective assistance of counsel claims are litigated and proven. The prejudice analysis always requires the parties and the court to participate in what is essentially an extended thought exercise—considering what evidence trial counsel would (hypothetically) have presented to the jury had trial counsel not performed deficiently. *See, e.g.*, *Winston v. Pearson*, 683 F.3d 489, 495 (4th Cir. 2012) (affirming finding of prejudice based on testimony from 'post hoc' witnesses, noting that these witnesses "would have testified during Winston's sentencing hearing, but his attorneys never sought them out"). *See also Wiggins*, 539 U.S. at 534–35 (similar); *Williams*, 529 U.S. at 397–98 (finding state court analysis of prejudice unreasonable because it failed to "evaluate the totality of the available

mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"); *Caro v. Woodford*, 280 F.3d 1247, 1259 (9th Cir. 2002) (describing omitted expert testimony, presented at later evidentiary hearing in habeas proceedings, as "compelling" and finding prejudice); *Middleton v. Dugger*, 849 F.2d 491, 495 (11th Cir. 1988) (finding that new psychiatric expert testimony presented at habeas evidentiary hearing demonstrated prejudice and affirming grant of new sentencing hearing). Indeed, the Fourth Circuit has said that a petitioner *must* introduce the testimony that the petitioner contends should have been introduced at trial. *Cf. Vandross v. Stirling*, 986 F.3d 442, 452 (4th Cir. 2021) ("When a petitioner's ineffective assistance of counsel claim rests on trial counsel's failure to call particular witnesses, expert or otherwise, we require 'a specific proffer . . . as to what an expert witness would have testified.'").[6] In fact, the government itself has acknowledged in this case that ineffective assistance of counsel claims are litigated by hypothesizing about what would have happened had trial counsel performed effectively. *See* ECF No. 497 at 51 ("The conclusions of [two government trial experts who did not testify at trial] are certainly relevant both to the claimed mental issues Runyon currently faces and to trial counsel's decision not to proceed with a mental health defense . . . Had Runyon opened the door to a mental health defense, the rebuttal mental health information offered by Drs.

---

[6] None of the government's cited cases is to the contrary, and most stand for propositions irrelevant to this case. No one has argued that Mr. Runyon has a "due process right to an effective expert witness," Mot. at 19, or that counsel is not "entitled to and can rely on the reports of experts who are consulted." *Id.* at 20. Nor has Mr. Runyon argued that "an expert's failure to diagnose a mental condition [] constitutes ineffectiveness." *Id.* This is also not a case of trial counsel receiving an "unfavorable opinion" or where a "later psychiatric expert disagrees with the expert consulted" at trial. *Id.* at 21. The government cites these unrelated cases because it misunderstands or misrepresents the facts here. Dr. Merikangas did not reach a final opinion in 2009. This could not be clearer. His report states it in no uncertain terms—twice: "These tests [the MRI, PET, and EEG] have yet to be accomplished, and therefore this is a *preliminary* report." Merikangas Report at 1. "*Full report will follow* the results of his brain imaging." *Id.* at 2. As Dr. Merikangas never completed a full report, there simply was no trial opinion for other experts to disagree with.

Montalbano and Patterson would have contrasted not only with that information, but also with other proposed mitigating factors that Runyon had offered . . .").

Ignoring all of this authority, the government now argues that the Court should exclude all of Mr. Runyon's habeas experts, with the exception of Dr. Merikangas (who was also a trial expert).[7] *See* Mot. at 12-22. But the question in Mr. Runyon's case is not limited to the direct effect of Dr. Merikangas's MRI opinion: the question is what constitutionally effective counsel would have done once they were informed the MRI revealed organic brain damage. Nor was the claim the Fourth Circuit remanded to this Court for further evidentiary development limited to Dr. Merikangas. On the contrary, the panel majority's opinion discussed and based their remand on opinions from numerous other habeas experts—including Dr. Mark Cunningham, Dr. Allen Mirsky, and Dr. Richard Dudley—as well as Army records and lay witness testimony that could have been presented to the jury as evidence corroborating Mr. Runyon's history of head injury.[8] *See Runyon*, 944 F.3d at 205–08. And the scope of the prejudice analysis in a *Strickland* claim is not limited solely to what evidence trial counsel collected or which experts they may have hired. In fact, the opposite is true: the crux of such an analysis is determining what trial counsel could and would have done differently if they were constitutionally effective. *See, e.g.*, *Rompilla v.*

---

[7] The government states that in a September 4, 2023 meet and confer, "habeas counsel could not confirm whether they intend to call Dr. Merikangas when the hearing resumes." Mot. at 12. At the time of that meeting, discovery had just closed, none of Petitioner's experts was yet under contract, and Petitioner had not had an opportunity to meaningfully begin preparing for the upcoming evidentiary hearing. Mr. Runyon intends to call Dr. Merikangas in November, and the government will have an opportunity to cross-examine him about all of the issues they raise in their brief.

[8] Dr. Mirsky passed away days before the February 2023 hearing. Dr. Dudley retired before that hearing and is no longer testifying, and thus was replaced by Dr. Nadkarni. As discussed below, Dr. Martell was hired as a government expert in these § 2255 proceedings but was released by the government because he concluded that Mr. Runyon is brain damaged. The government does not appear to challenge testimony by Jean Barrett, as limited by this Court's prior order. Mot. at 13.

*Beard*, 545 U.S. 374, 390–93 (2005) (discussing all the follow-up and further fact development effective trial counsel likely would have conducted). As set forth below, the opinions and testimony that will be offered by Mr. Runyon's habeas experts are a critical part of these proceedings, and necessary to inform the Court's prejudice analysis. Precluding them from testifying—particularly now, on the eve of the resumed evidentiary hearing and when the government has offered nothing new to support its late motion—would not only "impede [Mr. Runyon's] ability to present his claim," ECF No. 799 at 2-3, it would prevent him from doing so entirely.

a.   *Dr. James Merikangas*

The government "does not challenge the relevancy of Dr. Merikangas's testimony," Mot. at 13, so there is nothing for the Court to rule on with respect to Dr. Merikangas. However, several of the government's claims about Dr. Merikangas and his testimony merit a brief response.

*First*, the government hypothesizes that Mr. Runyon "could attempt to elicit" testimony from Dr. Merikangas "identifying mental health issues he failed to diagnose before trial," which the government says would be irrelevant because "[t]here is no due right [sic] to an effective expert witness[.]" Mot. 859 at 3-4. But Mr. Runyon has never alleged that he has a constitutional right to the effective assistance of an expert; rather, his argument is that trial counsel failed to follow up with Dr. Merikangas (and other experts) to get their final opinions after Mr. Runyon's brain imaging was available, and that this failure prejudiced Mr. Runyon. Dr. Merikangas's testimony bears on both of these issues.

*Second*, the government contends that Dr. Merikangas's supplemental October 2, 2023,

declaration is an attempt to "sidestep his earlier misstatement."[9] Mot. 13. That is not so. Rather, that declaration was provided in order to ensure that the factual record is accurate. *See, e.g.*, Va. R. Prof. Conduct 3.3(a)(4) (requiring that "[i]f a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take remedial measures"). The government is certainly free to examine Dr. Merikangas in November about any statements in his declarations they wish to test.

    *b.  Jean Barrett*

As the government acknowledges, the Court already granted its motion to limit her testimony to explaining what the standards of care were at the time of the trial. Her inclusion in the motion is superfluous and no action is required by the Court.

    *c.  Dr. Mark Cunningham*

Dr. Cunningham was on Mr. Runyon's pre-February 2023 hearing witness list and was prepared to testify in those proceedings without challenge or objection from the United States. The government provides no justification for why this late challenge should now be entertained.

In addition to being waived, the government's attempt to challenge Dr. Cunningham's relevance fails on the merits. The government argues that Dr. Cunningham was "hired by defense counsel to testify in a certain manner, and ultimately did so." ECF No. 859 at 15. To support this argument, the government cites trial counsel's Rule 12.2 notice stating that they expected Dr. Cunningham to testify about "adverse outcomes" and Mr. Runyon's social history. *Id.* at 13. But Dr. Cunningham was prevented from testifying on this and similar topics because counsel for the government successfully objected to questioning by Mr. Hudgins on the grounds that Dr.

---

[9] The government suggests in a footnote that by showing Dr. Merikangas the documents belatedly produced during the February hearing, Mr. Runyon violated a court order. Mot. at 3 n.3. The government subsequently filed a separate brief on this topic, ECF No. 861. Mr. Runyon will respond to the point raised in the government's footnote 3 in that separate briefing.

Cunningham's disclosed report *did not* include psychosocial history data. Trial Tr. 2079, 8/20/09.[10]

Dr. Cunningham thus was limited at trial to testifying about future dangerousness. Live testimony

at the upcoming hearing is needed to explore, among other issues, *why* trial counsel planned and

sought through their Rule 12.2 Notice to include expert opinion testimony from Dr. Cunningham

that was not included in his report and, therefore, not admissible for consideration by jurors." Dr.

Cunningham's testimony therefore will be relevant to both prongs of Mr. Runyon's ineffective

assistance of counsel claim—*i.e.,* trial counsel's performance in failing to offer his opinions at

trial, and what he would have testified to had he not been limited.

> d.  *Dr. Siddhartha Nadkarni*

The government also recycles arguments it made in advance of the February hearing in

seeking to exclude Dr. Nadkarni's testimony. *See* ECF No. 743 (arguing as part of a larger "trial

brief" that Dr. Nadkarni's testimony should be excluded). However, during the hearing, despite

extensive discussion regarding scheduling of witnesses including Dr. Nadkarni, the government

failed to raise any objection to his testimony going forward. *See* Feb. Hr'g Tr., 981-82. There is

no basis to permit a second bite at the apple on this score.

Originally, Dr. Richard Dudley was engaged as a neuropsychiatric expert in Mr. Runyon's

§ 2255 proceedings. The government did not object to Dr. Dudley's involvement in these

proceedings. When Dr. Dudley retired and was no longer available to testify, Dr. Nadkarni was

retained to replace him. Once again, the government did not object at that time, thus waiving any

such objection. The government's argument that Dr. Nadkarni's testimony is procedurally

defaulted, Mot. at 17, is both waived and unsupported. Testimony cannot be "procedurally

---

[10] The government's argument that "Dr. Cunningham submitted a report in line with th[e Rule 12.2] notice," Mot. at 13, is incorrect. Dr. Cunningham's report covered only one of the several topics listed in the Rule 12.2 notice.

defaulted," and the government cites no authority in support of this novel, flawed argument. In any event, Dr. Nadkarni was not a late addition to Mr. Runyon's expert roster, as the government suggests. Rather, he was retained to replace an expert who is no longer available to testify but whose opinions were timely disclosed—without objection by the government.

The government next argues that no "*post hoc* conclusion by Dr. Nadkarni can undermine the fact that counsel consulted with an expert regarding Petitioner's mental health," and that his testimony is "irrelevant to counsel's state of mind at the time of the investigation." Mot. at 17. These are *non sequiturs*. Mr. Runyon has never claimed that trial counsel failed to consult with mental health experts; his claim is that trial counsel abandoned their investigation into Mr. Runyon's mental health before it was complete. Dr. Nadkarni will not testify to "counsel's state of mind," nor could he. His testimony is, however, necessary to establish prejudice—what evidence trial counsel would have unearthed had they carried their mitigation investigation to its logical conclusion.

Finally, the government puzzlingly claims that "Dr. Nadkarni did not review any relevant brain scans or their companion radiology reports," Mot. 16. But this is simply wrong, as evidenced by Dr. Nadkarni's report, which discusses his review of Mr. Runyon's 2009 MRI scan. *See* ECF No. 743-2 (Nadkarni Report) at 9 ("An MRI from 2009 shows multiple white matter hyperintensities consistent with David Runyon's history of head injuries."). And while the government argues the 2018 MRI scan is irrelevant because it would not have been available to trial counsel, the fact that a physician hired by the Bureau of Prisons to read Mr. Runyon's subsequent 2018 MRI scan,[11] determined that Mr. Runyon has encephalomalacia—*i.e.*,

---

[11] The government refers to this 2018 MRI conducted at the behest of BOP as both "undisclosed" and "incomplete." Mot. at 19, 16. Mr. Runyon has been working for many months to acquire a

irreversible loss of brain volume that is "late stage" evidence of severe prior head injury—is highly relevant to the question of whether Mr. Runyon was brain damaged in 2009. The government is certainly free to cross-examine Dr. Nadkarni and other witnesses who reviewed the 2018 MRI report about the relevance of those findings to whether Mr. Runyon was brain damaged at the time of the crime. But there is no basis to exclude that evidence at the outset, especially given that there is no jury involved, and the Court is capable of determining at the close of the proceedings what evidence to consider and how much weight, if any, to give certain evidence.

   *e.  Dr. Daniel Martell*

   The government hired Dr. Martell twice in these proceedings—in 2009 in advance of trial, and again in 2022 as part of these § 2255 proceedings. Certainly, the government must have believed Dr. Martell qualified to render relevant expert opinions when it hired him each time.[12] Now that "his present opinion is generally favorable to Petitioner," however, the government contends that "Dr. Martell lacks the expertise to render a relevant opinion today." Mot. at 18. The government does not explain how or why Dr. Martell's determination that Mr. Runyon suffers from longstanding brain dysfunction suddenly renders him unqualified to testify in these proceedings. And it is difficult to imagine a witness more relevant to the prejudice inquiry than the expert the government hired at the time of trial to assess whether Mr. Runyon suffers from

---

copy of this scan from the Bureau of Prisons, and he would welcome the government's assistance to help him obtain it.

[12] The government no doubt found him qualified when it hired him in at least six other federal capital cases. *See United States v. David Paul Hammer*, M.D. Pa. No. 96-CR-239 (federal capital § 2255 proceedings); *United States v. Angela Jane Johnson*, N.D. Iowa, No. C09-3064 (federal capital § 2255 proceedings); *United States v. Wesley Ira Purkey*, W.D. Mo., No. 01-00308-01-CR-W-FJG (federal capital trial); *United States v. Louis Jones*, N.D. Tex., No. 5:95-cr-00047-C-1 (federal capital trial); *United States v. Arboleda A. Ortiz*, W.D. Mo., No. 04-8001-CV-W-GAF (federal capital § 2255 proceedings); *United States v. Keith Dwayne Nelson*, W.D. Mo., No. 4:04-cv-08005-FJG (federal capital § 2255 proceedings).

brain damage and/or mental illness.

Dr. Martell is fully qualified to come to an opinion regarding Mr. Runyon's brain damage and has done so from the materials that were available to him at the time of trial. The Court deserves to hear his testimony.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motion.

Dated: October 19, 2023                    Respectfully Submitted,

/s/ *Kathryn M. Ali*

Kathryn M. Ali, VSB No. 97966
Ali & Lockwood LLP
300 New Jersey Avenue N.W., Suite 900
Washington, D.C. 20001
Telephone (202) 651-2475
katie.ali@alilockwood.com

Elizabeth J. Peiffer, VSB No. 71353
Capital Representation Resource Center
1155 Seminole Trail #6391
Charlottesville, VA 22906
Telephone (434) 817-2970
Fax (434) 817-2972
epeiffer@vcrrc.org

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Carrie Lee Ward
Department of Justice
Capital Case Section
1331 F Street, NW
Room 650
Washington, DC 20530
Telephone (202) 923-7154
Fax: (202) 305-9779
Carrie.Ward@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

/s/ *Kathryn M. Ali*