IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,                )
                                      )
        Petitioner                    )    CRIMINAL ACTION NO.: 4:08cr16
                                      )    CIVIL ACTION NO.: 4:15cv108
v.                                    )
                                      )
UNITED STATES OF AMERICA,             )
                                      )
        Respondent.                   )

**GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

COMES NOW the United States of America, by and through undersigned counsel and submits the following proposed Findings of Fact and Conclusions of Law:

**FINDINGS OF FACT**

A.      **Trial Counsel and Investigators**

1.      Attorneys Lawrence H. Woodward, Jr., and Jon M. Babineau were initially appointed to represent David Runyon (hereinafter "Runyon" or "the Petitioner"). Babineau came into the case with a wealth of capital experience. (Tr. 319).[1] He was primarily responsible for the penalty phase of the case, while Woodward was responsible for the guilt phase. (Tr. 321, 389).

2.      Babineau wanted to retain psychologist Dr. Evan Nelson and Woodward agreed. (Tr. 322). Babineau had great confidence in Dr. Nelson's judgment. (Tr. 322). Babineau provided Dr. Nelson with a comprehensive list of records. (Tr. 323). Dr. Nelson was retained, among other reasons, in order to provide a "reliable social history of Davis Runyon and his family that will constitute the centerpiece of the penalty phase defense." (Tr.331-332; GX 9; DX 109, 130).

---

[1] References to the hearing transcript will be designated as "Tr. [page number]." References to government or defense exhibits that were utilized during the hearing will be designed as "GX" or "DX." References to Court exhibits will be designated "CX."

3.	When Babineau got involved in the case, he started assembling the investigative team right away, including investigator Glenn Ford and mitigation specialist Shelia Cronin. (Tr. 361-62; GX3). The budget for various experts and investigators was, as of September 2008, in excess of $270,000. This budget had to be approved by the Court. (Tr. 368).

4.	Babineau made efforts to get military and other records pertaining to Runyon. (Tr. 372; GX 4). The defense investigation also involved a comprehensive effort to locate and interview Runyon's family, friends, work colleagues and other witnesses. (GX 2). The defense attempted to locate and obtain records of medical treatment. In certain instances, such records were either not located or determined not to exist by the time of trial. (Tr. 58; GX 4, 41). These efforts continued "up till the last day of the trial." (Tr. 57). The trial team could not get direct information as to a claimed 1996 car accident in terms of any hospital records. *Id.* The team also tried, without success, to get information on any grenade explosions referenced by Runyon. *Id.* Counsel asked for a continuance to try to obtain additional information, which request was ultimately denied when counsel could not show a likelihood of obtaining the records. (Tr. 58).

5.	Shelia Cronin did extensive pre-trial investigation. (Tr. 804). She provided trial counsel with regular reports of the mitigation investigation, her efforts and results from locating witnesses and documents and the need for additional action. (Tr. 146; GX 20, 21, 24, 41). These efforts continued up until the time of the penalty phase in August 2009. (Tr. at 32). The team was not able to find records showing blast injuries or emergency room records that verified an automobile accident. (Tr. 153). The team "exhausted all the efforts that we could come up with to try and get them." (Tr 153-54).

6.	Cronin traveled to meet witnesses in Missouri, Kansas, Oklahoma and Hawaii. (Tr. 925). Cronin provided regular updates to the trial attorneys in the form of memos and reports.

(Tr. 812; DX 86, 87, 88, 121; GX21, 64, 65). Cronin met with many individuals from Runyon's past in investigating his social history and provided reports of these interviews to trial counsel along with other materials. (Tr. 824, 825, 834, DX 47, 83,122). "Everything I learned was shared with counsel in my reports." (Tr. 860). This included conversations about Runyon's head injuries (Tr. 868). But the source of some of Cronin's reports was David Runyon himself. For instance, Runyon reported to Cronin that he had PTSD and at least as of April 2009, he was the only source for this information. (Tr. 933; GX21).

7.     In June 2008, the Court entered an order setting out a list of deadlines for the disclosure of mental health information. (GX 9A). Babineau filed a Rule 12.2 Notice some 90 days before the trial. (Tr. 378-79; GX 9, 9A). At this point, Drs. Evan Nelson, Mark Cunningham and an unspecified neuropsychologist were named. Dr. Cunningham had been engaged in October or November 2008, after Dr. Nelson's appointment. Although Dr. Cunningham was noticed to potentially provide testimony on adverse developmental factors, he did not engage in this effort. Dr. Nelson, who had been involved since the outset of the case, worked to provide a social history for Runyon. (GX 9).

8.     At the time that the Rule 12.2 Notice was filed, Dr. Nelson had provided a letter to Babineau, dated December 11, 2008, that indicated that Runyon suffered from a narcissistic personality and was not acutely mentally ill at the time of the offense. Dr. Nelson described the offense behavior as "out of character." (GX 119). Dr. Nelson engaged in a series of interviews with Runyon and, indeed, spent more time with him than any subsequent expert. (GX 122).

9.     Babineau received another letter from Dr. Nelson, dated February 11, 2009, that provided a summary of his opinions to date. (Tr. 346; GX 11). Dr. Nelson had a "pretty emphatic opinion as to his involvement in the case" from the standpoint of testifying as an expert. (Tr. 348).

That opinion was "[t]hat he would not be a helpful witness, that we would be better off using lay witnesses because he felt like, based upon what he observed of Mr. Runyon at this point, not having the neuropsychological evidence or other evidence that was still being accumulated at the time, that because of his severe narcissism, self-aggrandizement, that he believed he would not be a helpful witness, because, if asked by the United States, he would have a hard time saying anything helpful other than he believed that Mr. Runyon's actions were willful, deliberate, knowing that even what he had observed, it still was not an excuse for his conduct." (Tr. 381-82).

10.    Dr. Nelson's February 2009 letter also described Runyon as having a narcissistic personality style and that "[t]his offense was generally out-of-character when compared to the known universe of his past behavior." (GX 11). Babineau had confidence in Dr. Nelson's opinions. (Tr. 383). Dr. Nelson continued to work on the case as new information came to light. (Tr. 386).

11.    Dr. Cunningham also provided a report to Babineau, dated February 5, 2009. (GX 14). This report only provided information related to a violence risk assessment in prison. *Id.* Thus, Dr. Cunningham was not permitted to testify outside of this disclosure during the penalty phase at trial. There was no indication that Dr. Cunningham requested additional background information beyond what the defense team had provided him.

12.    Shortly after receiving these letters from Drs. Nelson and Cunningham, Babineau was removed from the case due to a conflict of interest and did no further work on the case. (Tr. 317, 354). Attorney Stephen A. Hudgins was thereafter appointed in February 2009. (Tr. 15).

13.    Hudgins practiced as a lawyer from 1980-2012, when he became a state court judge. (Tr. 110). Prior to his involvement in Runyon's case, he had handled murder cases on the state and federal level. (Tr. 111). He had dealt with experts in his prior litigation and constantly had to

decide whether or not to use a particular expert. (Tr. 111). Hudgins had decades of experience in determining whether and which experts to use. (Tr. 112). This included presenting experts and reports to a jury.

14. Hudgins obtained Babineau's file when he replaced him. (Tr. 135). By the time Hudgins got involved in the case, Dr. Cunningham had already provided his expert disclosure and Dr. Nelson had provided his February 2009 letter to Babineau. (GX 11, 14). Hudgins did not want to present this information provided by Dr. Nelson to a jury. (Tr. 142).

15. Although Hudgins largely assumed Babineau's role in handling the mitigation aspect of the investigation, Woodward was fully involved with Hudgins in deciding the mitigation strategy and which witnesses to present. (Tr. 16, 392, 403; GX 105). Woodward had experience handling death penalty cases at the time of his appointment in 2008. (Tr. 401).

16. Once Hudgins was appointed, the defense team sought a series of continuances of the trial and/or penalty phases, some of which were approved. (Tr. 149; GX 19, 25, 47, 48). Hudgins also sought extensions to do additional testing and supplement mental health reports.

17. Hudgins was aware that Runyon had reported episodes of vertigo after a claimed auto accident. There were follow-up records after the accident, but not original records of treatment. (Tr. 154). Cronin presented defense counsel with her review of Runyon's military medical records (1994-1997). (GX 26). This included a review of a motor vehicle accident and resulting symptoms. A number of these summaries indicated the exams were normal, including that in December 1996, a "Dr. Newton reassured David that his symptoms were not consistent with neurologic injury and advised him to continue Meclizine." (GX 26). Most of the Runyon's history of head injuries were self-reported with little or no corroboration. (Tr. 50-51).

18.     Additionally, Runyon's records of drug trials in which he participated did not show any neurological or mental issues or any problems that would render Runyon unsuitable for testing. (Tr. 204).     Cronin acknowledged that the team could not determine which drugs that Runyon actually took when engaging in the various drug studies.  (Tr. 935, GX 21).  Cronin, at times in her testimony in February 2023, professed a very good memory, but faltered on cross-examination when discussing drug studies.  (Tr. 938 ["I don't know.  I don't remember.  It was fifteen years ago."], 941).  On certain drug study questionnaires, Runyon denied ever being in a serious accident or motor vehicle accident or having any mental health problems.  (Tr. 939, 942; GX 79).

19.     In June 2009, the defense team began taking steps to retain Drs. Alan Mirsky and James Merikangas and sought Court permission for this.  (GX 28, 29, 35).  The requests to the Court confirmed trial counsel's effort to continue to investigate mental health issues.

20.     On June 4, 2009, Woodward advised Cronin that after meeting with Runyon and discussing the entire case, trial counsel would request new mental health experts (as they indeed, did) but felt that while their sentencing case would likely not focus on "psychiatric/psychological impairment" but they would continue to explore it.  (GX 30).  This email was not shown to trial counsel by former habeas counsel prior to the creation of their declarations in support of Runyon's habeas petition.  Hudgins was not shown his file or any invoices from Dr. Merikangas.  (Tr. 159).

21.     Runyon consistently denied his guilt to Woodward and Hudgins and resisted any defense based on mental health.  (Tr. 157).  Runyon did not want to present a mental health defense because he didn't feel like he had a mental health issue and he denied committing the crime.  (Tr. 162).  In continuing to pursue a mitigation mental health case, trial counsel always knew that Runyon did not want this presented.  (Tr. 162).  And, if convicted, a mental health strategy would be inapposite with the innocence defense presented to the jury.

22.    In the course of an interview that Runyon staged with Virginia Pina, his actions were shown to be "manipulative and calculating," in trial counsel's opinion.  (GX 30).   Runyon always maintained his innocence in conversations with defense counsel.  (Tr. 197).

23.    The primary strategy that Hudgins was given at a New Orleans capital conference (attended in March 2009 shortly after his appointment in the case) was that trial counsel should convince Runyon to accept a plea.  (Tr. 197).  But Runyon claimed he would not plead guilty to something he didn't do.  (Tr. 199).  Runyon denied any mental illness or the use of any mental illness to excuse actions in his interviews with government experts.  (Tr. 200).  Hudgins would not have wanted these statements about denial in the offense and setting aside mental health being put before a jury.  (Tr. 200).  Hudgins did not want to employ a mental health defense that would open the door to this type of information. (Tr. 201).

24.    Dr. Scott Bender had been retained and noticed as a neuropsychologist in the spring of 2009.  (GX 22).   Bender advised Hudgins that he didn't write a report and that Hudgins would not have wanted him to report what he found.  (Tr. 139).  This "report would be very negative on David."  *Id.*  It would be an adverse opinion and Dr. Bender, to Hudgins recall, did not recommend any particular types of testing.  (Tr. 140).  Ultimately, the defense team discontinued its retention of Dr. Bender following what was determined to be unfavorable reviews by Dr. Bender.  (GX 39).

25.    Drs. Nelson, Patterson and Montalbano (the latter two were government experts) came to similar conclusions that Runyon was a narcissist, which Hudgins did not want coming before a jury. (Tr. 202-203, 208).  Trial counsel had reviewed the reports of Drs. Patterson and Montalbano.  (Tr. 194, 196).

26.    Dr. Montalbano also recorded information from the defendant that Hudgins would not have wanted presented in considering the penalty to impose on Runyon.  (Tr. 205).  Many of

Runyon's reports of injury were not otherwise documented. (Tr. 206-207). This created a situation where because Runyon denied involvement in the offense, there could be concerns about information that he provided to other experts. (Tr. 214).

27.     Dr. Nelson continued to consult on the case through the summer 2009. (Tr. at 121; GX33). Dr. Nelson provided his view of the risks of presenting a mental health defense when the defendant denied being a hitman. (Tr. 123; GX 33). Hudgins acknowledged that if a jury convicted Runyon, all the information Runyon provided to experts that was used in forming opinions would be deemed unreliable. (Tr. at 123).

28.     These concerns of Dr. Nelson were reflected in a June 5, 2009, email sent to Hudgins (never shown to Hudgins prior to the February 2023 hearing). Dr Nelson opined:

- "[I]t's hard to imagine that expert testimony is so much more a benefit than a risk."

- "So, testimony based on what the defendant self-reported will not be of much use and will generate cross examinations that highlight that he probably lied, and make the expert look like he relied upon evidence that is not credible."

- "**We discussed that if you believe you can muster them to testify about important pieces of the story then it probably would be better not to call me to testify so that, strategically, you also prevent the USA's expert from testifying.**"

(Tr. 124; GX 33 (emphasis in original)). Dr. Nelson also suggested that Dr. Cunningham could be called as a "teaching expert," as "someone who has not evaluated Runyon." This, in fact, was done by trial counsel. (GX 33). To this end, Runyon had admitted to leaving answers off the a test with Dr. Montalbano because he felt they could be used against him. (Tr. 930, GX 20).

29.     Dr. Nelson continued to consult with the trial team through the summer of 2009. At one point, Dr. Nelson inquired in a July 17, 2009 email, "did the trial portray him [Runyon] as a highly scheming individual and therefore you don't want expert testimony?" (Tr. 181, GX 46).

8

This reflected trial counsel's discussions with Dr. Nelson about the viability of using a mental health defense. (Tr. at 181).

30. After a request for a continuance, the trial team was given 30 days between eligibility and selection phases and attempted to fill that time with as much mitigation work as could be accomplished. (Tr. at 183-84). The trial team moved away from Dr. Nelson and Dr. Bender because they offered opinions that were not favorable to Runyon. This led to an effort to find experts that would render favorable opinions. (Tr. 160; GX 37).

31. Trial counsel preserved their ability to present a mental health defense, by providing an additional Notice of Intent to Introduce Mental Health Testimony on July 20, 2009. (GX 50). This notice related to the testimony of Drs. Cunningham and Mirsky and, if approved, Dr. Merikangas. (GX 50). Dr. Merikangas was not approved/appointed until after July 22, 2009. (Tr. 164; GX 51, 54). Any delay in obtaining Dr. Merikangas did not prevent counsel from seeking his appointment and all the steps for him to be involved. (Tr. 164).

32. Dr. Mirsky provided a preliminary report to trial counsel. (GX36). Although he offered some preliminary diagnoses, he indicated the need for further neurological testing. (GX38). Dr. Mirsky further recommended evaluation by a neurologist. (GX 38). Trial counsel were fully aware of the preliminary reports of the experts. (Tr. at 35). No defense mental health expert recommended the retention of a neuroradiologist.

33. Although Dr. Mirsky noted various self-reported injuries, there were portions of Runyon's medical records where he did not report prior head injuries, including prior blast injuries or an accident when he was at Wentworth Military Academy. (Tr. 956, 957; DX 83). The medical records also revealed that Runyon, himself, was the source of reporting on prior accidents (including the glass embedded in his face). (Tr. 958). Part of the reports also stated no loss of

consciousness from the 1996 accident. (Tr. 959). Runyon also relayed that he believed he had PTSD, but a diagnosis was not presented. (Tr. 959).

34.    Additionally, Cronin acknowledged that she never found a diagnosis of PTSD for Runyon, beyond the fleeting mention in the Army medical reports from 1994-1997 that contained Runyon's claims of PTSD and possible references from treatment providers. (Tr. 960). She never found corroboration of blast injuries or records of a Wentworth Military Academy auto accident or even hospital records from the 1996 accident. (Tr. 960). She also found no records of an individual who was prosecuted for causing the accident. *Id.*

35.    Hudgins described that he was unable to find records that corroborated Dr. Mirksy's claim of grenade injuries. (Tr. 106). There were a number of incidents of injuries that came only from the defendant's self-reporting. (Tr. 106). Hudgins pursued any information regarding mental health up until the time of the penalty phase. (Tr. 107).

36.    Dr. Merikangas, in his August 5, 2009 report, suggested that Runyon could suffering from the withdrawal of experimental drugs. (Tr. 108; GX 63). Dr. Merikangas did not provide Hudgins with any information as to what these drugs might have been. (Tr. 108). This type of unsupported diagnosis (without evidence) caused Hudgins concerns about presenting this information in a penalty phase without having corroboration. (109). "It just didn't seem to have any foundation, and it just - - it kind of seemed like a wild Hail Mary." (Tr. 150).

37.    After receiving approval for Dr. Merikangas and obtaining his preliminary report, trial counsel sought approval for the MRI and PET scans recommended by Dr. Merikangas. (GX 60). Trial counsel also reached out to Dr. Mirsky to see if he had anything to add. (Tr. 217-18; GX 60A). Dr. Mirsky stated "I don't think I have anything to add until I know the results of the imaging tests on Mr. Runyon, but I feel confident that my tests show the effects of the blast injuries

10

(plus automobile accidents!) he suffered when in the ROTC." (GX 60A). Hudgins reviewed the report of Dr. Mirsky but determined that it would not be sufficient to use in mitigation given reports of other experts and the denial of guilt. (Tr 173). Trial counsel further assessed that if the door was opened to mental health, all the negative information would be presented. (Tr. 173).

38.     In the lead up to the penalty phase beginning with Dr. Merikangas's interview/examination of the defendant, filings and other actions were occurring almost daily. (Tr. 233). Based on the request of Drs. Merikangas and Mirsky, Hudgins made efforts to obtain MRI and PET scans. (GX 60). Hudgins testified that if he had the results of the brain scans there would have been no reason that he would not have sent them on to the experts. (Tr. 235; GX 60, 61, 63).

39.     Trial counsel sought leave of the Court for both Drs. Mirsky and Merikangas to supplement their reports. (GX 66). The Court permitted this. (GX 68). No supplemental reports were received from Drs. Merikangas or Mirsky by the required date of August 20, 2009. (Tr. 236; GX 68). There was nothing that the experts requested that the team did not do. (Tr. 238-239).

40.     In fact, although not shown to trial counsel at the time of their declarations, Hudgins and Woodward did have a conversation with Dr. Merikangas at 3:30pm on August 13, 2009. Hudgins summarized the conversation in a Memo to File. (GX 92). Dr. Merikangas informed trial counsel, among other things:

- "[H]e [Dr. Merikangas] did not believe we were in a good position to present a mental health defense as it would open us up to the Government presenting their version of the mental health picture."

- "Since he [Dr. Merikangas] does not feel we have a strong case of any defect in David, he does not believe we would be wise to present the mental health defense."

- "[H]is exam of David was not abnormal and Davis did not tell him the truth."

11

- "[U]nless there is something glaring in the MRI or PET scan that would give us a very strong argument, he does not recommend presenting a mental health defense."

- "[E]ven if there is some defect shown in the scans or testing, it would still be a risk that we would have to weigh as to whether or not to present a mental health defense absent some very bad injury or defect."

(GX 92). This conversation was corroborated by a number of other documents, including Hudgins' billing records (DX 158); Woodward's billing records (GX 93, 94, 95, 115) (both of which reflect the call with Dr. Merikangas on August 13th); and an email that Cronin sent on August 18, 2009, where she wrote "Woody and Steve spoke with Dr. Merikangas and, according to Woody, Dr. Merikangas does not think that he should testify. Dr. Merikangas felt that David was lying to him and that opening the door to Montalbano and Patterson could do a lot of damage." (GX 97). Additionally, Dr. Merikangas's own billing records reflected that he received and reviewed the scans, which he previously has denied in a sworn declarations. (GX 89, 98).

41. At the same time Hudgins was working on mental health exams and experts in the days prior to the penalty phase, he was also working to build a case from a social and family and friend perspective. (Tr. 210). Hudgins persisted in putting Runyon's mother on the stand in spite of some risks. (Tr. 211). Hudgins made decisions about other witnesses in terms of being cumulative or not compelling. (Tr. 212; GX 105). Part of the strategy to be employed was that Runyon was not the worst of the worst. (Tr. 223). The trial team made the decision to submit mitigators based on the information they had available at the time, including past conversations and experiences with experts. (Tr. 238).

42. Trial counsel considered various aspects of the defendant's social history and other themes proposed by Shelia Cronin and others but did not believe this information provided appropriate mitigation for the murder for hire committed by defendant. (GX 64, 65).

12

43.     Rather, defense counsel selected a mitigation strategy that focused on various aspects of the defendant, including, among others, a comparison of culpability with the co-defendants, his lack of criminal history, his work, education and military history, his positive adjustment to incarceration, his experience of family conflict and difficult background, the positive acts of kindness and generosity he committed and the impact of a death sentence on certain family members. (GX 69, 70). They presented evidence of Runyon being a nice and kind person. (Tr. 82). Hudgins wanted the jury to be left with the image presented by Dr. Provost ("Quiet. Gentle. Fun. Generous. Kind"). (Tr. 250-51). Hudgins had "very strong concerns" that the mental health information developed to date could have clouded this image. (Tr. 251). Hudgins articulated these concerns to include the lack of finding direct evidence of blast injuries and car accidents, the adverse information from Drs. Bender and Nelson, the government experts and maintaining of innocence – this would result in an incongruity that they elected not to present. (Tr. 251-252). It was "absolutely" a strategic decision not to put on a mental health defense based on the information obtained to date. (Tr. 252-56). Hudgins looked at all the available information, including every report, in determining the strategy to take. (Tr. 310). Woodward and Hudgins agreed with the strategy pursued. (Tr. 310).

44.     Hudgins interviewed the penalty phase witnesses that came in from throughout the country and would have made any decisions not to have individuals testify at the penalty phase of the trial. (Tr. 66). Hudgins would have read Maria Runyon's grand jury testimony. (Tr. 69).

45.     Hudgins' goal in defending Runyon was that he not receive the death penalty and Hudgins considered all available mental health information. (Tr. 113). The trial team certainly faced resource constraints of time and money. (Tr. 114). But Hudgins requested expert approvals through the summer of 2009 and up until the penalty phase of the trial. (Tr. 115). Even though

13

Woodward and Hudgins were leaning (in June 2009) away from using mental health information as a pillar of the sentencing case, they continued to be open to it through the summer of 2009 and "[w]e got the other experts and worked toward giving them everything they needed, the PET scan and MRI and whatnot.  We were continuing to prepare that, just so it was an avenue for us to have." (Tr. 120; GX 30).

46.     The purpose of the penalty presentation was to try and show Runyon's humanity and avoid alienating a jury that had just found that he had intentionally killed Cory Allen Voss. (Tr. 125).  Counsel made the decision to present their mitigation case after considering the mental health information.  (Tr. 126).  Had trial counsel obtained additional information from the brain scans, they would have gone to the court.  (Tr. 128).

47.     Hudgins considered what information Dr. Merikangas provided to him.  (Tr. 133). The decision not to present additional mental health information was made after a full consideration of all the mental health work done in the summer of 2009.  (Tr. 134).

48.     Trial counsel also attempted to show that the defendant was safe and non-threatening in prison "the Cunningham defense."  (Tr. 143).  Hudgins would not have wanted the jury to see Nelson's report where he wrote that "[i]f the defendant is found guilty of the current murder for hire, it will demonstrate that he has the capacity for violence." (Tr. 143).  Trial counsel had already procured the services of Drs. Cunningham, Bender and Nelson by summer 2009, but did not believe they had a viable mental health defense so continued to look for other experts.  (Tr. 170).

49.     Dr. Cunningham was able to fulfill the Dr. Nelson recommended role of taking the stand without opening the door to government or adverse opinions.  (Tr. 166).  Dr. Cunningham gave Hudgins a script to use.  (Tr. 167).  Hudgins tried to get into some social development issues

14

with Dr. Cunningham but was prevented from doing so because such testimony was outside the scope of his February 2009 expert report.  (Tr. 167).

50.    Dr. Nelson subsequently wrote to Hudgins after the verdict and death sentences that "Alas, this is not a surprise.  It's what all of us had been trying to tell him for months – he would likely lose the trial, and if he did then the jury's perception of him for the penalty phase was that he a cold blooded, planful hired gun.  As they say, you can lead a horse to water but you cannot make him drink, and that is what happened when Mr. Runyon was given good advise [sic] but competently chose to gamble on refusing it."  (GX 70).  This email did reflect advice given to trial counsel by Dr. Nelson.  (Tr. 243).

51.    Attorney Woodward verified that a decision was made at some point not to present mental heath information and there were many elements to that decision.  (Tr. 406).  Woodward also confirmed that Runyon did not want a mental health defense presented at trial.  (Tr. 416, 419). Woodward thought that the mental health information, which would open the door to certain government evidence, was a mixed bag.  (Tr. 424-25).  "I just remember that my impression in trying to get a sentence of life, not death, was that the mental health evidence that we had was not going to help us get there, because I had looked…….I made the best decision, collectively with Steve [Hudgins] that I could at the time based on what we had." (Tr. 427).  "This was a planned, sort of concocted , as I recall[.]"  The defense as trial had been that Runyon did not commit the crime, so to pivot to a mental health defense was "a dangerous trial strategy."  (Tr. 429).   Part of the strategy was that a horrendous crime does not equal a horrendous person.  (Tr. 415-516; GX 64).

52.    Woodward reviewed his billing records that reflected various calls with Dr. Merikangas.  (Tr. 2206-07; GX 93).  He wrote memos to file regarding Dr. Merikangas that could

not be located.  (Tr. 2207, 2219; GX 93).  Woodward recalled that the experts advising the defense team were not helpful, and he and Hudgins discussed whether it was smart or helpful to Runyon to present a mental health defense. (Tr. 2222).   The team "clearly decided not to present a mental health defense."  (Tr. 2226).  When shown a series of recently produced documents, Woodward testified that the contemporaneous emails and memo "refreshes my recollection or confirms my recollection that we did not think it was a good idea to call Dr. Merikangas."  (Tr. 2229).

53.     Woodward explained that counsel had problems securing witnesses, contacting them or agreeing to come testify, Maria Runyon specifically. (Tr. 2244).  Counsel located and interviewed a "good cross-section of people that knew [Runyon] at different stages of his life." (Tr. 2248). Woodward recalled he: "certainly concluded, based on my review of it…. that our best strategy was not to present a mental health defense and to present a defense of a different sort." (Tr. 2249).  This was a strategic decision.  (Tr. 2236, GX 90, 112).

54.     Trial counsel did not involve Cronin in any strategy regarding Dr. Nelson.  (Tr. 893, 898).  Cronin did also not recall anything about the involvement of Dr. Bender.  (Tr. 893). Cronin did not discuss the reports of government experts with trial counsel.  (Tr. 902).  Cronin agreed that it was a strategic decision of counsel as to why certain witnesses may not have testified at the penalty phase.  (Tr. 917)

55.     Cronin also acknowledged that she had received reports of Mirsky and Merikangas, even though she had claimed in her prior declaration that counsel had not share these reports with her.  (Tr. 961).  She claimed that "I had forgotten when I had prepared that [the declaration.]"  *Id.*

**B.      Lay Witnesses**

56.     Runyon's ex-wife, Maria Runyon claimed to have talked to defense counsel prior to her penalty phase testimony but could not recall it because she was drunk.  (Tr. 474-75).  Maria

testified in February 2023, while being on medication, that she was not certain if the medication impacted her memory. (Tr. 477). Maria was drinking during her marriage to David and had problems with alcohol up until May 2011. (Tr. 478-79).

57.    Maria further testified that she had memory problems and her PTSD affected her memory. (Tr. 479). She was not sure about certain aspects of the injuries Runyon experienced in the car accident. (Tr. 481). At one point she testified that "I don't actually remember what I testified to today." (Tr. 490). Maria was shown her 2008 grand jury testimony, in which she did not attribute any change in David's behavior to the accident itself, but to his bitterness as to how the other driver was not prosecuted. (Tr. 492-94). Maria admitted that what she testified to at the hearing was "probably" different than what she testified to in the Grand Jury on January 25, 2008.

58.    Wren Fleming was born in 1990 and would have only been six years old when David Runyon had his accident. This was just a year or two after his mother had married David Runyon. (Tr. 504, 515, 521). Fleming just saw Runyon as a loving, kind and caring individual who never abused anyone. (Tr. 522).

59.    Mark Runyon testified that his mother was a "monster," and that he hated her, which would have been at odds with a mitigator that she would suffer emotional harm were Runyon to face the death penalty. (Tr. 611-12, 15). Some of Mark Runyon's memories did not begin to emerge until he had therapy over a year or a year and a half after the 2009 trial. (Tr. 640-41). Mark was not able to give clear answers to what he reviewed before he testified in 2023. (Tr. 646-49). He had difficulties recalling whom he spoke with and when. (Tr. 650-53). The Court recognized at one point "So far he [counsel for the government] has established that Mr. Runyon's memory is very poor." (Tr. 658). Mark did not have certain details available to share with Cronin. (Tr. 663). He didn't volunteer other information. (Tr. 680). The first time that the accident with

17

his truck/David may have been raised was after the trial when he was interviewed by Mr. Chavis, who asked him questions. (Tr. 681). Mark attributed any change in David to his toxic relationship with Maria Runyon. (Tr. 683). Cronin also acknowledged that the 1996 vehicle accident was not in her report documenting her interview of Mark Runyon, although insisted "[h]e must have told me during a follow-up telephone call." (Tr. 953; DX 102). She then acknowledged she did not recall how she learned this information, but knew Mark Runyon told her. (Tr. 954).

60.     The United States raised various objections to the purported psycho-social history related by David Dombrowski, including issues of prenatal care, Dombrowksi's mental health, heredity and wounded warrior. (Tr. 698, 724-26, 731, 749, 753, 755, 761-62). The Court indicated that it would sort out relevancy issues. (Tr. 755, 763). Dombrowski acknowledged he did tell certain facts to Cronin and that his testimony was different than it was in 2009. (Tr. 772-775, 780).

### C.     Expert Witnesses

61.     Dr. Cunningham, who also testified at trial, testified as a clinical and forensic psychologist and utilized a 96-page PowerPoint slide deck that was not admitted into evidence. (Tr. 1237-38). He was not offered as an expert in psychiatry, neuropsychiatry, neuropsychology, neurology, radiology or the law. (Tr. 1163-64). He did not go to law school, is not a member of any bar, and does not teach law. (Tr. 1164).

62.     Dr. Cunningham has testified in well over 100 federal habeas cases. (Tr. 1155). He is called almost exclusively by the defense. (Tr. 1156). He was originally retained in October 2008 to do a violence risk assessment for prison. (Tr. 1167). He prepared a report dated February 5, 2009, on violence risk assessment that was never supplemented. (Tr. 1171, 1182; GX 14). Many of the records and interviews on which Dr. Cunningham would ultimately rely for his 2023

testimony were not readily apparent or available in 2009. The Court indicated that it could determine the proper relevancy pertaining to this testimony. (Tr. 1204).[2]

63.    From 2018-2023, Dr. Cunningham testified approximately 70 times. (Tr. 1378). He has always testified in capital cases for the defense in hundreds of testimonies across 30-35 years. (Tr. 1382). Dr. Cunningham has never looked at a defendant's background and not found some issue that he would consider and adverse development factor. (Tr. 1385, 1412, 1413).

64.    Cunningham was not tasked in 2008-09 with doing a social history pertaining to adverse developmental factors. This was the role being undertaken by Dr. Evan Nelson. (GX 9). Dr. Cunningham acknowledged that Dr. Nelson had been noticed to provide the social history. (Tr. 1419). Hudgins' appointment was after Cunningham had submitted his report.

65.    In late 2008, Dr. Cunningham offered the generalized adverse testimony piece to defense counsel before he had even done a review of defendant's background. (Tr. 1411; GX 8). He "assumed" that there would be such factors available. *Id.* Cunningham's 2015 report was entered into evidence, but for limited purposes, with his opinions about trial counsel not permitted. (Tr. 1212; DX 31). The Court rejected his improper supplemental report that was created in January 2023. (Tr. 1363-64).

66.    Cunningham testified extensively using a PowerPoint demonstrative that he largely read into the record. (e.g., Tr. 1296). All of the facts in the PowerPoint were found by someone else. (Tr. 1386). Dr. Cunningham did no interviews and just relied on information he was provided by habeas counsel, often through the lens of Shelia Cronin and another investigator from habeas counsel. (Tr. 1303, 1304-5). No follow up was done on any of this information. (Tr. 1387).

---

[2] As it did at the hearing, the United States maintains that testimony pertaining to so called "adverse developmental factors" is not relevant to the remanded claim.

Runyon was a source for various events, but Dr. Cunningham did not interview him. (Tr. 1325, 1328). Dr. Cunningham attempted to give testimony implicating various expert areas outside his own admitted areas of expertise. (Tr. 1314-21, 1329, 1331, 1334). Dr. Cunningham synthesized the information of other individuals, and picked and chose what he deemed important or recognizable as an "adverse developmental factor." (Tr. 1331).

67.     Dr. Cunningham prepared the PowerPoint, but defense counsel staff may have edited certain slides. (Tr. 1387, 1389). It initially was created in January or February 2023 and provided to former habeas counsel. (Tr. 1388). Dr. Cunningham spent some 54 hours in 2015 and another 60 hours in 2023 prior to the hearing being continued. (Tr. 1391). He then spent another 63 hours since Feb. 2023. (Tr. 1392). Dr. Cunningham also spent extensive time preparing for his testimony with defense counsel. (Tr. 1392, 1397, 1478). An adverse development assessment costs significantly more than a violence risk assessment due to the time involved. (Tr. 1571). Dr. Cunningham has done the adverse development some 300 times and always found some developmental adversity. (Tr. 1572).

68.     Dr. Cunningham could not identify any instance where he communicated that he wanted to present adverse development factors to trial counsel. (Tr. 1403, 1404). It was never arranged that he would prepare adverse development testimony. (Tr. 1405). He was approved for $15,000 at the trial stage (50 hours), but spent over 150 hours ($360 per hour) since 2015. (Tr. 1405).

69.     Dr. Cunningham saw no inconsistency between opining (in 2009) that Runyon would not be a serious risk of violence in prison with an opinion (2015/2023) that he would be predisposed to some type of violent conduct because of adverse developmental factors. (Tr. 1409).

Dr. Cunningham also knew that David Runyon denied committing the murder many times in many reports, yet also relied on David Runyon's self-reports for parts of his opinion.  (Tr. 1415).

70.    Dr. Cunningham did review one report of Dr. Nelson that found David Runyon to be a narcissist and claimed to consider it.  (Tr. 1422, GX11).  He was not aware of certain other retained experts in the case.  (Tr. 1427).  He had not seen Dr. Nelson's email to counsel where Dr. Nelson recommended that a mental health defense not be employed. (Tr. 1432; GX 33).

71.    Prior to the penalty phase, when his schedule was in flux, Dr. Cunningham offered to be replaced by another expert who would be able to come in just a couple of weeks before the penalty phase and testify as Dr. Cunningham would.  (GX103; Tr. 1441)

72.    With respect to his 2015 report, members of the defense team provided a footnoted version for Dr. Cunningham to review that contained source attributions – some 400 footnotes.  (Tr. 1449-1453, 1465; CX 3).  This misled the Court and counsel for the government as to what Dr. Cunningham relied upon, which he referred to as a "study aid."  (Tr. 1459, 1468).  This "study aid" was produced for Dr. Cunningham by habeas counsel.  (Tr. 1467-69).  Dr. Cunningham reviewed "[m]aybe 20 to 40" of the 432 total footnotes.  (Tr. 1470).  This effort to annotate his report by defense counsel was an uncommon experience for Dr. Cunningham that had never happened before in all his time as an expert witness (some 35 years).  (Tr. 1475, 76).

73.    Dr. Cunningham was provided with investigate materials by former habeas counsel from July 2015 until his report was prepared and signed on September 25, 2015.  ((Tr. 1480-1504; DX 95, 103, 104, 31; DX 31). These included unsigned interview notes of Runyon's family members and the declaration of Cat Voss, which was different than her Statement of Facts.  (Tr. 1491-94).  A good number of the reports and other materials were not prepared or completed until after 2009.  (Tr. 1495).  Dr. Cunningham was sent the interview notes of David Dombrowski and

the declaration of Maria Runyon by letter dated September 18, 2015.  He signed his report a week later on September 25, 2015.  (Tr. 1498-1500).  The Dombrowski report, received just a few days before he signed the report, formed the basis for dozens of footnoted entries in Dr. Cunningham's report.  (CX 3).  Dr. Cunningham did no independent verification of the information in the notes.  (Tr. 1501).

74.    Dr. Cunningham was not provided any grand jury testimony for Maria Runyon.  (Tr. 1504).  He was not provided with an email relaying an assessment of Maria Runyon that was provided to counsel.  (Tr. 1506-07, GX 126).  If she provided different information about the source of Runyon's personality change in the grand jury, Dr. Cunningham would have wanted to see this information.  (Tr. 1505).   He would have also wanted to see an email he was shown that assessed Maria Runyon and another potential witness. (Tr. 1507; GX 126).

75.    Dr. Cunningham also never saw Government Exhibit 92, reflecting a conversation Hudgins and Woodward had with Dr. Merikangas on August 13, 2009.  (Tr. 1510-1514).  Dr. Cunningham would have wanted to see this information.  (Tr. 1514).  He testified that "[i]t would raise questions about how to interpret his findings and report, if this seems to disavow that." *Id.* Dr. Cunningham was also not provided with he notes from Dr. Nelson reflecting interviews with Runyon.  (Tr. 1515; GX 122).  He would have liked to have been able to consider such notes and information.  (Tr. 1515; GX 122).

76.    Cunningham acknowledged that if additional materials were available that called into question the materials that he relied upon, he would want to know this and it could affect his opinion.  (Tr. 1539-40;  *see e.g.*, GX 119, 122).

77.    Dr. Siddhartha Nadkarni, a neurologist not retained until well after the filing of the Petition, also had his report annotated by habeas counsel.  (Tr. 1584).  He found Runyon to be

severely brain injured. (Tr. 1599-1600).   But Dr. Nadkarni's report was not prepared until November 9, 2022, and relied on sources after 2015.  (DX 137).  Nadkarni relied on various self-reports and sources summarized by defense investigators.  (Tr. 1657-58).

78.     Dr. Nadkarni reviewed the 2009 MRI and found evidence of white matter hyperintensities and evidence of injury on 2009.  (Tr. 1667).  There was nothing in the record to indicate that any of these concerns discussed by Dr. Nadkarni were raised to trial counsel.  (Tr. 1686).  Dr. Nadkarni acknowledged that Runyon did not report symptoms of seizures (of any kind) prior to 2009. (Tr. 1749).  Any reports of visions or hallucinations were self-reports. These were not corroborated by others. (Tr. 1769).  Dr. Nadkarni also acknowledged that not everybody with white matter hyperintensities has executive dysfunction. (Tr. 1821).

79.     Dr. Nadkarni stated that testimony that Runyon was well behaved in prison, that he remains quite intelligent, and evidence of his substantial planning and premeditation would have little bearing on opinion whether he was brain injured or not. (Tr. 1825).

80.     Dr. Daniel Martell also testified that Runyon showed signs of brain impairment. (Tr. 1865).  He acknowledged that Runyon has a very high IQ and functions in the above average to superior range in most areas, except processing speed (as found by Dr. Montalbano and Dr. Mirsky), where he still performed in the average range. (Tr. 1869).

81.     Dr. Martell explained that if one has a single, not severe, concussion, one can generally return to normal within six months. But multiple, become cumulative and can end up with more significant brain impairments. (Tr. 1880).  Other than Runyon's reports to the experts in 2009, he reviewed no information to corroborate the claimed incidents of head trauma. (Tr. 1898).

82.    Dr. Merikangas also testified at the November 2023 hearing.  (Tr. 1916).  He offered a number of explanations and conclusions that were not contained in his 2009 preliminary report or his subsequent reports and declarations.  (Tr. 1933).  He explained that the hallmark of impaired executive function was making bad decisions or being impulsive or sticking to bad decisions and having the inability to exercise proper judgment from weighing the consequences. This would include changes in mood control, ability to control emotions, produce successful plans, maintain employment/relationships. (Tr. 1976).

83.    Dr. Merikangas signed a February 2023 declaration in which he claimed he did not have further contact with trial counsel (which records show he did) or receive the brain scans (which his own records also showed he received).  (Tr. 2025; GX 89, 98).  He did not recall being involved in drafting this declaration.  (Tr. 2027-2028).  Dr. Merikangas did not take steps to verify the declaration.  (Tr. 2031).

84.    Dr. Merikangas denied he would have had the conversation reflected in the contemporaneous trial counsel memo in which he indicated that a mental health defense should not be pursued.  (Tr. 2048-51; GX 92).

85.    Dr. Merikangas claimed that he diagnosed Runyon with grandiose thoughts and delusions, based in part on the government expert reports, but that information was contradicted by Dr. Patterson's or Montalbano's findings (Tr. 2082-83-85; GX 55A, 55B).

86.    Dr. Merikangas acknowledged that he would have had various discussions with trial counsel after submitting his August 5, 2009 preliminary report.  (Tr. 2085).  Dr. Merikangas did not recall the substance of these conversations, but after reviewing his own billing records agreed that he did receive and review the brain scans and have some conversations with trial counsel following that date, and that would have been his practice to do so. (Tr. 2089).  Dr.

24

Merikangas had no record of reaching out to trial counsel, after reviewing the scans on August 17, 2009. (Tr. 2113).

87.    The presence of white matter hyperintensities does not reveal brain damage, on their own. (Tr. 2136).  Dr. Merikangas's declarations were prepared by habeas counsel, and he could not recall the source of the information, or whether he provided the information to counsel. (Tr. 2145-47).  Dr. Merikangas not shown the Virginia Pina video, which his attorneys found Runyon to be "manipulative and controlling." (GX 30). He would have liked to review prior to issuing his opinions. (Tr. 2153).

88.    Dr. Merikangas had no recollection of talking with trial counsel after his examination or of looking at the brain scans.  (Tr. 1979-80, 2025).  He signed a declaration to contrary in February that he could not recall how it was put together.  (Tr. 2025, 2029).  He could not say what information was accurate in the declaration.  (Tr. 2033).  Dr. Merikangas has testified over 100 times, with over 95 for the defense.  (Tr. 1981).   He could not remember his testimony in a number of recent cases.  (Tr. 1982, 1984).  He could not remember what he was paid in 2015. (Tr. 2003).

89.    Dr. Geoffrey Aguirre testified as an expert in neurology and behavioral neurology and introduced his report.  (GX 75).  He described that the automobile accident in 1996 had the clearest documentation suggestive of an incident of head trauma (Tr. 2314). In the materials he reviewed (prior expert reports), everyone generally accepted that Runyon experienced child abuse at approximate age of three, resulting in injury. The facial weakness, as described by the other experts, involved the side of the face, including the forehead. That pattern of weakness is caused by peripheral nerve damage, after the nerve has left the brain stem. A substantive brain injury wouldn't cause that kind of facial weakness since the various impacted parts of the face are

controlled by different parts of the brain. (Tr. 2316). A traumatic physical injury would have more… prolonged loss of consciousness, bleeding, hospitalization. It would be a major component of his medical history. Tr. 2316. The face is controlled by the motor strip, located at the very back of the frontal lobe. For one lesion to cause this widespread injury, it would have to be substantial. Tr. 2317.

90. If there was a substantial traumatic brain injury at age three, one would expect to see a pattern of deficit to the behavior and function in the years that follow, such as missing milestones, being held back in school, etc. (Tr. 2320). In the information available, Runyon enjoyed school and did well, engaged in activities, learned to play piano, suggesting a fairly normal developmental trajectory. (Tr. 2320-21). Runyon's reports of various concussive injuries are not uncommon, particularly for people that are active and play sports. To assess a history of substantial head injury, there would be an examination of long-term changes in behavior, cognitive function, and evidence of medical care and changes in activity. That was not evidenced in this case. (Tr. 2321).

91. Concussive events typically take about six months for full recovery, aligning with the symptoms reported in this case. (Tr. 2324). For example, Runyon returned to jump status at six months. Some descriptions of improved memory also indicated recovery. Dr. Aguirre explained that white matter hyperintensities (WMHI) are a remarkably common finding. (Tr. 2368). Studies suggest that 30-40% of people in this age range (30s to 40s) have at least one of these WMHI and a substantial proportion will have more than one, associated with many conditions like migraines, high blood pressure, diabetes. There is some lack of clarity within the medical literature as to how strong the association is between having had a history of concussion

and the likelihood of seeing one of these white dots. (Tr. 2371). In 2009, these images do not show the presence of old blood, common for frontal lobe/traumatic brain injury. (Tr. 2372).

92. These scans alone would not suggest that Runyon has meaningful impairments in intellectual or behavioral function. (Tr. 2375). There were two sets of neuropsychological tests done in 2009, Drs. Mirsky and Montalbano. Neither showed clear deficits. (Tr. 2376). The overall impression was that in 2009, Runyon performed very well on his testing. The imaging, the neuropsychological test reports, the descriptions of life events, all informed the overall impression that he had a concussion in 1996, made substantial recovery, and that there was no change in his overall intellectual and behavioral function as a consequence of that event. (Tr. 2386). Dr. Aguirre noted there was nothing glaring in the MRI scan, which was read as normal by the interpreting radiologist. (GX 61). Dr. Aguirre did not see evidence of a sufficient neurologic injury to account for behavior, for a change in behavior. (Tr. 2493).

93. Finally, Dr. Lipton testified as a neuroradiologist. He was called as a rebuttal witness (to which the government objected). None of the prior experts testified that they recommended the services of a neuroradiolgist to trial counsel. Dr. Lipton, despite his findings of damage on the MRI scan, could not provide a connection between his findings on the 2009 scans and Runyon's behavior. He was not in a position to respond to any specific changes in cognitive function or behavior. Tr. 2603. Dr. Lipton noted that it is common for neurologists to review MRI scans. (Tr. 2609). Based on the radiology report there is no reason to think that there is any abnormality in the 2009 MRI. (Tr. 2610).

## CONCLUSIONS OF LAW

To demonstrate ineffective assistance of trial counsel, Runyon must show his attorney's performance was deficient (performance prong), and that the deficiencies were prejudicial (prejudice prong). *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficiency is defined as performance that fell below prevailing professional norms, at the time of trial. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009); *United States v. Salazar*, 323 F.3d 852, 857 (10th Cir. 2003). In demonstrating unreasonable performance, Runyon must overcome a strong presumption that counsel provided adequate assistance. *United States v. Kennedy*, 225 F.3d 1187, 1197 (10th Cir. 2000) (citation omitted). The prejudice prong of *Strickland* imposes a heavier burden on the petitioner than the harmless error test applied on direct appeal. *United States v. Haddock*, 12 F.3d 950, 958 (10th Cir. 1993). Under the prejudice prong, Runyon must show that, absent an alleged error, a reasonable probability exists that he would have received a more favorable verdict. *See Haddock*, 12 F.3d at 958.

The Court "must not set aside sentences due to ineffective assistance of counsel absent manifest incompetence that falls outside 'the wide range of reasonable professional assistance' permissible under the Constitution." *Runyon,* 994 F.3d at 217-18 (quoting *Strickland,* 466 U.S. at 689). Judicial scrutiny of counsel's performance is highly deferential. *Id.* At 689 (The purpose is "not to improve the quality of legal representation, . . . [but] simply to ensure that criminal defendants receive a fair trial."). An attorney need not investigate all leads or present all available mitigating evidence, so long as the decision to forego a particular lead or present particular evidence is reasonable under the circumstances. *See Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir. 2008). "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). "[T]he

28

[prejudice] question is whether there is a reasonable probability that, absent [counsel's] errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Wilson v. Trammell*, 706 F.3d 1286, 1305 (10th Cir. 2013) (quotations and alterations omitted).

### A.    Counsel's Performance

The evidence adduced in the evidentiary hearing revealed that trial counsel were effective, exercising a reasonable standard of care with all available information, at the time of the performance.  Counsel clearly made a strategic decision not to present a mental health defense after full investigation and consultation with experts.  Regrettably, due to the conduct of former habeas counsel, much of the information that trial counsel considered that counseled against a mental health defense was never presented to this Court or the Fourth Circuit prior to being developed at the recent hearing.

In *Strickland* itself, the Supreme Court reviewed a capital defense attorney's strategic decision to forego character and psychological evidence to avoid damaging rebuttal evidence, finding the decision was "the result of reasonable professional judgment." *Id.* At 699(*see also, Wong v. Belmontes,* 558 U.S. 15, 20, 28 (2009) (per curiam) (rejecting ineffective assistance of counsel claim based on decision not to present additional mitigating evidence); *Darden v. Wainwright*, 477 U.S. 168, 184–87 (1986) (similar).

Deficient representation is an objective standard of reasonableness "under prevailing professional norms" that consider "all the circumstances" and evaluates conduct "from counsel's perspective at the time." *Strickland*, 466 U.S. at 688, 689. "[S]trategic choices made after thorough investigation of [relevant] law and facts . . . are virtually unchallengeable." The same is true of

29

reasonable decisions that "make[ ] particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also Schriro v. Landrigan,* 550 U.S. 465, 475–77 (2007) (determining that federal district court was within its discretion to conclude that attorney's failure to present mitigating evidence made no difference in sentencing); *Woodford v. Visciotti*, 537 U.S. 19, 26–27 (2002) (per curiam) (determining that state courts could reasonably have concluded that failure to present mitigating evidence was outweighed by "severe" aggravating factors). The seminal authority in all ineffective assistance claims eschews the application of specific rules of practice, and the question before the Court is simply one of reasonableness.

Jon M. Babineau, at the outset of his appointment, established a defense team well-versed in the necessary investigations for a death penalty trial. Sheila Cronin, in particular, had a breadth of experience, and ably executed her duties in this case. She researched Runyon's education, social, family, and professional histories. She tracked down records, conducted interviews, and synthesized her findings into succinct memos for trial counsel. Trial counsel then followed up, traveling as needed to conduct further interviews, ordering records be produced from various sources, and exercised due diligence in researching her findings, before assessing how to assimilate the information into the penalty phase strategy and ultimate trial presentation.

After the trial and the years that followed during the habeas process, several lay witnesses conveyed new and novel information to habeas counsel that was never provided to trial counsel. Maria Runyon, for example, testified that she did not convey information to trial counsel about Runyon's purported brain injury and personality change following a 1998 motor vehicle accident. She testified at the hearing that she was drunk and angry, unwilling to discuss the matter. However, she did testify at the grand jury in 2008, providing information that was available to trial counsel prior to the commencement of the penalty phase proceeding. There she denounced any change in

30

personality following the accident. Likewise, Runyon's father, David Runyon also admitted that he did not testified to at the hearing.

Although both Drs. Nelson and Bender reached opinions that were antagonistic to Runyon's case, they suggested trial counsel employ the services of a neurologist or neuropsychiatrist, to determine whether Runyon suffered a physical brain injury or defect, which could alter the course of a mental health assessment. Trial counsel did so, seeking and receiving the appointment of Drs. Mirsky and Merikangas. Both provided preliminary reports, recommending radiological testing, which was ordered and completed prior to the penalty phase proceedings.

By this time, Runyon had conveyed anecdotal tales of multiple incidents of head trauma, either to Cronin, trial counsel, or the various experts involved in this case. At the time of trial, everyone accepted as true that Runyon likely suffered some incident(s) of head trauma. The investigation continued, until the eve of the penalty phase proceeding, to find any corroborating information that might aid an expert in explaining the potential meaning of this information to a jury. However, as Drs. Nelson, Bender, and ultimately Dr. Merikangas, advised, there was insufficient evidence to support this theory. (GX 33, 92). Each of these three experts recommended to the trial team that a mental health defense not be employed in mitigation. Again, trial counsel was not shown these emails, memos and billing records prior to testifying in 2023.

At the time of trial, no lay witness was able to corroborate early episodes of brain injury. Maria Runyon confirmed, at the time of trial, that Runyon was involved in a 1996 motor vehicle accident. The follow-on military paperwork showed that he was in an accident, did not lose consciousness, and was released the same day. Trial counsel were aware that Runyon complained of vertigo, that his doctors denied any symptom of neurological deficit, and prescribed mezcaline

treatment. Maria Runyon testified at the grand jury that Runyon did not exhibit a change in personality relating to the accident itself.  She did not convey to trial counsel any information that would have supported a mental health/brain injury strategy.

Wren Fleming, Runyon's stepson— and a small child at the time of the incident— painted the picture of a kind and loving man, a good father, who continued to be a positive influence in his life. When asked about possible changes of behavior following the 1998 accident, Fleming still attributed any such change to Maria— an abusive spouse with substance abuse issue. Notably, those arguable "changes" in personality were not directed at the children, whom Runyon continued to love and support. As trial counsel aptly testified, the problem was corroboration. When Runyon insisted on presenting an innocence claim, it was an insurmountable burden to present expert testimony that was predicated, almost entirely, on Runyon's own anecdotes of trauma.

Nonetheless, counsel persisted. They attended a training in New Orleans, presenting Runyon's case to nationally renowned experts, learned in death penalty litigation. Overwhelming, the advice was to convince Runyon to plead guilty. When he exercised his rights, and refused to do so, trial counsel remained in close contact with David Bruck, resource counsel, who provided advice and guidance until and through the completion of the presentencing proceeding.

Dr. Merikangas[3] was appointed and performed an assessment of Runyon, ordering radiological scans (MRI AND PET scans) to determine whether Mr. Runyon suffered physical brain injury or defect. Despite his contrary assertions, Dr. Merikangas did consult with trial counsel, pending results of the scans.  (GX 92, 97). On or about Augst 13, 2009, Dr. Merikangas

---

[3] The Court must make credibility determinations.  The United States submits that Dr. Merikangas was simply not a credible witness at the hearings, due to his memory, defensiveness and evasiveness, prior declarations that contrasted with other evidence in the record and apparent bias.  Ample basis was provided for the Court to make similar assessments on other witnesses.

relayed he did not believe that the defense was in a good position to present a mental health defense because of the government's rebuttal.  Dr. Merikangas indicated that the examination of Runyon was not abnormal, and that Runyon was not truthful.  Dr. Merikangas indicated that unless there was something glaring in the MRI or PET scan, he did not recommend a mental health defense, and even if there were a defect shown in the scans or testing, it would be a risk the defense counsel would have to weigh as to whether or not to present a mental health defense absent a very bad injury or defect. (GX 92). This conversation is further corroborated by two invoices late discovered in trial counsel files, both from August 2009; one reflects "MRI and PET 8/17/2009 Review" for two hours at $100 per hour accompanied by a court reimbursement invoice signed by Dr. Merikangas that has the written description of "review of MRI and PET scans"; and the other invoice reflects "MRI and PET 8/17/2009" also for two hours at $100 per hour.  (GX 89, 98).

Central to the remanded claim is whether trial counsel abandoned an incomplete mental health investigation.  In support of that claim, Runyon has repeatedly asserted that trial counsel failed to provide Dr. Merikangas with MRI and PET scans that would have revealed brain damage had he reviewed them in August 2009.  In support of his motion for collateral relief, Runyon attached a declaration from trial counsel Hudgins that stated, "I filed with the court preliminary reports from Dr. Merikangas and Dr. Mirsky.  Dr. Merikangas wanted brain scans of Runyon. I do not remember the results of the scans.  I cannot remember why Dr. Merikangas and Dr. Mirsky did not testify in the penalty phase." (ECF No. 511-5,¶ 6).  But before obtaining the declaration, Petitioner's former habeas counsel did not provide Hudgins with access to his own files, which contained the recently disclosed contradictory documents.

This Court was not tasked to judge Dr. Merikangas's performance, nor would there be a legal or constitutional basis to do so. There is no due right to an effective expert witness, and any

33

supposed errors of Dr. Merikangas do not bear on counsel's performance. *See, e.g., Joseph v. Angelone*, 184 F.3d 320, 327 (4th Cir. 1999). Dr. Merikagnas has falsely or inaccurately claimed in 2015 and 2023 that trial counsel cut off communications with him after his 2009 exam of Mr. Runyon, that he never reviewed the ordered brain imaging, and that he did not discuss the images with trial counsel. But it is clear that they did, indeed, consult with him and consider his advice.

Dr. Merikangas' clear involvement in Petitioner's pretrial mental health investigation negates any entitlement to a *post hoc* expert witness. The limited question before this Court is whether trial counsel was effective in their investigation of a potential mental health claim. There is ample evidence that they consulted with resource counsel, retained a well-respected mitigation expert, utilized resource counsel, training, and subject matters experts to review possible strategies in this specific case, and did consult and retain multiple mental health experts, pursuing funding, resourcing, and testing through the eve of the sentencing proceeding. They were ably advised not to pursue a mental health claim by Dr. Merikangas (and Drs. Nelson and Bender), despite his inexplicable present claims to the contrary. Petitioner may be unsatisfied with Dr. Merikanagas's pretrial opinions, but there is no due process right to an effective expert witness, and his fallacies bear little impact in assessing the performance of counsel. *See, e.g., Joseph v. Angelone*, 184 F.3d 320, 327 (4th Cir. 1999). A later expert opinion does not show incompetence of counsel for relying on the first expert that counsel had at trial; *McClain v. Hall*, 552 F.3d 1245, 1253 (11th Cir. 2008); *Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008); *Marcrum v. Luebbers*, 509 F.3d 489, 510- 11 (8th Cir. 2007), reversing the grant of the writ; *Gonzalez v. Knowles*, 515 F.3d 1006, 1015 (9th Cir. 2008); *Card v. Dugger*, 911 F.2d 1494, 1513, *remanded* 963 F.2d 1440, *superseded* 981 F.2d 481, *reh. den.*, 987 F.2d 776 (11th Cir. 1990). Counsel is entitled to and can rely on the reports of experts who are consulted. *See Stokley v. Ryan*, 659 F.3d 802, 814 (9th Cir. 2011)(adding that a

34

further duty to investigate the expert's opinion would defeat the whole aim of having experts). *Cullen v. Payton*, 658 F.3d 890, 894 (9th Cir. 2011) (nothing counsel was told at trial would have alerted later claim of PTSD); *Murtishaw v. Woodford*, 255 F.3d 926, 947 (9th Cir. 2001) (entitled to rely on expert consulted); *Moran v. Godinez*, 57 F.3d 690, 699-700 (9th Cir. 1994); *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990).

When trial counsel had defendant examined without favorable results, a later opinion does not establish ineffectiveness; an expert's failure to diagnosis a mental condition does not constitute ineffectiveness. *Stokley v. Ryan*, 659 F.3d 802, 814 (9th Cir. 2011) (any error of the expert is not a basis for ineffective assistance of counsel, citing *Sims v. Brown*, 425 F.3d 560, 585-86 (9th Cir. 2005); *Earp v. Cullen* 623 F.3d 1065, 1075-76 (9th Cir. 2010) and an expert's failure to identify a diagnosis, even if wrong, does not establish ineffective assistance. *Earp* at 1077; *Fairbank v. Ayers*, 632 F.3d at 612, 619 amended and reh. den., 650 F.3d 1243, 1252 (9th Cir. 2011).  Both cases recognize that there is no constitutional right to the effective assistance of experts. *Fairbank*, 650 F.3d at 1252; *Earp* at 1077; *Payton v. Cullen*, 658 F.3d 890, 893-94 (9th Cir. 2011) (counsel had defendant examined by three experts who found no problem and no evidence at the time of the first examination disclosed what petitioner now espouses). This principle is an aspect of the principle described in *Bobby v. Van Hook*, 558 U.S. 4, 11-12, 130 S.Ct. 13, 19, 175 L.Ed.2d 255 (2009) (per curiam) that such a case is not one of failure to act but instead, a case like *Strickland* itself where defense counsel's "decision not to seek more" fell "well within the range of professionally reasonable judgments, and see *Earp* at 1077-78, and see *Leavitt v. Arave*, 646 F.3d 605, 608-10 (9th Cir. 2011) also citing *Bobby* and noting that *Leavitt* was not a case of last-minute scramble or failure to investigate entire areas but a reasonable conclusion not to seek more in light of what counsel knew.

35

**B.     Resulting Prejudice**

"[T]he [prejudice] question is whether there is a reasonable probability that, absent [counsel's] errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Wilson v. Trammell*, 706 F.3d 1286, 1305 (10th Cir. 2013) (quotations and alterations omitted). For the aforementioned reasons, as well as those presented further herein, no prejudice accrued to Runyon as a result of his counsel's strategic decision not to present a mental health defense. Such a defense would have had the very "hail Mary" effect described by trial counsel and would have conflicted with the chosen mitigation strategy. And even assuming some head injury (as all the experts did) no expert could link any claimed damage from the late 1990s to the defendant's behavior ten years later.

Nonetheless, Runyon was permitted to present the testimony of multiple experts at the evidentiary hearing, attempting to bolster the meaning of the "brain scans." Drs. Martell, Nadkarni and Merikangas all addressed the potential import of the 2009 brain scans. Dr. Martell testified that the brain scans may corroborate Mr. Runyon's anecdotal tales of prior incidents of head trauma. He identified multiple points of white matter hyperintensities, a fact not disputed by the experts in this case. However, and most importantly, Dr. Martell is a psychologist. Habeas counsel did not provide Dr. Martell with evidence of social history, or anecdotes that might evidence a resulting effect.

Dr. Cunningham testified at length about adverse development factors, but Runyon's team already had Dr. Nelson retained for the purpose of providing a social history that would review Runyon's background and formative influences. Dr. Cunningham was not retained for that purpose and did not offer or suggest it to trial counsel in 2009. Much of the information that Dr. Cunningham relied upon was simply not available in 2009 and there has been no showing that it

could have been.  Additionally, former habeas counsel did not provide certain information to Dr. Cunningham, including adverse statements (e.g., Maria Runyon, Cat Voss) or adverse reports or correspondence from other experts (e.g., Drs. Nelson and Merikangas).

At the evidentiary hearing, only one expert was asked about the consequences of potential brain injury or defect. The government presented the testimony of Dr. Aguirre, who testified that he was instructed to accept the history of head trauma as true, but still found no cognitive impact on Runyon.

Counsel need not continue looking for an expert just because an unfavorable opinion has been received. *Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008), adding that counsel is not ineffective for structuring a case on the basis of opinion received at the time counsel consulted); *Smith v. Cockrell*, 311 F.3d 661, 676 (5th Cir. 2003); *Walls v. Bowersox*, 151 F.3d 827, 835 (8th Cir. 1998); *Sidebottom v. Delo*, 46 F.3d 744, 753 (8th Cir. 1995). Counsel need not "shop" for contrary expert opinions.  *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995). *See also Dyer v. Calderon*, 113 F.3d 927, 943 (9th Cir. 1997), superseded, 122 F.3d 720, 735, *vacated on other grounds*, 151 F.3d 970 (9th Cir. 1998). In fact, the Court goes further in *Fields v. Brown*, 431 F.3d 1186, 1206 (9th Cir. 2005) to recite that because a later psychiatric expert disagrees with the expert consulted doesn't mean that counsel is ineffective, *affirmed* 503 F.3d 755, 783 n.24 (9th Cir. 2007) (en banc). *See also Sims v. Brown*, 425 F.3d 560, 584 reh 71 and reh en banc den. 430 F.3d 1220 (9th Cir. 2005)(referring to petitioner's claim turning on a prohibited latter day battle of experts); *Crittenden v. Ayers*, 620 F.3d 962, 981, amended 624 F.3d 943, 965 (9th Cir. 2010) (same); *Pinholster v. Ayers*, 525 F.3d 724, 759 (9th Cir. 2008), affd. 590 F.3d 651, 665-66 (9th Cir. 2009) (en banc), *revd. on other grounds, Cullen v. Pinholster*, 563 U.S. __, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011); (when habeas fingerprint expert at best creates a "battle of experts" which

doesn't show state expert lying or misinformed although it doesn't in itself mean there is no prejudice but a wealth of other evidence identified petitioner); *Mickey v. Ayers*, 606 F.3d 1223, 1248 (9th Cir. 2010) (not ineffective at trial to avoid battle of experts by not introducing expert in rebuttal and it is not prejudicial per se not to get in the last word; counsel had defendant examined by multiple experts so that further examination was reasonably avoided, citing *Wood v. Allen*, 558 U.S. 290, 303, 130 S.Ct. 841, 850-51, 175 L.Ed.2d 738 (2010); and counsel has no authority to manipulate various expert opinions in order to achieve a consistent presentation. *Mickey* at 1246; *Raley v. Ylst*, 444 F.3d 1085, 1090-93 *amended* 470 F.3d 792, 801-03 (9th Cir. 2006) (No prejudice when counsel had petitioner examined by three experts but none totally supportive); *Clark v. Mitchel*l, 425 F.3d 270, 282-83 (6th Cir. 2005) (counsel had petitioner examined and the report suggested no need for further examination, distinguishing failure to investigate or limited investigation despite indications warranting further investigation.

Simply put, the experts testifying at the evidentiary hearing did little to move the ball forward to substantiate claims that Runyon suffered from a substantial brain injury or defect that in any way impacted his behavior. Trial counsel testified, at length, regarding the challenges in this investigation.  The vast majority of the stories of potential injury were anecdotal. Runyon insisted on presenting an innocence defense, and he simply would not have been believed by a jury that had not only determined his guilt but adjudged his substantial role in the crime.

"[I]n fulfilling his duty to investigate, it must be recognized that counsel need not have investigated "every conceivable line of mitigating evidence." *Runyon*, 994 F.3d at 207 (citing *Williams*, 914 F.3d at 313. But counsel do have a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* (quoting *Strickland*, 466 U.S. at 691). Of course, "strategic choices made after thorough investigation of

38

law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

In this case, trial counsel's mitigation strategy at sentencing focused on: (1) the conspirators (Voss and Draven) that were equally culpable in the offense, but were not subject to the death penalty; (2) that Runyon had done decent things in his past and was of good character such that he was not the "worst of the worst;" and (3) that Runyon would not be a risk of future violence in prison. The jury accepted the first two approaches, but rejected the third, in part, based on the paucity of information offered by the testifying deputies contrasted with the evidence of a jail assault orchestrated by Runyon and also based on a rejection of Dr. Cunningham's testimony (upon whom Runyon now relies heavily). Counsel's approach led to most or all of the jury finding eight of the thirteen mitigating factors proffered and offering three additional mitigators.

The mental health evidence offered at the hearing was either considered by counsel or not available at the time of the sentencing hearing. Moreover, the information that *was* available indicated that Runyon did not suffer from any mental health issues that would have been of useful mitigation value when balanced against his counsel's chosen strategy at the sentencing hearing.

Each category of evidence that Runyon faults trial counsel for not adducing carries sharp aggravating factors with its mitigating thrust. Such evidence functions as a "two-edged sword." *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989); *see also Vasquez v. Thaler*, 389 F. App'x 419, 429 (5th Cir. 2010) ("The Supreme Court has held that evidence of mental impairment can be both mitigating and aggravating[.]"). Considering this danger, even with the diagnoses offered by Runyon, the Court must consider whether a reasonably attorney would put that information before a jury. *See Harrington v. Richter*, 131 S. Ct. 770, 789 (2011) (finding no error when counsel failed

to uncover evidence because it would "be reasonable to conclude that a competent attorney might elect not to use it"). This evidence (such that Runyon was brain damaged, dangerous and the product of adverse development factors) was double-edged in terms of mental health and/or duplicative of that already provided by the various friends and relatives. Additionally, such evidence would likely have been contrary to the various mitigators focused on Runyon having a low risk of future violence and making a positive adjustment to incarceration. These concerns were expressed in the testimony of trial counsel.

## CONCLUSION

Defense counsel fully and adequately investigated Runyon's mental health background and it was not error for counsel to forgo available information to this end in favor of a strategy that highlighted the positive attributes of Runyon's character. Moreover, Runyon did not establish a reasonable probability that had mental health evidence played a larger role at sentencing, the outcome would have been different. While the jury did find and consider certain positive attributes of Runyon's character, Runyon has not shown how a mental health defense would have resulted in a different sentence.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:      /s/
Brian J. Samuels
Assistant United States Attorney
Virginia State Bar No. 65898
Lisa R. McKeel
Assistant United States Attorney
Carrie L. Ward, Trial Attorney
Department of Justice
Attorneys for the United States

40

United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: (757) 591-4000
Fax: (757) 591-0866
Email: Brian.Samuels@usdoj.gov
Email:
Email: Carrie.Ward@usdoj.gov

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of January 2024, I electronically filed a true copy of the foregoing with the Clerk of Court using the CM/ECF system who will send notice to all filers.

By:               /s/              

Brian J. Samuels
Assistant United States Attorney
Virginia Bar Number: 65898
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: (757) 591-4000
Fax: (757) 591-0866
Email: Brian.Samuels@usdoj.gov