**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

DAVID ANTHONY RUNYON,

        Petitioner,

    v.

UNITED STATES OF AMERICA,

        Respondent.

Case No. 4:15-cv-108

Initial Criminal No. 4:08-cr-16-3

CAPITAL § 2255 PROCEEDINGS

**PETITIONER DAVID ANTHONY RUNYON'S PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

## **TABLE OF CONTENTS**

PROPOSED FINDINGS OF FACT ............................................................................. 1

    A.    Runyon's Trial Counsel & Other Background. .................................................. 1

    B.    Trial Counsel's Penalty Phase Investigation.................................................... 2

    C.    The Selection Phase & Jury Verdict. .............................................................. 17

    D.    Runyon's counsel failed to present significant additional available
          evidence of brain damage, mental illness, and psychosocial history.................. 18

        i.    Runyon's 2009 MRI showed marked abnormalities. ............................... 19

        ii.    Runyon's neurological examinations were uniformly abnormal.............. 21

        iii.    Neuropsychological testing by both defense and government trial
              experts showed frontal lobe damage........................................................ 22

        iv.    Other evidence corroborates brain injury and related symptoms of
              mental illness. ......................................................................................... 23

        v.    Runyon's childhood was marked by trauma and instability..................... 25

LEGAL STANDARD & PROPOSED CONCLUSIONS OF LAW ............................................ 25

    I.    Trial Counsel's Performance Was Deficient. ....................................................... 27

        A.    Counsel Prematurely Abandoned Their Investigation. ............................. 27

        B.    Counsel Failed To Take Reasonable Steps To Understand The
            Evidence They Had.................................................................................... 29

        C.    Counsel's Failure To Present This Evidence Cannot Be Credited
            As Strategic. ............................................................................................. 32

    II.    Runyon Was Prejudiced By His Trial Counsel's Deficient Performance. ........... 34

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) ........................................................ 38

*Brewer v. Aiken*, 935 F.2d 850 (7th Cir. 1991).............................................................. 38

*Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1998) ......................................................... 30

*Couch v. Booker*, 632 F.3d 241 (6th Cir. 2011)............................................................. 32

*Dixon v. Yates*, No. 2:10-CV-0631, 2016 WL 1183588 (E.D. Cal. Mar. 28, 2016)................... 33

*Doe v. Ayers*, 782 F.3d 425 (9th Cir. 2015)................................................................. 32

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ................................................................ 34

*Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011) .......................................... 30, 32, 38, 42

*Fitzgerald v. Trammell*
  No. 03-CV-531, 2013 WL 5537387 (N.D. Okla. Oct. 7, 2013) ......................................... 33, 38

*Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995).................................................................. 38

*Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008) ............................................... 30, 32, 38

*Griffin v. Warden*, 970 F.2d 1355 (4th Cir. 1992) ......................................................... 35

*Hinton v. Alabama*, 571 U.S. 263 (2014) .................................................................... 36

*Holt v. Smith*, No. 1:97-CV-06210, 2023 WL 3126313 (E.D. Cal. Apr. 27, 2023) ............... 33, 43

*Hyman v. Aiken*, 824 F.2d 1405 (4th Cir. 1987)....................................................... 32, 34

*Johnson v. United States*, 860 F. Supp. 2d 663 (N.D. Iowa 2012) ............................... 32

*Lockett v. Anderson*, 230 F.3d 695 (5th Cir. 2000)......................................................... 38

*McMullen v. Dalton*, 83 F.4th 634 (7th Cir. 2023) ....................................................... 34

*Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999)............................................................ 37

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ...................................................................... 41

*Porter v. McCollum*, 558 U.S. 30 (2009)............................................................ 29, 37, 38, 41

*Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009) .................................................. 35

*Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007).......................................................... 32

*Rogers v. Dzurenda*, 25 F.4th 1171 (9th Cir. 2022) ........................................................ 30

*Rompilla v. Beard*, 545 U.S. 374 (2005)................................................................. passim

*United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013) ................................................. 21

*United States v. Runyon*, 994 F.3d 192 (4th Cir. 2021).42*Scanlon v. Harkleroad*, 740 F. Supp. 2d 706 (M.D.N.C. 2010)............................................................................................... 30

*Sears v. Upton,* 561 U.S. 945 (2010) ............................................................................... 37

*Showers v. Beard*, 635 F.3d 625 (3d. Cir. 2011) ........................................................... 32

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004)........................................... 34, 35, 37, 38

*Stankewitz v. Wong*, 698 F.3d 1163 (9th Cir. 2012) ..................................................... 36

*Strickland v. Washington,* 466 U.S. 668 (1984) ..................................... 28, 29, 30, 32

*Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005) ..................................................... 38

*Tennard v. Dretke*, 542 U.S. 274 (2004)......................................................................... 34

*Tice v. Johnson*, 647 F.3d 87 (4th Cir. 2011) ................................................................. 35

*United States v. Gray*, 878 F.2d 702 (3d Cir. 1989) ...................................................... 35

*Valdez v. Motyka*, No. 15-cv-0109, 2021 WL 1123576 (D. Colo. Mar. 24, 2021) ...................... 41

*Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009)................................................. 35

*Walbey v. Quarterman*, 309 F. App'x 795 (5th Cir. 2009).......................................... 36

*Wallace v. Stewart*, 184 F.3d 1112 (9th Cir. 1999) ....................................................... 30

*Wiggins v. Smith*, 539 U.S. 510 (2003)................................................................... passim

*Williams v. Stirling*, 914 F.3d 302 (4th Cir. 2019) ............................................... passim

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................................. 29, 34

**Other Authorities**

ABA Standards for Criminal Justice 4–4.1, Commentary, 4–55 (2d ed. 1980) .......................... 35

ABA Guidelines for the Appointment and Performance of Defense Counsel in
   Death Penalty Cases, Guideline 10.11, commentary (2003) ....................................... 31, 33, 34

## PROPOSED FINDINGS OF FACT

### A.   Runyon's Trial Counsel & Other Background.

1.      In March 2008 Lawrence Woodward and Jon Babineau were appointed to represent Petitioner David Runyon concerning his indictment for the murder of Cory Voss. ECF 27.

2.      Woodward assumed chief responsibility for the guilt phase of trial, and Babineau was chiefly responsible for the penalty phase. GX25 at 10; Hr'g Tr. 389:21–391:11. Sheila Cronin joined Runyon's trial team as the mitigation specialist in April 2008. *Id*. 925:25–926:4. At that time, she had been a psychiatric and medical social worker for 25 years and a capital case mitigation specialist for 13 years. *Id.* 804:25–807:7.

3.      Babineau withdrew from Runyon's case on February 13, 2009. DX165. Stephen Hudgins was appointed one week later. ECF 161. The mitigation investigation at that time was not complete. GX25 at 13; Hr'g Tr. 347:15–17, 350:7–9. Hudgins never discussed the case with Babineau. *Id.* 16:25–17:7.

4.      Trial was scheduled to begin less than a month after Hudgins was appointed. He was not an experienced death penalty lawyer, and mitigation was new to him. *Id.* 809:19–22, 810:18–20. He was not ready to go to trial on the scheduled date. *Id.* 17:8–10. Counsel thus sought and were granted a continuance to May 4, 2009. ECF 160, 162.

5.      On February 26, 2009, just a few days after the earlier continuance was granted, Hudgins moved for another continuance, representing to the Court that in light of his "full schedule between [February 25] and May 4, 2009, and beyond, which includes three jury trials," as well as "the unusual quantity of discovery material," counsel "cannot be adequately prepared for trial on May 4[.]" DX10 at 2. The Court granted this motion, setting trial for June 30, 2009. ECF 171.

6.      On April 13, 2009, counsel again moved to continue the trial, this time to October

1

2009, representing: "[W]e cannot provide competent representation under the current schedul[e]."[1] GX25 at 1. *See also id.* at 9, 13. To support their request, counsel outlined "extensive" mitigation-related work that remained outstanding. *Id.* at 2. The Court denied the motion, but advised that counsel could later move to continue the penalty phase in the event of a guilty verdict. ECF 194.

### B. Trial Counsel's Penalty Phase Investigation.

7.      Trial counsel were aware early on that Runyon had a history of significant head injuries, childhood trauma, and mental health issues. For example, Runyon told Cronin during their first meeting in May 2008 that he was in a car accident while in the Army and "diagnosed with posttraumatic stress disorder in 1996 or 1997 due to the accident." DX86 at 4. *See also* DX87. Runyon's Army records—which trial counsel had by April 2009—confirmed this 1996 accident and that Runyon continued to seek medical care for head injury-related symptoms for many months following. *See* Proposed Findings of Fact (hereafter, "PFF") ¶¶ 23–24. Although Hudgins testified that Runyon "didn't know what state the accident was in," or "what hospital he had gone to," which Hudgins suggested frustrated his efforts to get information about the accident, Hr'g Tr. 57:9–21, Runyon's Army records included all of this information*, see* DX83 at 49–51; DX88 at 3.

8.      Many witnesses who testified or were available to testify at trial had information about the 1996 accident and Runyon's resulting symptoms. *See* Hr'g Tr. 456:8–468:1 (ex-wife describing accident and symptoms, including that Runyon's "whole personality changed"); *id.* 507:5–509:16 (stepson describing accident and personality change); *id.* 545:12–547:24 (brother-in-law testifying to cognitive decline, memory loss, and loss of "sharpness" post-accident); *id.* 555:21–56:18 (sister-in-law: Runyon was "slower" post-accident); *id.* 631:19–638:19 (brother describing accident, personality change); *id.* 561:22–565:10 (friend, similar); *id.* 603:3–604:12

---

[1] The government did not object to a six-month continuance. ECF 181 at 1.

(former supervisor testifying Runyon had trouble retaining information).

9.      The 1996 accident was just one of many head injuries Runyon suffered before the crime. His first occurred at age three. While living in Panama, Runyon's biological father, David Dombrowski, hit and/or choked Runyon and threw him across the room, causing permanent facial asymmetry. *See id.* 772:25–773:19 ("I did it, and I'm not proud of that but it did happen");[2] *cf. id.* 1776:5–7 (Runyon's mother confirming his facial asymmetry was not congenital and began in Panama). Several experts who examined Runyon before trial reported his facial asymmetry and this incident of childhood abuse. *See* PFF ¶¶ 17, 20, 37. All three neurologists who testified at Runyon's habeas hearing agreed that his facial asymmetry is consistent with trauma, and that the trauma must have been extremely severe to cause such damage. *See* Hr'g Tr. 1625:21–1626:1 (Nadkarni); *id.* 1928:17–1929:1, 1930:5–10 (Merikangas); *id.* 2316:15–18, 2428:17–25 (Aguirre).

10.     Runyon also sustained a head injury at age five or six when he ran into a telephone pole while playing football and was knocked out. *See* DX88 (Cronin memo describing incident); Hr'g Tr. 819:1–7, 859:7–15, 860:2–5 (Cronin testifying about incident); *id.* 624:2–12 (brother testifying about incident); DX55a at 12 (Patterson describing incident); DX55b at 20 (Montalbano, similar); DX137 at 5 (Nadkarni, similar); Hr'g Tr. 1780:21–1781:5 (Nadkarni, similar). And he suffered two blast injuries during training exercises while attending Wentworth Military Academy. *See, e.g.*, DX87 at 3 (Cronin memo describing incidents); GX36 at 2 (Mirsky); GX55a at 12 (Patterson); GX55b at 20 (Montalbano); DX137 at 5 (Nadkarni); Hr'g Tr. 1655:6–21 (Nadkarni).

11.     Runyon was also in a serious car accident in 1990, where he fell asleep at the wheel

---

[2] Dombrowski previously disclaimed this incident, but he only spoke with Hudgins before trial for "10 or 15 minutes at best." Hr'g Tr. at 780:19–21. As Runyon's counsel represented in seeking a trial continuance, "[w]ithout adequate time to develop the relationship of trust required for effective representation in a capital case, counsel may never learn or be able to present the most crucial facts about the defendant . . ." GX25 at 7.

and drove under a tractor trailer. *See, e.g.*, DX83 at 36 (Army records showing Runyon seeking treatment for lesions caused by glass embedded in his face from accident). Runyon's brother and ex-wife testified about this accident. *See* Hr'g Tr. 628:6–630:20 (brother learned of accident in 1991 and observed scars on Runyon's face); *id.* 468:13–469:8 (ex-wife testifying that Runyon had issues from "glass in his face" post-accident). Runyon also reported this accident to Cronin and several experts. *See* DX87 (Cronin memo); GX36 at 2 (Mirsky); DX137 at 5–6 (Nadkarni).

12.     Trial counsel knew about Runyon's head injuries and trauma, and of the need for expert evaluations of Runyon's brain function and potential mental illness. As early as December 2008, Dr. Evan Nelson, a psychologist, encouraged Babineau to seek a neuropsychological evaluation, advising: "Given [Runyon's] repeated history of losing consciousness, a long-standing problem with sagging on the right side of his face (a potential soft neurological sign), and repeated failures to achieve at a level commensurate with his intellectual ability, it is plausible that neuropsychological deficits are a defining element of his personality and behavior," which "would be relevant to mitigation[.]" DX126.

13.     Also in December 2008, counsel received jail medical records including treatment notes from a provider who evaluated Runyon, describing him as "gra[n]diose" and delusional, and suggesting diagnoses of schizoaffective and/or bipolar disorder. DX44 at 2–3; Hr'g Tr. 1721:2–8.

14.     On December 12, 2008, counsel filed a notice of intent to present mental health evidence, disclosing Dr. Nelson and Dr. Mark Cunningham. DX109. Although Dr. Cunningham's retention was limited to a "violence risk assessment for prison," Trial Tr. 2112:14–20; Hr'g Tr. 1167:2–1168:13, the notice stated that he would offer much broader mitigation-related testimony, DX109 at 4; Trial Tr. 2076:23–2078:18. And it represented that Runyon was "seeking Court budget approval for retaining a neuropsychologist to evaluate Runyon for the presence of

neuropsychological deficits that may bear on mitigation." DX109 at 5.

15.     Following this disclosure, two government experts—Drs. Paul Montalbano and Raymond Patterson—evaluated Runyon in February 2009. GX55a, GX55b.

16.     Dr. Montalbano, a psychologist, catalogued many of the head injuries described above, including: (i) "a bad car accident in 1996 when [Runyon] was hit by a drunk driver in a head-on collision," which "[h]is former wife corroborated [ ] during her grand jury testimony," and for which he "received follow-up treatment at an Army hospital"; (ii) "being knocked out playing football, when he ran into a telephone pole" in elementary school; and (iii) being "knocked out" by a grenade simulator and "stunned" by a C-4 explosive in military training. GX55b at 20. Runyon "thought there might be additional head trauma but could not recall any." *Id.* Runyon also reported to Dr. Montalbano "memory problems secondary to" the 1996 accident. *Id.* at 21.

17.     Dr. Montalbano also described childhood abuse. *See* GX55b at 11 (incident where Dombrowski hit or choked Runyon); *id.* at 12 (punishment by mother and stepfather included "use of a hand, belt, or paddle" and "forced ingestion of cigarettes"). Runyon also reported that his mother, Suk Cha, did "a lot of screaming," and Dr. Montalbano noted that she reportedly "suffered from a mood disorder and had difficulty regulating her anger and at times became physically violent." *Id.* at 11. Although Runyon described close familial relationships, he admitted to Dr. Montalbano he had not seen his parents in seven years and had basically lost contact entirely with his only sibling. *Id.* Dr. Montalbano described Runyon's educational, employment, and relationship history as uneven and marked by apparent underachievement. *See id.* at 16–17.

18.     Dr. Montalbano administered psychological testing, finding no malingering and opining that Runyon's assessment of his own distress "may underrepresent what is actually occurring." GX55b at 23–24. *See also id.* at 28; Hr'g Tr. 1869:3–15 (Martell, similar). Testing

showed significant processing speed deficits. GX55b at 24–25; Hr'g Tr. 1875:21–1876:21, 1913:3–8 (Martell: this deficit was "enough in itself" to conclude Runyon was brain damaged).

19.      Although Dr. Montalbano opined that Runyon had no "significant mood dysfunction," instead suggesting a personality disorder, GX55b at 26–29, he conceded that "problems such as attention to detail may have been part of the sequelae from" the 1996 accident. *Id.* at 29. And while he relied on the fact that Runyon's "problems with lateness and conflict with peers and/or supervisors predated the accident," *id.*, to reach the personality disorder diagnosis, this ignores Runyon's significant history of head injuries pre-dating the 1996 accident, and that the DSM-IV TR precludes a personality disorder diagnosis when symptoms can alternatively be explained by head injury. *See* Hr'g Tr. 1723:2–13 (Nadkarni testifying it is inappropriate to diagnose personality disorder if symptoms are explained by another diagnosis); *id.* 1910:12–1911:2 (Martell, similar); *id.* 2477:14–2478:10 (Aguirre, similar). Ultimately, Dr. Montalbano opined that "only a more detailed neuropsychological, neurological and biopsychosocial investigation would definitely rule in or rule out brain dysfunction[.]" GX55b at 30.

20.      Dr. Patterson, a psychiatrist, similarly recounted Runyon's history of trauma and head injuries. GX55a at 7, 11. This included: (i) childhood abuse, which Runyon reported caused his facial asymmetry; (ii) being knocked out playing football at age 5 or 6, during military training exercises, and wrestling; and (iii) the 1996 car accident. *Id.* at 11–12, 18, 20. Dr. Patterson also reported that Runyon described "a couple of times when he heard his name called when he was alone," that on "one occasion, he thought it was his father, which did not make any sense," *id.* at 20–21, and that Runyon described himself in heroic terms. *Id.* at 22. He nevertheless concluded without explanation that Runyon's "perception of reality appears unimpaired." *Id.* at 21. Like Dr. Montalbano, Dr. Patterson suggested a personality disorder, *id.* at 23, but failed to account for both

Runyon's history of head injury before 1996 and that the DSM-IV-TR requires that head injury be ruled out before a personality disorder diagnosis can be made. *See* PFF ¶ 19.

21.     On February 5, 2009, Dr. Cunningham sent his preliminary report to counsel. GX14. This report included only a violence risk assessment, not any social history mitigation information or opinions. *See id.*; Hr'g Tr. 1167:2–1168:10, 1173:4–18, 1177:16–1178:25. Dr. Cunningham billed no time to Runyon's case from the date of his report until August 14, 2009— five days before the penalty phase began. *See* DX180; Hr'g Tr. 1169:11–18, 1182:3–10. Hudgins did not contact Dr. Cunningham for the first time until mid-July 2009, when the guilt phase was already well underway. *See* DX181. Dr. Cunningham was never provided with the materials necessary to conduct a mitigation investigation, *see* Hr'g Tr. 1178:20–1180:10, nor was he ever asked to supplement his report to include a discussion of adverse developmental factors, *id.* 1186:13–1187:15, 1167:2–1168:10, 1182:19–22.

22.     Trial counsel first disclosed their intent to retain a neuropsychologist, Dr. Scott Bender, in April 2009. *See* GX22. However, Dr. Bender never evaluated Runyon, and counsel later represented that they never "accessed" his services. *See* GX35.

23.     As noted above, counsel also received Runyon's army medical records in April 2009. *E.g.*, DX83 at 4. These records contained detailed information about head injuries Runyon sustained in the 1990 and 1996 car accidents, and his resulting persistent and serious symptoms.

24.     For example, an August 1995 record reports that Runyon had "recurrent inflammatory lesions to forehead and nose" for several years after a car accident "resulting in glass embedding in face[.]" DX83 at 36. Beginning on November 12, 1996, many records detail the 1996 accident and its aftereffects. *See id.* at 49–51 (Runyon was "cut out of [his] truck," sustained serious injuries, and was taken to the emergency room at Lake Martin Hospital in Alabama).

Follow-up notes one month later recount that Runyon was continuing to suffer vertigo and numbness, among other symptoms, and to seek follow-up care, including for post-accident anxiety. *Id.* at 53–54, 70. A January 1997 record documents Runyon's persistent vertigo and complaints of short-term memory loss and insomnia, and suggests post-traumatic stress disorder (PTSD). *Id.* at 55. The same record reports an abnormal neurological exam—specifically, increased deep tendon reflexes, which is the same finding Dr. Merikangas made in 2009 (and again in 2015, as did Dr. Nadkarni in 2022). *Id. See also* Hr'g Tr. 2172:18–2175:11. The record further states: "Explore possible symptoms of depression and antidepression meds[.]" The next month, Runyon sought "urgent" care for symptoms of PTSD. DX83 at 56. Nearly a year after the accident, Runyon continued to complain of vertigo and headaches lasting "3–4 days." *Id.* at 59–60 (August 1997); *see also id.* at 62 (September 1997). Runyon's latest available army medical record—dated September 1997—documents "frequent or severe headaches," dizziness, "head injury," trouble sleeping, depression, memory loss, and PTSD. *Id.* at 65–66.

25.    On June 9, 2009, trial counsel represented in a court filing that they were aware of "various medical issues involved in [Runyon's] past that require review by a psychiatrist," but that "have still not been able to be investigated" because counsel did not have Runyon's military medical records. GX35 at 1. As noted above, however, counsel had received these records in April, and in fact Cronin had summarized them in a memo for counsel dated May 5. GX26.

26.    Runyon was first evaluated by a neuropsychologist, Dr. Allan Mirsky, on June 26, 2009—four days before the guilt phase began. GX36. Dr. Mirsky's preliminary report describes many of the same head injuries reported to Drs. Montalbano and Patterson and to Cronin, including: (i) blast injuries during military training exercises; and (ii) "two serious car accidents with cognitive sequelae—one in 1990 and the other in 1996," which "produced a variety of

symptoms," including "brief unconsciousness," vertigo, numbness, "impaired memory," "'jumbled thoughts,' and according to a report from his estranged wife, marked personality changes including a short temper." *Id.* Dr. Mirsky noted that "[s]ome of the medical professionals who saw David raised the possibility of post-traumatic stress disorder." *Id.*

27.    Dr. Mirsky found deficits on neuropsychological testing "consistent with some mild, diffuse brain damage," and "brainstem injury" and "clearly indicative of dysfunction in [the] brainstem-cortical system[.]" *Id.* at 5–6. Dr. Mirsky explained that Runyon's "poor scores, as well as his continuing symptoms of vertigo" might "explain his spotty and uneven work history." *Id.* at 6. He noted that no imaging had been done, *id.* at 2, opining that Runyon "merit[ed] further intensive neurological investigation," *id.* at 6. And he concluded by noting that his report was "preliminary," and that any diagnosis was "deferred pending receipt of further information." *Id.*

28.    On June 29, 2009, the government disclosed the reports of Drs. Patterson and Montalbano. *See* GX55a, GX55b. Resource counsel shared impressions of these reports with Runyon's counsel, including from David Freedman, a mental health expert, and Lisa Greenman, a death penalty lawyer with mental health expertise. Freedman's view was that "the 'personality' disorder stuff (which is exceptionally soft here) sounds like traumatic brain injury from the car accident." DX111. Greenman's was similar: "Wow - these are really not such scary reports . . . even the personality disorder diagnosis isn't really damning . . . [T]hese prosecution expert witnesses could end up being more helpful than the defense witnesses." DX144. Greenman further opined: "There really isn't a big attack to be mounted . . . the work that needs doing is putting together a defense presentation . . . It sure doesn't sound like Montalbano or Patterson would be inciting the jury in favor of death." *Id.* Greenman subsequently sent potential impeachment material for Dr. Montalbano, which Woodward didn't follow up on. *See* Hr'g Tr. 2266:18–2277:12

(Woodward discussing DX182 and testifying that he did not pursue this possible impeachment and would not have done so before deciding whether to present brain injury or mental health evidence).

29.     The guilt phase began on June 30, 2009. During the twelve trial days, Runyon's counsel devoted little time to the mitigation investigation. According to counsel's billing records, Woodward's penalty phase work from June 30 through July 19 was limited to a one-hour meeting with Hudgins and Cronin on July 6. *See* GX94 at 3.[3] Hudgins spent approximately 12 hours on mitigation-related work during this period. *See* DX158.[4]

30.     On July 2, 2009, Dr. Mirsky reiterated to counsel that it was "clear from the data that there is strong evidence that [Runyon] is suffering from a neurological disorder" and that evaluation by a neurologist was "essential . . . to establish the nature of the disorder." GX38.

31.     On July 17, 2009, jurors returned a guilty verdict, ECF 245, after which counsel sought a 90-day continuance for the penalty phase, detailing the extensive investigative work that had not yet been done and representing that they "will simply not be ready to present the defendant's case for life . . . unless a substantial continuance is granted." GX47 at 1–3. Counsel separately requested funding for Dr. Merikangas at that time. *See* DX18.

32.     A few days later, trial counsel filed a "Notice of Intent to Introduce Mental Health Testimony," enclosing the reports of Drs. Cunningham and Mirsky. *See* GX50. As noted above, PFF ¶ 21, Dr. Cunningham's report did not discuss Runyon's mental health or social history. The same day (July 20), Hudgins told Dr. Nelson he did not anticipate calling Nelson as a witness, *see* GX49, because by that point Hudgins did not "anticipate using the mental health as a mitigator." Hr'g Tr. 189:10–17. As of this date, Runyon had not had a neurological examination, Dr. Mirsky

---

[3] Woodward attested that his billing records were accurate. *See* Hr'g Tr. 2213:1–7.

[4] This includes 10 hours to "review mitigation material" on July 5 and 12, the same 1.0 hour meeting that Woodward billed on July 6, and 1.2 hours spent emailing experts on July 10.

had provided only a preliminary report, and no imaging had been performed.

33.     On July 22, 2009, the jury found Runyon death-eligible, after which the Court granted funding for Dr. Merikangas, GX54, and a four-week continuance, GX53.

34.     The next day, Dr. Mirsky again advised Runyon's counsel that he was "firmly convinced" that Runyon was "still suffering from the effects" of several head injuries. GX59. And he explained the basis of this firm conviction, including that: (i) Runyon's neuropsychological test results showed "classical symptoms of blast injury and impact injury after a car accident," (ii) his "quickness to anger, and impulsivity" were "well documented in the brain injury literature," and (iii) his "occasional dizziness" was "symptomatic of brainstem injury." GX59.

35.     Dr. Merikangas examined Runyon on July 29, 2009. *See* GX63. The next day, he faxed orders for MRI and PET scans to Hudgins, GX60, requesting that the scans be sent directly to him, as was his usual practice. *See id.*; Hr'g Tr. 1941:16–19, 1949:4–10.

36.     Two weeks before the selection phase began, Dr. Merikangas wrote a preliminary report.[5] *See* GX63. At that time, counsel had sent him the Patterson and Montalbano reports, but not Dr. Mirsky's report or other records, even though Merikangas had requested Runyon's medical and other social history records. *See* Hr'g Tr. 1994:21–1996:7 (Merikangas testifying he "didn't have anything except [the] Montalbano and Patterson [reports]," and never received medical records even though his "practice in hundreds of cases" was to request them); *id.* 1961:16–21 (similar). *See also id.* 1958:12–1959:15, 1962:15–1964:11, 1969:1–23, 2094:20–2095:23, 2113:16–22, 2171:21–2181:9 (Merikangas explaining importance of these records).

37.     As described in his preliminary report, Dr. Merikangas's neurological examination

---

[5] Dr. Merikangas testified that the amount of time he had to examine Runyon and prepare a report was "much shorter" than he is typically afforded in a capital case. Hr'g Tr. 1922:12–17.

of Runyon revealed abnormal findings, including that: (i) he had scars on his head and face and a lump on his scalp "from trauma"; (ii) his forehead "does not wrinkle with facial expression and his right lip sags," which "may be congenital or the result of beatings he sustained in childhood"; and (iii) his deep tendon reflexes were symmetrically increased and the distal phalanges of the thumbs were "hyper-extensible." GX63 at 2.[6] *See also* Hr'g Tr. 1927:7–1933:203 (explaining findings); *id.* 1967:2–1968:4 (reflex abnormality is "corroborative of a diffuse brain injury"); *id.* 2078:24–2079:8 (clinical history, headaches, and hyperreflexia corroborate brain damage). Based on the exam and information reported by Drs. Montalbano and Patterson, Dr. Merikangas preliminarily concluded that Runyon "clearly ha[d] impaired executive functioning suggestive of frontal lobe brain impairment," and was "either in a fantasy world of grandiose wishful thinking, or suffering from delusions." GX63 at 2–3. *See also* Hr'g Tr. 1937:5–1939:8, 1973:8–19. "Because of [Runyon's] history of multiple head injuries, beatings in childhood, and . . . severe headaches," Dr. Merikangas opined that he "require[d] brain imaging and an EEG," advising that a full report would follow his analysis of the imaging. GX63 at 2–3; Hr'g Tr. 1937:14–16.

38.     Counsel did not understand the significance of these experts' findings, nor did they take steps to try to learn what they meant. *See e.g.*, Hr'g Tr. 303:9–18 (Hudgins admitting he did not know "the criteria for" "traumatic brain injury," "post-traumatic stress disorder," "delusional disorder," or "psychosis," or "how to investigate for those things"). Nor did counsel consult with Cronin to better understand the experts' findings. *Id.* 904:18–23, 912:10–24.

39.     On August 5, 2009, Hudgins informed Dr. Mirsky that he intended "to file a

---

[6] Dr. Merikangas further opined that the evaluations of Drs. Montalbano and Patterson "suggested that Runyon suffered from Migraine-like headaches," attention deficit disorder, and PTSD, which he based on these experts' "observations," not "their diagnos[e]s," which he did not rely on. Hr'g Tr. 2013:15–2014:4, 2015:1–8, 2083:22–23, 2163:17–22.

supplement" to Mirsky's report following the results of the brain scans. GX60A. Dr. Mirsky responded on August 7 that he did not "have anything to add until I know the results of the imaging," repeating that he was "confident" that neuropsychological testing "showed the effects of" multiple head injuries and that "Runyon is impaired and this needs to be considered in his sentencing." *Id.* But the undisputed evidence shows that counsel never provided the scans or MRI report to Dr. Mirsky. Trial counsel's files contained no written communications with Dr. Mirsky between this date and the end of the penalty phase. The last reference in Hudgins's billing records to any communication with Dr. Mirsky before the close of the penalty phase is from August 5. *See* DX158; *cf.* Hr'g Tr. 2273:1–19 (Woodward testifying he didn't know if Hudgins did anything to follow up with Dr. Mirsky). Woodward's billing records contain no reference to communications with Dr. Mirsky, *see* GX93, and Woodward testified that he never spoke with Dr. Mirsky. Hr'g Tr. 2276:24–25. It was not until after the penalty phase concluded and jurors had already returned a death sentence that counsel ever discussed the MRI results with Dr. Mirsky (telling him the scans had been "read as normal"), and even then, they did not provide him with the scans or MRI report. *See* DX41. In response, Dr. Mirsky cautioned Runyon's counsel that a "normal" MRI reading did not mean Runyon was not brain damaged, and recommended additional neuroimaging. *Id.*

40.     On August 6, 2009, the United States disclosed two new trial experts—Dr. Daniel Martell, a neuropsychologist, and Dr. Michael Batipps, a neurologist.[7] *See* DX176. Dr. Martell testified that when he is disclosed as a testifying expert, as he was in this case, his role is "to give an independent opinion based on what I see," not to be "an advocate." Hr'g Tr. 1884:10–1885:2. Dr. Martell spent 5.75 hours in advance of trial reviewing neuropsychological testing data from

---

[7] Dr. Montalbano is not a neuropsychologist, *see* Hr'g Tr. 1870:17–20, which presumably is why the United States retained Dr. Martell to rebut Dr. Mirsky.

Drs. Mirsky and Montalbano. *See id.* 1883:10–22, 1887:6–17; DX201. These data were enough for Dr. Martell to conclude that Runyon is brain damaged. Hr'g Tr. 1868:2–20, 1893:12–1894:11.

41.     On August 10, 2009, trial counsel moved for permission to "supplement the reports of [Runyon's] mental health experts after the MRI and PET scan results are available," based on "the seriousness of this case and the statements by the doctors of the necessity for the test results to determine if defendant has damage to his brain as a result of injuries that occurred prior to [the crime]." GX66. The Court granted this motion on August 17. GX68. The Court's ruling acknowledged that the Mirsky and Merikangas reports were preliminary, pending the results of further testing, and that "without such data, the defendant's experts would have been ill-equipped with the necessary information to make a full and accurate report insofar as their conclusions would rely upon the interrelatedness of <u>all</u> the data." *Id.* at 8 (emphasis in original). The Court found that the defense and government experts were "in substantial agreement that the mental health examinations already administered reveal that the defendant suffered some head trauma," *id*. at 4. The Court further found that "while the United States' and the defendant's experts do not agree on their ultimate conclusions about Mr. Runyon's cognitive abilities," they were in "substantial agreement" that further testing "would allow the expert witnesses to offer the jury a more complete opinion regarding the normalcy, or lack thereof, of the defendant's brain functions. Without those opinions, the jury may be left to speculate as to the significance of the defendant's past head injuries as such may relate to his sentence. This result is unacceptable where there is an opportunity for the jury to have this information." *Id.* at 5–6. The Court concluded: "a more detailed evaluation of the defendant's brain functions is necessary to provide an adequate defense and adequate information to the jury." *Id.* at 8–9.

42.     The scans were performed on August 13, 2009. GX61. Dr. Kirsten Davis, a

radiologist at the imaging facility, read the MRI that afternoon, reporting it as "normal." *Id.* Dr. Davis is a breast imaging specialist with no neuroradiology training. Hr'g Tr. 2566:18–2570:11.

43.     Also on August 13, 2009, Runyon's counsel spoke to Dr. Merikangas for the last time. A "Memo to File" purporting to summarize the contents of that call was found in trial counsel's files. GX92.[8] The memo is undated and does not identify the author. *Id.* It is apparent from the Memo that neither counsel nor Dr. Merikangas had seen Runyon's MRI at the time of the conversation. *Id.* Dr. Merikangas did not make the statements the Memo attributes to him. *See* Hr'g Tr. 2044:4–2051:24, 2094:9–2095:4. Woodward had no memory of the August 13 call—or ever speaking to Dr. Merikangas. *Id.* 2207:1–21, 2218:12–2219:6, 2255:11–20, 2249:5–7, 2287:9–25, 2283:25–2284:3. Hudgins was not shown the Memo, but his testimony makes clear that he had no independent recollection of the August 13 call. *See id.* 132:5–20, 292:21–294:2.

44.     Counsel's files contained no communications with Dr. Merikangas after August 13, which is also the date of the last reference in their billing records to any communication with Dr. Merikangas. *See* DX158; GX91.[9]

45.     On August 14, 2009, Hudgins asked the Court to allow the scans to be released directly to him "so that getting the materials to the defense expert can be expedited." GX67. This confirms that neither he nor Merikangas had possession of the scans as of August 14. The Court granted this motion the same day, DX163, but Hudgins did not obtain the scans until August 17—less than 48 hours before the penalty phase began. *See* DX158 at 19 (August 17, 2009 entry stating: "to jail for med. scans, scans to marshall [sic]."). Dr. Merikangas could only have received the

---

[8] The memo was admitted over Runyon's objections that it is improper double hearsay. *E.g.* Hr'g Tr. 1510–11, 1746–47, 1906, 2038, 2102–2108, 2490. Runyon maintains his objections to the admissibility of the memo.

[9] Hudgins agreed it was "possible" that he "wouldn't have talked to Dr. Merikangas about the results of the scans." *Id.* 307:15–19.

scans on a disk via mail, not electronically. *See* Hr'g Tr. 1945:25–1946:6.

46.     Dr. Merikangas's billing records reflect an entry for "MRI and PET" on August 17, 2009. DX169. There is no evidence showing whether trial counsel sent the scans to Dr. Merikangas, or whether he received them directly from the medical facility, as he had requested.[10] It is clear from trial counsel's bills and the absence of any post-August 13 communications in their files, PFF ¶ 44, that they never communicated with Dr. Merikangas after he had the scans, and thus that counsel never learned Dr. Merikangas's opinion about what the scans showed.

47.     Although Hudgins could think of no reason why he would not have sent the MRI results to his experts once he obtained them, *see* Hr'g Tr. 235:1–7, undisputed evidence shows he never sent them to Dr. Mirsky. *See* DX41; PFF ¶ 39.

48.     Counsel also never sent the scans or MRI report to Sheila Cronin. *See* Hr'g Tr. 898:16–899:1 ("Q. [D]o you have knowledge about his reaction to undergoing these brain scans? A. I don't have knowledge of his reaction, and I also never saw the results. Q. Did you have any discussions with the attorneys about these brain scans or the results? A. It was a matter of waiting on them, and everything was crushed into a very narrow time frame, and I never got word that they actually received the results. Q. Never got word from who? A. From Woodward or Hudgins.").

49.     Trial counsel did not request that their experts supplement any of their preliminary reports after receiving the scans. As noted above, counsel's last communications with Drs. Mirsky and Merikangas prior to the conclusion of the penalty phase were on August 5 and August 13, respectively—before the MRI was done.

---

[10] Counsel's files did not contain, for example, any transmittal letter or receipt of mailing showing they sent the scans. Dr. Merikangas did not recall how he received them. Hr'g Tr. 1949:4–10.

### C.   The Selection Phase & Jury Verdict.

50.   The selection phase began on August 19, 2009. Neither Dr. Mirsky nor Dr. Merikangas testified. Counsel presented no evidence of Runyon's brain damage or mental illness. The only defense expert who testified was Dr. Cunningham. After trial counsel previewed that Dr. Cunningham would testify broadly about mitigating evidence from Runyon's background, the government moved *in limine* to limit his testimony to a violence risk assessment because his report included no such broader mitigation information. *See* ECF 267. The Court granted this motion after trial counsel apparently conceded the issue. *See* Trial Tr. 2078:21–2079:18.

51.   Counsel presented 21 lay witnesses, a third of whom testified about Runyon's good behavior in jail. Trial Tr. 2084–92, 2158, 2199:7–2242:8. Lay witnesses provided some social history evidence, *e.g.*, *id.* 2341:13–2345:18, 2349:3–2350:12, 2410:10–2411:15, but this was incomplete and unaccompanied by any expert testimony about why this evidence was relevant to Runyon's moral culpability.

52.   Although Hudgins had assumed principal responsibility for the selection phase, he declined to deliver the closing argument. During Woodward's closing, he told jurors he had known the government's lawyers "a long time" and that "they don't come here before you and lightly ask you to put someone to death." *Id.* 2633:1–3. He further lamented that he did not have a "glib answer" or "pat response" as to "what caused Runyon to get involved in this and to be where we are today," *id.* 2645:8–16, instead focusing on the impact a death sentence would have on Runyon's family, the inequity of Runyon's codefendants having received life sentences, and the low likelihood of Runyon's future dangerousness, *id.* 2647:5–2656:16.

53.   Jurors deliberated for eight hours, during which they questioned what would happen if they could not agree on a sentence. *Id.* 2707:9–2709:17. Ultimately, Runyon was sentenced to death on two counts and life imprisonment on the third count. *Id.* 2714:18–23. Jurors

17

found ten of the fourteen mitigators proposed by the defense, as well as three mitigators the defense had not proposed, including that Runyon experienced "domestic violence and paternal conflict/abuse from [his] mother and adoptive father." *United States v. Runyon*, 707 F.3d 475, 487–88 (4th Cir. 2013). Among the four aggravating factors jurors found was "lack of remorse." Trial Tr. 2711:21–23.

> **D.     Runyon's counsel failed to present significant additional available evidence of brain damage, mental illness, and psychosocial history.**

54.     Significant objective evidence was available in 2009 that Runyon was severely brain damaged at the time of the crime, but trial counsel failed to (i) uncover this evidence and/or (ii) appreciate its significance because they prematurely abandoned their investigation.

55.     There is no single test to diagnose brain injury. *See, e.g.*, Hr'g Tr. 1792:8–1794:6. Instead, experts rely on a series of diagnostic tools, including clinical history, brain imaging, neuropsychological testing, and neurological examination. *See, e.g.*, *id.* 1924:6-1925:20, 1968:18–1969:3 (Merikangas); *id.* 1600:3–1601:20, 1670:23–1673:21, 1687:13–1687:6, 1692:1–24, 1699:5–14, 1704:17–1704:12, 1833:20–1834:12 (Nadkarni describing sources informing his opinion that Runyon is "severely brain injured" with "marked frontal lobe dysfunction"). In Runyon's case, all of these data points demonstrate frontal lobe damage. *See, e.g.*, *id.* 2171:3–16 (Merikangas explaining that exam findings and history "all come[] together" to suggest frontal lobe damage); *id.* 1881:9–18 (Martell, similar); *id.* 1688:2–15 (Nadkarni, similar).[11]

56.     Frontal lobe damage compromises critical processing tools and causes poor judgment. Hr'g Tr. 2561:3–8. *See also id.* 1650:5–1650:15, 1651:8–1653:4, 1976:9–1977:12

---

[11] Moreover, multiple head injuries have cumulative effects, particularly those sustained at a young age. *See* Hr'g Tr. 1658:13–1659:22, 1664:11–14 (Nadkarni); *id.* 1879:6–19 (Martell); *id.* 2438:14–2439:1 (Aguirre); *id.* 2580:17–2581:9 (Lipton).

(frontal lobe injury leads to executive functioning deficits and impulsivity). These precise effects are borne out in Runyon's exam results, as described in more detail below.

### i.    *Runyon's 2009 MRI showed marked abnormalities.*

57.    Runyon's 2009 MRI scan revealed numerous, significant abnormalities.

58.    All three neurologists who reviewed Runyon's 2009 MRI scan—including the government's habeas expert—identified numerous white matter hyperintensities. *See* DX137 at 9 (Nadkarni report); Hr'g Tr. 1678:22–1687:12 (Nadkarni); DX21 at 4 (Merikangas 2015 report); Hr'g Tr. 1954:7–10, 1956:25–1957:2, 1965:6–1966:20 (Merikangas); GX75 at 4 (Aguirre report); Hr'g Tr. 2368:19–22, 2463:12–2466:20 (Aguirre). Drs. Nadkarni and Merikangas testified that the location of the white matter hyperintensities on Runyon's 2009 scan is characteristic of traumatic brain injury. *Id*. 1966:22–20 (Merikangas); *id.* 1683:3–1686:12, 1821:21–1823:1 (Nadkarni).  For the reasons explained in PFF ¶ 71, the Court should reject Dr. Aguirre's contrary opinion that Runyon's 2009 MRI was unremarkable despite the presence of these lesions.

59.    In rebuttal to Dr. Aguirre, Dr. Lipton—the only neuroradiologist who reviewed Runyon's 2009 MRI—identified white matter hyperintensities in locations highly corroborative of traumatic brain injury, Hr'g Tr. 2544:21–2545:1, 2549:2–2550:7, 2553:1–2554:23, 2558:11–2561:8, and in far greater number than would be expected in someone Runyon's age, *id.* 2551:11–2553:7, 1685:7–12. Dr. Lipton also identified bifrontal encephalomalacia—*i.e.*, loss of brain matter in Runyon's frontal lobes—that was "almost certainly due to traumatic injury," *id*. 2613:17–2618:5, 2621:12–2625:13, 2628:5–2630:6.[12] *Cf. id.* 2467:20–2468:13 (Aguirre testifying that

---

[12] The Court excluded this testimony but accepted a proffer from Dr. Lipton. Hr'g Tr. 2613:17-2630:6. For the reasons Runyon previously briefed, *see* ECF 890, this was properly within the scope of rebuttal. The Court excluded entirely testimony from Drs. Lipton and Nadkarni about Runyon's Bureau of Prison medical records, including concerning a 2018 MRI in which a BOP neuroradiologist identified encephalomalacia. *See* Proposed DX161 (not admitted). Dr. Lipton (continued…)

encephalomalacia is a permanent loss of brain tissue resulting from severe injury). Dr. Lipton testified that he had "complete confidence" in his MRI findings and opinions of Runyon's brain injury. *Id.* 2624:3–6. Encephalomalacia is "highly unlikely" to result from a mild brain injury like a concussion, and highly likely to impact frontal lobe function. *Id.* 2628:5–2630:6, 2571:24–2572:19, 2584:3–9.

60.     Because neuroradiologists review orders of magnitude more brain MRIs than neurologists and diagnostic radiologists, and thus develop specialized skills and expertise in reading brain MRIs, only a neuroradiologist is qualified to report results of a brain MRI. *See, e.g.*, Hr'g Tr. 1667:11–1670:22 (Nadkarni); *id.* 1880:17–22, 1902:21–24 (Martell); *id.* 1948:3–12, 2161:9–16, 2163:2–9 (Merikangas); *id.* 2309:15–22, 2363:14–2364:2, 2410:3–25, 2454:15–19 (Aguirre); *id.* 2524:12–18, 2525:21–2526:3 (Lipton). Although the diagnostic radiologist at the facility where the 2009 MRI was performed read the scan as normal, GX61, multiple experts testified this reading should be given little or no weight.[13] *See* Hr'g Tr. 2570:20–2571:23 (Lipton); *id.* 2161:9–16, 2163:2–9 (Merikangas). Dr. Aguirre agreed he would give more weight to a neuroradiologist's reading than that of a diagnostic radiologist. *Id.* 2410:21–25, 2456:20–2458:10. Had trial counsel followed up with their experts in 2009, they would have learned this and then

---

opined in his report but was not permitted to testify that the 2018 MRI report shows "describes encephalomalacia with hemorrhage in the same location as is visible on the 08/14/2009 MRI[.]" *See* Proposed DX200 (not admitted). A BOP neurologist subsequently opined (not admitted) that Runyon's abnormal MRI and hyperreflexia were "related to several [incidents] of old head trauma," finding stroke "unlikely." Proposed DX161 at 7. *See also* Proposed DX200 ("Neurologist Dr. Paine excluded stroke (ischemic change) and concluded that the finding was due to prior trauma."). That two BOP physicians—who have no stake in these proceedings and were reviewing Runyon's imaging and other test results in a treatment (not expert witness) capacity—made the same findings in 2018 that Dr. Lipton made concerning Runyon's 2009 MRI corroborate Dr. Lipton's findings and Runyon therefore submits that this evidence should have been admitted under Fed. R. Evid. 703 to assist the Court in evaluating Dr. Lipton's opinions.

[13] Nor would a normal MRI rule out brain injury; most people with brain injuries have normal MRIs. Hr'g. Tr. 2578:15–2580:16, 2584:11–18 (Lipton); *id.* 2466:24–2467:4 (Aguirre). And even "[w]hen we do see something on MRI, it's just . . . the tip of the iceberg." *Id.* 2580:6–16 (Lipton).

reasonably would have consulted a neuroradiologist. *Id.* 1951:19–24, 1973:20–1974:25. Even if counsel had not retained a neuroradiologist at that point, they likely would (and should) have done so once the government sought to rebut Dr. Merikangas with its own neurologist. PFF ¶ 40 (government disclosed its neurologist on August 6, 2009).

### ii.    *Runyon's neurological examinations were uniformly abnormal.*

61.    Runyon underwent neurological examinations in 2009 and 2015 by Dr. Merikangas and in 2022 by Dr. Nadkarni. These exams yielded consistent and abnormal results, including: (i) hyperreflexia, *see* GX63 at 5 (Merikangas 2009), DX21 at 3 (Merikangas 2015), DX137 at 8 (Nadkarni 2022); and (ii) facial asymmetry resulting from either brain damage or peripheral nerve damage, *see* DX21 at 3, 5 (Merikangas), DX137 at 5, 6, 8, 10 (Nadkarni).[14] *See also, e.g.,* Hr'g Tr. 2166:20–2170:16 (Merikangas testifying about abnormal exam findings); *id.* 1607:14–22 (Nadkarni testifying that mental status, cranial nerve, reflex, and motor exams were all abnormal); *id.* 1608:1–1630:2, 1640:17–1654:15,1665:18–1666:18, 1832:11–1833:5.

62.    Like Dr. Merikangas, Dr. Nadkarni concluded that Runyon was "severely brain injured" with "marked frontal lobe dysfunction" and "many attendant psychiatric and cognitive diagnoses." Hr'g Tr. 1599:15–1600:10. *See also id.* 1723:14–22.

63.    Dr. Nadkarni further opined that the permanent damage to Runyon's face makes it impossible for him to move his face on one side, which presents as a "flat affect," which, without proper explanation and context, jurors might have interpreted as Runyon inappropriately "smiling or [being] glib or off." Hr'g Tr. 1626:2–18. *See also id.* 1627:16–1629:6; DX137 at 10.

---

[14] Dr. Nadkarni made other findings corroborative of brain injury, including Hoffman's signs, a positive Palmomental reflex, and motor deficits. DX137 at 8–9; Hr'g Tr. 1641:14–1643:12. Dr. Merikangas's 2015 exam also showed a positive Romberg response. DX21 at 3.

### iii. *Neuropsychological testing by both defense and government trial experts showed frontal lobe damage.*

64.     Testing administered by both the defense (Mirsky) and government (Montalbano) experts in 2009 showed deficits consistent with frontal lobe damage. *See* PFF ¶ 18, 27; Hr'g Tr. 1866:4–1879:2 (Martell describing that both government and defense trial experts found significant processing speed deficits); *id.* 1882:21–25 ("Impairment [in] processing speed is generally a frontal lobe function."); *id.* 1827:19–1828:8 (Nadkarni testifying that "[t]he data in Dr. Montalbano's report is very significant and abnormal").[15]

65.     Dr. Martell, who was originally retained by the government before trial and again in 2022 during Runyon's habeas proceedings, concluded that Runyon "suffers from longstanding brain dysfunction," and that information available to counsel at the time of trial (test data from Dr. Montalbano and Dr. Mirsky) was sufficient to support this opinion. *See* DX145 at 1, 2, 4; Hr'g Tr. 1864:1–1865:13, 1868:2–20, 1891:19–1894:11. Dr. Martell determined that both experts had identified "significant and stable deficits in his speed of information processing." DX145 at 3.

66.     Dr. Nadkarni opined that Runyon's test results revealed deficits in multi-tasking and complex problem-solving, short-term memory issues, and word finding issues. DX137 at 6. *See also* Hr'g Tr. 1649:9–11 (Runyon exhibits signs of frontal lobe damage), *id.* 1649:17–1653:4 (damage to the frontal lobe results in impulsivity and confabulation). This is consistent with Runyon's medical records following the 1996 car accident, *see* DX83 at 65–66 (describing memory and other cognitive issues), as well as findings by experts who evaluated Runyon in 2009, *see* GX55a at 20 (Dr. Patterson noting that Runyon reported memory issues since 1996 accident).

---

[15] Dr. Mirsky evaluated Runyon again in 2015 and made similar findings. *See* Hr'g Tr. 1882:8–20. Dr. Mirsky died before Runyon's evidentiary hearing began in February 2023.

iv.     *Other evidence corroborates brain injury and related symptoms of mental illness.*

67.     Runyon also has a documented history of migraines beginning after the 1996 car accident—a common post-traumatic symptom corroborative of brain injury. *See, e.g.*, Hr'g Tr. 1719:21–1720:1, 1835:13–20. Medical records following the accident discuss severe headaches lasting days at a time. *See* DX83 at 65–66; *see also* Hr'g Tr. 1752:19–1753:2, 1764:10–19, 1836:7–1842:5. Runyon also reported migraine-like symptoms to Dr. Merikangas in 2009 and 2015, and to Dr. Nadkarni in 2022. *See* DX21 at 5, 3; DX 137 at 4; Hr'g Tr. 1617:1–1620:14.

68.     Many witnesses testified to Runyon's personality change after the 1996 accident, PFF ¶ 8—another common brain injury symptom. *See, e.g.*, Hr'g Tr. 1707:13–23 (Nadkarni).

69.     Several evaluators also reported that Runyon was grandiose and prone to confabulation. For example, in a 2008 jail medical record, a medical provider described Runyon as grandiose, delusional, and rambling, which suggested to the provider that Mr. Runyon may have schizo-affective disorder or bipolar disorder. *See* DX44 at 2–3. Dr. Nadkarni's findings are consistent with this account. *See* DX137 at 8; Hr'g Tr. 1608:1–1610:1, 1611:23–1614:25. Dr. Nadkarni also reached a diagnosis of schizo-affective disorder, which "can be a consequence of traumatic brain injury." *Id*. 1720:2–1721:23.

70.     Dr. Nadkarni—the only epileptologist to evaluate Runyon—also "made a diagnosis of epilepsy," *id*. 1713:3–14, which he attributed to brain injury, *id*. 1718:20–1719:15. Seizure activity can alter the brain and cause behavioral changes. *Id*. 1719:16–20 (untreated epilepsy can cause "the same kinds of problem[s]" as "a brain injury"; "[e]ach seizure is like another little injury to the brain"). *See also* DX137 at 4; Hr'g Tr. 1713:3–1717:12, 1845:3–1846:8.

71.     Dr. Aguirre's testimony does not undermine—but rather corroborates—the evidence showing that Runyon was brain damaged at the time of the crime. Dr. Aguirre agreed

that clinical history is important in making a diagnosis, *id.* 2418:11–18, but did not ask for and was not provided Runyon's medical, school, or employment records; neuropsychological testing data; or declarations or testimony from people familiar with Runyon, his history of trauma or head injuries, or his symptoms, *id.* 2415:24–2419:13. He also did not examine Runyon. *Id.* 2419:3–7. And although Dr. Aguirre discounted all of Mr. Runyon's head injuries except the 1996 accident as uncorroborated, he conceded that he "did not ask for" materials that might have corroborated them, *id.* 2424:24–2425:8, and that he had disregarded evidence he was provided in discounting Runyon's facial asymmetry and the possibility that it resulted from childhood trauma, *id.* 2425:3–2428:25. Dr. Aguirre also acknowledged that if Runyon had suffered a head injury before 1996, this could explain his behavioral and employment issues. *Id.* 2479:1–15. Further, while Dr. Aguirre opined that the 1996 accident likely resulted in only a minor concussion, he was unaware when he formed that opinion that Runyon had continued to seek treatment for many months after that accident, and agreed that this would be relevant to his assessment of whether Runyon suffered a traumatic brain injury.[16] *Id.* 2429:4–2435:3, 2470:5–2471:4, 2485:2–15. Dr. Aguirre also agreed with Runyon's experts that (i) Runyon's 2009 MRI showed white matter hyperintensities, which "in a perfectly normal brain . . . you would not see," *id.* 2368:19–22, and which "can be an indication of traumatic brain injury," *id.* 2466:1–20; (ii) Runyon's clinical history includes several events consistent with concussion, *id.* 2439:25–2445:18; (ii) multiple concussions can have a "cumulative effect" on function, *id.* 2438:13–16; and (iv) depression, anxiety, and PTSD are common sequelae of traumatic brain injury, as are many other symptoms reported in Runyon's

---

[16] The evidence Dr. Aguirre relied on to opine that Runyon's cognitive health had "resolve[d]" within "approximately 6 month[s]" was that (i) he had jumped out of an airplane, which "essentially healed him," and (ii) that Runyon reported in 2009—13 years post-accident—that "his memory has improved but that he still gets vertigo at times," GX75 at 3; Hr'g Tr. 2451:14–2452:9.

medical records pre-dating the crime, including vertigo, memory loss, insomnia, and severe headaches, *id.* 2431:15–2433:25. Further, while Dr. Aguirre relied heavily on the 2009 MRI and MRI report to support his opinions, he misread the MRI report, *see id.* 2456:14–2457:11, 2461:3–2463:3, and testified that Runyon's MRI showed a higher volume of hyperintensities than what he had noted in his report. *Id.* 2464:21–2465:2. Finally, Dr. Aguirre agreed with Dr. Lipton that an MRI finding of encephalomalacia is a permanent loss of brain tissue, consistent with traumatic brain injury, and cannot result from a mild head injury such as a concussion. *Id.* 2467:20–2468:13.

> *v.    Runyon's childhood was marked by trauma and instability.*

72.    Dr. Cunningham testified that Runyon's social history was marked by many "adverse developmental factors," including, among other things, a significant family history of mood disorders, Hr'g Tr. 1253:10–12; *id.* 1255:4–1257:8; significant evidence of intergenerational physical abuse, *id.* 1257:9–1259:5, 1294:1–19, and chronic stress in childhood, *id.* 1337:2–1354:13, including childhood neglect and physical and emotional abuse.[17] Dr. Cunningham also testified about the multiple head injuries Runyon sustained during his youth. *Id.* 1322:2–1329:5. Had counsel provided him critical background materials and supplemented his report to include this information, Dr. Cunningham could have testified to these facts at trial, which would have helped to synthesize the mitigation evidence for the jury and explain why Runyon's history of trauma and other developmental factors bore directly on his moral culpability.

## LEGAL STANDARD & PROPOSED CONCLUSIONS OF LAW

1.    To prevail on his ineffective assistance of counsel claim, Runyon must show that counsel's performance was deficient and that he was prejudiced as a result. *Strickland v.*

---

[17] Dr. Cunningham was prepared to testify to additional neurodevelopmental factors, but this testimony was excluded. *See* Hr'g Tr. 1313:14–1321:22, 1329:6–22, 1335:8–1336:7.

*Washington,* 466 U.S. 668, 687 (1984); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Stirling*, 914 F.3d 302 (4th Cir. 2019). To satisfy *Strickland*'s first prong, Runyon "must show that counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. In making this assessment, the "[p]revailing norms of practice as reflected in American Bar Association standards" should be used as "guides." *Id.* at 688; *see also Rompilla v. Beard*, 545 U.S. 374, 387 & n.7 (2005) ("We long have referred to these ABA standards as guides to determining what is reasonable."). Under these standards, mitigation investigations must "comprise efforts to discover *all reasonably available* mitigating evidence." *Williams*, 914 F.3d at 313 (citation omitted). "[T]o establish prejudice, '[Runyon] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 694). In death penalty cases, the question is whether "there is a reasonable probability that at least one juror would have struck a different balance." *Id.* at 537. In conducting this inquiry, the Court must consider "'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweigh it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)) (cleaned up). Ultimately, the Court must determine whether the "undiscovered 'mitigating evidence, taken as a whole, [would] have influenced the jury's appraisal of [the defendant]'s culpability.'" *Rompilla*, 545 U.S. at 393 (quoting *Wiggins*, 539 U.S. at 538).

2.     Runyon's trial counsel unreasonably failed to complete their investigation into Runyon's brain damage, mental illness, and psychosocial history, and to take reasonable steps to

understand the evidence in their possession.[18] As a result, they did not uncover or understand significant evidence of Runyon's brain damage, mental illness, and mitigating factors in his family and social history. These failures were not strategic decisions, but rather the byproduct of an investigation that fell below an objective standard of reasonableness.

## I.  Trial Counsel's Performance Was Deficient.

### A.  Counsel Prematurely Abandoned Their Investigation.

3.      Although counsel are not required to investigate "every conceivable line of mitigating evidence," they have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Stirling*, 914 F.3d at 313 (quoting *Strickland*, 466 U.S. at 691). This includes consulting with relevant experts and providing these experts with the information they need to form opinions, such as pertinent medical records. *Id.* at 315 (counsel deficient for failing to provide expert with requested records and failing to obtain a requested MRI until week prior to trial); *Gray v. Branker*, 529 F.3d 220, 239 (4th Cir. 2008) (counsel deficient for failing to undertake a reasonable investigation after reviewing expert report and therefore failing to provide expert with additional information he requested); *Rogers v. Dzurenda*, 25 F.4th 1171, 1185 (9th Cir. 2022) (counsel deficient for failing to "provide [expert] with documents that were essential to his testimony, and the documents they did provide were not adequately discussed with him"); *Ferrell v. Hall*, 640 F.3d 1199, 1227 (11th Cir. 2011) (finding that counsel's investigation was "unjustifiably and unreasonably circumscribed" where they hired an expert, but failed to provide him with sufficient records).[19]

---

[18] The government has contested whether counsel's failure to adequately investigate and present Runyon's psychosocial history is part of the claim remanded by the Fourth Circuit. For the reasons that Runyon has previously argued, *see* ECF 866 at 3–6, it was.

[19] *See also Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999) (counsel have a duty to provide pertinent information about client to mental health experts, even if experts do not request it); *Caro* (continued…)

4.     Here, Runyon's trial counsel were ineffective for failing to provide Drs. Mirsky and Merikangas highly relevant information and records that these experts repeatedly made clear they needed to reach final opinions, and failing to follow up with these experts to seek their final opinions so counsel could properly evaluate mitigation strategy. *See* PFF ¶¶ 27, 36, 39, 41, 47–48. *See also* GX68 (Court finding experts were "ill-equipped . . . to make a full and accurate report" because they were missing data and MRI results).

5.     The late-disclosed evidence that came to light during the February 2023 hearing—which showed Dr. Merikangas reviewed Runyon's MRI in 2009—does not establish that counsel's investigation was reasonable. To the contrary, it confirms counsel never contacted Dr. Merikangas after the scans were performed, and thus never learned his opinion of the scans or how they impacted his opinion—or the overall picture—of Runyon's neuropsychiatric health.[20] PFF ¶ 46. And counsel's failures to provide critical information went beyond the MRI scans. *E.g.*, *id.* ¶ 36.

6.     Counsel also were ineffective for failing to provide Dr. Cunningham with critical background records or requesting that Dr. Cunningham supplement his report to include mental health and social history evidence. *See* PFF ¶ 21. These failures were not strategic. Counsel crudely presented some social history evidence through lay witnesses, *see id.* ¶ 51, and attempted to elicit testimony from Dr. Cunningham on this topic but were barred from doing so because they failed to supplement his report to include this information, *id.* As a result, what little social history jurors heard was presented in a confusing, half-baked fashion without any expert testimony to tie the

---

*v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1998) (similar); *Scanlon v. Harkleroad*, 740 F. Supp. 2d 706, 718 (M.D.N.C. 2010) (counsel deficient for failing to provide requested records to expert).

[20] Moreover, the record is unclear as to how or when Dr. Merikangas received these scans, though the most plausible scenario is that he received them from the facility that performed the imaging. Hudgins did not obtain the scans until August 17, *see* PFF ¶ 45, and would have had to send the scans on a disk by mail, *id.*, in which case *the earliest* Dr. Merikangas could have received them was August 18. But Dr. Merikangas's billing records list the date of review as August 17, *id.* 46.

28

evidence together or explain its relevance to Runyon's moral culpability or the appropriate sentence. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.11, commentary (2003) (expert witnesses may be useful to present social history and "may assist the jury in understanding the significance of the observations.").

7.      It was Runyon's counsel's duty to follow up with their experts and provide them critical information. *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) ("[T]he mere hiring of an expert is meaningless if counsel does not consult with that expert to make an informed decision about whether a particular defense is viable." (citing *Strickland*, 466 U.S. at 691)); *Showers v. Beard*, 635 F.3d 625, 633 (3d. Cir. 2011). Their failure to do so was unreasonable and fell short of their duty to investigate Runyon's case. *See Doe v. Ayers*, 782 F.3d 425, 437, 442 (9th Cir. 2015) (counsel deficient for failing to provide records to expert or otherwise follow up); *Ferrell*, 640 F.3d at 1238 (counsel ineffective for failing to provide corroborating evidence of mental illness to expert); *Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011) (counsel cannot simply "accept" an expert's report "without further discussion"; reliance on expert opinions "does not give trial counsel a free ride when it comes to the obligation to undertake a 'thorough investigation of law and facts relevant to plausible options' for a defense" (quoting *Strickland,* 466 U.S. at 690)) (internal citations omitted); *Johnson v. United States*, 860 F. Supp. 2d 663, 891 (N.D. Iowa 2012) (counsel ineffective for failing to follow up with or provide test results to experts).

**B.      Counsel Failed To Take Reasonable Steps To Understand The Evidence They Had.**

8.      Runyon's counsel also were ineffective for failing to take reasonable steps to understand the significance of the mitigating evidence they did have. It was their duty to "be familiar with readily available documents necessary to an understanding of their client's case." *Hyman v. Aiken*, 824 F.2d 1405, 1416 (4th Cir. 1987). When a case involves medical information

outside of counsel's expertise, counsel must take steps to enable them to understand the evidence well enough to "connect the indicators suggesting further investigation." *Stirling*, 914 F.3d at 315; *see also Gray*, 529 F.3d at 232 (counsel deficient for failing to understand "that expert mental health evidence could be critical" to sentencing and "miss[ing] or ignor[ing]—and fail[ing] to act on—the many signs that [defendant] was mentally and emotionally unstable"); *Holt v. Smith*, No. 1:97-CV-06210, 2023 WL 3126313, at *61, 64 (E.D. Cal. Apr. 27, 2023) (counsel deficient for "fail[ing] to do his homework," including consulting with experts and reviewing evidence); *Dixon v. Yates*, No. 2:10-CV-0631, 2016 WL 1183588, at *20 (E.D. Cal. Mar. 28, 2016) (counsel ineffective for not taking steps to understand medical records); *Fitzgerald v. Trammell*, No. 03-CV-531, 2013 WL 5537387, at *96 (N.D. Okla. Oct. 7, 2013) (counsel ineffective for "misunderstanding" expert testimony "and how it should be used"). Here, Runyon's counsel utterly failed to appreciate the significance of the evidence they had, including: medical records and other evidence of multiple traumatic events; Army records showing an abnormal neurological exam after the 1996 accident and reporting a host of other persistent symptoms consistent with brain injury; several expert reports (including from government experts) discussing Runyon's facial asymmetry and history of abuse; and expert reports of abnormal neurological and neuropsychological exams suggesting frontal lobe dysfunction. *See* PFF ¶¶ 7, 9, 37, 55, 64, 66.

9.      Indeed, Runyon's counsel chiefly responsible for the mitigation case did not even know "the criteria for" "traumatic brain injury," PTSD, "delusional disorder," or psychosis, and did "not know how to investigate for" these things. PFF ¶ 38. Nor did trial counsel take reasonable measures to bridge this knowledge gap, including the easy and obvious step of consulting with their own experts or even their own mitigation specialist, who had decades of experience with brain injury and mental health issues, *see* PFF ¶¶ 2, 48. *Cf.* ABA Guidelines, commentary, at 959

(mitigation specialists have "clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts").

10.     Runyon's counsel also acted unreasonably by fundamentally misunderstanding the purpose of mitigation evidence. Hudgins testified that he believed presenting mental health evidence would require arguing to jurors that Runyon's brain damage and mental illness were why they "should not hold [Runyon] accountable for doing what he did." Hr'g Tr. 252:1–5. *See also id.* 123:15–20 (Hudgins describing mental health evidence as "an excuse for" the crime). But "mitigating evidence need not necessarily excuse or diminish the defendant's illegal conduct." *McMullen v. Dalton*, 83 F.4th 634, 642 (7th Cir. 2023); *Williams*, 529 U.S. at 398 (mitigating evidence "may alter the jury's selection of penalty, even if it does not [ ] rebut the prosecution's death-eligibility case"); *Eddings v. Oklahoma*, 455 U.S. 104, 113–15 (1982) (evidence that is not a "legal excuse" for the crime still relevant in mitigation); *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) ("impaired intellectual functioning is inherently mitigating," even if it has no "nexus to the crime"); ABA Guideline 10.11, commentary ("Often, a mitigation presentation  is offered not to justify or excuse the crime but to help explain it.") (cleaned up). It is instead presented to "influence[] the jury's appraisal of [the defendant's] moral culpability," and support a sentence less than death. *See Williams*, 529 U.S. at 398; *see also Stirling*, 914 F.3d at 313; *Smith v. Mullin*, 379 F.3d 919, 943 (10th Cir. 2004) ("mitigation evidence affords an opportunity to humanize and explain") (internal quotation omitted).

11.     Counsel's failure to take basic steps to understand the powerful mitigating evidence in Runyon's case resulted in decisions based on "ignorance rather than on understanding of the facts and the law," *Hyman*, 824 F.2d at 1416. Such performance is deficient. *See id.*

**C.      Counsel's Failure To Present This Evidence Cannot Be Credited As Strategic.**

12.      Counsel's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Failure to uncover and present evidence thus cannot be justified as a tactical decision when counsel have not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background." *Williams*, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4–4.1, Commentary, 4–55 (2d ed. 1980)). Here, counsel "were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable." *Wiggins*, 539 U.S. at 536. *See also United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) ("[C]ounsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made.").

13.      Counsel's *post hoc* rationalizations should be given no weight. *See Richards v. Quarterman*, 566 F.3d 553, 566 (5th Cir. 2009) (affirming decision disregarding post hoc account of supposed trial strategy); *Tice v. Johnson*, 647 F.3d 87, 105 (4th Cir. 2011) ("We are therefore disinclined to accept the Director's invitation to engage in after-the-fact rationalization of a litigation strategy . . . 'courts should not conjure up tactical decisions an attorney could have made'" (quoting *Griffin v. Warden*, 970 F.2d 1355, 1358 (4th Cir. 1992))).

14.      That is particularly so given that these explanations are both unsupported by the record and objectively unreasonable. For example, counsel testified that they did not put on mental health evidence out of concern it would "open the door" to negative evidence about Runyon, such as that he denied involvement in the crime. Hr'g Tr. 173: 7–13, 200:17–201:3, 424:8–11, 2236:1–16. But jurors already knew this: they had just witnessed his attorneys argue his innocence in the guilt phase. *See id*. 251:24–25 (Hudgins conceding jury knew Runyon maintained his innocence).

32

And the government raised the issue during sentencing anyway. Trial Tr. 2555:2–4. Accordingly, this was not a legitimate reason to withhold from jurors important brain damage and mental health evidence. *See, e.g., Wackerly v. Workman*, 580 F.3d 1171, 1178–79 (10th Cir. 2009) ("the mitigating edge of unproduced . . . evidence [can] be sharper than its aggravating edge," especially when aggravating "edge" is already before the jury (citing *Mullin*, 379 F.3d at 943 n.11)); *Stankewitz v. Wong*, 698 F.3d 1163, 1175 (9th Cir. 2012) ("probability that the proffered mitigation evidence would have cut in the prosecution's favor [was] low" when "jury was already aware" of its aggravating edge); *Walbey v. Quarterman*, 309 F. App'x 795, 805–06 (5th Cir. 2009) (similar).

15.     Both Hudgins and Woodward also professed concern about opening the door to rebuttal by government experts. *See* Hr'g Tr. 251:20–21, 294:9–13, 2236:1–16. But multiple experienced resource counsel had advised that the government reports were not aggravating and could even "end up being more helpful than the defense witnesses." *See* PFF ¶ 28. And Hudgins acknowledged that "the fact that the government was going to have their own experts that might present an unfavorable opinion was not a reason" "to not investigate or not present the mental health mitigation evidence," Hr'g Tr. 281:1-4. The alleged door-opening concern also rings hollow given that counsel declined to conduct any research into the government witnesses, even when presented with specific avenues for impeachment. *See* PFF ¶ 28.

16.     Hudgins also said he was concerned that presenting mental health evidence would mean "information from Dr. Evan Nelson and Dr. Bender . . . would then come in." Hr'g Tr. 251:18–20; *see also id.* 173: 7–11 (expressing concern that "negative" information would come in); *id.* 294:3–13 (clarifying that the "negative" information at issue was in part "the information from Dr. Nelson, the information from Dr. Bender"). But, as Hudgins later conceded, the government did not have Dr. Nelson's report, nor could they have obtained it even if Runyon had

presented mental health evidence in mitigation. *Id.* 299:11–16. This "ignorance of a point of law that is fundamental to [the petitioner's] case combined with [the] failure to perform basic research on that point is a quintessential example of unreasonable performance." *Hinton v. Alabama*, 571 U.S. 263,274 (2014). And Dr. Bender could not have been the source of negative information about Runyon because he never evaluated Runyon. *See* PFF ¶ 22.

17.     Finally, counsel claimed that brain injury and mental health evidence would have been inconsistent with their mitigation theory that Runyon was a good person. *See* Hr'g Tr. 256:15–18 (mental health mitigation "might make [Runyon] seem less kind"); *id.* 256:19–257:11. But, as Hudgins later agreed, these mitigation theories were not inconsistent: a person can be mentally ill and kind, generous, and helpful. *Id.* 302:19–303:8. And in fact, the unpresented mitigating evidence could have helped to reconcile the jurors' guilt phase verdict and the evidence they heard in the penalty phase, by explaining "how [Runyon]'s organic brain damage caused . . . this 'kind hearted' person to commit such a shocking crime," *Mullin*, 379 F.3d at 943. The idea that these two mitigation theories are inconsistent "reveal[s] a fundamental misunderstanding of the purpose for which [brain damage] mitigation evidence would have been presented." *Id.*

3.     None of these post hoc justifications constitutes a reasonable trial strategy, and this Court should not "condone unreasonable decisions parading under the umbrella of strategy." *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999).

## II.     Runyon Was Prejudiced By His Trial Counsel's Deficient Performance.

18.     Because counsel prematurely abandoned their investigation and failed to take reasonable steps to understand the evidence they had, jurors did not hear any evidence of Runyon's brain damage or mental illness, and were also kept in the dark about much of Runyon's childhood trauma and other critical psychosocial history information. Presenting this evidence would have transformed the sentencing profile presented, making it likely "at least one juror" "would have

struck a different balance," *Wiggins*, 539 U.S. at 537. *See also Rompilla*, 545 U.S. at 390–93.

19.    Precedent—including precedent pre-dating Runyon's trial—dictates that evidence of brain damage and mental illness is highly mitigating. *Porter*, 558 U.S. at 41, 43; *id.* at 35 n.4 (discussing mitigating value of PTSD diagnosis); *Sears v. Upton,* 561 U.S. 945, 949 (2010) (describing brain damage as significant mitigating evidence); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 261–63 (2007) (describing "possible neurological damage" as mitigating); *Rompilla*, 545 U.S. at 392–93 (organic brain damage is powerful mitigation); *Stirling*, 914 F.3d at 318 (brain injury highly mitigating); *Gray*, 529 F.3d at 236 (evidence of mental disorder which "would have provided the jury with a medical explanation" for conduct "would surely have provided a significant boost" to mitigation case). And research shows this type of mitigation is particularly compelling to jurors. *See Mullin*, 379 F.3d at 942 (empirical evidence shows evidence of "mental retardation, brain damage, and troubled background" is "exactly the sort of evidence that garners the most sympathy from jurors"); *Brewer v. Aiken*, 935 F.2d 850, 861–62 (7th Cir. 1991) (Easterbrook, J., concurring) (citing empirical research showing "jurors are more likely to credit" and express sympathy for evidence of brain damage). Many courts—including the Supreme Court—have found prejudice where this sort of evidence is omitted from a mitigation case. *See, e.g.*, *Porter*, 558 U.S. at 41, 43 (finding prejudice where counsel failed to present evidence of the "kind of troubled history [the Supreme Court] ha[s] declared relevant to assessing a defendant's moral culpability," including "brain abnormality"); *Ferrell*, 640 F.3d at 1203, 1234–35 (finding prejudice where counsel failed to introduce evidence of "organic brain damage to the frontal lobe, bipolar disorder, and temporal lobe epilepsy"); *Lockett v. Anderson*, 230 F.3d 695, 716 (5th Cir. 2000) (finding prejudice in light of undiscovered evidence of "organic brain disorder that tended to explain [defendant's] violent conduct and made him less able to control his behavior"); *Glenn*

35

*v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1995) (collecting cases and noting, "[o]ur sister circuits have had no difficulty in finding prejudice . . . where counsel failed to present pertinent evidence of mental [ ] capacity").[21]

20.     This is precisely the type of evidence counsel had in their possession and would have discovered more of if they had not prematurely abandoned their investigation. Specifically, had defense counsel followed up with Dr. Merikangas about the MRI results and shared those results with Dr. Mirsky, they would have learned that: (i) the MRI shows white matter hyperintensities in locations, quantities, and patterns highly corroborative of traumatic brain injury, *see* PFF ¶ 58–59; (ii) the "normal" reading of the scan by the diagnostic radiologist should be given little or no weight; and (iii) a neuroradiologist would be best suited to accurately interpret the scans. And given Dr. Merikangas's testimony that he regularly consulted with and relied on neuroradiologists (as the other two neurologists who testified confirmed is common practice), it is reasonable that the next step in the investigation would have been to consult with a neuroradiologist like Dr. Lipton. *See id.* ¶¶ 59–60. This would have led counsel to learn that Runyon's 2009 MRI also shows bifrontal encephalomalacia—permanent loss of brain volume in the frontal lobes—which is irrefutable evidence of severe brain damage.[22] *Id.* ¶ 59.

21.     This evidence would have provided powerful corroboration of the defense experts' preliminary findings that Runyon suffered symptoms of brain injury. Drs. Mirsky and Merikangas

---

[21] *See also Summerlin v. Schriro*, 427 F.3d 623, 643 (9th Cir. 2005) (seizure caused by temporal lobe epilepsy "would have strongly affected [the petitioner's] ability to control his actions" post-seizure); *Fitzgerald*, 2013 WL 5537387, at *95–97 (failure to introduce "evidence of petitioner's frontal lobe damage and its implications for petitioner's behavior [wa]s a particularly egregious omission," and prejudicial because evidence of mental illness and/or brain injury "is the most compelling mitigating evidence").

[22] Had counsel carried their investigation to its reasonable conclusion, they likely would have retained a neuroradiologist like Dr. Lipton to rebut Dr. Batipps. *See* PFF ¶ 60.

had exam results—Dr. Mirsky from neuropsychological testing and Dr. Merikangas from his neuropsychiatric examination of Runyon—that strongly suggested brain dysfunction, but requested more information because diagnosing brain injury generally requires a range of diagnostic inputs. *See* PFF ¶ 55. The scans would have enabled them to render final opinions that Runyon was severely brain damaged at the time of the crime. *See id.* ¶¶ 39, 58–59.

22.     And trial counsel's failures were not limited to the MRI scan. Their failure to provide Dr. Merikangas with critical records was also highly prejudicial. In particular, the Army records—which contain objective evidence of frontal lobe injury and cognitive sequelae, and which predate the crime and are consistent with the experts' other findings in 2009, *see id.* ¶¶ 23–24, 36—would have been powerful evidence if given to Dr. Merikangas and presented to jurors. And had counsel interviewed Runyon's family and friends about his history of head injuries and resulting symptoms, they would have unearthed even more corroborating evidence. *Id.* ¶ 8.

23.     Counsel had this type of evidence and would have found more if they had carried the investigation to its logical conclusion. Together, this evidence would have supported a powerful case against death. But none of it was put before jurors. That is the definition of prejudice. *See Rompilla*, 545 U.S. at 390–93 (finding prejudice where unpresented mitigating evidence included, among other things, evidence of brain damage).

24.     Counsel's failures were especially prejudicial because the evidence of brain damage in Runyon's case is particularly strong. That Runyon has abnormalities across the entire diagnostic spectrum dramatically increases confidence in the diagnosis, as does the fact that much of the evidence is corroborated by multiple sources, including multiple experts (defense and government) with the same results, and numerous people who recounted the same traumatic events in Runyon's life. As Dr. Nadkarni put it: "[E]verywhere I looked in his case . . . points to a brain

injury, frontal lobe injury[.]" Hr'g Tr. 1688:2–14. Furthermore, that Runyon's brain damage was visible on his 2009 MRI is significant: most brain damage does not, and this finding means Runyon's brain damage is severe. *Id.* 2578:15–2580:16, 2584:3–18, 1671:3–10, 1673:13–21. It also means jurors could have viewed the MRI with the guidance of an expert and seen the damage with their own eyes. *See Valdez v. Motyka*, No. 15-cv-0109, 2021 WL 1123576 (D. Colo. Mar. 24, 2021) ("[V]isual evidence generally has a very powerful effect on a trier of fact.").

25.    This evidence would have been especially compelling to jurors because it has clear implications for Runyon's ability to control his actions. As experts could have explained, frontal lobe damage compromises critical processing tools and causes poor judgment. *See* PFF ¶¶ 56, 64, 66. These precise effects are borne out in Runyon's neurological and neuropsychological testing. *Id.* ¶¶ 37, 55, 64, 66. This evidence could have provided jurors with an explanation for the crime, *see Stirling*, 914 F.3d at 315, and thus "could have been outcome-determinative," *id.* at 318.

26.    Counsel's failure to present evidence concerning mental illness and Runyon's psychosocial history, including childhood trauma, also prejudiced Runyon. Runyon spent his formative years in a deeply troubled family environment characterized by abuse and emotional neglect, unstable parental figures, and chronic stress, and his family tree is rife with mental illness, violence, and trauma. *See* PFF ¶ 72. This means Runyon is not only genetically predisposed to mental illness, but also that he grew up under conditions highly likely to lead to abnormal development. *See id.* All of this is highly mitigating; "[e]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background may be less culpable." *Porter*, 558 U.S. at 41 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)); *see also Wiggins*, 539 U.S. at 537. Had counsel presented this evidence, it would have completely "altered the

sentencing profile presented," *Porter*, 558 U.S. at 41, especially since the mitigation case jurors actually heard contained "almost nothing" that would "allow them to accurately gauge [Runyon's] moral culpability," *id*. *See also* PFF ¶ 51.

27.     This evidence also would have undercut the government's case in aggravation and provided crucial context for the crime. Central to the government's case for a death sentence was Runyon's supposed "lack of remorse"—an aggravator the government proposed and jurors unanimously found. *United States v. Runyon*, 994 F.3d 192, 198 (4th Cir. 2021). But as Dr. Nadkarni explained, Runyon's facial asymmetry may appear as a "flat affect" or lack of emotion, when in fact it is a consequence of brain injury or nerve damage from trauma. *See* Hr'g Tr. 1627:19–1629:6. Had experts like Drs. Cunningham and Nadkarni been able to explain the developmental and neurological sources for Runyon's apparent lack of remorse, that might have made a difference to at least one juror. The unpresented evidence also could have helped explain that Runyon's poor work performance—which the government stressed during the penalty phase, *see, e.g.*, Trial Tr. 2614:7–14; 1929:21–1930:17; 1937:25–1938:5—was not due to any moral failing, but rather to neurological deficits beyond his control. And it would have rebutted the government's argument in closing that Runyon "had a good upbringing," which he "rejected" "and walked away from," *id.* 2622:9–12. That the unpresented evidence would not only have strengthened the mitigation case but also have "weaken[ed] the aggravating circumstances" further demonstrates prejudice. *See Ferrell*, 640 F.3d at 1235 (brain damage weakens aggravators because it "reduce[s] the volitional nature of the crime, as well as [] ability to plan and act rationally").

28.     Moreover, had counsel unearthed and presented this evidence, it not only would have transformed the mitigation case, but also could have changed the course of the proceedings entirely. If counsel had completed their investigation and supplemented their expert reports, this

39

would have triggered the government to consult Dr. Martell, who would have opined based on the data available to him in 2009 that Runyon is brain damaged, PFF ¶¶ 18, 40, 65—an opinion the government would have had to disclose. Given that this would have unfolded on the eve of or even after the penalty phase was already underway, there is a reasonable probability that the government—with its own expert agreeing that Runyon was brain damaged—would have decided not to pursue the death penalty at all, as it already had done regarding both of Runyon's codefendants. At a minimum, the government would have been left either without a neuropsychologist to rebut Dr. Mirsky's testimony that Runyon was brain damaged, or with one who concurred with Dr. Mirsky's opinions. *See id.*

29.     Runyon only needed to persuade one juror, and the jurors were instructed as such. Trial Tr. 2675. Even on the evidence actually presented at the penalty phase, the aggravating evidence did not overwhelm the mitigating evidence and jurors were clearly open to considering mitigation evidence. *See* PFF ¶ 53. This further demonstrates that, had counsel investigated and presented the copious and powerful mitigating evidence detailed at the habeas hearing, there is a reasonable probability the outcome would have been different. *See Stirling*, 914 F.3d at 318 (considering that jury was initially deadlocked in finding new evidence could have tipped balance); *Holt*, 2023 WL 3126313, at *67 (considering time jurors spent deliberating to find prejudice).

30.     The "undiscovered 'mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Runyon's] culpability.'" *Rompilla*, 545 U.S. at 393 (quoting *Wiggins*, 539 U.S. at 538). Runyon has therefore established that he was prejudiced by counsel's deficient performance. *See Stirling*, 914 F.3d at 318 (finding prejudice where undiscovered evidence of frontal lobe brain damage could have provided explanation for criminal conduct).

Dated: January 15, 2024                    Respectfully Submitted,

                                           /s/        *Kathryn M. Ali*

                                           Kathryn M. Ali, VSB No. 97966
                                           Ali & Lockwood LLP
                                           300 New Jersey Avenue N.W., Suite 900
                                           Washington, D.C. 20001
                                           Telephone (202) 651-2475
                                           katie.ali@alilockwood.com

                                           Robert Lee, VSB No. 37410
                                           Elizabeth J. Peiffer, VSB No. 71353
                                           Capital Representation Resource Center
                                           1155 Seminole Trail #6391
                                           Charlottesville, VA 22906
                                           Telephone (434) 817-2970
                                           Fax (434) 817-2972
                                           roblee@vcrrc.org
                                           epeiffer@vcrrc.org

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Carrie Lee Ward
Department of Justice
Capital Case Section
1331 F Street, NW
Room 650
Washington, DC 20530
Telephone (202) 923-7154
Fax: (202) 305-9779
Carrie.Ward@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

/s/        *Kathryn M. Ali*