UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

      Petitioner,

                                    ACTION No.  4:15cv108
    v.                      [ORIGINAL CRIMINAL No. 4:08cr16-3]

UNITED STATES OF AMERICA,

      Respondent.

## OPINION

On April 29, 2007, David Anthony Runyon ("Petitioner") killed Cory Allen Voss, a United States Navy officer, in a murder-for-hire conspiracy. A jury found him guilty of this crime and sentenced him to death. See 18 U.S.C. § 3593(e) (jury decides the imposition of the death penalty). Petitioner now challenges his sentence via Claim 6 of his motion under 28 U.S.C. § 2255, arguing that his trial counsel were ineffective for failing to investigate and present to the jury certain mental health evidence at the penalty selection phase of trial. ECF No. 511 at 41-83 ("§ 2255 Motion"). For the following reasons, Claim 6 of Petitioner's § 2255 Motion is **DENIED**.

## I. PROCEDURAL HISTORY[1]

On February 13, 2008, a federal grand jury returned a five-count indictment against Petitioner and two codefendants, Catherina ("Cat") Voss and Michael Draven. ECF No. 3. The indictment alleged that Cat Voss and Mr. Draven hired Petitioner to murder Cat's husband, Cory Allen Voss, and as a result, "[o]n or about April 29, 2007, between approximately 11:45 p.m. and midnight, RUNYON shot and killed Cory Allen Voss in his vehicle" in Newport News, Virginia. See id. at 2-3.[2] The indictment charged the defendants with Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a) (Count One); Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2 (Count Two); Bank Robbery Resulting in Death, in violation of 18 U.S.C. §§ 2113(a), (e), and 2 (Count Three); Conspiracy to Commit Robbery Affecting Commerce, in violation of 18 U.S.C. § 1951(a) (Count Four); and Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(j) and 2 (Count Five). Id. at 4-12. The Indictment also included a Notice of Special

---

[1] This Procedural History chronicles the undisputed events relevant to trial counsel's performance that were available prior to the 2023 evidentiary hearing. The court addresses the evidence adduced at the evidentiary hearing for the first time infra Section IV.

[2] See ECF No. 560 at 2-9 for a thorough recitation of the facts underlying Petitioner's crimes of conviction.

Findings for the death penalty, pursuant to 18 U.S.C. §§ 3591 and 3592. Id. at 13-14.

On March 4, 2008, Lawrence H. Woodward, Jr. and Jon M. Babineau were appointed to represent Petitioner. On July 17, 2008, the United States filed a notice that it would seek the death penalty against Petitioner if he were convicted on Count One, Two, Three, or Five. ECF No. 67. The United States also filed a notice stating that it would not seek the death penalty against Draven. Case No. 4:08cr16-2, ECF No. 68. Cat Voss pled guilty to all five counts the following day. See Case No. 4:08cr16-1, ECF No. 69. The court imposed on Cat Voss four concurrent life sentences on Counts 1, 2, 3, and 5, and a 240-month concurrent sentence on Count 4. Case No. 4:08cr16-1, ECF No. 127.

Petitioner's trial was initially scheduled to begin on March 13, 2009. The court determined that the trial would proceed in three phases: (1) the "merits" phase, where the jury would determine the defendants' guilt or innocence; (2) the "eligibility" phase, where the jury would determine whether the government had proven the necessary factors to impose the death penalty; and (3) the "selection" phase, where the jury would weigh the aggravating factors and mitigating factors and determine a sentence. ECF No. 132 at 2. At that time, Mr. Babineau and Mr. Woodward decided to divide the labor of their representation, with Mr. Woodward having primary responsibility for the merits phase

3

and Mr. Babineau having primary responsibility for the penalty phases.  See ECF No. 179 at 10.

**A. Preparation Prior to the Merits Phase**

Counsel initially sought the appointment of three experts to prepare for trial.  On April 8, 2008, Petitioner filed a motion seeking the appointment of an investigative expert, R. Glenn Ford, to assist in preparation of both the merits phase and mitigation aspects of the penalty phases.  See ECF No. 104 at 3.[3]  On April 17, 2008, Petitioner sought the appointment of mitigation specialist Shelia Cronin to assist in gathering information pertinent to potential mitigating factors at the penalty phases.  Id.  On May 22, 2008, counsel sought the appointment of a forensic psychologist, Dr. Evan Nelson, to assist in preparation of the mitigation aspects of the case.  Id.  The court approved the appointment of each of these experts and provided budget allowances for their services.  Id.

On June 16, 2008, the court entered an order outlining the procedure for counsel to provide notice of their intention to introduce mental health evidence and expert reports of such evidence in accordance with Federal Rule of Criminal Procedure 12.2, if the trial proceeded to the penalty phases.  ECF No. 65

---

[3] ECF No. 104 was filed ex parte and under seal.  The court unsealed this motion on January 18, 2023.  ECF No. 727.

at 1-2.  On December 12, 2008, Mr. Babineau filed a notice pursuant to this order, indicating his intent to introduce expert mental health evidence at the penalty selection phase from three experts: Evan Nelson, Ph.D.; Mark Cunningham, Ph.D.; and a neuropsychologist who had yet to be identified.  ECF No. 135.  The notice stated that Dr. Nelson would present a social history of Petitioner and his family, focusing on factors that "may have contributed to David Runyon's psycho-social development and functioning."  Id. at 1.  Dr. Cunningham, another clinical psychologist, was noticed to present evidence of adverse developmental factors in Petitioner's background that "singly and cumulatively increased his risk of adverse adolescent and adult outcomes, including delinquency, criminality, and criminal violence."  Id. at 2.  The notice additionally stated that Dr. Cunningham may also be called upon to "address factors that increase the likelihood of the defendant making a positive adjustment to a life term in the federal Bureau of Prisons ('BOP[')] (i.e., positive prisoner evidence)."  Id.  Finally, the notice stated that Petitioner was in the process of seeking out a neuropsychologist to evaluate him for "for the presence of neuropsychological deficits that may bear on mitigation."  Id. at 3.

On February 4, 2009, Mr. Babineau alerted the court that a conflict of interest may have developed that would preclude his

continued representation of Petitioner.  ECF No. 151.  Mr. Babineau withdrew from the case on February 13, 2009, see ECF No. 159, and the court appointed Stephen A. Hudgins to replace him on February 18, 2009, see ECF No. 161.  On February 20, 2009, Mr. Woodward moved to continue the trial date to allow Mr. Hudgins time to familiarize himself with the case.  ECF No. 160.  The court granted this motion on February 23, 2009, and continued the trial until May 4, 2009.  ECF No. 162.  On February 26, 2009, Mr. Hudgins sought another continuance, citing the need for additional time to prepare for trial.  ECF Nos. 164, 165.  The court granted the continuance and set the trial date for June 30, 2009.  ECF No. 171.

On April 8, 2009, Mr. Hudgins filed a notice of his intent to offer two more mental health experts, Scott Bender, Ph.D., a neuropsychologist, and Seymour Halleck, Ph.D., a psychiatrist. ECF No. 177.  The notice was conditional on Petitioner's attorneys receiving Petitioner's family medical records and medical records from the United States government for the period when Petitioner served in the Army.  Id. at 1.  Once Petitioner's attorneys received such records, and if the attorneys determined that the records suggested that mental health experts would be appropriate, they planned to have Dr. Bender perform psychological testing and to have Dr. Halleck testify as to factors based on Petitioner's medical records and interviews with his family members.  Id. at 1-2.

6

On April 13, 2009, Mr. Hudgins sought another continuance. ECF No. 179. Mr. Hudgins's motion described difficulties in obtaining necessary mitigation evidence, namely, that "necessary medical records are in the possession of the United States Army or some other branch of the government which makes their timely acquisition impossible," and "the remoteness of all mitigation witnesses and documentation not in possession of the government." Id. at 13. Mr. Hudgins concluded that, although he was working diligently with a mitigation expert and an investigator, he did not think he would not be able to complete a sufficient investigation before the trial date. Id. at 13-14. The court denied the continuance because the completion of the mitigation investigation did not affect the merits phase of the trial. ECF No. 194 at 8. However, the court held that it would consider continuing the selection phase if the jury found Petitioner guilty. Id.

On June 9, 2009, counsel filed a motion seeking the appointment of a psychiatrist, James R. Merikangas, M.D., and to replace Dr. Bender with Allan F. Mirsky, Ph.D., for neuropsychological services. ECF No. 206.[4] Counsel reported that

---

[4] ECF No. 206 was filed under seal. The court unsealed this motion on January 18, 2023. ECF No. 727.

they discovered "various medical issues involved in defendant's past" but they had difficulty investigating these issues because they could not obtain military records related to Petitioner. Id. at 1. Counsel sought to have Petitioner examined by Dr. Merikangas and Dr. Mirsky notwithstanding the absence of the military records, given the approaching trial date, believing that such examinations could bear on the mitigation at the selection phase. Id. at 1-2. The court took this motion under advisement pending the outcome of the merits phase of the trial. ECF No. 229. Mr. Hudgins provided a supplemental notice of his intent to offer Dr. Merikangas and Dr. Mirsky on June 29, 2009. ECF No. 230.

On June 16, 2009, Mr. Hudgins moved the court to issue a subpoena to the Department of the Army under Federal Rule of Criminal Procedure 17(c). ECF No. 214. The proposed subpoena would require the Department of the Army to provide personnel and medical records relating to Petitioner and his family prior to the trial date. Id. at 1-2. The motion included an exhibit detailing Mr. Hudgins's unsuccessful efforts to obtain the records without a subpoena, filed under seal. See ECF Nos. 215, 221. The United States opposed this motion, ECF No. 219, and the court denied it, finding that Petitioner made an insufficient showing of specificity and relevance of the requested records, ECF No. 223 (citing United States v. Nixon, 418 U.S. 683 (1974)).

On June 29 and 30, 2009, the United States filed the reports of its mental health experts, Dr. Raymond Patterson and Dr. Paul Montalbano.  ECF Nos. 276, 277.[5]  The United States planned to call these experts in rebuttal if Mr. Hudgins introduced mental health evidence at the selection phase.  Dr. Patterson, a psychiatrist, conducted an examination of Petitioner on February 4, 2009, and reviewed dozens of documents related to his mental health.  ECF No. 276 at 1-5.  His report discussed Petitioner's life history, noting several head injuries in his past, and provided summaries of his interviews with Petitioner.  See generally id. at 5-22.  He concluded his opinion that Petitioner,

> does not suffer from any serious mental illness, mental disorder, or brain pathology and that there are no mental health factors that are mitigating or aggravating to whatever sentence, if any, is determined by the court.

Id. at 23.  He further opined that Petitioner "meets the criteria for the diagnosis of Personality Disorder, Not Otherwise Specified with Narcissistic Features," and that his "self-reported history of 'concussions' and short[-]term memory problems do not represent serious or severe impairments suggestive of significant brain damage or dysfunction."  Id. at 23-24.

Dr. Montalbano, a psychologist, examined Petitioner on February 20 and 21, 2009, and also reviewed voluminous records

---

[5] These reports were filed under seal.  The court unsealed them on March 2, 2016.  ECF No. 519.

9

before preparing his report.  See ECF No. 277 at 1-6.  Dr. Montalbano similarly reported on Petitioner's life history and accounts of his head injuries.  See generally id. at 10-20.  He performed a series of psychological tests on Petitioner and discussed the results in his report.  Id. at 23-26.  Dr. Montalbano concluded that "[r]ecord review, interview and psychological testing did not indicate any gross disturbance of psychiatric functioning."  Id. at 26.  However, Dr. Montalbano did find "some level of impairment in functioning associated with personality dysfunction," and found that Petitioner met the criteria for a personality disorder, similar to that found by Dr. Patterson.  Id. at 26-28.  Dr. Montalbano noted that Petitioner claimed a series of head injuries, but stated that, "[w]hile a full neuropsychological battery was not performed, the results of cognitive testing during this evaluation did not reveal any significant cognitive impairment."  Id. at 30.

## B. Merits and Eligibility Phases

The merits phase against Petitioner and Mr. Draven commenced on June 30, 2009.  The first two days consisted of individualized voir dire, and the jury was impaneled on July 2, 2009,[6] after which opening statements and the presentation of evidence began.  On

---

[6] Prior to jury selection, prospective jurors had completed jury questionnaires approved by all counsel.  See ECF No. 211.  Counsel then agreed on a qualified pool of jurors for the jury selection process.

July 15, 2009, at the conclusion of all evidence, the court dismissed Count Three, pursuant to Federal Rule of Criminal Procedure 29.

On July 17, 2009, Mr. Hudgins filed a supplemental motion to continue the capital sentencing hearing. ECF No. 240.[7] In the supplemental motion to continue, he requested that, in the event the jury found Petitioner guilty, the court continue the selection phase for at least 90 days to develop mitigation evidence. Id. at 1-2. Mr. Hudgins cited the need for diagnostic studies of a potential mental health disorder, the continued need to access Petitioner's medical records, and for additional investigation of his social and family history, as reasons justifying a continuance. Id. at 2-3. Mr. Hudgins elaborated on the need for diagnostic testing in an accompanying filing:

> David Runyon has been preliminarily evaluated by neuropsychologist, Allan Mirsky. Dr. Mirsky's testing revealed deficits which will require neurological testing and the evaluation by a neurologist.

ECF No. 242. Mr. Hudgins sought the appointment of Dr. Merikangas, who is a neurologist as well as a psychiatrist, for this purpose. Id. The jury returned its verdict later that day, finding Petitioner and Mr. Draven guilty as to Counts One, Two, and Five, and not guilty as to Count Four. ECF No. 245 (Verdict Form).

---

[7] Mr. Hudgins filed an identical motion, ECF No. 247, on July 20, 2009, following the jury's verdict. See ECF No. 254 at 2 n.3.

On July 20, 2009, Mr. Hudgins filed a notice of intent to introduce mental health testimony at the selection phase. ECF No. 248. The notice stated that Petitioner intended for Dr. Cunningham and Dr. Mirsky, and potentially Dr. Merikangas, to testify at the selection phase. Id. Mr. Hudgins then provided the reports of Dr. Cunningham and Dr. Mirsky to the United States. Although the notice of Dr. Cunningham as an intended expert indicated that he may provide a risk of prison violence ("RPV") assessment and an adverse development factor ("ADF") assessment, his report, dated February 5, 2009, only included the RPV assessment. See ECF No. 267 at 2.

Dr. Mirsky had conducted a neuropsychological evaluation of Petitioner on June 26, 2009, and provided a preliminary report of his findings. GX 36.[8] Dr. Mirsky briefly reviewed Petitioner's medical history, including several head injuries in his past. Id. at 1-2. Dr. Mirsky performed a battery of tests in his evaluation and Petitioner's scores on these tests were mixed. Id. at 3-5. He opined that Petitioner's poor scores on some tests "merit further intensive neurological investigation" and that they are "entirely consistent with brainstem injury, which could have resulted from his earlier motor vehicle injuries (or possibly the

---

[8] The docket entry for Dr. Mirsky's and Dr. Cunningham's reports, ECF No. 246, only contains a placeholder for the sealed documents. The court references the exhibit number of Dr. Mirsky's report here as it was introduced at the 2023 evidentiary hearing.

blast from the grenade explosions)." Id. at 6.  Dr. Mirsky stated that "it would be extremely helpful to have available the results of the other psychological and neuropsychological tests," and, without this data, his report could only be considered as preliminary.  Id.

On July 22, 2009, the jury found that Petitioner was eligible for the imposition of the death penalty.  ECF No. 255 (Special Verdict Form).  The jury found that Petitioner intentionally killed Cory Voss, and two statutory aggravators: (1) that Petitioner "committed the offense in consideration for the receipt of, or in expectation of the receipt, of anything of pecuniary value"; and (2) that Petitioner "committed the offense after substantial planning and premeditation to cause the death of a person."  Id.

## C. Preparation for the Selection Phase

Following the jury's verdict in the eligibility phase, the court granted Petitioner's motion for a continuance from the bench and set the selection phase of trial to begin on August 19, 2009. ECF No. 254 at 2.  The court also granted Mr. Hudgins's request for issuance of witness subpoenas, ECF No. 256, and for the appointment of Dr. Merikangas as a psychiatrist and neurologist, ECF No. 257.  The order appointing Dr. Merikangas provided an initial expense allowance of $7,500 and required him to complete examinations and a report of his findings on or before August 6, 2009.  ECF No. 257.

On July 30, 2009, Mr. Hudgins filed a motion requesting the court to order a magnetic resonance imaging ("MRI") and positron emission topography ("PET") scans of Petitioner.   ECF No. 259.[9] The motion stated:

> On July 29, Dr. Merikangas traveled to Portsmouth City Jail and performed a physical examination and interview of the defendant and provided a preliminary report ... stating the need for an MRI and PET scan to determine if there are physical injuries/medical explanations for the deficits that the defendant is demonstrating upon psychological and neurological testing.

Id. at 1.  The motion included requests for these scans signed by Dr. Merikangas, dated July 30, 2009.  Id. at 3-4.

Mr. Hudgins filed Dr. Merikangas's report on August 6, 2009. ECF No. 263.  The report noted that Petitioner had been evaluated by government experts Dr. Montalbano Dr. Patterson, whose evaluations, Dr. Merikangas found, "suggested that Mr. Runyon suffered from Migraine-like headaches, Attention Deficit Disorder and Post-Traumatic Stress disorder."   Id. at 1.   Dr. Merikangas reported that he "conducted a neurological examination and ordered an MRI scan of the brain, [a] PET scan of the brain, and an electroencephalogram (EEG)."  Id.  At the time of the report, Dr. Merikangas stated that "these test[s] have yet to be accomplished, and therefore this is a preliminary report."   Id.   The report

---

[9] ECF No. 259 was filed ex parte and under seal.  The court unsealed this motion on January 18, 2023.  ECF No. 727.

14

concluded with Dr. Merikangas's impression following his examination:

> Because of his history of multiple head injuries, beatings in childhood, and his current severe headaches, he requires brain imaging and an EEG. His psychiatric evaluations, including my own, suggest that at the time of the crime in question he was suffering from the effects of, or withdrawal from, the experimental drugs that he was taking as a paid experimental subject. I await the chronology and details of the drugs involved. He presently is either in a fantasy world of grandiose wishful thinking, or suffering from delusions. He clearly has impaired executive functioning suggestive of frontal lobe brain impairment. Full report will follow results of his brain imaging.

Id. at 1-2.

On August 10, 2009, Mr. Hudgins filed a motion requesting that the court allow him to supplement Petitioner's mental health reports. ECF No. 269. Mr. Hudgins stressed the need for the MRI scan and PET scan to supplement the expert reports, as both Dr. Mirsky's and Dr. Merikangas's reports were preliminary "pending the outcome of further neurological testing." Id. at 1-2. The motion reported that "[t]he earliest the Marshal[]'s office was able to schedule this testing was August 14, 2009." Id. at 2.

The United States partially objected to this motion. ECF No. 73. The United States did not object to the supplementation of expert reports with testing results, provided that government experts be afforded a similar opportunity to review the results. Id. at 2. However, noting that Dr. Mirsky and Dr. Merikangas had been provided the reports of the government experts prior to

15

submitting their preliminary reports, the United States objected to any supplementation of the expert reports based on information available prior to the August 6 deadline.  Id.  In reviewing the motion, the court found "substantial agreement among the experts that further testing of the defendant's brain functions, by actually viewing his brain, would allow the expert witnesses to offer the jury a more complete opinion regarding the normalcy, or lack thereof, of the defendant's brain functions."  ECF No. 278 at 5.[10]  The court thus granted the motion, allowing Dr. Mirsky and Dr. Merikangas to file supplemental reports upon review of the brain scans.  Id. at 10.  The supplemental reports were to be filed by August 20, 2009, to allow the United States' experts sufficient time to review them and the underlying data and to respond.  Id.  On August 14, 2009, Mr. Hudgins filed a motion to release the results of the MRI and PET scans directly to counsel, so that counsel could expedite transfer of the results to experts for review, ECF No. 274, and the court granted the motion that day, ECF No. 275.

**D. The Selection Phase**

The selection phase began on August 19, 2009.  Mr. Hudgins proposed fifteen mitigating factors and offered twenty-one

_____

[10] ECF No. 278 was filed under seal.  The court unsealed this motion on January 18, 2023.  ECF No. 727.

16

witnesses.[11]  See ECF No. 285.  Seven of these factors emphasized Petitioner's good nature and ability to positively adjust to life in prison.  See id.[12]  Two of these mitigating factors concerned Petitioner's early experience of domestic violence.  Id. at 2 ("6. David Anthony Runyon grew up in a family filled with parental conflict until his mother and biological father separated. 7. David Anthony Runyon witnessed and experienced domestic violence between his parents during his early life.").  Mr. Hudgins did not file supplemental reports from Dr. Mirsky or Dr. Merikangas and he did

---

[11] Mr. Hudgins presented seven law enforcement or corrections officers (Eric Westrick, Lauretta Johnson, Brandy Anderson, Candace Mabry, Erica Singledecker, Hector Diaz, and William Banks); eight friends or acquaintances of Petitioner (Larry Eaglebear, Thomas Kumorski, Michael Grbic, Charles Ferguson, Warren Scott Linker, Tiffany Linker, Robert Lockwood, and Phyllis Provost); five of Petitioner's family members (David Dombrowski (biological father), David H. Runyon (adoptive father), Suk Cha Runyon (mother), Mark Runyon (brother), Maria Runyon (ex-wife)); and one expert witness (Dr. Mark Cunningham).  Over the objection of the United States, see ECF No. 267, Dr. Cunningham testified as to his RPV report, which opined that Petitioner had a low risk of violence in prison.

[12] "5. David Anthony Runyon committed acts of kindness and generosity for his neighbors and his community. ... 8. David Anthony Runyon has demonstrated his ability to make a positive adjustment to incarceration. 9. David Anthony Runyon has the respect and support of correctional officers.  10. David Anthony Runyon has had no disciplinary write-ups while incarcerated and has helped other inmates to conduct themselves in non-violent or non-aggressive ways.  11. David Anthony Runyon has contributed to the well-being of his fellow inmates through Bible study.  12. If David Anthony Runyon is sentenced to life in prison without the possibility of release, he will have the opportunity to continue to contribute to help other inmates.  13. David Anthony Runyon does not present a risk of future violence or danger to the public while in prison for the rest of his life."  Id.

not present any mental health evidence regarding Petitioner's potential brain injuries.

On August 27, 2009, the jury returned a recommendation for death on Counts One and Five, and life imprisonment on Count Two. ECF No. 291.   The jury found four non-statutory aggravating factors:   (1) Petitioner caused injury, harm, and loss to the victim, and the victim's family and friends; (2) Petitioner utilized training, education, and experience gained during criminal justice college courses, his time in the Kansas National Guard, his work as a law enforcement officer, and his experience as a member of the United States Army; (3) Petitioner engaged in acts of physical abuse towards women; and (4) Petitioner demonstrated a lack of remorse.   ECF No. 291.

The jury also found thirteen mitigating factors.   Id.   Two of the mitigators were statutory factors: (1) that Petitioner did not have a serious criminal record; and (2) other persons equally culpable in the crime would not be punished by death.   Id. at 1-2. Eight of the mitigators were non-statutory factors presented by defense counsel:   (1) Petitioner will serve a sentence of life in prison without the possibility of release, if not sentenced to death; (2) Petitioner has worked and been legally employed for all of his life; (3) Petitioner committed acts of kindness and generosity for his neighbors and community; (4) Petitioner grew up, witnessed, and experienced domestic violence and parental

18

conflict until his mother and biological father separated; (5) Petitioner's son will suffer emotional harm if Petitioner is executed; (6) Petitioner's mother will suffer emotional harm if Petitioner is executed; (7) Petitioner served his country as a member of the United States Army and was honorably discharged; and (8) Petitioner graduated from high school, earned an associate of arts degree, and took further college courses. Id. at 3-4. The other three mitigators were non-statutory factors of the jury's own creation: (1) Petitioner continued to witness and experience domestic violence and parental conflict/abuse from his mother and adoptive father; (2) Petitioner's brother will suffer emotional harm if Petitioner is executed; and (3) Petitioner was given the impression that Cory Voss was molesting his own daughter. Id. at 4.

## E. Post-Conviction

Petitioner timely filed an appeal, see ECF No. 312, and the Fourth Circuit Court of Appeals affirmed his conviction and sentence on February 25, 2013, United States v. Runyon, 707 F.3d 475 (4th Cir. 2013). On October 6, 2014, the Supreme Court denied his petition for a writ of certiorari. Runyon v. United States, 135 S. Ct. 46 (2014) (No. 13-254). On October 19, 2014, Petitioner requested the appointment of Michele J. Brace of the Virginia Capital Representation Resource Center ("VCRRC") as counsel for habeas corpus proceedings pursuant to 28 U.S.C. § 2255. ECF No.

19

405.  The court appointed Ms. Brace on November 5, 2014, ECF No. 410, and later appointed Dana Hansen Chavis of the Federal Defender Services of Eastern Tennessee ("FDSET") as co-counsel, ECF No. 432.

On October 5, 2015, Petitioner filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence.  ECF No. 478 (Initial § 2255 Motion).  Following responsive filings and motions for discovery, Petitioner submitted an amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence on February 4, 2016.  ECF No. 511 (Amended § 2255 Motion).  The Amended § 2255 Motion raised eighteen claims, many with one or more subparts.[13]  See generally id.  As relevant here, Claim 6

---

[13] Petitioner's eighteen claims challenging his sentence and conviction were, generally:  (1) dishonest law enforcement officers were involved in the case; (2) the prosecution failed to disclose exculpatory evidence about codefendant Draven;  (3) ineffective assistance of trial counsel at the merits phase; (4) trial counsel did not advocate for Petitioner at the eligibility phase; (5) ineffective assistance of trial counsel regarding Petitioner's competence to stand trial; (6) ineffective assistance of trial counsel at the penalty phase; (7) violation of Sixth Amendment right to confront witnesses; (8) ineffective assistance of trial counsel on direct appeal; (9) the conviction under 18 U.S.C. § 924(c) is unconstitutional; (10) the sentencing phase jury instructions unconstitutionally lowered the government's burden of proof; (11) the death sentences are unconstitutional because they are based on defective aggravating circumstances; (12) the death penalty was disproportionately and unconstitutionally applied according to Petitioner's race; (13) the death sentence was disproportionate and arbitrary; (14) the death sentence violates the Eighth Amendment because Petitioner is severely mentally ill; (15) the selection of the jury was tainted; (16) the prosecution engaged in racial and gender discrimination in exercise of its peremptory strikes; (17) the voir dire violated

alleged that "[trial] counsel rendered ineffective assistance by failing to investigate and present mitigating evidence regarding Runyon's psycho-social history, brain damage, and mental health." Id. at 41.

Petitioner's ineffective assistance of counsel claim in Claim 6 contained four subparts: (1) Mr. Hudgins appeared in the case too late to effectively investigate and present mitigation; (2) trial counsel abandoned the incomplete mental health investigations and presented repetitive lay person testimony; (3) a complete psycho-social history and its implications would have added weight to mitigating factors, reduced the weight of aggravating factors and informed the jurors about Petitioner's lesser culpability; and (4) trial counsels' failure to investigate and present mitigating evidence undermines confidence in Runyon's death sentence. See id. at ii-iii.

Petitioner alleged that Mr. Hudgins joined the trial too late to conduct a necessary mental health investigation. Id. at 50-51. In the limited time Mr. Hudgins had, Petitioner argued that he unduly focused on obtaining medical records, which "constrained the investigation of Runyon's mental health." Id. at 52. Although Dr. Merikangas ordered the MRI and PET scans, and such scans were

---

Petitioner's Fifth and Sixth Amendment rights; and (18) the trial court unlawfully excluded potential jurors based on their questionnaire responses without voir dire.

performed on August 14, 2009, Petitioner alleged that "[t]he results were released directly to defense counsel and not shown to Dr. Merikangas or a similar expert." Id. at 53.

Petitioner also faulted trial counsel for putting on evidence of his social history through lay witnesses without accompanying mental health evidence. Id. at 54-56. Petitioner argued that mental health evidence regarding his social history would have instructed the jurors on the mitigatory weight to assign to such evidence. Id. at 57. Petitioner further argued that trial counsel overlooked readily available evidence and witnesses regarding his social history and past head injuries. Id. at 58-88. Petitioner concluded that, "[h]ad counsel presented the available mitigating evidence ... which explains how and why Runyon's past relates to who he was at the time of the crime, it might well have influenced the jury's appraisal of Runyon's moral culpability." Id. at 91.

Petitioner attached 39 exhibits to his § 2255 Motion. Three of these exhibits were declarations from Petitioner's trial team. Mitigation specialist Sheila Cronin characterized the preparation for the penalty phases as rushed and underprepared. ECF No. 511-4. Although she stated trial counsel pursued mental health evidence up to the beginning of the selection phase, she claimed that they "did not share with me the reports from Dr. Mirsky or Dr. Merikangas" and she did not feel she had enough time to speak with witnesses. Id. at 6.

22

Mr. Hudgins provided a declaration with his best recollection of the trial strategy. ECF No. 511-5. Regarding the mental health evidence, Mr. Hudgins stated that Dr. Merikangas wanted brain scans of Petitioner, but that Mr. Hudgins could not remember the results of the scans nor why Dr. Merikangas and Dr. Mirsky did not testify at trial. Id. at 2. Mr. Woodward also provided a declaration detailing his recollection of the decision-making process with regard to retaining experts and calling witnesses. ECF No. 511-6. Mr. Woodward noted that he did not review his file prior to making these statements and that habeas counsel did not respond to his request to know the nature of Petitioner's claims. Id. at 3.

The exhibits also included three declarations from experts. Dr. Merikangas submitted a declaration dated September 25, 2015. ECF No. 511-2 ("2015 Merikangas Declaration"). In his declaration, Dr. Merikangas stated, "I did not get to testify [at the selection phase], but if I had, I would have testified that in my expert opinion[, Petitioner] was a brain damaged individual with migrainous headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process." Id. at 1. The 2015 Merikangas Declaration stated that Dr. Merikangas examined Petitioner again on September 24, 2015, while Petitioner was in federal prison. Id. at 3. Regarding the 2009 brain scans, Dr. Merikangas stated:

> I reviewed the MRI and Pet scans of the brain done in August 2009. They revealed multiple white matter hyperintensities [("WMHIs")] on the MRI consistent with his history of head injuries and migraine. The PET scan was non-diagnostic.

Id. at 4.

Dr. Cunningham submitted a declaration acknowledging that he had provided RPV assessment at the selection phase, but "[h]ad it been requested, [he] could have provided a broader evaluation of adverse development factors ... as well." ECF No. 511-8. He completed a report on Petitioner's adverse development factors and identified fourteen factors that could have been presented to the jury. Id. at 50. Although the jury heard much of the information underlying his conclusions, Dr. Cunningham felt it should have been accompanied by "testimony regarding their implications." Id. at 50. Dr. Mirsky completed a neuropsychological evaluation of Petitioner on August 28, 2015. ECF No. 511-35. Dr. Mirsky concluded that his tests results "indicate the presence of significant damage to the right side of the brain, as well as psychotic disorder." Id. at 6.

The exhibits also included several declarations from lay witnesses. See, e.g., ECF Nos. 511-13 (Scott Linker Declaration); 511-26 (David Dombrowski Declaration); 511-27 (Mark Runyon Declaration); 511-28 (Maria Runyon Declaration); 511-31 (Robert Seeger Declaration); 511-32 (Deborah Seeger Declaration); and 511-33 (Captain Harris Declaration). As relevant here, the witness

declarations generally stated that the witnesses felt they could have provided mitigating information at the selection phase, but trial counsel did not ask them to do so.  Habeas counsel also included as exhibits correspondence from the time of the selection phase relevant to trial counsel's investigation of mental health evidence.

The United States responded in opposition on April 22, 2016, ECF No. 536, and Petitioner replied on July 7, 2016, ECF No. 551, including five new exhibits in support.  Significant among these new exhibits was an updated declaration from Mr. Hudgins.  ECF No. 551-1.  In his updated declaration, Mr. Hudgins stated:

> David Runyon's current attorneys informed me that a radiologist reported a 'normal brain MRI.'  This report would not have supplied me with enough information to make a decision to cease investigation of David Runyon's mental health or social history.  I understand the difference between a radiologist's reading and a neuropsychiatrist's/neurologist's reading of such scans.

Id. at 2.  Although Dr. Merikangas did not offer an opinion on the brain scans at the time of the trial in 2009, Mr. Hudgins's updated declaration further stated:

> David Runyon's current attorneys informed me that Dr. Merikangas recently read the film from the 2009 scans and that one scan revealed brain damage.  This is the type of information I would have been looking for at the penalty phase.

Id.

25

On January 19, 2017, the court issued an opinion denying relief on each of Petitioner's eighteen claims. Runyon v. United States, 228 F. Supp. 3d 569 (E.D. Va. 2017) ("Runyon I"). Regarding Claim 6, the court found that "counsel took reasonable and proper steps to investigate the Petitioner's mental health and psycho-social history, both before and after Hudgins was appointed to the case, and that the Petitioner suffered no prejudice by the later addition of Hudgins to the defense team." Id. at 611. The court found that counsel "did not neglect their duty to investigate and prepare mitigating mental health evidence" and that counsel "effectively searched for experts and various forms of testing." Id. at 613, 614. Regarding the brain scans specifically, the court considered evidence that a radiologist had read the scans as normal at the time of trial and found that counsels' decision not to present them to the jury was not deficient performance. Id. at 614. The court further found that counsels' decision not to introduce mental health evidence was a reasonable trial strategy. Id. at 623-24. The court concluded that "Petitioner is unable to show how introduction of mental health evidence or a different focus during the penalty phase would meet the Strickland prejudice standard and undermine confidence in the outcome." Id. at 625.

On August 18, 2017, Petitioner filed a notice of appeal. ECF No. 590. On August 14, 2019, the Fourth Circuit granted a certificate of appealability as to four issues: (1) whether

26

Petitioner's § 924 conviction was invalid because the offense was not committed during and in relation to a "crime of violence" (Claim 9); (2) whether trial counsel provided ineffective assistance by failing to investigate and present mitigating evidence of Runyon's brain injury and potential mental illness (Claim 6); (3) whether the government violated Brady v. Maryland, 373 U.S. 83 (1963), in failing to disclose the codefendant's history of sexual assault or whether, in the alternative, trial counsel's failure to investigate that history and present it to the jury constituted ineffective assistance of counsel (Claim 2); and (4) whether the government exercised its peremptory jury strikes in a discriminatory manner, in violation of Batson v. Kentucky, 476 U.S. 79 (1986), or whether counsel unreasonably failed to challenge the government's strikes at trial or on direct review (Claim 16). United States v. Runyon, Case No. 17-5 (4th Cir. August 14, 2019), ECF No. 46. The Fourth Circuit issued its opinion on December 23, 2020, affirming the court's dismissal as to Claims 2, 9, and 16, but reversing the court's dismissal of Claim 6. United States v. Runyon, 994 F.3d 192, 197 (4th Cir. 2021) ("Runyon II").[14]

---

[14] The Fourth Circuit's opinion was originally published as United States v. Runyon, 983 F.3d 716 (4th Cir. 2020), but was amended and republished on February 12, 2021, to remove a single sentence unrelated to Claim 6. See Order, United States v. Runyon, Case No. 17-5 (4th Cir. February 12, 2021), ECF No. 110.

The Fourth Circuit panel's decision was split 2-1 as to each of these claims. Judge Niemeyer wrote the majority opinion and was joined by Judge Wilkinson in affirming the court's dismissal of Claims 2, 9, and 16. Judge Gregory dissented as to these parts of the opinion but concurred with Judge Niemeyer's reversal on Claim 6. See id. at 212-17 (Gregory, J., concurrence in part). Judge Wilkinson dissented from the court's reversal on Claim 6, finding that trial counsel conducted a thorough mental health investigation considering the requirements set forth in Strickland v. Washington, 466 U.S. 668 (1984). See id. at 217-223 (Wilkinson, J., concurrence in part).

In addressing Claim 6, the majority opinion reviewed the evidence available on the docket as well as that developed along with the § 2255 Motion. Regarding the brain scans, the majority found:

> The brain scans that Dr. Merikangas ordered were in fact provided to Hudgins, along with a radiologist's report that the scans were 'normal.' But Hudgins recognized, as he later stated, that readings by a neuropsychiatrist, rather than a radiologist, were necessary. Yet, he never provided the scans to Dr. Merikangas, as Dr. Merikangas had requested, nor to Dr. Mirsky.

Id. at 205. The majority opinion also highlighted Dr. Merikangas's and Dr. Mirsky's 2015 declarations stating that the scans indicated brain damage, and the 2015 declaration of Dr. Cunningham regarding Petitioner's apparent dysfunction and

28

cognitive defects.  Id. at 206.  The majority opinion reviewed Petitioner's Army medical records and the affidavits from acquaintances describing a personality change following a car accident.  Id. at 206-07.  Finally, the majority opinion considered the Mr. Hudgins's declarations regarding the significance of the brain scan evidence.  Id. at 207.

The majority found that "the evidence that trial counsel Hudgins had in hand, as well as trial counsel's later reflections on why further investigation was not conducted, indicates that the district court should have made a further inquiry into whether, under the applicable standards, Runyon received effective assistance of counsel."  Id. at 208.  It found that Dr. Mirsky's preliminary report, a follow-up email from Dr. Mirsky, and Dr. Merikangas's preliminary report were "red flags [that] clearly pointed to potential mitigating evidence."  Id.  While acknowledging that trial counsel could have placed a reasonable limit on further investigation had they made a strategic choice to pursue other arguments, the majority found that "the record remains unclear whether such a strategic choice was made."  Id. (emphasis omitted).  The Fourth Circuit thus concluded that an evidentiary hearing should be conducted to resolve the issue of whether Mr. Hudgins made a strategic choice not to further investigate mental health evidence and, if the failure to develop mental health evidence was not the

product of a strategic choice, whether such a failure prejudiced Petitioner. Id. at 208-09. Accordingly, the Fourth Circuit vacated the portion of this court's opinion denying relief on Claim 6 and remanded the case to this court for an evidentiary hearing. Id. at 209.

## II. THE EVIDENTIARY HEARING

On November 19, 2021, Ms. Brace withdrew from her representation of Petitioner, and the court appointed her colleague at VCRRC, Elizabeth J. Peiffer, as substitute counsel. ECF No. 649. The court entered a pre-evidentiary hearing scheduling order on January 27, 2022, ECF No. 657, and ultimately directed the Clerk to schedule the evidentiary hearing to begin on February 7, 2023, see ECF No. 695. The court handled numerous evidentiary and pre-hearing issues prior to the commencement of the evidentiary hearing. On February 2, 2023, the court granted Petitioner's request to add attorney Helen Susanne Bales of FDSET as a third capital habeas attorney, ECF No. 751, further granting her pro hac vice status on February 7, 2023, ECF No. 772.

## A. February 2023 Hearing

The evidentiary hearing commenced on February 7, 2023. Petitioner's first witness was Mr. Hudgins. See Tr. at 15.[15] Mr.

---

[15] References to the transcript of the evidentiary hearing are labelled as "Tr." Petitioner's exhibits from the evidentiary

Hudgins gave testimony regarding his representation of Petitioner, including his investigation into Petitioner's mental health as a mitigating factor.    During Mr. Hudgins's testimony, it became apparent that habeas counsel had access to his case file from the trial, but habeas counsel had only provided Mr. Hudgins limited documents from his file before he signed his 2015 declarations. See id. at 62-64.[16] Mr. Hudgins expressed surprise when Ms. Chavis acknowledged she had his case file and he asked the court to declare him an adverse witness upon this discovery.[17] His testimony

_____

hearing are labelled as "PX" and government exhibits are labelled as "GX."

[16] Ms. Chavis attempted to introduce Petitioner's Army medical records, which, she suggested, Ms. Cronin had sent to Mr. Hudgins in May 2009.  Tr. at 62-63.  However, Mr. Hudgins testified that he was unable to recall reviewing the medical records.  Id. at 63-64.  In an attempt to establish the relevance of the records, Ms. Chavis asked Mr. Hudgins if he would have reviewed the records if they were in his case file.  Id. at 64.  Mr. Hudgins answered that he would have, but he did not know what was in his case file.  Id.

[17]     Q. Well, Judge Hudgins, if these records were found in your -- within your case files, would you have not reviewed them?
     A. I would have, but I don't know what was in my case file. Nobody has shown it to me. I'm surprised. Do you have my case file?
     Q: Yes.
     THE WITNESS:    Sorry, Your Honor.  You should probably declare me an adverse witness at this point because I can't believe what I'm hearing. I will be adverse from this point forward.

Id. at 64-65 (Mr. Hudgins was appointed as a District Court Judge for the Ninth Judicial District of Virginia on July 1, 2012, and, as such, is referred to as "Judge Hudgins" in the transcript).

was limited by his lack of memory and he only remembered certain events after being shown relevant documents for the first time since the trial.  See id. at 269-70.[18]

Petitioner next called Jon Babineau, Petitioner's trial counsel until February 2009.  Mr. Babineau testified about the early stages of the mitigation investigation prior to Mr. Hudgins's appointment.  Specifically, his testimony discussed his working relationship with Mr. Woodward, retaining Ms. Cronin and Mr. Ford, retaining the original experts, and reviewing the initial evidence.  Mr. Babineau had turned his case file over to Mr. Hudgins when he left the case and had not seen the file since then, Tr. at 327, which created difficulty in authenticating certain evidence, see id. at 328, 337-38.

---

[18]   Q. What information did you provide to your experts after -- throughout, as you were working up to the penalty phase? We have heard a lot about how you continued to work on the mitigation up to the penalty phase.
A. Are you asking me in a vacuum to tell you what? I have no idea. If you show me something, I can say, yes, I did that. But not having my file, I can't go back and get any idea of what I did. This is 13 years ago. I don't remember what I did. I remember the things I'm testifying to because I'm being shown exhibits. Some of them, sounds like, came from my file. I don't know how that happened. But if you show me exhibits, and I can say, yes, yes, I recall that, yes, I did that. But if you're going to say what did you do in a vacuum, I can't answer that. You want me to answer what I said and sent to Dr. Mirsky; I can't answer that. Did you look in my file? Maybe you can tell.

Petitioner's third witness was Lawrence Woodward, Petitioner's second trial counsel who focused on the merits phase. Mr. Woodward testified about the trial team's decision-making process throughout the trial. After the merits phase, Mr. Woodward began focusing his efforts on assisting the mitigation case, which included advising Mr. Hudgins on which witnesses to call. Tr. at 391-92. Mr. Woodward testified that he and Mr. Hudgins collaborated extensively prior to the selection phase, and that they had agreed that Mr. Woodward would present the closing argument. Id. at 404.

On the third and fourth day of the evidentiary hearing, Petitioner called nine witnesses who personally knew him: Maria Runyon, Petitioner's ex-wife, Tr. at 454; Wren Fleming, Petitioner's stepson, Tr. at 503; Warren Scott Linker, Petitioner's former brother-in-law (Maria Runyon's brother), Tr. at 527; Tiffany Linker, Petitioner's former sister-in-law (Warren Linker's wife), Tr. at 552; Robert and Deborah Seeger, former neighbors and friends of Petitioner, Tr. at 557, 572; Captain Jeffrey Harris of the City of Bethel, Georgia, Police Department, Petitioner's former supervisor, Tr. at 600; Mark Runyon, Petitioner's brother, Tr. at 606; and David Dombrowski, Petitioner's biological father, Tr. at 695. Of these witnesses, Maria Runyon, Warren Linker, Tiffany Linker, Jeffrey Harris, Mark Runyon, and David Dombrowski also testified at the selection phase

33

of trial.[19]   Wren Fleming was interviewed by the trial team's investigator but was not asked to testify at the selection phase.[20] The Seegers were also interviewed by the investigator and flew to Norfolk from Alaska to testify at the selection phase, but they were not called to testify.  Tr. at 576-77.

Petitioner called mitigation specialist Sheila Cronin on the fifth day of the hearing, who testified about the mitigation investigation leading up to the penalty phases.  Tr. 804.  Ms. Cronin worked with Petitioner's trial counsel to develop a history of Petitioner's life and to identify potential mitigators.  She had thirteen years of experience working as a capital case mitigation specialist prior to joining Petitioner's trial team. See id. at 804-807.   Her investigation included interviewing Petitioner's relatives and friends and developing a report of her findings for trial counsel to review.  She worked with investigator Glenn Ford, who primarily worked on the merits phase but assisted with the mitigation investigation.  Id. at 811.

On the morning of the fifth day of the evidentiary hearing, habeas counsel provided the government attorneys an email from the time of the selection phase regarding the trial team's scheduling

---

[19] See supra note 11.

[20] Mr. Fleming could not recall being interviewed but apparently was interviewed by the mitigation investigators.  See Tr. at 516-518.

of an expert witness. Id. at 972-73. This document had not previously been disclosed the United States. Id. at 973. Assistant United States Attorney Brian Samuels brought this to the attention of the court following Ms. Cronin's testimony, expressing concern that he had not had an opportunity to ask previous witnesses about the document and that he did not know whether other potentially relevant emails from the trial team's case files had been withheld from disclosure. Id. at 974. Ms. Chavis responded that she had produced "hundreds if not thousands" of documents and she did not have a record of what had been disclosed to the government. Id.

Dr. Merikangas was scheduled to testify on February 14, 2023. The court had allowed him to testify via videoconference and he provided an updated declaration prior to his testimony. ECF No. 754-3 ("2023 Merikangas Declaration"). However, before testimony began, Ms. Bales updated the court on the document disclosure issue. Tr. at 988-89. Ms. Bales reported that she had reviewed habeas counsels' files and discovered more documents that were responsive to the government's discovery request that had not been disclosed. Id. at 989. Habeas counsel had difficulty determining which documents had already been disclosed to the United States and had not completed review of its files at that time. Id.

The court adjourned for the afternoon to allow habeas counsel to continue reviewing its files and reconvened at 5:00 P.M. for an

update.  Id. at 1003.  Habeas counsel reported that they still needed additional time to review their files but had disclosed a batch of responsive documents to the United States.  Mr. Samuels expressed concern with the newly disclosed documents that the United States had just received, reporting that there were documents that were directly relevant to the performance of trial counsel and "run contrary to the representations that have been made in the pleadings." Id. at 1010.  The court adjourned for the day, instructing habeas counsel to continue reviewing their files and to disclose any responsive documents to the United States as soon as possible.

The court reconvened on February 15, 2023, at 4:05 P.M.  At that time, habeas counsel had provided approximately 340 documents to the United States, but they were still reviewing their files for undisclosed documents.  See id. at 1029.  Ms. Bales then reported that there had been a breakdown in communication within the habeas counsel team and Ms. Chavis had locked her out of their shared workroom.  Id. at 1031, 1043.  Ms. Bales stated that she had never seen some of the undisclosed documents, including billing records and memos related to Dr. Merikangas.  Id. at 1032.  However, Ms. Bales recalled a previous conversation with Ms. Chavis in which Ms. Chavis suggested that the habeas team should not disclose Dr. Merikangas's billing records to the government.  Id. at 1034-35.  Ms. Chavis reported that habeas counsels' failure to

36

disclose the documents was the result of a mistake, as they had not searched through one of the two folders of trial attorney documents in their initial discovery search. Id. at 1042. Ms. Chavis stated that Ms. Bales and Ms. Peiffer were leveling false accusations against her and that she could no longer trust them. Id. at 1045.

Ms. Chavis then moved to withdraw from the case. Id. at 1052. After conferring with her supervisor at FDSET, Ms. Bales also moved to withdraw from the case. Id. at 1059. The court granted Ms. Chavis's motion to withdraw but took Ms. Bales's motion under advisement for full briefing. Id. at 1063. FDSET had been part of the habeas case since 2015 and the court was hesitant to grant Ms. Bales's motion to withdraw because it would have been detrimental to the institutional memory of Petitioner's habeas counsel team. See id. at 1064.

Ms. Bales filed her motion to withdraw on February 17, 2023, ECF No. 788, and the United States responded on February 21, 2023, seeking further development of Ms. Bales's alleged conflict of interest, ECF No. 790. The court reconvened the evidentiary hearing on February 22, 2023, and granted Ms. Bales's motion to withdraw. Tr. at 1105. The court also addressed the status of the document disclosures. The United States reported that, at that point, habeas counsel had disclosed over 800 documents to them, and that disclosure was still ongoing. Id. at 1102. The

court continued the hearing and cancelled the remaining scheduled witnesses until habeas counsel could complete review and disclosure of all relevant documents.  Id. at 1115.

On April 12, 2023, Petitioner filed a motion to appoint Kathryn Marshall Ali of Ali & Lockwood LLP as a second habeas counsel.  ECF Nos. 802, 803.  Petitioner also sought the appointment of additional attorneys from Covington & Burling LLP. Id.  The court appointed Ms. Ali as second habeas counsel "for the sole purpose of moving the case forward on the one issue now before the court for an evidentiary hearing."  ECF No. 810 at 2.  The court further advised Petitioner that other attorneys could represent him pro bono, but that the court would not appoint or grant pro hac vice status to any additional attorneys.  Id.

During this time, review of the newly disclosed documents was ongoing, and the parties were unable to agree on a date to resume the evidentiary hearing.  See ECF No. 809 at 1.  On June 7, 2023, Petitioner sought to substitute Ms. Peiffer for attorneys from Covington & Burling and sought pro hac vice admission for these attorneys.  ECF Nos. 814, 815.  The court held a status conference on June 16, 2023, to address these issues.  ECF No. 817.  The court denied Petitioner's motion to substitute counsel,[21] directed

---

[21] The reasons for the court's decision are on the record. ECF No. 820 at 1-2.  Petitioner appealed this interlocutory order on June 26, 2024.  ECF No. 821.  Petitioner sought a writ of mandamus requiring the court to grant the Covington & Burling

that the parties complete discovery by August 31, 2023, and scheduled the evidentiary hearing to resume on November 1, 2023. ECF No. 820.

Petitioner again sought to substitute Ms. Peiffer on September 13, 2023, this time proposing the court appoint attorney Barry Coburn in her place. ECF Nos. 843, 844. The court denied this motion, concerned that removing Ms. Peiffer from Petitioner's habeas team would eliminate remaining institutional memory of the proceedings, as VCRRC, through Ms. Brace, and then Ms. Peiffer, had been in the habeas proceeding from the inception as lead counsel. See ECF Nos. 863, 864. On October 2, 2023, Petitioner filed a notice of filing regarding a supplemental and revised declaration of Dr. Merikangas. ECF Nos. 854, 854-1 (Revised Merikangas Declaration). In his revised declaration, Dr. Merikangas responded to newly disclosed documents that seemed to contradict statements in his earlier declarations. ECF No. 854-1. The court struck the Revised Merikangas Declaration on October 27, 2023, finding such a revised declaration improper in the middle of the evidentiary hearing. See ECF No. 873 at 2. On October 20, 2023, Robert E. Lee, of VCRRC, filed a notice of appearance as counsel for Petitioner. ECF No. 874. Mr. Lee stated that he would

---

attorneys pro hac vice admission, which the Fourth Circuit denied on July 24, 2023. ECF No. 826. The Fourth Circuit further affirmed the court's denial of Ms. Peiffer's motion to withdraw on September 28, 2023. ECF No. 856.

represent Petitioner along with Ms. Ali and Ms. Peiffer at the evidentiary hearing and that his "limited appearance will facilitate the presentation of the evidence at the hearing without disrupting the proceedings." Id. at 2.

## B. November 2023 Hearing

The evidentiary hearing resumed on November 1, 2023. Petitioner's remaining witnesses were expert witnesses. The first expert witness was Dr. Mark Cunningham, the clinical and forensic psychologist. See Tr. at 1144. Dr. Cunningham's testimony discussed his contact with trial counsel prior to the selection phase. He also gave a presentation of adverse development factors in Petitioner's life history and the effect that these factors could have on Petitioner's executive functioning. This is the type of presentation Petitioner claims that Dr. Cunningham could have presented to the jury if trial counsel had asked him to do so.

On November 3, 2023, Petitioner called Dr. Siddhartha Nadkarni, a neurologist and psychiatrist. PX 154; Tr. at 1589. Dr. Nadkarni was not involved in the penalty phases of trial but was retained by habeas counsel in 2021. He reviewed Petitioner's reported history of head injuries and found them to be consistent with brain injury. He also found that Petitioner's facial asymmetry suggested a severe blow to his head. Tr. at 1625-26. Dr. Nadkarni examined Petitioner in July 2022 and submitted a

report finding that Petitioner had frontal lobe brain dysfunction.
PX 137.  Overall, he found Petitioner "to be severely brain injured
and [to] have marked sort of frontal lobe dysfunction and a frontal
lobe syndrome with many attendant psychiatric and cognitive
diagnoses."  Tr. at 1600.  He testified that Petitioner's 2009 MRI
showed WMHIs, which are consistent with a brain injury.  Id.
at 1678, 1684.

Petitioner next called Dr. Daniel Martell, a forensic
neuropsychologist.  Tr. at 1859.  Dr. Martell was originally
retained by the United States as a potential rebuttal expert for
the selection phase of trial and the United States retained him
again in 2022 for the habeas proceedings.  After reviewing evidence
for the evidentiary hearing, Dr. Martell informed the United States
that his opinion would not be favorable to the government, and he
was subsequently retained by Petitioner in fall 2023.  Dr. Martell
testified that, while WMHIs can be benign, he believed that the
WMHIs present on Petitioner's brain scans were consistent with
head injuries and blast injuries reported in Petitioner's history
and that these injuries could be the cause of Petitioner's reported
impairments on neurocognitive tests.  Id. at 1881.

Petitioner's final witness was Dr. James Merikangas, the
neurologist and psychiatrist originally retained by trial counsel.
Tr. at 1916.  Dr. Merikangas ordered brain scans prior to the
selection phase, but in his declaration in support of the habeas

41

petition and his updated February 2023 declaration, he claimed that he never spoke with trial counsel after ordering the brain scans and never reviewed them until 2015. Dr. Merikangas testified as to the performance of trial counsel but was confronted with newly disclosed documents, including his own billing records, that undermined previous statements he made in this habeas proceeding. See infra Section IV.A.2(e).

The United States called two witnesses. Mr. Hudgins had passed away at age 68 on September 19, 2023, so he was not able to be recalled to testify about the newly disclosed documents. Many of these documents of particular importance were from Mr. Hudgins's own case file, including contemporaneous memoranda, emails, and billing records, and the evidentiary record would have greatly benefitted from his testimony on them. The United States did recall Mr. Woodward to update his testimony with the benefit of the newly disclosed documents. Mr. Woodward testified to the best he could remember on the trial team's decision-making process, in light of the new evidence.

The United States' second witness was Dr. Geoffrey Aguirre, a professor of neurology, who was a rebuttal witness to Dr. Nadkarni. Tr. at 2298. Dr. Aguirre did not perform any neurocognitive testing on Petitioner, but he reviewed the 2009 brain scans and the reports from other experts. Id. at 2312-13. He questioned Dr. Nadkarni's conclusion that Petitioner's facial

asymmetry was caused by a physical injury, id. at 2315-17, and opined that a 1996 car accident likely resulted in a mild traumatic brain injury (mTBI) that would have only affected Petitioner for a short period of time, id. at 2327-28.  Dr. Aguirre testified that the WMHIs present on Petitioner's 2009 MRI are a common finding and the "scans alone would lead me to not suspect that this person has meaningful impairments in intellectual or behavioral function."  Id. at 2375.

The last witness of the evidentiary hearing was Dr. James Lipton, Petitioner's rebuttal expert witness to Dr. Aguirre.  Dr. Lipton is a neuroradiologist and neuroscientist.  Tr. at 2522.  In reviewing the 2009 MRIs, Dr. Lipton found more WMHIs than any of the other experts and disagreed with Dr. Aguirre's conclusion that the WMHIs were normal.  Id. at 2549.  He found that these WMHIs could be associated with a substantial alteration in Petitioner's behavior or cognition.  Id. at 2561.

The evidentiary hearing concluded on November 14, 2023.[22]  The parties filed their proposed findings of fact and conclusions of law on January 15, 2024.  ECF Nos. 913 (United States), 914 (Petitioner).  Throughout the evidentiary hearing, the court

---

[22] Although he prepared a report in support of Petitioner's § 2255 Motion, ECF No. 511-35, Dr. Mirsky did not testify at the evidentiary hearing and neither party anticipated calling him as a witness, see ECF Nos. 698, 699.  Dr. Mirsky passed away on February 3, 2023.

strived to focus the evidence presented to the relevant issues on remand:   the scope of trial counsel's investigation of mental health, trial counsel's decision-making process, and the evidence that trial counsel could have obtained in 2009.   This was a particularly difficult task in the presentation of the expert witnesses, as the expert opinions were based on a mix of evidence available in 2009 and evidence that was later developed for the habeas proceeding.   The court was required to make numerous evidentiary rulings to ensure the proper scope of the hearing, which are on the record.[23]   Despite the noted difficulties with late-disclosed documents and resulting gaps in the testimony, one example being Mr. Hudgins's inability to review and testify about his case file due to his untimely death, the court has now developed a comprehensive evidentiary record to properly consider Claim 6.

### III. LEGAL STANDARD

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel.   U.S. Const. amend. VI.   To succeed on an ineffective assistance of counsel claim, Petitioner must show that: "(1) counsel's performance fell below an objective standard of reasonableness (the performance prong); and (2) the deficient representation prejudiced the defendant (the prejudice

---

[23] Petitioner also proffered evidence that the court found to be outside the scope of remand.

prong)." United States v. Cannady, 63 F.4th 259, 265 (4th Cir. 2023) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). "Under the performance prong, counsel must provide reasonably effective assistance pursuant to 'professional norms.'" See id. (quoting Padilla v. Kentucky, 559 U.S. 356, 366 (2010)); see also Owens v. Stirling, 967 F.3d 396, 412 (4th Cir. 2020) (quoting Winston v. Pearson, 683 F.3d 489, 504 (4th Cir. 2012) ("In all, the 'critical question' is whether counsel's performance 'amounted to incompetence under prevailing professional norms, not whether it deviated from best practices."). "This assistance should, among other things, be legally competent, include relevant research, and raise important issues." Id. (citing Strickland, 466 U.S. at 687-90).

"Prevailing norms of practice as reflected in American Bar Association [("ABA")] standards" should be used as "guides." See Strickland, 466 U.S. at 688; Rompilla v. Beard, 545 U.S. 374, 387 n.7 (2005) (cleaned up) ("We long have referred to these ABA Standards as guides to determining what is reasonable."). The ABA provides a detailed guideline for death penalty representations. See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 921 (2003) ("ABA Guidelines"). While the ABA Guidelines may be helpful for evaluating counsel's performance, "such guides are just that—'only guides'—for determining what

constitutes reasonable representation in a given case, and no fixed set of rules may 'take account of the variety of circumstances faced by defense counsel.'"   Owens, 967 F.3d at 412 (internal citation omitted) (quoting Strickland, 466 U.S. at 688).   The ABA Guidelines do not define a minimum standard for effective performance and courts should not treat them as "inexorable commands."   See Bobby v. Van Hook, 558 U.S. 4, 8 (2009).

Particularly relevant to Petitioner's claim is counsel's duty to investigate potentially mitigating evidence.   "[C]apital sentencing counsel have an 'obligation to conduct a thorough investigation of defendant's background,' in an effort 'to discover all reasonably available mitigating evidence.'"   Owens, 967 F.3d at 413 (internal citations omitted) (first quoting Williams v. Taylor, 529 U.S. 362, 395 (2000), then quoting Wiggins v. Smith, 539 U.S. 510, 524 (2003)).   Counsel's mitigation investigation "need only be reasonably thorough."   Id. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."   Rompilla, 545 U.S. at 383.

A reasonable investigation includes the duty to explore "red flags" present in the mitigating evidence at hand.   See id.; see also Andrus v. Texas, 590 U.S. 806, 816 (2020) (finding counsel's performance deficient where he "disregarded, rather than explored, [] multiple red flags."); Wiggins, 539 U.S. at 527 ("[A] court

46

must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); Williams v. Stirling, 914 F.3d 302, 315 (4th Cir. 2019), as amended (Feb. 5, 2019) (finding deficient performance where counsel failed to conduct any investigation despite red flags indicating presence of fetal alcohol syndrome). Neither the Supreme Court nor the Fourth Circuit have set universally applicable minimum requirements for the scope of counsel's investigation into such "red flags." Instead, the standard for an attorney's decision to further investigate "red flags", and the extent of such an investigation, is reasonableness, and courts consider such decisions on a "case-by-case approach." See id. at 393-394 (O'Connor, J. concurring).

Supreme Court and Fourth Circuit precedent routinely emphasize that the court's "scrutiny of counsel's performance must be highly deferential." Cannady, 63 F.4th at 265 (quoting Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000)); Harrington v. Richter, 562 U.S. 86, 105 (2011) ("[T]he standard for judging counsel's representation is a most deferential one."); Premo v. Moore, 562 U.S. 115, 126 (2011) (internal citation omitted) ("In applying and defining [Strickland's] standard substantial deference must be accorded to counsel's judgment."). "Because '[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence,' and 'all too easy for a

court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission ... was unreasonable,' Strickland cautions that '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight ... and to evaluate the conduct from counsel's perspective at the time.'" Owens, 967 F.3d at 412 (alterations in original) (quoting Strickland, 466 U.S. at 689).

The court analyzes counsels' decision to put on mitigating evidence based on the reasonableness of counsels' investigation into developing that evidence. In evaluating counsels' decision not to present certain mitigating evidence, the court's "principal concern in deciding whether [counsel] exercised 'reasonable professional judgment,' is not whether counsel should have presented a mitigation case." Wiggins, 539 U.S. at 522-23 (cleaned up) (quoting Strickland, 466 U.S. at 691). "Rather, [the court] focus[es] on whether the investigation supporting counsel's decision not to introduce mitigating evidence ... was itself reasonable." Id. at 523 (citing Stickland, 466 U.S. at 691). If counsel has made a thorough investigation of the law and the facts, counsel's strategic choices are "virtually unchallengeable." Strickland, 466 U.S. at 689.

"Strategic decisions—including whether to hire an expert—are entitled to a 'strong presumption' of reasonableness." Dunn v.

Reeves, 594 U.S. 731, 739 (2021) (quoting Harrington, 562 U.S. at 104 (2011)).   "Defense lawyers have 'limited' time and resources, and so must choose from among 'countless' strategic options."   Id. (quoting Harrington, 562 U.S. at 106-07).   "The burden of rebutting this presumption 'rests squarely on the defendant,' and '[i]t should go without saying that the absence of evidence cannot overcome [it].'"   Id. (alterations in original) (quoting Burt v. Titlow, 571 U.S. 12, 22-23 (2013)).   "In fact, even if there is reason to think that counsel's conduct 'was far from exemplary,' a court still may not grant relief if '[t]he record does not reveal' that counsel took an approach that no competent lawyer would have chosen.'"   Id. (quoting Titlow, 571 U.S. at 23-24)).

"Once a defendant has established that counsel's performance was deficient, he must then prove that counsel's deficient performance prejudiced his defense under Strickland's second prong."   Owens, 967 F.3d at 412. "Under the prejudice prong, a defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"   Cannady, 63 F.4th at 265 (quoting Strickland, 466 U.S. at 694).   "A reasonable probability, in turn, is one 'sufficient to undermine confidence in the outcome.'"   Owens, 967 F.3d at 412 (quoting Strickland, 466 U.S. at 694).

"In the capital sentencing context, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" Id. (citing Strickland, 466 U.S. at 694). In the present posture of this case, the court must consider "'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" Andrus, 590 U.S. at 821 (quoting Williams, 529 U.S. at 397-98). And because Petitioner's death sentence required a unanimous jury recommendation, see 18 U.S.C. § 3593(e), "prejudice here requires only 'a reasonable probability that at least one juror would have struck a different balance' regarding [Petitioner's] 'moral culpability.'" Id. (quoting Wiggins, 539 U.S. at 537-38).

## IV. ANALYSIS

With these principles in mind, the court now "'reconstruct[s] the circumstances of counsel's challenged conduct,' and consider[s] the timeliness and scope of the investigation performed by counsel, the fruits of that effort, and the decisions counsel made as a result of it." Emmett v. Kelly, 474 F.3d 154, 162 (4th Cir. 2007) (quoting Strickland, 466 U.S. at 689).

## A. Performance Prong

Petitioner contends that his trial counsel were deficient for failing to investigate and present mitigating mental health evidence.  Petitioner argues that such evidence was available to his trial counsel prior to the penalty phases in 2009 and that they could have discovered such evidence had they done a more thorough investigation.  The evidence that Petitioner claims his trial counsel should have further investigated and presented can be divided into two categories:  (1) Petitioner's head injuries and resulting changes in behavior; (2) medical evidence of brain injury and cognitive dysfunction.[24]

### 1.  Head Injuries and Resulting Changes in Behavior

Petitioner contends that he suffered several head injuries throughout his life and that there was evidence of these injuries that trial counsel could have discovered.  Further, Petitioner argues that there was evidence that he underwent a change in

---

[24] The United States objected to the court's consideration of Petitioner's psycho-social history, particularly Dr. Cunningham's adverse development factor presentation, as outside the scope of the Fourth Circuit's remand.  See ECF No. 859.  This presentation was distinct from the other evidence in that it focused on events from Petitioner's life history that could have affected his cognitive functioning as opposed to alleged deficits in cognitive functioning that resulted from head injuries.  Nevertheless, while staying within the bounds of relevancy, the court has strived to create an evidentiary record that is as complete as possible, and this presentation was part of Claim 6 in Petitioner's § 2255 Motion.  The court thus allowed the introduction of the psycho-social history evidence and has considered it here.

behavior following a 1996 car accident supports his claim of brain injury. The court next reviews each alleged head injury, and the evidence available for such injury in 2009.

### (a) Child Abuse

According to Petitioner, he was physically abused by David Dombrowski, his biological father, at age three. See ECF No. 914 at 8. While his family was living in Panama, Petitioner claims that his father threw him across the room while he was trying to break up his parents' fight. Id. Petitioner further contends that this abuse is the cause of his facial asymmetry. Id. At the 2023 evidentiary hearing, this claim was corroborated by testimony from Mr. Dombrowski, who confirmed that he abused Petitioner as a child in Panama. See Tr. at 773.

In 2009, trial counsel would have been aware of the abuse claim through mitigation investigator Sheila Cronin's report. GX 129 ("Cronin Report"). Petitioner's mother, Suk Cha, described the child abuse that Petitioner experienced in Panama to Ms. Cronin. See id. at 15 ("[Dombrowski's] behavior escalated and he began beating Suk Cha and [Petitioner] ... [Dombrowski] went to [Petitioner's] bedroom, swung him by the wrist and heaved him across the room."). The Cronin Report further summarizes Petitioner's version of events. Id. at 42 ("David saw his father hitting his mother and tried to stop him by biting his leg. His father's response was to throw him across the room."). According

52

to the Cronin Report, Suk Cha claimed that Petitioner developed his "crooked smile" while the family lived in Panama.  Id. at 15.

Trial counsel would have also been made aware of the abuse incident from the reports of Dr. Patterson and Dr. Montalbano. According to Dr. Patterson's report, Petitioner told him that "he recalls his biological father choking him and hitting him, and he believes he passed out."  ECF No. 276 at 11.  Dr. Patterson stated that Petitioner had told him that he believed that the sag in his lip was caused by a physical altercation with Mr. Dombrowski.  Id. Petitioner reported the story similarly to Dr. Montalbano, which Dr. Montalbano included in his report.  ECF No. 277 at 11 ("On that occasion, he was not sure if his biological father 'choked me or hit me.'").

The only sources of the evidence of Mr. Dombrowski's physical abuse of Petitioner available to trial counsel were Petitioner's and his mother's self-reporting.[25]  Notably, Ms. Cronin found that Petitioner was a "poor historian."  GX 129 at 41.  When Ms. Cronin interviewed Mr. Dombrowski in 2009, he denied ever abusing Petitioner, and specifically denied the alleged throwing incident. Id. at 24.  Mr. Hudgins followed up on the reports of child abuse

---

[25] Petitioner's account to Ms. Cronin also differed slightly from accounts to Dr. Patterson and Dr. Montalbano.  The Cronin Report describes Petitioner being thrown across the room. Petitioner did not report being thrown to Dr. Patterson or Dr. Montalbano, only that he was choked or hit.

in the Cronin Report by asking Mr. Dombrowski whether he ever abused Petitioner, which Mr. Dombrowski denied at the time.  <u>See</u> Tr. at 780.

Further, the only link between the child abuse and Petitioner's facial asymmetry was Suk Cha's speculation.  Suk Cha told Ms. Cronin that "she d[id] not know how or why he got it, but had a theory based on something she read."  GX 129 at 15.  Her theory was that Petitioner developed nerve damage in his face because he would often sleep on the cold floor outside the bathroom.  <u>Id.</u>  However, she thought it was "possible" that the facial asymmetry resulted from Mr. Dombrowski's abuse.  Petitioner was three years old at the time of the abuse.  His later-stated belief to Dr. Patterson that the child abuse was the cause of his sagging lip is more likely post-hoc speculation than based on his actual observations at the time.

So, the only evidence of child abuse available to trial counsel was the recollection of two witnesses, one of whom was three years old at the time.  The alleged perpetrator had denied it ever happened.  The only link between the child abuse and Petitioner's facial asymmetry was a layperson's speculation that such a link was "possible," although it was not even her main theory of how the facial asymmetry developed.

### (b) Football Injury

Petitioner claims he was knocked out after running into a telephone pole while playing football when he was a child. ECF No. 914 at 8. Trial counsel had information about this incident in the Cronin Report, GX 129, Dr. Patterson's report, ECF No. 276, and Dr. Montalbano's report, ECF No. 277. The Cronin Report summarized Petitioner's description of the incident as:

> When he was approximately ten, he hit his head against a telephone pole while running backwards to catch a football. However, he felt fine when he came to and never told his parents about the incident and was never medically evaluated.

GX 129 at 41. Petitioner told Dr. Patterson that he "caught the ball, turned around, and ran into a telephone pole when he was approximately 5 or 6 years old." ECF No. 276 at 12. According to Dr. Montalbano, "[Petitioner] recalled being knocked out playing football, when he ran into a telephone pole and was briefly 'knocked out.' He guessed he was in elementary school at the time." ECF No. 277 at 20.

At the 2023 evidentiary hearing, Ms. Cronin testified that she was not able to verify this injury because Petitioner never told anyone about it. Tr. at 860. Mr. Hudgins also testified that he never found any record relating to a football injury. Id. at 206. However, Mark Runyon, Petitioner's brother, remembered the incident, stating:

> But I remember David bouncing off the telephone pole like a Ping-Pong ball, knocked him out cold, and I thought that was — we were kids. He thought it was fun. He got up, shook it off and went and sat down, and the same thing, you know, you just keep going.

Id. at 624.

So, in 2009, trial counsel knew about the incident from Petitioner's self-reporting and could have corroborated the incident with Mark Runyon.   However, there were no medical records available regarding the incident.   Mark Runyon testified at the selection phase, but he did not testify about the football injury.   In his testimony at the 2023 evidentiary hearing, Mark stated that the relevance of such testimony at the sentencing hearing might have seemed "dubious" at that time, although he was never asked about his brother's head injuries.   Id. at 677-78.

### (c) Grenade Blasts

Petitioner also claims to have "suffered two blast injuries during training exercises while attending Wentworth Military Academy." ECF No. 914 at 8.   There are descriptions of these blast injuries in a memo from Ms. Cronin to trial counsel dated August 8, 2008, PX 87, the Cronin Report, GX 129, Dr. Mirsky's report, GX 36, Dr. Patterson's report, ECF No. 276, and Dr. Montalbano's report, ECF No. 277.   Each of these gives slightly different account of what occurred.   Ms. Cronin's August 8, 2008, memo reports:

56

> [Petitioner] said he also lost consciousness during a
> military grenade simulation practice.  He passed out and
> then came to.  Someone in the group notified Sergeant
> Metzger, who asked David if he was okay or if he needed
> medical treatment.  [Petitioner] told him he was fine.

PX 87 at 3.  The Cronin Report later stated:

> While in Army Basic Training, [Petitioner] lost
> consciousness again during a grenade simulation, but it
> was momentary so he felt that no medical intervention
> was necessary.

GX 129 at 42.  Dr. Mirsky described two blast injuries:

> Prior injuries of potential relevance to [Petitioner's]
> mental status include two incidents of grenades being
> detonated quite close to him during training exercises
> while in service.  These occurred between 1989 and 1991.

GX 36 at 2.  Dr. Mirsky opined that Petitioner's demonstrated

scores on a neurological functioning test were consistent with a

brainstem injury, and that such an injury could have been caused

by the reported blast injuries.  Id. at 6.

Petitioner told Dr. Patterson that he had been knocked out

during military training with concussions from explosions.  ECF

No. 276 at 20.  Dr. Montalbano also discussed two blast injuries.

First, Petitioner reported to him that he was "knocked out" by a

hand grenade simulator.  ECF No. 277 at 20.  Then, during another

military exercise, Petitioner reported that a "C-4 explosive went

off as he was diving into a bunker," with the shockwave from the

explosion hitting him below the torso.  Id.[26]  Petitioner reported that he was stunned but did not pass out.  Id.

Petitioner's self-reporting was the source of information for all of these accounts.  At the initial 2023 evidentiary hearing, Ms. Cronin testified that she never found any corroboration of a blast injury from Wentworth Academy.  Tr. at 960.  Mr. Hudgins could not verify this information either.  Id. at 214.  Mr. Hudgins followed up with Dr. Mirsky on August 5, 2009, seeking an additional report.  GX 60A.  Dr. Mirsky replied that he had nothing to add without the MRI or PET scans, but that he felt that his examination had shown the effects of the blast injuries and car accidents.  Id.

### (d) 1990 Car Accident

Petitioner also contends that he suffered two serious car accidents.  First, in 1990, Petitioner fell asleep at the wheel and drove under a tractor trailer.  ECF No. 914 at 8-9.  This accident apparently led to treatment for lesions caused by glass embedded in his face.  See id.  Petitioner's recounting of this

---

[26] Given these accounts, it is somewhat unclear what actually happened.  Ms. Cronin's August 8, 2008, memo and the Cronin Report each report a single blast injury, and these documents appear to describe the same event.  Dr. Mirsky and Dr. Montalbano report two blast injuries.  The Cronin Report states that the blast injury occurred at Army Basic Training, while Dr. Mirsky's report states that blast injuries occurred between 1989 and 1991.  According to the Cronin Report, Petitioner did not join the National Guard until 1992.  GX 129 at 47.  Dr. Mirsky reported two grenade blasts, while Dr. Montalbano reported a grenade blast and a C-4 blast.

event was included in the Cronin Report.  GX 129 at 47 ("He fell asleep at the wheel, ran off the road and totaled the car.  He ended up in the Emergency Room having shards of glass removed from his face.").  Dr. Mirsky also noted the 1990 car accident in his report.  GX 36 at 2 ("He also reports two serious car accidents with cognitive sequelae—one in 1990 and one in 1996.").  The 1990 car accident was mentioned in an Army medical record from August 17, 1995.  PX 38 at 36.

Once again, the source of all these accounts of appears to be Petitioner's self-reporting.  The account in the Cronin Report and Dr. Mirsky's report were clearly summarizing what Petitioner had told them.  The report contained in the 1995 Army medical records is a consultation report from Petitioner's appointment with a dermatologist following his complaints of skin problems.  See id. at 34.  Regarding the 1990 accident, the consultation report states: "[Patient] was involved in [a motor vehicle accident'] resulting in glass in face 5 [years] ago."  Id. at 35.  However, rather than providing an objective corroboration of the 1990 accident, the consultation report, in context, appears to simply restate what Petitioner had told the treating doctor about the car accident.  See Tr. at 958 (Cronin Cross) ("[I]t's the medical report stating what David told them.").  It seems highly unlikely that the treating doctor would have independently verified that

Petitioner was involved in a car accident before including this brief description in his handwritten report.

At the 2023 evidentiary hearing, Mark Runyon testified about the 1990 car accident. Mark testified that Petitioner had driven his truck under a tractor-trailer and later observed that Petitioner's face looked different. Tr. at 628. However, Mark's knowledge of the 1990 accident is based on what Petitioner told him. Id. at 629 ("THE COURT: And, again, tell us where you are getting all this information. THE WITNESS: From David Runyon, when I was visiting him at Wentworth Military Academy."). Mark's only independent observation was the scarring on Petitioner's face following the accident. Id. at 628-29. Mark discussed the accident with Shelia Cronin prior to the selection phase but did not mention any resulting scarring. Id. at 665-66.

Maria Runyon also testified about the 1990 car accident at the 2023 evidentiary hearing. Tr. at 468-69. However, the 1990 car accident occurred before she knew Petitioner, and her knowledge is based on what Petitioner and his parents told her. Id. at 468. She attributed Petitioner's skin problems to acne and also to glass in his face that probably came from the car wreck. Id. at 469. Again though, Maria's knowledge of glass in Petitioner's face came from other accounts of the car accident, not from her independent knowledge.

### (e) 1996 Car Accident

Petitioner was involved in another car accident in 1996.  ECF No. 914 at 7.  This accident is the most well-documented of Petitioner's claimed head injuries.  Petitioner also points to observations of his alleged personality change and other symptoms following the 1996 accident as evidence of brain injury caused by the 1996 accident.  Id.

Petitioner reported the 1996 accident to Shelia Cronin, and it is discussed in each of the selection phase expert reports.[27]

---

[27] See GX 36 (Mirsky Report) ("He also reports two serious car accidents with cognitive sequelae—one in 1990 and the other in 1996.  These incidents produced a variety of symptoms, according to Mr. Runyon, including brief unconsciousness, vertigo (from which he still suffers occasionally), temporary deafness, numbness, impaired memory, 'jumbled thoughts,' and according to a report from his estranged wife, marked personality changes, including a short temper."); ECF No. 276 (Patterson Report) ("[Petitioner] also reported 'a bad car accident' while in the military in Alabama, and the doctors told him he should have died after he was hit by a drunk driver in a head-on collision, but he does not recall losing consciousness.... He reported that the accident occurred when he was 26 at the end of 1996, and the doctors at some point indicated he should be in a wheelchair.  He said he was treated with meclizine for vertigo, but he has not used it in a long time."); ECF No. 277 (Montalbano Report) ("[Petitioner] reported that he was in a bad car accident in 1996 when he was hit by a drunk driver in a head on collision.  His former wife corroborated this during her grand jury testimony.  [Petitioner] reported that the drunk driver was going 'well over 100 mph' and that objects from the back of the truck hit him in the back of the head and his knees went up into the steering column.  He did not believe that he lost consciousness.  He reportedly was treated at a local hospital and released.  He received follow-up treatment at an Army hospital.... He indicated that he had memory problems and his wife told him he would forget things.  He would get vertigo at times. He reported that his memory had improved but that he still gets vertigo at times.  In one of

The Cronin Report describes the accident in some detail, noting that it was a "high speed motor vehicle accident with a drunk driver."[28]   GX 129 at 42.   Ms. Cronin reported that the truck Petitioner was driving was "completely demolished" and that the "jaws of life" were needed to extricate Petitioner from his truck. Id.   Ms. Cronin further reported that Petitioner "lost consciousness and was taken to a local emergency department," but he was discharged and "told to follow up at Fort Benning."   Id. Ms. Cronin summarized the Army medical records of his treatment at Fort Benning, stating:

> He had soft tissue injuries to his back, knee, and shoulder.   David underwent physical therapy for his injuries and gradually improved, but he started having periods of postural vertigo and short-term memory lapses.   Doctors at Fort Benning did not feel his symptoms were indicative of anything serious.   At one point, doctors told him that he might be suffering from Post Traumatic Stress Disorder.

Id.

Petitioner's Army medical records contain several references to his follow-up treatment.   On November 12, 1996, a record states

---

his emails he also writes that he has 'hearing loss & two bad knees.'"). The 2009 Merikangas report discusses the symptoms from the accident in a single sentence, apparently combining the 1990 and 1996 accidents into a single accident.   ECF No. 263 at 2 ("He had multiple scars on his head and face from trauma, including an automobile accident that rendered him unconscious and contributed to his [post-traumatic stress disorder ("PTSD")].").

[28] The Cronin Report states that the accident occurred in 1997.   Id.

that Petitioner was in a civilian emergency room following a car accident on November 9, 1996.  PX 83 at 49.[29]  A follow-up record from December 12, 1996, states that Petitioner exhibited symptoms of vertigo and was treated with a meclizine regimen.  Id. at 43. Another follow-up record from December 16, 1996, reports: "B[enign] P[ositional] V[ertigo] [with] anxiety probable hyperventilation [with] subsequent paresthesia[]. [Patient] given reassurance this is not consist[e]nt with neurologic injury." Id. at 44.  A record from a follow-up appointment on January 9, 1997, reflects that Petitioner's complaints of vertigo resolved after taking meclizine, but he then complained of short-term memory loss and insomnia.  Id. at 45.  The record continues that Petitioner "[a]lso explained PTSD and life stressors as possible etiology for insomnia and memory loss."  Id.

A record of a telephone consultation on February 5, 1997, states that Petitioner was recommended for a psychological evaluation regarding possible PTSD, but that the provider did not recommend any change in Petitioner's job status or medical profile

---

[29] The name of the hospital is nearly illegible on the document, but at least indicates the word "Lake" in the name of the hospital and that it is in Alabama.  Petitioner somehow reads it to say, "Lake Martin Hospital."  ECF No. 914 at 12.  There are several possible interpretations of the handwritten second word in the name of the hospital; "Martin" is not one of them.  When Ms. Cronin read from the exhibit at the 2023 evidentiary hearing, she plausibly interpreted it to say, "Lakeshore Hospital, Dadeville, Alabama."  Tr. at 865.

until such evaluation was completed. _Id._ at 46. On August 27, 1997, a consultation report states that Petitioner described three episodes of vertigo upon waking and the treating doctor recommended a CT scan of his head. _Id._ at 49. Petitioner's complaints of vertigo are further documented in reports from August 27, 1997, _id._ at 50; September 2, 1997, _id._ at 53; and September 9, 1997, _id._ at 56-57. The September 9 report further states that Petitioner complained of trouble sleeping, depression, and PTSD. _Id._ at 57.

While there are documented reports regarding the 1996 accident and Petitioner's subsequent symptoms, trial counsel lacked medical records describing treatment of Petitioner's injuries immediately following the accident. The expert reports completed in 2009 relied on Petitioner's description of the accident and the reporting in the Army medical records. The Army medical records largely repeat Petitioner's own self-reporting of what happened and his complaints of his symptoms resulting from the accident. The Army medical records provide strong evidence that Petitioner experienced vertigo, but do not provide any diagnosis of brain injury. Moreover, while the Army medical records suggest that Petitioner thought he may have had PTSD, they do not contain a PTSD diagnosis. Notably, a CT scan was recommended to investigate Petitioner's complaints, but it does not appear that Army doctors followed up on this request.

Trial counsel tried to locate Petitioner's hospital records from the time of the accident but were unable to do so.  At the 2023 evidentiary hearing, Ms. Cronin testified that they were not able to get medical records from the civilian hospital where Petitioner was treated because the hospital "no longer had the records there."[30]  Tr. at 861.  She further testified that hospital records regarding the 1996 accident had been destroyed.  Id. at 960.[31]

### (f) Summary of the Head Injury Evidence

Trial counsel had to consider a significant problem with the head injury evidence:  most of the injuries were self-reported,

---

[30] At the 2023 evidentiary hearing, Mr. Hudgins testified that Petitioner "did not know what state the hospital was in" and "[c]ertainly didn't know which hospital he had gone to."  Tr. at 57.  Petitioner suggests that Mr. Hudgins could have located the hospital and his performance was thus deficient because the name of hospital was contained in the Army medical records, and the city in which the accident took place was contained in a 2008 memo from Ms. Cronin to Mr. Babineau.  ECF No. 914 at 7.  Here, Mr. Hudgins was testifying about records he had reviewed nearly a decade and a half earlier and as discussed, he had not been provided an opportunity to review relevant documents from his case file prior to his testimony.  The only mention of the name of the hospital was contained in a single sentence of a voluminous record, which was poorly handwritten and misspelled, and the name of the city was a single sentence in Cronin's memo.  Regardless of whether Mr. Hudgins remembered locating the hospital, Ms. Cronin identified and located the hospital prior to the penalty phase, which was appropriate for her role as a mitigation specialist.  See Tr. at 861.

[31] The investigator for habeas counsel also sought records from the hospital in 2015.  The hospital reported that it did not have any records related to Petitioner and that it is hospital policy to destroy records after seven years.  ECF No. 511-8 at 3.

other evidence regarding the injuries was based on self-reporting, and the injuries could not be verified by contemporaneous medical records. Some of the injuries could be corroborated by witnesses, but there was little documentary evidence of these injuries. The only documentary evidence trial counsel was able to find were Army medical records five years after the 1990 car accident, and follow-up appointments after the 1996 car accident. Even the Army medical records mostly reflected Petitioner's self-reporting of his injuries. While this evidence could be consistent with a brain injury and resulting cognitive functioning, none of the evidence conclusively showed this.

Trial counsel were right to worry about how this evidence would hold up on cross-examination. In these habeas proceedings, several witnesses testified that Petitioner's behavior changed following the 1996 accident. Cross-examination of these witnesses was particularly effective.[32] For example, on cross-examination, Maria Runyon admitted that her testimony regarding Petitioner's behavior change was contradicted by her sworn testimony to the grand jury. See id. at 492-94. Although Wren Fleming claimed that Petitioner's behavior changed following the 1996 car

---

[32] Cross-examination of the lay witnesses at the 2023 evidentiary hearing was led by Brian Samuels and Lisa McKeel. Mr. Samuels and Ms. McKeel also would have cross-examined these witnesses at the selection phase, as they were prosecuting attorneys in this case in 2009.

accident, _id._ at 507-08, he was six years old at the time it happened, see _id._ at 515.   Deborah Seeger, Petitioner's former neighbor, testified that Petitioner's behavior changed following the 1996 car accident.   _Id._ at 563.   However, she did not discuss this behavior change when she was interviewed by trial investigator Ford, _id._ at 566-68, and she had only observed Petitioner for a very limited time, _id._ at 569-71.   Robert Seeger testified that he picked up Petitioner from the hospital following the car accident, but he did not testify as to any resulting behavioral change.   _Id._ at 575-76.   Although Mark Runyon felt that Petitioner's behavior changed following the accident, he had previously stated that the behavior change was related to Petitioner's unhappy marriage.   _Id._ at 683.   Additionally, the United States showed that Petitioner denied ever having mental health problems or being in a motor vehicle accident when he self-reported his medical history to participate in drug studies.   See GX 79.

## 2. **Expert Reports and Brain Scans**

Given these problems, trial counsel sought supporting medical evidence to fully consider whether they should present brain injury as a mitigating factor to the jury.   They sought out opinions from medical experts for this purpose.   The court next reviews trial counsels' consultations with each expert prior to the selection phase.

### (a) Dr. Evan Nelson

Evan Nelson is a forensic psychologist. Mr. Babineau requested Dr. Nelson's appointment by the court on May 22, 2008. See ECF No. 104 at 3. On December 2, 2008, Dr. Nelson recommended that Mr. Babineau request a neuropsychological evaluation of Petitioner, which might be "relevant to mitigation if there is a death penalty hearing." GX 10. On December 11, 2008, Dr. Nelson wrote an initial letter to Mr. Babineau, in which he opined that Petitioner "was not acutely mentally ill" at the time of the murder, although "[i]t is possible that neuropsychological deficits contributed to his failure to succeed." GX 119 at 2. Mr. Babineau filed a Rule 12 Notice on December 12, 2008, stating that counsel were seeking approval of a neuropsychologist "to evaluate Petitioner for the presence of neuropsychological defects." ECF No. 135 at 3.

Dr. Nelson provided an update to Mr. Babineau on February 2, 2009. GX 11. Mr. Babineau discussed the status of the mental health evidence with Dr. Nelson following this letter and Dr. Nelson had an "emphatic opinion" that "he would not be a helpful witness." Tr. at 381. At the 2023 evidentiary hearing, Mr. Babineau recalled Dr. Nelson's opinion at that time as:

> [W]e would be better off using lay witnesses because he
> felt like, based upon what he observed of Mr. Runyon at
> this point, not having had the neuropsychological
> evidence or other evidence that was still being
> accumulated at the time, that because of his severe

> narcissism, self-aggrandizement, that he believed he
> would not be a helpful witness, because, if asked by the
> United States, he would have a hard time saying anything
> helpful other than he believed that Mr. Runyon's actions
> were willful, deliberate, knowing, that even what he had
> observed, is still not an excuse for his conduct.

Id. at 381-82. However, Mr. Babineau continued to provide updates on the case to Dr. Nelson as he received new information. Id. at 383.

After Mr. Hudgins replaced Mr. Babineau, he reviewed Dr. Nelson's correspondence with Mr. Babineau and determined that he did not want to present Dr. Nelson's opinion to a jury. Id. at 142. At the 2023 evidentiary hearing, Mr. Hudgins agreed that such information was a "double-edged sword of mental health information" and "that's why we didn't move further with Dr. Nelson." Id. Mr. Hudgins confirmed that he ultimately decided to move away from Dr. Nelson in early June 2009 because Dr. Nelson's opinion was unfavorable. Id. at 160.

### (b) Dr. Mark Cunningham

Dr. Cunningham is the clinical psychologist, whom Mr. Babineau first retained in October 2008. See GX 107 at 86-87. Dr. Cunningham originally proposed conducting an RPV assessment and an ADF assessment. See GX 107 at 95. Mr. Babineau considered using Dr. Cunningham for mental health mitigation, see Tr. at 1411-12, and he filed a Rule 12 Notice of his intent to have Dr. Cunningham present both presentations, ECF No. 135. Dr.

Cunningham provided a report to Mr. Babineau dated February 5, 2009, limited to the RPV assessment.  GX 14.

On June 7, 2009, Dr. Nelson suggested to Mr. Hudgins that he should use Dr. Cunningham as an expert witness who could testify regarding future dangerousness.  GX 33.  Dr. Nelson thought that Dr. Cunningham would be well-suited to make this presentation because he had not personally examined Petitioner, so he could testify without opening the door to government or adverse opinions. Id.  Mr. Hudgins emailed Dr. Cunningham on July 13, 2009, to confirm that Dr. Cunningham was still willing to testify as to his RPV report, if the jury found Petitioner guilty.  GX 107 at 38. On July 20, 2009, Mr. Hudgins disclosed Dr. Cunningham's RPV report, ECF No. 246, and provided Rule 12 notice regarding his intent to call Dr. Cunningham at trial, ECF No. 248.

Mr. Hudgins called Dr. Cunningham to testify at the selection phase.  The United States filed a motion in limine to exclude Dr. Cunningham's testimony, based in part on anticipated ADF testimony.  See PX 28.  Mr. Hudgins conceded that Dr. Cunningham's report did not include an ADF assessment, and the court found the United States' argument to be moot.  Id.  Although Mr. Hudgins attempted to elicit Dr. Cunningham's testimony as to Petitioner's social history, the court sustained an objection that this was outside the scope of the RPV report.  See Tr. at 167.  At the 2023 evidentiary hearing, Dr. Cunningham could not recall any decision

as to why he was only asked to provide the RPV report and not an ADF presentation at the selection phase.  See id. at 1403-06.

### (c) Dr. Scott Bender

Scott Bender is a neuropsychologist whom Mr. Babineau originally retained on January 16, 2009.  See GX 12 at 4.  Dr. Bender reviewed the records that trial counsel sent to him, but he did not personally evaluate Petitioner.  Tr. at 291-92.  After coming onto the case, Mr. Hudgins travelled to Dr. Bender's office in Charlottesville on March 30, 2009, and met with him for about an hour.[33]  Id. at 139.  Dr. Bender informed Mr. Hudgins that he did not write a report about Petitioner, because he felt such a report would be very negative and he did not recommend any other tests for Petitioner.  Id. at 139-40.  Dr. Bender remained involved in the case until at least May 1, 2009, when he reviewed Petitioner's military records.  See GX 39 at 2.  In early June 2009, Mr. Hudgins decided to move away from Dr. Bender because his opinion was unfavorable.  Tr. at 160.

### (d) Dr. Allan Mirsky

On the recommendation of Dr. Merikangas, trial counsel decided to replace Dr. Bender with neuropsychologist Dr. Allan Mirsky.  See GX 29.  Trial counsel sought to retain new experts

---

[33] This meeting is corroborated by Mr. Hudgins's and Dr. Bender's billing records, although there is some discrepancy as to the length of the meeting.  See PX 158 at 5 (Hudgins billing record); GX 39 at 2 (Bender billing record).

because they thought that the mental health evidence they had developed at that point was weak. <u>See</u> Tr. at 170 (Hudgins Cross) ("The fact that we were even looking for somebody else was because we knew that as far as mental health as a defense – of as a mitigator was concerned, what we had was nothing.  So we were looking for somebody else."). On June 4, 2009, Mr. Woodward emailed Ms. Cronin reporting that he and Mr. Hudgins met with Petitioner and discussed the guilt and penalty phases. GX 30. Mr. Woodard reported that, based on the information they had at the time, "we both feel that it is most likely that our sentencing case will not be based on psychiatric/psychological impairment but will continue to explore it." <u>Id.</u> Mr. Hudgins sought Dr. Mirsky's appointment on June 9, 2009. ECF No. 206.

Dr. Mirsky evaluated Petitioner on June 26, 2009, and submitted a preliminary report to counsel. GX 36. The report included a discussion of Petitioner's self-reported head injuries. <u>See generally</u>, Section IV.A.1. Based on the neuropsychological testing that Dr. Mirsky performed, he opined that Petitioner's results were "consistent with brainstem injury" and that his symptoms "merit[ed] further intensive neurological testing." GX 36 at 6. Dr. Mirsky also requested the results of "other psychological and neuropsychological tests" to complete his analysis. <u>Id.</u>

Dr. Mirsky wrote a letter to Mr. Hudgins on July 2, 2009, in which he stated that "there is strong evidence that [Petitioner] is suffering from a neurological disorder. It would be essential for Mr. Runyon to be evaluated by a neurologist and have the necessary tests to establish the nature of his disorder." GX 38. On August 5, 2009, Mr. Hudgins emailed Dr. Mirsky requesting an update of his preliminary report and informing him that they were still trying to have Petitioner undergo MRI and PET scans. GX 60A. Dr. Mirsky replied on August 7, 2009, stating, "I don't think I have anything to add until I know the results of the imaging tests on Mr. Runyon, but I feel confident that my results showed the effects of the blast injuries." Id.

Mr. Hudgins decided not to present Dr. Mirsky's preliminary report without further corroboration. Mr. Hudgins was concerned about presenting information to the jury through the expert reports that was only confirmed through self-reporting, because it could call into question the experts' conclusions. Tr. 214-15. He did not think Dr. Mirsky's preliminary report was strong mitigating evidence, and any mitigating value would be outweighed by opening the door to negative information about Petitioner. Id. at 172-73. Mr. Hudgins was concerned about opening the door to adverse expert opinions, id. at 173, including the reports of Dr. Patterson and Dr. Montalbano, which opined that Petitioner was narcissistic and had a personality disorder, id. at 208. However, Mr. Hudgins

73

continued to consider using Dr. Mirsky, if he could provide a beneficial supplemental report following review of the brain scans. On August 10, 2009, Mr. Hudgins filed a motion to allow Dr. Mirsky and Dr. Merikangas to supplement their expert reports following their receipt and review of the MRI and PET scans. ECF No. 269. The court approved this motion on August 17, 2009, requiring the supplemented reports to be filed by August 20, 2009. ECF No. 278. However, neither expert filed a supplemental report.

According to trial counsels' billing records, the last time either attorney spoke with Dr. Mirsky before the selection phase was on August 5, 2009. ECF No. 158 at 16. It is unclear whether Mr. Hudgins sent the brain scans to Dr. Mirsky prior to the selection phase. Mr. Hudgins had a conversation with Dr. Mirsky on September 17, 2009, after the selection phase, and Dr. Mirsky had a report on the scans at some point on or before that day.[34] See PX 41. Mr. Hudgins discussed the MRI and PET scans with Dr. Mirsky and had apparently told Dr. Mirsky that the results were read as "normal." See id.

---

[34] It is unclear when Mr. Hudgins sent the report on the brain scans to Dr. Mirsky. Habeas counsel suggested that Dr. Mirsky's letter to Mr. Hudgins showed that Mr. Hudgins did not provide him with a report on the brain scans until September 17, 2009. Tr. at 267. Mr. Hudgins disagreed with this reading of the letter and doubted that he would have provided a report on the scans on September 17, but he did not know when he first provided a report to Dr. Mirsky. Id.

The next day, September 18, 2009, Dr. Mirsky wrote a letter to Mr. Hudgins providing four comments as to why Petitioner may still have brain damage despite the "normal" reading of the scans. Id.  Dr. Mirsky's comments were premised on Petitioner's exposure to grenade blasts "while serving in the ROTC."[35]  Id.  He speculated that brain scans at the time of the blast, which were not done, might have been read as "abnormal" at that time.  Id.  In fact, Petitioner apparently did not seek any medical attention following either blast exposure.  Notably, Dr. Mirsky did not attribute any of Petitioner's supposed deficiencies to the car accidents, despite discussing the car accidents in his preliminary report.[36]

### (e) Dr. James Merikangas

Dr. Merikangas was trial counsels' neurologist and psychiatrist.  See Tr. at 1916.  The trial team consulted with Dr. Merikangas about taking on the case on June 1, 2009, GX 28, and Mr. Hudgins sought Dr. Merikangas's appointment on June 9, 2009,

---

[35] There is some confusion as to when the grenade blasts actually happened.  See supra note 26.  Dr. Mirsky's September 18 letter is the first to mention "ROTC," but it's possible he was referring to Petitioner's time  at Wentworth Military Academy. See Tr. at 93.  The difficulty of establishing the exact circumstances of the head injuries underscores the unreliability of basing potential diagnoses on self-reported injuries.

[36] As noted, Dr. Mirsky did not testify at the 2023 evidentiary hearing and neither party planned to call him as a witness.  See supra note 22.

ECF No. 206.  The court approved Dr. Merikangas's appointment on July 22, 2009.  ECF No. 257.

Dr. Merikangas examined Petitioner on July 29, 2009.  ECF No. 263.  On August 5, 2009, he sent a preliminary report, consisting of little more than a single page, to Mr. Hudgins.  Id.  Dr. Merikangas reported that he had "conducted a neurological examination and ordered an MRI scan of the brain, [a] PET scan of the brain, and an electroencephalogram (EEG)."  Id. at 1.  The report included Dr. Merikangas's impression that Petitioner was suffering from the effects of or withdrawal from experimental drugs, and that a "[f]ull report will follow the results of [Petitioner's] brain imaging."  Id. at 2.  Trial counsel provided this report to Ms. Cronin.[37]

Mr. Hudgins was concerned about the report's suggestion that Petitioner was affected by experimental drugs or the withdrawal effects therefrom.  See Tr. at 150.  At the 2023 evidentiary hearing, Mr. Hudgins testified that this theory seemed like "a wild Hail Mary" that lacked a foundation.  Id.  Even if Mr. Hudgins

---

[37] Ms. Cronin's 2015 declaration stated that trial counsel never provided her with the reports of Dr. Merikangas or Dr. Mirsky.  ECF No. 511-4 at 6.  When questioned about this at the 2023 evidentiary hearing, she changed her story, testifying that she "think[s] they did, but [she] had forgotten when [she] had prepared" her 2015 declaration.  Tr. at 961.  Ms. Cronin further testified that she did not have or review her records prior to signing the 2015 declaration and that the declaration was prepared for her to sign by then-habeas counsel from the FDSET.  Id. at 962-63.

had decided to use mental health as a mitigating factor, he would have tried to exclude the experimental drug information, but he was not sure how he could have done this.  Id.

Mr. Hudgins sought the court's approval for MRI and PET scans on July 30, 2009, ECF No. 259, and Dr. Merikangas ordered the MRI and PET scans the same day, see ECF No. 261.  Mr. Hudgins and Mr. Woodward had a telephone conversation with Dr. Merikangas at 3:30 P.M. on August 13, 2009, regarding a potential mental health mitigation presentation.  See GX 92.  Mr. Hudgins drafted a "Memo to File" recording the substance of this conversation:

> [Dr. Merikangas] relayed that he did not believe we were in a good position to present a mental health defense as it would open us up to the Government presenting their version of the mental health picture.  Since he does not feel that we have a strong case of any defect in David, he does not believe it would be wise to present the mental health defense.  He opened the conversation by saying that his exam of David was not abnormal and that David did not tell him the truth.  He stated that unless there is something glaring in the MRI or PET scan that would give us a very strong argument, he does not recommend presenting a mental health defense.  He went further to say that even if there is some defect shown in the scans or testing, it still would be a risk that we would have to weigh as to whether or not to present mental health defense absent some very bad injury or defect.

Id.[38]  Ms. Cronin also discussed this call in an August 18, 2009, email, writing,

---

[38] This memo was part of the late-disclosed documents and was from Mr. Hudgins's case file.  He was not provided this memo prior to his 2015 declaration or his testimony at the 2023 evidentiary hearing.  The United States introduced GX 92 as evidence following

> Woody [Mr. Woodward] and Steve [Mr. Hudgins] spoke with
> Dr. Merikangas and, according to Woody, Dr. Merikangas
> does not think that he should testify.  Dr. Merikangas
> felt that David was lying to him and that opening the
> door [for] Montalbano and Patterson could do a lot of
> damage.

GX 97.[39]

The MRI and PET scans were performed by Harbour View Health Center on August 13, 2009.  GX 61 at 3.  The radiologist reported that the brain MRI was "normal."  Id.  The brain scans were then sent to Dr. Merikangas, and he reviewed them on August 17, 2009.[40] GX 89 at 3; GX 98 at 3.  From the evidence presented, it does not appear that Dr. Merikangas communicated with trial counsel again after he received and reviewed the brain scans.

---

the resumption of the evidentiary hearing and Petitioner objected to its introduction.  The court overruled the objection and found GX 92 admissible under Federal Rule of Evidence 807.  As stated on the record, Tr. at 2640-44, the court found that the statement made in the Memo to File was supported by numerous guarantees of trustworthiness and that the statement is more probative than any other evidence that could be obtained relating to trial counsels' performance, particularly given Mr. Hudgins's untimely death and the fact that his file had been withheld from him by Ms. Chavis and the FDSET.

[39] This email was also part of the late-disclosed documents. The August 13, 2009, phone call was also corroborated by Mr. Hudgins's billing records, PX 158 at 17, and Mr. Woodward's billing records, GX 93 at 3, 10; GX 195 at 4.

[40] The evidence is unclear exactly when or how Dr. Merikangas received the scans.  See ECF No. 914 at 21.  Regardless, Dr. Merikangas's billing records clearly indicate he reviewed them on August 17, 2009.

When he was recalled as a witness following the resumption of the evidentiary hearing in November 2023, Mr. Woodward had little recollection of the events surrounding the August 13, 2009, call. Tr. at 2219.  Although Mr. Woodward did not specifically remember the conversation with Dr. Merikangas, he testified that his billing records reflecting the call were accurate.[41]  Id.  He could not remember specifics of the trial team's later discussions regarding Dr. Merikangas, but could recall that, generally, "the experts that we had gotten were not, in our opinion, helpful."  Id. at 2221.  He did remember discussing with Mr. Hudgins and Ms. Cronin "whether it was smart to present or whether it would be helpful to Mr. Runyon to present a mental health defense."  Id. The August 18, 2009, email from Ms. Cronin, GX 97, further refreshed his recollection that "trial counsel did not think it was a good idea to call Dr. Merikangas."  Id. at 2229.

For his part, Dr. Merikangas questioned whether Mr. Hudgins's memo accurately reflected their conversation on August 13, 2009. He testified that the call may have occurred but that he did not

---

[41] According to his billing records, Mr. Woodward also produced his own memo regarding the conversation with Dr. Merikangas.  GX 93 at 3.  Mr. Woodward testified that this memo would have been included in his case file, but it was apparently never found.  See Tr. at 2219-20; see also id. at 2280 (Woodward Cross) ("I would not have written down and sent this Court something saying I did something I didn't do.  I made the call.  I did the memo.  You all [(habeas counsel)] took my file.  The memos aren't around.  You find out where they are.  I did the memos.").

remember what the conversation was about.   Tr. at 2101-02.
However, Dr. Merikangas doubted the accuracy of his purported
statements as reflected in the memo, because he has "never said
things like that." Id. at 2101.

The court found that Dr. Merikangas was simply not a credible
witness.   His demeanor on the witness stand was evasive and
combative and his testimony seemed well-rehearsed to avoid
answering difficult questions.[42]   The late-disclosed documents
directly contradicted Dr. Merikangas's claim in his February 2023
declaration, ECF No. 754-3, that he never heard from trial counsel
after ordering the brain scans and that he had never seen the brain
scans until habeas counsel showed them to him in 2015.   During the
pause in the evidentiary hearing caused by the discovery violation,
habeas counsel attempted to address this contradiction by showing
the late-disclosed materials to Dr. Merikangas and attempting to
revise his declaration.   ECF No. 854-1.   In the proposed revised
declaration, Dr. Merikangas attempted to explain away the apparent
contradictions by stating that he did not prepare the billing
records that dispute his sworn statement.   Id.

The court struck Dr. Merikangas's revised declaration,
finding that the apparent inaccuracies in his sworn declaration

---

[42] See, e.g., Tr. at 2123 ("THE COURT:  We are getting to the
point that a witness is asking questions of the Court and the
attorneys and doesn't recall anything and is being quite, I will
put on the record, defiant.").

entered before the court in the earlier February 2023 part of the evidentiary hearing would be better addressed through his testimony on the witness stand, rather than through a revised declaration which had been carefully prepared in anticipation of having to justify the contradictions of his earlier sworn declaration.   See ECF No. 873.   In that way, the court could properly assess his testimony and credibility.   His testimony rehashed the reasoning of his revised declaration, generally professing little recollection of the events surrounding the selection phase and blaming his administrative staff for any apparent inaccuracies.   His testimony on cross-examination was combative and seemed more concerned with what information the United States could otherwise prove to discredit him, rather than providing his complete recollection of the events.   See, e.g., Tr. at 2090 (Merikangas Cross) ("Q. Did you have any trouble e-mailing Mr. Hudgins?   He had your e-mail address, right?   A. Does he have any e-mails from me that you are going to show me, because I don't think so.").   After observing Dr. Merikangas on the witness stand for approximately seven hours, including his defensive, combative demeanor, the court finds that it cannot rely on his testimony regarding trial counsels' performance and, accordingly, affords that testimony little to no weight.   In the court's opinion, he was simply an incredible, unreliable witness.

### 3. Conclusion of Performance Prong

Analysis of Petitioner's ineffective assistance of counsel claim begins and ends with trial counsels' performance. Trial counsel conducted a thorough investigation of potential mitigators. They hired a mitigation specialist, who travelled across the country chasing down potential leads. They also used an investigator who did the same and assisted in the mitigation investigation. Mr. Hudgins attended a death penalty conference, where he sought and received advice on the best trial strategy. Trial counsel also regularly consulted with David Bruck, a respected death penalty resource counsel.

Trial counsels' mitigation investigation carefully considered using mental health as a mitigation factor. Trial counsel learned of Petitioner's reported head injuries, and they further explored these "red flags." See Rompilla, 545 U.S. at 383. Trial counsel attempted to locate documents that could corroborate the head injuries, but they had little to go on beyond Petitioner's self-reporting. The abuse Petitioner experienced as a child and his football injury were never medically treated, so there was no corroborating documentary evidence available. Counsel faced the same problem with the reported blast injuries and the 1990 accident. The only head injury for which Petitioner was medically treated was the 1996 car accident. However, the contemporaneous hospital records of his treatment had been destroyed by the time

of Petitioner's trial.  Counsel were reasonably concerned about presenting this uncorroborated evidence to the jury.

To be sure, trial counsel had some evidence of Petitioner's head injuries that they could have chosen to use at the selection phase.  The lay witnesses could have testified about the incidents, his Army medical records contained references to the car accidents, and potential expert reports contained Petitioner's descriptions of his head injuries.  However, there were still credibility problems with this evidence.  The lay witnesses, Army medical records, and expert reports mostly rely on Petitioner's own self-reporting of the incidents,[43] although there were some potential eyewitnesses, such as, Suk Cha witnessing the child abuse and Mark Runyon witnessing the football injury.  Some lay witnesses could have also testified as to Petitioner's alleged behavior change following the 1996 accident, but they faced significant credibility issues.  While none of these concerns foreclosed the possibility of using these incidents as the basis of a mental health mitigation presentation, these were the credibility concerns that trial counsel had to consider.

---

[43] In an email to Mr. Hudgins on June 7, 2009, Dr. Nelson outlined the concerns with presenting this information through the expert reports:  "So, testimony based on what the defendant self-reported will not be of much use and will generate cross examinations that highlight that he probably lied, and make the expert look like he relied upon evidence that is not credible." GX 33 at 1.

Trial counsels' investigation into corroborating Petitioner's claimed head injuries was in line with the ABA Guidelines. The trial team "locate[d] and interview[ed] the client's family members" and many others[44] who knew him, including friends, neighbors, employers, and correctional officers. ABA Guidelines, 31 Hofstra L. Rev. at 1024. They also sought to corroborate these interviews with records. As the ABA Guidelines state, "[r]ecords—from courts, government agencies, the military, employers, etc.--can contain a wealth of mitigating evidence, documenting or providing clues to ... brain damage ... and corroborating witnesses' recollections." Id. Moreover, "[t]he collection of corroborating information from multiple sources--a time-consuming task--is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence." Id. at 1025. The trial team spent considerable time seeking out such records, but few records existed, and the ones they were able to obtain only provided limited corroboration.

Trial counsel also had Petitioner undergo mental health evaluations and considered several experts for a mental health

---

[44] The ABA Guidelines recommend that death penalty counsel interview "virtually everyone" who knew the client and his family. 31 Hofstra L. Rev. at 1024. This is an unrealistic standard to apply in practice, as an unsuccessful defendant could always claim deficient performance by pointing to a hypothetical acquaintance whom trial counsel could have, but did not, interview. Once again, the court considers the scope of trial counsels' interviews of Petitioner's acquaintances under the "reasonableness" standard.

mitigation presentation in line with the ABA Guidelines.  See id. at 956.  They encountered further difficulties here.  In fact, three of the five potential expert witnesses they consulted discouraged a mental health mitigation presentation.  Dr. Nelson told Mr. Babineau that he did not think that he would be a helpful witness and Mr. Hudgins later determined that he would be unfavorable.  Both Mr. Hudgins and Mr. Woodward determined that they did not want to use him.  See Tr. at 404.  Dr. Bender did not even complete an expert report because his report would have been negative.  While Dr. Merikangas's preliminary report could have been helpful to mental health mitigation, Mr. Hudgins was concerned about introducing it because it discussed Petitioner's participation in drug trials.  Tr. at 108-09.  The preliminary report also contradicted his later statement to trial counsel that he did not think a mental health mitigation would be useful unless the MRI or PET scan showed a significant brain injury.  See GX 92. He then reviewed the brain scans on August 17, 2009, GX 98, and apparently did not find anything significant enough to warrant changing his opinion or contacting counsel.

Trial counsel conducted a reasonable investigation into the mental health investigation up until the penalty phase.  At some point, they had to decide whether it was worth continuing to pursue this investigation, considering the time needed to focus on the other mitigating factors they intended to present, the consistency

of a mental health presentation with those factors, and the potential derogatory information the United States could get in if they opened the door to Petitioner's mental health. At that time, their mental health evidence consisted of a series of events that were difficult to corroborate and preliminary reports from a neuropsychologist and a neurologist, both of which anticipated the results of the brain scans. Trial counsel also had to consider that their neurologist recommended against the presentation, echoing concerns of two other experts they had consulted. Trial counsel had Petitioner undergo brain scans so their neuropsychologist and neurologist could complete final reports, but the report they received from a radiologist read the scans as "normal." They sent the scans to their neurologist for further review, and he apparently did not find any significant deficiencies.

The evidence suggests that trial counsel effectively abandoned the mental health mitigation investigation after Dr. Merikangas told them it was not worthwhile on August 13, 2009.[45]

---

[45] As factfinder, the court is required to make credibility determinations of the witnesses and, having personally heard the relevant testimony, is in a unique position to do so. The court did not find, as Petitioner so claims, that trial counsels' explanations of their decision-making process were "post hoc rationalizations." ECF No. 914 at 37. Rather, the court found that trial counsel earnestly attempted to recall what they did and why they did it. If anything, it was Dr. Merikangas who attempted to justify his actions by providing "explanations [that were] both unsupported by the record and objectively unreasonable." See id.

His failure to respond after reviewing the brain scans would have confirmed to trial counsel that they did not have strong mitigation evidence.  Any alternative explanation is unavailing.  It would defy belief to think that Dr. Merikangas reviewed the brain scans, found a remarkable brain injury that could be used as mitigating evidence, and simply sat silently with this knowledge without notifying counsel.  Dr. Merikangas knew he had an obligation to contact trial counsel if he found a remarkable brain injury, see Tr. at 2054, and he knew how to contact trial counsel if he needed to, see id. at 2090-91.  If Dr. Merikangas recognized significant brain injury on Petitioner's brain scans but failed to notify counsel, he certainly would have been an ineffective expert for Petitioner, but an ineffective expert is not a Sixth Amendment violation.  See McHone v. Polk, 392 F.3d 691, 706 (4th Cir. 2004) (citing Thomas v. Taylor, 170 F.3d 466 (4th Cir. 1999) ("[A]ny ineffectiveness is attributable to McHone's expert rather than to his counsel and therefore cannot support a Strickland claim."); Wilson v. Greene, 155 F.3d 396, 401 (4th Cir. 1998) ("The Constitution does not entitle a criminal defendant to the effective assistance of an expert witness.").

Trial counsel would have reasonably interpreted this lack of follow-up as confirmation that the brain scans did not show significant deficiencies, particularly since they had received the radiologist's report reading the scans as "normal" before the

selection phase.  In their last communication with Dr. Merikangas,
he told them that they should not pursue a mental health
presentation unless the brain scans showed significant deficits.
GX 92.  Any change in this opinion was thus conditionally dependent
on Dr. Merikangas finding significant deficits present in the
scans.  It was reasonable for counsel to conclude, hearing nothing
further from Dr. Merikangas, that the brain scans did not change
his opinion, and this was not an "unreasonable juncture" for
counsel to abandon their investigation.  See Wiggins, 539 U.S.
at 527-28.  Having received a recommendation against presenting
mental health mitigation from their neurologist, trial counsel had
no duty to seek an alternative opinion from Dr. Mirsky, or any
other expert.[46]  See Owens, 967 at 416-17 ("[T]he [Supreme] Court
has never held that counsel is obligated to consult experts, let

---

[46] Since trial counsel sufficiently investigated the mental
health evidence and did not need to consult alternative experts,
the court does not consider the evidence from Petitioner's later-
retained experts in assessing trial counsel's performance.  The
relevance of these experts' opinions is based on counterfactual
scenario where Dr. Merikangas informed trial counsel they needed
to investigate further.  The reports and opinions of these experts
were not preexisting evidence that, as Petitioner suggests, was
waiting to be uncovered.  See ECF No. 914 at 23.  These reports
did not exist in 2009, they had to be developed based on each
expert's independent examination and review of the evidence, and
they are alternative expert evidence to what trial counsel had.
While trial counsel did not consult a neuroradiologist, nobody at
the time of the penalty phase, including trial counsels' other
experts, suggested that a neuroradiologist's opinion was
necessary.  Neurologists are qualified to read MRIs and regularly
do so.  See Tr. at 1667 (Nadkarni Direct).

alone a particular kind of expert, in developing a mitigation case.").

Trial counsel also had to consider that a mental health presentation could open the door to potential derogatory information about Petitioner.[47]   Trial counsel consulted with resource counsel David Bruck up until the selection phase, who shared the opinions of his colleagues that the reports of the government's potential rebuttal experts were not "too bad."   See PX 111, PX 144.   However, the potential rebuttal expert opinions still contained information about Petitioner that trial counsel did not want the jury to hear, including conclusions that Petitioner met the criteria for personality disorder.   See Tr. at 208.   Trial lawyers, not outside resource counsel, are the ones in the courtroom who must present the evidence to the jury, and as such, are in the best position to decide what evidence they think the jury should hear.   Dr. Patterson's report, specifically, included Petitioner's description of his reported head injuries, but also reports Petitioner saying that he does not think he has a mental illness.   ECF No. 276 at 18.   Counsel reasonably assessed

---

[47] See Tr. at 173 (Hudgins Cross) ("Q. Judge, did you think that you could just pick and choose what to put in, or if you went down the mental health road, it would open the door to other information coming in? A. We thought everything was going to come in that was negative about him."); id. at 424 (Woodward Redirect) ("I remember one of the reasons that was important to me in working with [Mr. Hudgins] at that point was we didn't want to, you know, open the door.").

that this would have been very difficult evidence for them to rebut. See Owens, 967 at 417 (citing Gray v. Branker, 529 F.3d 220, 239 (4th Cir. 2008)) ("While others might have judged differently, we think counsel judged with reasonable competence in avoiding such 'double-edged' evidence.").

A mental health presentation would have also conflicted Petitioner's claim of innocence and other mitigating evidence. See Terry v. Stirling, 854 F. App'x 475, 492 (4th Cir. 2021) (unpublished) (finding that, even if counsel failed to consider all evidence of the defendant's abuse, "this error doesn't amount to deficient performance, particularly when juxtaposed with the robust mitigation case that they did present."). At the 2023 evidentiary hearing, trial counsel emphasized that they would have had difficulty reconciling a mental health presentation with Petitioner's continuing claim of innocence. Mr. Hudgins was specifically concerned that a jury would not buy it.[48] Moreover,

---

[48] See Tr. at 123 ("And, again, this is to a jury, not a textbook. You are going to tell the jury he still maintains his innocence and did it all along ... and they have found him guilty, and now you are going to present an excuse for why he did it, and that's -- how do you sell that to a jury?"). Petitioner claims that this statement shows that Mr. Hudgins did not understand the purpose of mitigation evidence because such evidence "need not necessarily excuse or diminish the defendant's illegal conduct." ECF No. 914 at 36 (quoting McMullen v. Dalton, 83 F.4th 643, 642 (7th Cir. 2023)). This is a baseless argument. Mr. Hudgins clearly understood that mitigating evidence did not need to excuse Petitioner's conduct, as none of the fifteen mitigating factors he proposed sought to excuse Petitioner's conduct. See ECF No. 285. Instead, considering this statement in its appropriate context,

a mental health presentation suggesting that Petitioner had diminished executive functioning could have undermined the argument that he was at low risk for violence in prison. See Williams, 914 F.3d at 316 ("[C]ounsel may have concluded, after investigating and considering [fetal alcohol syndrome] as a mitigating factor, that it was an unsound strategy to present this information to the jury because, for example, it could indicate future dangerousness.").[49]

Trial counsel also had to consider the credibility of their overall presentation with the jury. See Dunn, 594 U.S. at 739 (quoting Harrington, 562 U.S. at 104) (finding that strategic decisions "are particularly difficult because certain tactics carry the risk of 'harm[ing] the defense' by undermining credibility with the jury or distracting from more important issues."). This would have been a particularly relevant

---

Mr. Hudgins was clearly expressing his concern that the mental health presentation would undermine the credibility of his other arguments to the jury.

[49] Dr. Cunningham testified at the 2023 evidentiary hearing that his RPV and ADF presentations would not necessarily have been inconsistent. Tr. at 1409 ("The risk of violence in in the community is distinct from the risk of violence in prison."). While the court appreciates Dr. Cunningham's precise distinction between these two presentations, trial counsel had to consider whether a jury would buy this. Trial counsel reasonably considered that, in the eyes of the jury, presenting Petitioner's adverse development factors as an explanation for the crime could have well undermined their argument that Petitioner posed little risk of violence in prison if he were given a life sentence.

consideration for Dr. Cunningham's ADF presentation.   The ADF presentation largely relied on the self-reported histories of Petitioner's relatives, none of whom Dr. Cunningham interviewed personally.   There were significant reliability problems with these accounts, which the United States certainly would have revealed on cross-examination and would have called into question Dr. Cunningham's conclusions.[50] Most of these witnesses testified at the selection phase.   See supra note 11.   Trial counsels' decision not to move forward with Dr. Cunningham's synthesis of this evidence, which was largely cumulative with the evidence the jury heard, or his expert conclusions drawn therefrom, was reasonable in crafting an effective mitigation presentation.   See Owens, 967 F.3d at 417 (quoting Wong v. Belmontes, 558 U.S. 15, 23 (2009)) ("The Supreme Court has likewise rejected the notion that

---

[50] For example, David Dombrowski's statement provided information underlying several pages in Dr. Cunningham's report. This account included Mr. Dombrowski's recollection from his childhood that his father (Petitioner's grandfather) was violent and had some affiliation with mobsters.  See Tr. at 1283-84.   Dr. Cunningham concluded that Petitioner would have inherited his paternal biological family's negative personality traits.  See Tr. at 1292-94.  He reached this conclusion even though Petitioner did not have a relationship with his biological father after the age of five and did not know about his paternal grandfather's violence or alleged connection with mobsters.  See id.; see also id. at 775-76; PX 46 at 11 (Patterson Report) ("[Petitioner] does not know much about his biological father.").  Moreover, when interviewed by Ms. Cronin prior to the penalty phase, Mr. Dombrowski told her he had memory problems and had occasional blackouts.  See Tr. at 773.   Trial counsel were aware of, and rightly considered, the dangers of presenting expert opinions based on unreliable witness accounts.  See supra note 43.

92

counsel must tell a defendant's life history with elaborative detail, reasoning that where (as here) counsel put forth 'substantial mitigation evidence,' any cumulative evidence about the same circumstances heard by the jury offers 'an insignificant benefit, if any at all.'").

Finally, it appears that Petitioner did not even want trial counsel to pursue a mental health investigation.  Mr. Hudgins testified that Petitioner did not want to undergo brain scans because "[h]e wasn't receptive to the mental health mitigation." Tr. at 239.  Mr. Woodward also testified that Petitioner told him and Mr. Hudgins that he did not want a "mental health defense" at the selection phase.  Tr. at 418-19.  This is consistent with Petitioner's statement to Dr. Patterson that he did not think he had a mental illness relevant to his sentencing.[51]  Although trial counsel had a duty to investigate the mental health evidence despite Petitioner's reluctance in pursuing this strategy, counsel

---

[51] ECF No. 276 at 18 ("I then advised [Petitioner] that the other component of mental illness issues is 'I have a mental illness, and therefore that mental illness should have something to do with whatever sentence there might be', and I then said to Mr. Runyon 'Again, I'm not hearing that from you' and that I really do want to understand his situation and how he sees it, and he replied 'I think you're correct, I don't think I suffer from any mental illness or ever have, you know, I'm not a certified doctor or whatever, but I don't feel like that and I don't think I ever have been, and I also think that, you know it's something that brings shame on me in a way because I think a lot of people try to do the insanity plea to excuse their actions, but I disagree with that line of thinking altogether.").

exceeded that duty here. See Gray, 529 F.3d at 231-32 (finding that counsel had an "independent duty to investigate" mental health evidence despite the defendant's refusal to hire an expert and self-assessment of his mental health). They considered Petitioner's objection to mental health mitigation, but it was not a controlling factor in their decision not to use this strategy. See Tr. at 430-31.

Considering all these factors, trial counsel made a reasonable decision not to put on a mental health presentation. They thoroughly investigated the issue and did not find strong evidence that pointed to an effective mitigator. They sought out experts to interpret the evidence that they had, and the expert advice they received about the strength of the evidence was mixed, at best. See Tr. at 425 (Hudgins Redirect) (stating that he thought "our mental health stuff was a mixed bag"). This is a case where trial counsels' "'decision not to seek more' mitigating evidence from the defendant's background 'than was already in hand' fell 'well within the range of professionally reasonable judgments.'" Bobby, 558 U.S. at 11-12 (quoting Strickland, 466 U.S. at 699). The evidence strongly suggests that this was a strategic decision and not merely "the result of inattention." Wiggins, 539 U.S. at 534. Trial counsel reasonably decided, in light of everything they had, that the potential adverse risks of mental health mitigation were not worth the perceived benefits.

See Meyer v. Branker, 506 F.3d 358, 372 (4th Cir. 2007) ("[T]here are many strategically valid reasons why defense counsel, given the circumstances of an individual case, may decide not to offer mental health mitigation testimony: it may not be persuasive [or] it may appear to be a 'flight into theory' without proper grounding in the facts of the case[.]").

Instead, trial counsel chose a mitigation strategy that focused on portraying Petitioner as not the "worst of the worst," as receiving a harsher sentence than his codefendants, and as being able to adjust to life in prison. They had to consider whether the evidence that would come in with a mental health presentation, such as descriptions of Petitioner as having narcissistic personality disorder or participating in drug trials, would undermine their overall strategy. This was a major concern for trial counsel, and their decision not to use mental health evidence as part of the mitigation strategy was deliberate and strategic.[52] The strategy they chose was successful in convincing the jury to find thirteen mitigating factors proposed by trial counsel,

---

[52] See Tr. at 256-57 (Hudgins Cross) (testifying that he was concerned that the mental health evidence they had would undermine their argument that Petitioner was not the worst of the worst); id. at 427 (Woodward Redirect) ("I just remember that my impression in trying to get a sentence of life, not death, was that the mental health evidence we had was not going to help us get there, because I had looked. I didn't want Mr. Runyon to get the death penalty. I still don't want him to get the death penalty, and I made the best decision, collectively with [Mr. Hudgins], that I could at the time based on what we had.").

including factors addressing Petitioner's difficult childhood and his acts of kindness.   See ECF No. 291 at 3-4.   However, this strategy, including Dr. Cunningham's RPV presentation, was unsuccessful in convincing a single juror to find that Petitioner would make a positive adjustment to incarceration or that he did not present a risk of future violence.   Id. at 2-3.   That trial counsels' mitigation strategy was ultimately unsuccessful is not reflection of their deficient performance, but rather, shows that their concern that the jury would perceive Petitioner as a violent individual, and that a mental health presentation could exacerbate that perception, was reasonable.   See Strickland, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.").

In sum, Petitioner has not met his burden to rebut the "strong presumption" that trial counsel's attention to other mitigating factors and to exclude mental health evidence "reflects trial tactics rather than 'sheer neglect.'" Harrington, 562 U.S. at 109 (quoting Yarborough v. Gentry, 540 U.S. 1, 8 (2003)).   The court finds that trial counsels' decision not to further investigate or present mental health evidence to the jury "falls within the wide range of reasonable professional assistance[.]" Strickland, 466

U.S. at 689.    Accordingly, Petitioner has not proven the performance prong of his ineffective assistance of counsel claim.

## B. Prejudice Prong

Because Petitioner has failed to show that trial counsels' performance was deficient, the court does not reach the prejudice prong in dismissing his ineffective assistance of counsel claim.[53] See id. at 700 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.").

### V. CONCLUSION

At the time the Fourth Circuit remanded this case for an evidentiary hearing, the relevant evidence regarding trial counsels' performance was "murky." Runyon II, 994 F.3d at 208. The court's evidentiary hearing endeavored to clarify the facts of said performance. This was always going to be a challenging task, as the memories of witnesses have understandably faded with time and relevant documents from trial counsels' files have apparently been, at best, lost by subsequent counsel on post-trial proceedings. This challenge was compounded by prior habeas counsels' selective disclosure of relevant evidence, thereby

_____

[53] The full habeas evidentiary record is available for review. Many aspects of the mental health evidence presented on the prejudice prong focused on hindsight evaluations, second-guessing prior opinions, and updated technological advances not available in 2009.

delaying the hearing for over eight (8) months, with the untimely death of Mr. Hudgins occurring during this delay.

Despite these challenges, there is now a comprehensive record of trial counsels' performance. While the court does not take the gravity of Petitioner's sentence lightly, the weight of the outcome cannot affect the objective analysis of Petitioner's claim. The court will not set aside the jury's unanimous verdict by imposing an impossibly high standard for the performance of death penalty trial counsel some fifteen years after-the-fact. Here, the evidence available on this claim strongly supports that trial counsel's performance at the selection phase of Petitioner's trial was sufficient and eminently reasonable at the time, and, thus, that there was no violation of Petitioner's Sixth Amendment right to effective assistance of counsel. Accordingly, Claim 6 of Petitioner's § 2255 Motion is **DENIED**.

For the reasons stated herein, the court declines to issue a certificate of appealability under Rule 11(a) of the Rules Governing § 2255 Proceedings. The Clerk is **DIRECTED** to forward a copy of this Opinion to counsel for Petitioner and the United States Attorney at Newport News.

**IT IS SO ORDERED.**[54]

_Rebecca Beach Smith_
REBECCA BEACH SMITH
SENIOR UNITED STATES DISTRICT JUDGE

June **14**, 2024

---

[54] On a final note, nobody wins in a case such as this one. Cory Voss, a respected, dedicated Naval Officer, and a loving, caring, family person, is dead. His young children have grown up without a father or a mother, being raised by their paternal grandparents. The three co-conspirators are incarcerated for life, with one facing the death penalty. All of this tragedy for greed and lust. The jury and the attorneys, together with the judicial system, have given their maximum effort and diligence to this case, but such cannot change or undo the loss and tragedy to all those involved.

## **Table of Contents**

I. PROCEDURAL HISTORY .......................................... 2

   A. Preparation Prior to the Merits Phase..................... 4

   B. Merits and Eligibility Phases........................... 10

   C. Preparation for the Selection Phase..................... 13

   D. The Selection Phase..................................... 16

   E. Post-Conviction......................................... 19

II. THE EVIDENTIARY HEARING .................................. 30

   A. February 2023 Hearing................................... 30

   B. November 2023 Hearing................................... 40

III. LEGAL STANDARD .......................................... 44

IV. ANALYSIS ................................................ 50

   A. Performance Prong....................................... 51

     1. Head Injuries and Resulting Changes in Behavior ........ 51

     2. Expert Reports and Brain Scans ......................... 67

     3. Conclusion of Performance Prong........................ 82

   B. Prejudice Prong......................................... 97

V. CONCLUSION ............................................... 97